UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-

DINESH D'SOUZA,

                Defendant.
-------------------------------------------------------x

**NOTICE OF MOTION**
14  Cr. 034 (RMB)

**PLEASE TAKE NOTICE** that, upon the annexed affidavit of **BENJAMIN BRAFMAN, ESQ.**, duly sworn to on the 17th day of April, 2014, the exhibits appended thereto, the accompanying Memorandum of Law,  the indictment, and upon all proceedings previously had herein, the undersigned, on behalf of the Defendant **Dinesh D'Souza**, will move this Court, before the Honorable Richard M. Berman, United States District Judge, Southern District of New York, at the United States Courthouse, 500 Pearl Street, New York, New York, at a date and time to be fixed by the Court, for an order granting the following relief:

1.    Pursuant to Fed. R. Crim. P. 12(b) dismissing the indictment on those grounds herein enumerated;

2.    Pursuant to *United States v. Armstrong*, 517 U.S. 456 (1996), granting Defendant discovery from the Government of certain enumerated materials in furtherance of his potential claim that this indictment was improperly motivated by selective prosecution;

and granting such other and further relief as to this Court may seem just and proper.

Dated:       New York, New York
             April 17, 2014

                          Respectfully submitted,

                          **BRAFMAN & ASSOCIATES, P.C.**
                          *Attorneys for Defendant Dinesh* D'Sousa
                          767 Third Avenue, 26th Floor
                          New York, New York 10017
                          212 750-7800


                   By:    _____
                          BENJAMIN BRAFMAN
                          BB2285



To:   Clerk of the Court,
              via ECF

      Hon. Richard M. Berman

      Carrie Heather Cohen, Esq.
      Paul Matthew Krieger, Esq.
              Assistant United States Attorneys,
                     via ECF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

UNITED STATES OF AMERICA

                              Plaintiff.            Case No. 1:14-CR-00034

        -against-

                                                **HON. RICHARD**
                                                **BERMAN**

DINESH D'SOUZA

                                              **AFFIDAVIT IN SUPPORT**
                                  **OF THE PRETRIAL**
                        Defendant.         **MOTIONS OF THE**
                                  **DEFENDANT DINESH**
                                  **D'SOUZA**

-------------------------------------------------------------------x

**State of New York  )**
                 )     SS:
**County of New York )**

    **BENJAMIN BRAFMAN** being duly sworn deposes and states:

1.    I am an attorney duly admitted to the practice of law in the state of New York and in the United States District Courts for the Southern and Eastern Districts of New York.

2.    I am the principal of Brafman & Associates, P.C., a law firm located at 767 Third Avenue in New York City.  I am counsel of record on behalf of the defendant, DINESH D'SOUZA, in connection with the above-captioned matter.

3.    This affidavit is respectfully submitted upon information and belief, in support of Mr. D'Souza's pre-trial motions, pursuant to Fed. R. Cr. P. 12(b), whereby he seeks an order dismissing the indictment on various grounds. Such include a) the unconstitutionality of 2 U.S.C. §441f, in light of *McCutcheon v Fed. Election Com'n*, 12-536, 2014 WL 1301866; b) the unconstitutional vagueness of 2 U.S.C. §437g(d)(1)(D); and c) the failure of Count Two to

allege a valid offense in violation of 18 U.S.C. §1001. Based on the requisite showing, Defendant further seeks discovery from the Government of certain enumerated materials in furtherance of his potential claim that this indictment was improperly motivated by selective prosecution. The basis for my information and the grounds for my beliefs are information provided from numerous sources; the Indictment, Discovery materials provided by the Government; and those other records, documents and materials comprising counsel's file in this matter.

## I.   **INTRODUCTION**

4.      In a two Count indictment, Defendant DINESH D'SOUZA is charged with agreeing to reimburse four individuals who agreed to make campaign contributions to the unsuccessful campaign for United States Senate of Wendy Long (Count I § 2 USC 441(f)). In total, $20,000 of contributions were involved.

5.      Mr. D'Souza is not alleged to have acted with knowledge of the candidate or the campaign, or in an effort to gain any quid pro quo from the candidate. At worst, this was an act of misguided friendship by D'Souza, who knew Ms. Long personally from their days as students at Dartmouth.

6.      It is instead alleged, in substance, that Mr. D'Souza, a successful Republican/Conservative pundit requested of four individuals that they donate to the 2012 New York Federal Senate campaign of Wendy Long, with the understanding that Mr. D'Souza would reimburse them. It is also claimed that in furtherance of those contributions, Mr. D'Souza indirectly caused the campaign to fill out the required campaign finance forms incorrectly (Count Two §18 USC Sec. 1001).

7.     There is no allegation, nor will there be any proof whatsoever, that Mr. D'Souza had any criminal, or corrupt intent in connection with any of the activities charged in the indictment.[1]

## II.     THERE IS A REASONABLE AND CREDIBLE BASIS FOR CONCERN THAT THE DEFENDANT DINESH D'SOUZA WAS TARGETED FOR FELONY PROSECUTION IN THIS CASE SPECIFICALLY BECAUSE OF HIS CONSISTENTLY CAUSTIC AND HIGHLY PUBLICIZED CRITICISM OF PRESIDENT BARACK OBAMA.

8.     For the reasons more fully discussed below, and based on such credible showing, counsel believes that there is good reason for concern that the defendant in this case was selectively targeted for felony prosecution because of his outspoken, vigorous and politically controversial criticism and condemnation of President Barack Obama and his administration.

9.     Indeed, there is nothing about how this case has been handled, which even suggests that it proceeded in the traditional manner in which virtually all other campaign finance investigations are investigated and routinely resolved without referral for criminal prosecution.

10.     Simply put, the timing in which the D'Souza case moved from campaign filings to formal FBI investigation and indictment is startling by itself when compared to all other comparable cases, when the funds involved are minimal and when there is no evidence whatsoever of official corruption or candidate involvement.

11.     In addition, the manner in which the government has resisted all efforts and inquiries from counsel for Mr. D'Souza and the Senate Judiciary Committee to determine "why" this case was singled out for criminal prosecution further suggests that the reasons for the prosecution may well have involved a prohibited selective process.

---

[1] The Government has provided counsel with certain Jencks material for the Government's principal witnesses. Accordingly, counsel is in a position to know what evidence will be introduced at trial.

III.   **DEFENDANT'S PERSONAL BACKGROUND**

> **A. MR. D'SOUZA'S EXTRAORDINARY WRITING AND FILM WORK IS CENTERED ON HIS ATTEMPTS TO UNDERMINE THE POLICIES AND PRINCIPLES OF BARACK OBAMA'S PRESIDENCY WHICH MADE HIM AN ATTRACTIVE TARGET FOR CRIMINAL PROSECUTION**

12.    DINESH D'SOUZA is, in many respects, a great success story, from his arrival in this country as a young immigrant to his position now as a respected political analyst. His is a story of relentless hard work and raw talent, which allowed him to eventually become one of the most successful and controversial conservative political commentators in the country.

13.    Mr. D'Souza has never been accused of any prior criminal conduct. The allegations in this case constitute a complete aberration from the excellent reputation for honesty he enjoys among his peers and colleagues. While his politics may be controversial, no one disputes his character, ability and work ethic.

14.    Born in Mumbai, India, Mr. D'Souza came to the United States as an exchange student. He subsequently graduated Phi Beta Kappa from Dartmouth College in 1983. After university, D'Souza flourished as a writer, acclaimed for his knowledge, political sophistication, wit, and candor. Mr. D'Souza has published twelve critically-acclaimed books.

15.    D'Souza's critically acclaimed writing has appeared in major magazines and newspapers, including the *New York Times*, *Wall Street Journal*, *The Atlantic Monthly*, *Vanity Fair*, *New Republic*, and *National Review*. He has also appeared as a political analyst on numerous television programs, including the *The Today Show*, *Nightline*, *The News Hour* on PBS, *The O'Reilly Factor*, *Moneyline*, *Hannity*, *Bill Maher*, NPR's *All Things Considered*, CNBC's

*Kudlow Report, Lou Dobbs Tonight*, and *Real Time with Bill Maher*. In recent years, his primary attention has turned to writing books and producing documentaries that have taken a very strong position attacking Presidenct Barack Obama..

### B. A SHARP CRITIC OF THE OBAMA PRESIDENCY WHO HAS INCURRED THE PRESIDENT'S WRATH

16.     In the Fall of 2010, Mr. D'Souza published "The Roots of Obama's Rage". On September 9, 2010, Forbes magazine also featured him in a cover story, entitled "How Obama Thinks." Both publications argued that President Obama subscribes to an anti-colonial ideology that originated from his father, and that based on this ideology, Mr. Obama is anti-free-market and wants to reduce America's power in the world.

17.     Shortly after the article appeared, the White House complained about D'Souza to the Washington editors of Forbes magazine. As a result, Forbes published a correction, amending some details in its article.

18.     During the same time period, also in the Fall of 2010, Mr. D'Souza started the "George Obama Compassion Fund" to assist Obama's half-brother, George Obama, who was at the time apparently living in a hut in a Huruma slum of Nairobi, Kenya. Mr. D'Souza personally donated his own money to the fund and also publicly encouraged others to donate as well. George Obama was then contacted by the White House officials who pressured George Obama not to accept money from D'Souza.

19.     Then, in March 2012, further embarrassing and angering the current administration, Mr. D'Souza actually went to Kenya and visited George Obama where he interviewed him on film.

20.     Subsequently, in the Summer of 2012, Mr. D'Souza published yet another book, entitled

"Obama's America" which quickly became Number One on the New York Times best-seller list. That same Summer, Mr. D'Souza also released his film "2016", which included footage of the Obama homestead in Kenya and D'Souza's interview with George Obama. [2]

21.     On August 10, 2012, after the release of "2016", Mr. D'Souza received a phone call from George Obama in Kenya asking Mr. D'Souza to donate 1,000 dollars to help George's sick child. Mr. D'Souza wired the funds to assist the child and then wrote about the child's ordeal in a further attack on President Obama's character.  ("I Have No One Else to Ask," August 16, 2012, theblaze.com).

22.     In response to all of D'Souza's anti-Obama rhetoric, in September of 2012, the Administration denounced Mr. D'Souza, his film, as well as his earlier writings, in an article that ran on the President's website BarackObama.com.  The President's website referred to D'Souza's film as "an insidious attempt to dishonestly smear" him (Obama) by engaging in "subterranean conspiracy theories and false, partisan attacks."  The article also ran a link to a Columbia Journalism Review's negative critique of D'Souza's work, which made further and specific charges of error by D'Souza.  While the claims were wrong--as was pointed out in a published D'Souza rebuttal--there was no doubt that D'Souza's anti-Obama campaign had enraged the President, something in which D'Souza took great pride.  (See Dinesh D'Souza, "How I Earned Obama's Rage," September 13, 2012, thewrap.com).

23.     It is during this very same time period that the New York Senate Campaign of Wendy Long began and the FBI's investigation of D'Souza's role in that campaign initiated.

---

[2] Shortly after the film "2016" was released, Mr. D'Souza's partner in the anti-Obama film Gerald Molen, who is the academy-award-winning producer of "Schindler's List," was contacted and questioned about his taxes by the Internal Revenue Service (IRS).  Mr. Molen had never previously been contacted by any law enforcement agency and never before been audited.

### C.   D'SOUZA'S INVOLVEMENT IN THE WENDY LONG SENATE CAMPAIGN

24.   When Ms. Long announced her candidacy for United States Senate, she approached D'Souza about helping her raise money to fund her campaign and to also consider hosting various fundraisers. Thus, in February 2012, D'Souza contributed $10,000 for himself and his then wife Dixie. He chose not to create a Political Action Committee (PAC) for Ms. Long, or even host a fundraiser for her because of the fear that President Obama's rage against D'Souza would then engulf the Long Campaign.[3]

25.   Instead, several months after his own contribution, and in order to support Long, D'Souza, in an act of pure but misguided friendship, asked two individuals, and their spouses, to donate $10,000 to Ms. Long's campaign, with the understanding that Mr. D'Souza would fully reimburse them. The first arranged donation was made on August 18, 2012 and came from Mrs. Denise Joseph and her then husband Dr. Louis Joseph.[4]

26.   The second arranged donation, also on August 18, 2012, came from D'Souza's then personal assistant at Kings College, Tyler Vawser, and his wife.

27.   It is important to note that both couples who made the contributions at D'Souza's personal request were not coerced into making that decision. Indeed, from a review of their respective Government interviews, both Denise Joseph and Tyler Vawser agreed to help Long's candidacy as a favor to D'Souza with whom they were both very close.

28.   It is also important to note that neither Wendy Long, nor her campaign were in any way involved in organizing these contributions. Nor were they even aware that Mr. D'Souza had

---

[3] To be sure, Ms. Long was the long shot candidate, with nobody suggesting that she had any real chance of unseating the well-funded incumbent Kirsten Gillibrand.

[4] At the time, Mr. D'Souza was separated from his wife and engaged in a romantic relationship with Mrs. Denise Joseph. She later divorced Louis Joseph and became engaged to Mr. D'Souza. That engagement now too is over.

agreed to reimburse any contributors. Thus, there was no corruption whatsoever on the part of the campaign, or the candidate.[5]

29.     Despite knowing that Long's efforts to unseat Senator Gillibrand would be futile, D'Souza donated out of friendship. Mr. D'Souza did not, however, publicly endorse Long for fear that his public involvement in the campaign might further anger the Democratic president, with his personal animosity for D'Souza shifting to Long as well. Eventually and not surprisingly, Long lost the general election for United States Senate to Gillibrand by more than 40 percentage points.

30.     In the end, the total amount of the contributions, the unsophisticated manner of procuring the contributions from close friends, and the insignificant effect they had on a failing campaign confirm that Mr. D'Souza was simply trying to symbolically extend kindness and friendship to a friend, and was not trying to corrupt a candidate or her political campaign.[6]

## IV.    THE FEDERAL ELECTION COMMISSION – THE AGENCY PRIMARILY RESPONSIBLE FOR THE ENFORCEMENT OF CAMPAIGN FINANCE LAW VIOLATIONS DOES NOT REFER CASES SUCH AS THE D'SOUZA CASE FOR FELONY PROSECUTION

31.     It is clear that the Federal Election Commission has "exclusive authority and responsibility for the civil enforcement of...federal campaign finance laws" and primary jurisdiction over federal campaigns for the U.S. Senate and House of Representatives, the

---

[5] Dr. Louis Joseph, the then-husband of Denise Joseph, later asked the campaign to refund $5,000. He claimed his wife Denise donated the funds without his approval. His decision to ask for a refund was fueled in part by learning of the extramarital affair between his wife and D'Souza. In any event, the campaign did nothing illegal when they accepted the donation or when they returned half ($5,000) to Dr. Joseph. Dr. Joseph never said anything to the campaign about the fact that he had been reimbursed by Mr. D'Souza.

[6] We have been unable to find any advisory opinion of the Federal Election Commission in which criminal charges were brought on facts similar to the allegations against Mr. D'Souza.(See  http://www.fec.gov/), absent an element of corruption or alleged candidate involvement. When the decision in this case to indict was made, it was absolutely clear that this case was devoid of any element of corruption.

Presidency and Vice Presidency.[7]

32.     The Commission has six members with no more than three who may be members of the same political party. They are nominated by the President and confirmed by the Senate. During the enforcement process, a vote of four commissioners is needed at every stage. They must vote to "(1) find reason to believe and initiate an investigation, (2) find probable cause that a violation has occurred or is about to occur, (3) settle a matter, or (4) authorize filing a lawsuit."[8]

33.     The General Counsel's Office of Complaints Examination and Legal Administration first reviews complaints, and, if all formal criteria are met, will then assign a Matter Under Review ("MUR") number to the matter. All actions regarding MURs are confidential, as required by law, until the matter is formally closed.

34.     The first step in an MUR is the First General Counsel's Report, in which the General Counsel recommends to the Commission whether or not there is "'reason to believe' [that] the respondent has committed or is about to commit a violation of the law."[9] The Commission may (1) find "reason to believe," that a violation may have occurred in which case there is an investigation or a pre-probable cause conciliation (i.e. settlement before investigating and finding probable cause); (2) dismiss the matter if it determines that it "does not merit further use of Commission resources" taking into account factors such as "the small dollar amount at issue, the insignificance of the alleged violation, [and] the vagueness or weakness of the evidence" (this is a cost-benefit analysis, and the Commission "may send a letter" to the respondent reminding him of his obligations under the law); or (3) find no "reason to believe" that a violation has occurred based on the complaint, any response filed by respondent, and "any publicly available

---

[7] Guidebook for Complainants and Respondents on the FEC Enforcement Process, Federal Election Commission, May 2012. Available: http://www.fec.gov/em/respondent_guide.pdf
[8] Id. at 5
[9] Id. at 12

information."[10]

35.     Civil penalties in conciliation agreements are also limited by statute. Thus, penalties for "knowing and willful" violations of Section 441(f), the statute charged in this indictment, are "not less than 300 percent of the amount involved in the violation and … not more than the greater of [$60,000] or 1000 percent of the amount involved in the violation."[11] If the Commission determines that there is probable cause to believe that knowing and willful violations occurred, it may also refer such violations to the Department Of Justice for possible criminal prosecution. A conciliation agreement bars further Commission action. However, a violation of the conciliation agreement entitles the Commission to sue to enforce its terms.

36.     Counsel for D'Souza and our investigators have also reviewed FEC's Enforcement Query System ("EQS") for various matters since the passage of the Bi-Partisan Campaign Reform Act of 2002 (BCRA), involving or alleging violations of 2 USC § 441(f). That statute states that "[n]o person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution."

37.     Notably, during our review, counsel found many cases that involved similar conduit contribution as in this case (some for even much higher amounts), and yet to our knowledge, none were referred to the Department of Justice (DOJ) for felony prosecution. As merely an example, we reference five (5) cases so that the Court can better appreciate counsel's concern.

38.     James Chao (MUR Case #5405), the president and sole shareholder of Apex Healthcare, reimbursed 31 contributions totaling $77,000.  Chao directed donations through 14 individuals, including relatives, employees and spouses of employees. The Commission found that he and the corporation violated §441f, among others, and that the violations were "willful and knowing."

----

[10] Id. at 13
[11] Id. at 17

He neither admitted nor denied the Commission's conclusions. He and the corporation entered into a pre-probable cause conciliation agreement with the Commission which stipulated that he and the corporation were to pay $275,000 total in civil penalties. According to the conciliation agreement, Chao approached several Apex employees as well as his own family members to solicit funds for four separate elections in 2002 and 2003. He promised each individual that he would fully reimburse his or her contribution.

39.    In the Chao case, the Commission found "reason to believe" that Charissa Chao, Grace Chao, Philip Chao, Dawn Burdelik, Jeffrey Burdelik, Kin S. Cheung, Sharon Linares, Lawrence Yip, Amy Yuen, Monica Fletcher, Douglas Fletcher, Marion Steng, Frances Mattivi, and Mei Fung Choi violated 2 U.S.C. § 441f, but took no further action and merely sent an admonishment letter to each of the individuals. Like D'Souza, the individuals included family members, employees, and employee spouses.

40.    Interestingly, the General Counsel's report stated that it did not even recommend conducting a formal investigation to determine whether the candidate or the committee were involved because, "given the small amounts at issue," it is not an "appropriate use of commission resources to conduct a formal investigation." In our case, the FBI concluded that there was no involvement by the campaign and the amount in question ($20,000) was substantially less than in Chao ($77,000) and yet D'Souza faces Felony Indictment and prison.

41.    In yet another case, Bank of America (MUR Case #5849), the bank made a sua sponte submission stating that it became aware that an employee had authorized reimbursement of campaign contributions using bank funds. The amount in question was approximately $10,000. Kathleen Cannon, the Bank's Senior Vice President of the Student Banking Division, appears to have been responsible for soliciting contributions from employees and authorizing approximately

$7,700 in reimbursements.

42.     Cannon directly supervised eight managers and appears to have solicited contributions from them as well as other employees. Indeed, she appears to have reimbursed individuals for small political contributions dozens of times. It is unclear exactly how many separate individuals she recruited, but from the filings it is clear that there were at least six. Another individual, Robert Rubio was also to have been involved. Cannon signed a pre-conciliation agreement, under which she was to pay $15,000 to the Commission. The bank was fined $1,800. We did not find any evidence that Cannon, Rubio or the bank was ever criminally charged.

43.     So too did Dr. Jose Valdez (MUR Case #5955) escape criminal prosecution. Valdez was an authorized fundraiser for a political committee.  He initially tried to pay for a number of colleagues with a company check, but the campaign committee rejected it. Valdez then personally reimbursed his colleagues after they paid individually to attend a political fundraiser. The total amount in question was $11,500. Despite being a part of a political committee, Valdez entered into a pre-probable cause conciliation agreement with the Commission and agreed to pay a $30,000 civil penalty. We found no evidence that he was criminally charged. According to General Counsel, this was "in accordance with past practice."

44.     In a fourth case, Sammy Joe Russo (MUR Case #5652) contributed an aggregate of $15,000 during the 2002 election cycle, exceeding contribution limits by $13,000. He signed a pre-probable cause conciliation agreement requiring him to pay a $5,000 civil penalty.  On June 20, 2007, four years later, the Commission voted four to zero to take no action other than admonish Russo regarding a §441f violation in the D'Souza case. The FBI was already conducting a criminal investigation within months of D'Souza's contribution.

45.     Finally, in FEC v Kazran (2012), the Commission's complaint alleges that Kazran and

other defendants arranged for others to make $67,900 in contributions to the Vern Buchanan for Congress Committee and then reimbursing them. The complaint further alleges that Kazran and other defendants violated 2 U.S.C 441a(a) during the election cycles in 2006 and 2008. After finding probable cause to believe the above described violations occurred over and over again, the Commission attempted to reach a conciliation agreement with Kazran and the other defendants. Even after the conciliation agreement failed, the Commission, based on serious facts of a far more and greater duration and value than the amount at issue in the D'Souza case still authorized a civil suit rather than referring the matter to the DOJ.

46.     Counsel could cite many additional cases that further confirm that the D'Souza case was treated differently. The point however, we believe, is made. The question of why D'Souza's case took a different and as more fully set out below, far more expedited path, remains unanswered.

## V.   THE FEC STANDARDS FOR CRIMINAL PROSECUTION WERE IGNORED IN THIS CASE

47.     Section 2 of the 1977 Memorandum of Understanding (MOU), between the DOJ and FEC, provides that the FEC will refer violations of the FECA to the DOJ when it finds (presumably by an affirmative vote of at least four Commissioners pursuant to 2 U.S.C. 437(c)), that such violations were committed "knowingly and willfully," and then only when a particular violation is "*significant and substantial and which may be described as aggravated in the intent with which [it was] committed, or in the monetary amount involved.*"[12]

48.     To date, to our knowledge, the FEC has not established a bright line rule regarding the

---

[12] In view of the significant enhancements to the criminal penalties for knowing and willful violations of FECA that Congress enacted through the Bi-Partisan Campaign Reform Act of 2002 (BCRA), the commission has exercised sensible discretion in not referring cases that do not warrant felony prosecution.

"monetary amount involved." Presumably, the Commission hesitated to create a framework in which contributors would know that improper contributions above the maximum but below a certain threshold would not be referred for criminal prosecution. However, the high volume of cases presented *to the Commission*[13] *has created a de facto numerical cutoff whereby violations under the threshold of $25,000 dollars are not generally referred for felony criminal prosec*ution[14].

49.     The FEC, which exists as the primary enforcer of campaign finance laws, has both vast experience and bi-partisan mandates. It is in the best position to make the determination of whether enforcement, and what kind of enforcement, should be taken in a given case. And yet, in the instant matter, Mr. D'Souza's case was not even seen by the Commission until after his indictment. No good reason has been given as to why he was treated differently.

50.     To be sure, the DOJ, in its prosecutorial discretion, may commence a felony prosecution for a violation of FECA even when the FEC itself would not believe such a case warrants prosecution. There are several categories of cases that arguably warrant felony prosecution[15].

51.     Thus, the DOJ has authorized the prosecution of cases due to the monetary amount of the contributions or complexity of the schemes involved. In U.S. v. William Danielcyz and Eugene Biagi (E.D. Va.), the defendants' crime spanned several years and totaled over $200,000. In U.S. v. Christopher Tigani (D. Del.), the defendant perpetrated a more

---

[13] The law, as listed on the FEC website, contains the provisions that existed prior to the BCRA, with a footnote amending the content found on the website. As written, the conduct alleged herein would only constitute a misdemeanor.

[14] This numerical cutoff finds legislative support in BCRA Section 12 which raised all "knowing and willful" violations of the Act that involve aggregate values of at least $25,000 in a given calendar year to the status of federal felonies. In addition, federal law allows for up to $37,500 of contributions to candidates and the authorized committees of candidate for a two year period under 2 U.S.C. 441a(3)(A).

[15] The cases counsel cites in this affidavit are the very cases the U.S. Attorney's Office relied on when denying defendant's request for a deferred prosecution.

expansive fraud in which the contributions also totaled over $200,000.

52.     So too has the DOJ authorized the prosecution of campaign finance violations in cases where politicians, officials or other individuals with a fiduciary duty (lawyers, accountants etc.) committed violations of FECA. See for example, U.S. v. Justin Lamar Sternad (S.D. Fla), the defendant, a politician, received over $80,000 dollars in improper contributions to fund his campaign. In U.S. v. Joseph Bigica (D.N.J.), the defendant, a government official used over $100,000 in conduit contributions in what was more than a 2.5 million dollar fraud. In U.S. v. Joseph Vas and Melvin Ramos (D.N.J.), the defendants, a politician and government official, not only violated FECA, but also embezzled funds from a government agency and engaged in a massive cover up in which they provided false documents to the FEC. And in U.S. v. Jerry Pierce-Santos (D.D.C.), a government official and attorney who had previously been involved in FECA cases in the past, was understandably prosecuted for arranging conduit campaign contributions.

53.     So too have other individuals with special skills been prosecuted. Thus, in U.S. v. Pierce O'Donnell (C.D. CA.), the defendant, an attorney with a *previous conviction* for violations of campaign finance laws, used over 13 donors as conduits for the instant offense. In U.S. v. Timothy Mobley and Timothy Hohl (N.D. Fla.), an accountant, helped disguise over $85,000 in conduct campaign contributions. And in U.S. v. Evan Snapper (C.D. Cal.), the defendant, a trusted fiduciary of an unknowing public figure, arranged for over $48,000 in conduit contributions through 20 different donors.

54.     Finally, the DOJ has of course, also authorized prosecutions in "political corruption" cases in which the contributors seeks some direct or indirect future benefit

from their contribution. In <u>U.S. v. Jian-Yun Dong</u> (D.S.C.), for example, the head of a company was motivated by a desire to benefit from the appointment of sympathetic politicians. In <u>U.S. v. John Junker</u>, et al. (D. Az.), the defendant, in a scheme that encompassed 11 donors, $40,000, and several elections, attempted to gain influence over the allocation of funds to build and enhance a sports stadium. In <u>U.S. v. Jay Odom</u> (M.D. Fla.), the contribution was made to "secure a legislative appropriation to fund" a hanger at an airport. In <u>U.S. v. Marybeth Feiss</u> (S.D. Fla.) the contributions were made to influence the appointment of judges. And in <u>U.S. v. George Tirado and United States v. Benjamin Hogan</u> (D. Conn.), members of a cigarette company contributed to secure their candidate and halt tax increases in their industry. Finally, in <u>U.S. v. Paul and Mark Magliochetti</u> (E.D. Va.), the defendants, political lobbyists, arranged for well over a $100,000 of contributions during a period in which they procured well over a $100,000,000 in political earmarks.

55.    As becomes readily apparent from the cases cited, the defendants, in these cases, engaged in larger, more sophisticated schemes and also exploited their positions as Government or campaign officials with special skills to advance corrupt schemes. Each of these cases involve far more sinister acts than the D'Souza case[16].

---

[16] The cases we cite were provided to counsel for D'Souza in response to our claim that he was being prosecuted for conduct that normally does not warrant felony indictment. We explained to the prosecution and we respectfully submit to the Court that <u>all</u> of those cases are clearly distinguishable from the D'Souza case.

**VI.   THE D'SOUZA INVESTIGATION, THE SMALL TOTAL SUM OF THE CONTRIBUTIONS, THE LACK OF ANY CAMPAIGN INVOLVEMENT, AND THE ABSENCE OF POLITICAL CORRUPTION, DISTINGUISH THIS CASE FROM VIRTUALLY ALL OTHER CASES PROSECUTED CRIMINALLY AND FROM THOSE SIMILARLY SITUATED WHERE NO PRESECUTIONS WERE UNDERTAKEN**

### A. THE FBI BEGINS A CRIMINAL INVESTIGATION OF D'SOUZA IN WHAT APPEARS TO BE RECORD TIME

56.   In April of 2013, the FBI had already initiated a criminal investigation of D'Souza[17].

57.   Shortly thereafter, when D'Souza became aware of the FBI investigation, he retained this firm. Counsel met with representatives of the United States Attorney's Office in the hope of discussing a Deferred Prosecution (DP), given the absence of any evidence of political corruption and no candidate involvement and the small amount of contributions involved.

58.   Following the denial of the DP, counsel inquired of the Government whether any other individual, absent large contributions, campaign involvement, or evidence of political corruption had ever been prosecuted on facts such as the case at hand. In response, the Government provided counsel with the cases we cite infra – at paragraphs 51 – 54. Counsel then requested a meeting with the Southern District of New York DP Committee.

59.   At the DP committee meeting, counsel again urged the United States Attorney's Office to defer prosecution and carefully distinguished every case the Government provided as support for their position. Counsel's request for a DP was denied.

60.   Then, counsel asked that the Government to at least consider resolving this case with a Misdemeanor prosecution. Counsel reiterated the fact that there was really no other similarly

---

[17] The Jencks material confirms that the investigation had already accelerated by April 11, 2013 when the FBI interviewed Mr. Tyler Vawser.

situated case with facts exactly like this case had ever been prosecuted as a Felony. The request for a Misdemeanor prosecution was also denied.

## B. **THE TIMING OF THE CASE SUGGESTS THAT MR. D'SOUZA WAS "SELECTED" FOR PROSECUTION**

61.     As previously outlined, the contributions at issue in this case were given to the campaign on August 18, 2012. According to the original October Quarterly Report, the contributions were received on August 30, 2012. (Exhibit 1).

62.     Subsequently, the campaign formally filed documents related to these contributions on October 15, 2012. As stated publicly in the U.S. Attorney's press release: "The Indictment is the result of a routine review by the FBI of campaign filings with the FEC by various candidates **after** the 2012 election." (Exhibit 2). The election occurred on November 6, 2012. Thus, the earliest the FBI could have even begun to review the filings was after November 6, 2012.

63.     And yet by April 11, 2013 federal agents were already interviewing Tyler Vawser. By the summer, counsel was informed by the U.S. Attorney's Office that the prosecutors were in a position to indict D'Souza.

64.     The speed with which the authorities responded to the conduct in this case is virtually unprecedented. In fact, a review of the cases provided by the U.S. Attorney's Office, and outlined supra and set out in the chart infra, indicates that the average similarly situated case involving conduit contributions takes at least several years from the time of contribution to the time of discovery and indictment. Outside of two cases that involved civilian informants[18], none of the cases proceed within months of the filing. Most cases proceeded several years later.

---

[18] The contributions in this case were discovered, according to the government, by a routine review as opposed to a civilian informant.

65.    As is readily apparent by comparing the timing of this prosecution and the cases that the

prosecutors described as similar, the D'Souza case was indeed fast tracked.

| CASE[19] | CONTRIBUTION DATE | INDICTMENT DATE |
|---|---|---|
| United States v. Jay Odom (M.D. Fla.) | December 1, 2007 | November 13, 2012 |
| United States v. Marybeth Feiss (S.D. Fla.) | January 2008 contribution and reimbursement (conspiracy from June 2007 to October 2009) | December 1, 2011 |
| United States v. Pierce O'Donnell (C.D. Ca.) | March 27-31, 2003 | July 24, 2008 |
| United States v. George Tirado and Benjamin Hogan (D. Conn.)* | November 2011 - May 2012 | July 25, 2012 |
| United States v. Justin Lamar Sternad (S.D. Fla.)* | April - August 2012 Conspiracy (specific contribution May 25, 2012 should have been reported July 10, 2012) | February 22, 2013 |
| United States v. Jian-Yun ("John") Dong (D.S.C.) | June 28, 2005 - late December 2009 | April 20, 2011 |
| United States v. William Danielczyk and Eugene Biagi (E.D. Va.) | September 2006 - September 2007 (false statement to FEC in December 2007) | February 16, 2011 |
| United States v. Timothy Mobley and Timothy Hohl (N.D. Fla.) | March 2006 - October 2008 | September 11, 2012 |
| US v. Timothy Hohl | same conduct as above | September 11, 2012 |
| United States v. Joseph Bigica (D.N.J.) | April 2005 - May 2009 | May 9, 2012 |
| United States v. John Junker, et al. (D. Az.) | September 2003 - October 2010 | March 13, 2012 |
| United States v. Christopher Tigani (D. Del.) | October 2003 - December 2008 | May 3, 2011 |
| United States v. Evan Snapper (C.D. Cal.) | June 2007 to May 2008 | December 3, 2010(Plea agreement signed November 29, 2010, filed January 3, 2011) |
| United States v. Joseph Vas and Melvin Ramos (D.N.J.) | May/June 2006 (contribution); other conduct through January 2007 | May 19, 2009 |
| United States v. Paul Magliocchetti and Mark Magliocchetti (E.D. Va.) | January 2003 - November 2008 | August 4, 2010 |
| US v. Mark Magliocchetti (E.D. Va.) | 2002-2008 | August 5, 2010 |
| United States v. Jerry Pierce-Santos (D.D.C.) | June - December 2003 | January 16, 2009 |

---

[19] The two cases marked by an asterisk on the following chart involved civilian informants thus explaining quick discovery and prosecution.

## VII.   THE DECISION TO INDICT DINESH D'SOUZA

66.     Upon D'Souza's indictment in January 2014, the United States Attorney's Office issued a press release, which read, in pertinent part: **"The Indictment is the result of a routine review by the FBI of campaign filings with the FEC by various candidates after the 2012 election for United States Senator in New York."** (Exhibit 2).

67.     The initial question is <u>why</u> the FBI was interested in a relatively small campaign donation that lacked any evidence of corruption and <u>why</u> the FBI did not refer the case to the FEC for a civil resolution, which more often than not is how these cases proceed. These questions remain unanswered, despite specific inquiry by counsel for D'Souza <u>and</u> the Senate Judiciary Committee.

68.     Thus, by letter dated February 19, 2014, Senate Members of the United States Senate Committee on the Judiciary, apparently concerned that D'Souza was targeted because of his politics,  sent a letter to the Director of the FBI, Honoroable James B. Comey Jr. In that letter four Senators asked the FBI "to explain the details of these routine reviews and to provide context to those who may be skeptical of the origins of this investigation." The letter requested a response to the Senators' twelve questions by March 5, 2014. (Exhibit 3)

69.     In a letter dated April 3, 2014, the FBI responded to the Senator's by refusing to answer <u>any</u> of the questions posed and without shedding any light on its investigation, or why Mr. D'Souza was targeted. (Exhibit 4).

70.     During this same time period, counsel also submitted Freedom of Information Law (FOIL) requests to the FBI to disclose documents key to understanding this investigation and why other similarly situated individuals have apparently never been criminally prosecuted. That

request remains unanswered as well.

71.     The Court should also note that counsel has been informed by Assistant United States Attorney Carrie Cohen, that she now is in possession of FBI documents that relate to the investigation of Mr. D'Souza, but despite the request of counsel for D'Souza, refuses to turn over the documents.[20]

## VIII.   COUNT TWO §18 USC SECTION 1001

72.     In Count two, it is also claimed that in furtherance of those contributions, Mr. D'Souza "willfully and knowingly caused the submission of materially false, fictitious, and fraudulent statements and representations, to wit, D'SOUZA caused the submission by an unwitting authorized campaign committee of a candidate for United States Senate to the FEC of reports that falsely reported the sources and amounts of contributions to the campaign by certain individuals (Count Two §18 USC Sec. 1001).

73.     However, the forms at issue do not contain false statements. (Exhibit 5). At the time of the contributions in question, it was, in fact, Tyler Vawser and Louis Joseph making the contributions. Whether or not the contributors were then reimbursed by D'Souza is not a question posed on the forms.

74.     Accordingly, the responses in the forms are literally true even if the government finds them misleading.

---

[20] Counsel thus turns to the Court for relief on this issue as the Motion for Dismissal of the Indictment for Selective Prosecution cannot be fully considered without these materials.

## IX.   CONCLUSION

75.   The above analysis leads to a single irresistible conclusion; It is certainly more likely than not that Mr. D'Souza was selected for prosecution because of what he said and who he is, and not because his actions warranted felony prosecution.

76.   The requests by counsel to gain information regarding the nature of the investigation into Mr. D'Souza have been met with resistance at every turn.

77.   We must now turn to the Court to order the requested discovery based on what we submit is a credible showing.

Respectfully Submitted,

Benjamin Brafman
BB 2285
Attorney for Defendant
767 Third Avenue, 26th Floor
New York, New York 10017

Sworn to before this
17 Day of April, 2014

Notary Public

MAYO SCHREIBER JR.
Notary Public, State of New York
No. 02SC4971959
Qualified in New York County
Commission Expires Nov. 17, 2006 /14

# MEMORANDUM OF LAW

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Indict No. 14 Cr 034 (RMB)

———————————————————

UNITED STATES OF AMERICA

- against -

DINESH D'SOUZA,

Defendant.

———————————————————

DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS
PURSUANT TO Fed. R. Cr. P. 12(b)

BRAFMAN & ASSOCIATES, P.C.
*Attorneys for Defendant Dinesh D'Souza*
767 Third Avenue, 26th Floor
New York, New York 10017
212 750-7800

BENJAMIN BRAFMAN
MARK M. BAKER
ALEX SPIRO

## Table of Contents

Preliminary Statement ............................................................... 1

Statement of Facts ................................................................... 1

Argument ............................................................................ 2

> Point I
> In light of *McCutcheon v. Fed. Election Commission*, Because 2 U.S.C. §441(f)
> Does Not Distinguish between Base and Aggregate Contribution Limits, it is
> Unconstitutional on its Face as Violative of a Contributor's Right to Free Speech
> under the First Amendment .................................................... 2

> Point II
> There Was Absent Fair Notice, in Violation of Due Process, that §437g(d)(1)(D)
> Could Be the Predicate for a Criminal Prosecution Where Defendant's Alleged
> Reimbursement of $20,000 Involved *Four* Persons, Amounting to a Mere Aggregate
> of an Allowable $5,000 as to Each; at the Least, the Statute Is Either Void for
> Vagueness or the Rule of Lenity Absolves Defendant of Any Criminal
> Wrongdoing ................................................................. 8

>> A.    Void For Vagueness ................................................... 9

>> B.    Rule of Lenity ....................................................... 11

> Point III
> Because Count Two, Alleging a Violation of 18 U.S.C. §1001, Relies on Statements
> that Were Literally True, even if Misleading, it Must be Dismissed Under Controlling
> Case law ................................................................... 15

> Point IV
> Defendant Has Made a Credible Showing of Some Evidence of Different Treatment
> of Other Individuals Similarly Situated Persons as to Warrant Discovery from the
> Government In Furtherance of a Potential Motion to Dismiss the Indictment on the
> Ground of Selective Prosecution .............................................. 19

>> A.    Applicable Principles ................................................. 19

>> B.    Discussion ........................................................... 22

Conclusion .......................................................................... 24

## Table of Authorities

### Federal Cases

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*,
    __ U.S. __, 131 S Ct 2806 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
    133 S. Ct. 2247 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ashcroft v. American Civil Liberties Union*, 535 U.S. 564 (2002) . . . . . . . . . . . . . . . . . . . . . 2-3

*Ashcroft v. American Civil Liberties Union*, 542 U.S. 656 (2004) . . . . . . . . . . . . . . . . . . . . . . 3

*Bell v. United States*, 349 U.S. 81 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Board of Trustees of State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bolling v. Sharpe*, 347 U.S. 497 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bronston v. United States*, 409 U.S. 352 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Bryan v. United States*, 524 U.S. 184 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 7

*Cheek v. United States*, 498 U.S. 192 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Citizens United v. Federal Election Comm'n*, 558 U.S. 310,
    130 S.Ct. 876, 898 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985) . . . . . . . . . . . . . . . . . . 20

*Connally v. General Construction Co.*, 269 U.S. 385 (1926) . . . . . . . . . . . . . . . . . . . . . . . . 9

*Crandon v. United States*, 494 U.S. 152 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Federal Election Commission v. Wisconsin Right to Life*,
    551 U.S. 449 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Federal Election Commission v. Massachusetts Citizens for Life, Inc.*,
    479 U.S. 238 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) . . . . . . . . . . . . . . . . . . . . 9, 10

*Hill v. Colorado*, 530 U.S. 703 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hughey v. United States*, 495 U.S. 411 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Kolender v. Lawson*, 461 U.S. 352 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*LaTrieste Restaurant v. Village of Port Chester*, 188 F.3d 65 (2d Cir 1999) . . . . . . . . . . . 20, 22

*Liparota v. United States*, 471 U.S. 419 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12 (2d Cir.1999) . . . . . . . . . . . . . . . 20

*Los Angeles Police Dept. v. United Reporting Publishing Corp.*,
    528 U.S. 32 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Lutwak v. United States*, 344 U.S. 604 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Mariani v. United States*, 212 F.3d 761 (3d Cir 2000) . . . . . . . . . . . . . . . . . . . 3, 4, 6

*McBoyle v. United States*, 283 U.S. 25 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*McCutcheon v. Fed. Election Com'n*, 12-536, 2014 WL 1301866
    (April 2, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 6, 7, 11

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) . . . . . . . . . . . . . . . . . . . . 8

*Oyler v. Boles*, 368 U.S. 448 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) . . . . . . . . . . . . . . . . . . . . . 9

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. ———,
    132 S.Ct. 2065 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ratzlaf v. United States,* 510 U.S. 135 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Reno v. American Civil Liberties Union,* 521 U.S. 844 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Rewis v. United States,* 401 U.S. 808 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Sable Communications of California., Inc. v. FCC,*
    492 U.S. 115, 126 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Smith v. Goguen,* 415 U.S. 566 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Virginia v. Hicks,* 539 U.S. 113 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Village of Hoffman Estates v. Flipside,* 455 U.S. 489 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ward v. Rock Against Racism,* 491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wayte v. United States,* 470 U.S. 598 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Yick Wo v. Hopkins,* 118 U.S. 356 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

*United States v. $35,520 U.S. Currency More or Less,*
    87 Cv. 6838 (CSH), 1990 WL 80054
    (SDNY June 1, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Alameh,* 341 F.3d 167 (2d Cir 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*United States v. Al Jibori,* 90 F.3d 22 (2d Cir 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Alvarez,* 132 S. Ct. 2537 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Armstrong,* 517 U.S. 456 (1996) . . . . . . . . . . . . . . . . . . . . . 1, 19, 20, 21, 24

*United States v. Bass,* 536 U.S. 862 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Bass,* 404 U.S. 336 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Batchelder,* 442 U.S. 114 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Berrios,* 501 F.2d 1207 (2d Cir.1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Chemical Foundation, Inc.,* 272 U.S. 1 (1926) . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Danielczyk*, 788 F. Supp. 2d 472 (E.D. Va. 2011),
    *opinion clarified on denial of reconsideration,*
    791 F Supp 2d 513 (E.D. Va. 2011) *revd in part on other grounds,*
    683 F.3d 611 (4th Cir 2012); *United States v Hsu*, 643 F Supp 2d 574,
    576 (S.D.N.Y. 2009) (Marrero, J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 6, 11

*United States v. Diogo,* 320 F.2d 898, 905 (2d Cir.1963) . . . . . . . . . . . . . . . . . . . . . 15, 16, 17

*United States v. Fares,* 978 F.2d 52, 60 (2d Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*United States v. Lanier*, 520 U.S. 259, 266 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*United States v. Lighte,* 782 F.2d 367 (2d Cir 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Lozano,* 511 F.2d 1 (7th Cir.), *cert. denied,*
    423 U.S. 850 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Mandanici,* 729 F.2d 914 (2d Cir.1984) . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Mahaffy*, 285 Fed. Appx 797 (2d Cir 2008) . . . . . . . . . . . . . . . . . . 15

*United States v. O'Donnell,* 608 F.3d 546, 556 (9th Cir 2010) . . . . . . . . . . . . . . . . . 3, 6

*United States v. Polouizzi,* 564 F3d 142, 158 (2d Cir 2009) . . . . . . . . . . . . . . . . . . . 12

*United States v. Santos,* 553 U.S. 507 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14

*United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218 (1952) . . . . . . . . . . . . . . 12

*United States v. Vesaas,* 586 F.2d 101, 104 (8th Cir.1978) . . . . . . . . . . . . . . . . . . . . 15

*United States v. Whittemore,* 944 F.Supp.2d 1003 (D. Nev. 2013) . . . . . . . . . . . . . . . 6, 11

*United States v. Williams,* 553 U.S. 285, 292 (2008) . . . . . . . . . . . . . . . . . . . . . . 6, 10, 11

## **United States Constitution**

First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-8, 10, 22

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 19

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 20

**Federal Statutes**

2 U.S.C. § 431(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

2 U.S.C. § 437g(d)(1)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 14, 15

2 U.S.C. §  441a(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2 U.S.C. § 441a(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2 U.S.C. §441f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

18 U.S.C. §1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

18 U.S.C. §1546 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. §1956(a)(1)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. §2252(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

31 U.S.C. §5316(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Federal Rules**

Fed. R. Cr. P. 12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**State Statutes**

West's Ann.Cal. Penal Code § 647(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

**Miscellaneous**

H. Packer, The Limits of the Criminal Sanction 95 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Indict No. 14 Cr 034 (RMB)

---

UNITED STATES OF AMERICA

- against -

DINESH D'SOUZA,

Defendant.

---

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO Fed. R. Cr. P. 12(b)

### Preliminary Statement

This memorandum of law is respectfully submitted in support of a motion brought by Defendant Dinesh D'Souza, dated April 17, 2014, whereby, he seeks an order of this court, pursuant to Fed R. Cr. P. 12(b), dismissing the indictment herein on various grounds and granting such other and further relief as to the Court seems just and proper. Pursuant to *United States v. Armstrong*, 517 U.S. 456 (1996), Defendant further seeks discovery from the Government of certain enumerated materials in furtherance of his claim that this indictment was improperly motivated by selective prosecution.

### Statement of Facts

The facts of this case, insofar as relevant to this petition, are contained in the accompanying affidavit of Benjamin Brafman, Esq. ("affidavit"), duly sworn to on the 17th day of April, 2014, and the exhibits appended hereto, all of which are incorporated herein and made a part hereof.

Argument

## Point I

**In light of *McCutcheon v. Fed. Election Commission*, Because 2 U.S.C. §441(f) Does Not Distinguish between Base and Aggregate Contribution Limits, it is Unconstitutional on its Face as Violative of a Contributor's Right to Free Speech under the First Amendment**

In the area of political contributions there exists a heightened concern of constitutionally protected free speech, which involves an "exacting scrutiny." "Under exacting scrutiny, the Government may regulate protected speech only if such regulation promotes a compelling interest and is the least restrictive means to further the articulated interest." *McCutcheon v Fed. Election Com'n*, 12-536, 2014 WL 1301866 (April 2, 2014) (citing *Sable Communications of California., Inc. v. FCC*, 492 U.S. 115, 126 (1989)).

In general, "[l]aws that burden political speech are accordingly subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Arizona Free Enterprise. Club's Freedom Club PAC v Bennett*, _ U.S. _, 131 S Ct 2806, 2817 (2011) (quoting *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, ——, 130 S.Ct. 876, 898 (2010)) (internal quotation marks omitted) and citing *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 256 (1986) (internal quotation marks omitted). *See also United States v. Alvarez*, 132 S. Ct. 2537, 2543-44 (2012) ("[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. As a result, the Constitution "demands that content-based restrictions on speech be presumed invalid ... and that the Government bear the burden of showing their constitutionality" (*quoting Ashcroft v. American Civil*

*Liberties Union,* 535 U.S. 564, 573 (2002) (internal quotation marks omitted) and *Ashcroft v. American Civil Liberties Union,* 542 U.S. 656, 660 (2004)).

Under 2 U.S.C. §441f, it is provided that "[n]o person shall make *a contribution* in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept *a contribution* made by one person in the name of another person" (emphasis added). In *Mariani v. United States,* 212 F.3d 761, 775 (3d Cir 2000) the Third Circuit upheld the statute, in the face of a First Amendment challenge.[1] The Court, however, singularly addressing that aspect of the statute which effectively required disclosure of all contributors to a candidate, thereby precluding anonymous contributions, based its ruling on constraint of the Supreme Court's holding in *Buckley v. Valeo,* 424 U.S. 1 (1976) (per curiam).

According to *Mariani*:

> *Buckley* carefully considered the danger posed by compelled disclosure. It held that the state interests promoted by the FECA's reporting and disclosure requirements justified the indirect burden imposed on First Amendment interests, and that the compelled disclosure requirements were constitutional in the absence of a "reasonable probability" that disclosures would subject their contributors to "threats, harassment, or reprisals." Id. at 74, 96 S.Ct. 612. Proscription of conduit contributions (with the concomitant requirement that the true source of contributions

---

[1] The statute has also been construed to "prohibit[], straw donor contributions, in which a defendant solicits others to donate to a candidate for federal office in their own names and furnishes the money for the gift either through an advance or a prearranged reimbursement." *United States v. O'Donnell*, 608 F.3d 546, 556 (9th Cir 2010), a conclusion which we do not challenge. *See also United States v Danielczyk*, 788 F. Supp. 2d 472 (E.D. Va. 2011) *op clarified on denial of reconsideration*, 791 F Supp 2d 513 (E.D. Va. 2011) *revd in part on other grounds,* 683 F.3d 611 (4th Cir 2012); *United States v Hsu*, 643 F Supp 2d 574, 576 (S.D.N.Y. 2009) (Marrero, J.).

> be disclosed) would seem to be at the very core of the Court's analysis. *In light of*
> *Buckley, we reject Mariani's argument that §441f fails to advance a compelling state*
> *interest.*

*Mariani v. United States*, 212 F.3d at 775 (emphasis added). *See also United States v. Danielczyk*,

*supra*, 788 F. Supp. 2d at 485 (upholding §441f in the face of a First Amendment challenge because,

citing *Buckley*, "the Supreme Court has held that, to combat corruption and there appearance thereof,

Congress *can* make campaign contributions exceeding certain limits *impermissible*.").

      Just recently, however, in *McCutcheon v. Fed. Election Com'n, supra*, the Supreme

Court severely undermined the impact of *Buckley*. Even more crucially for our purposes,

*McCutcheon* drew a fine line in the sand with regard to the different sorts of contributions that the

Federal Elections Campaign Act could constitutionally proscribe without running afoul of the

exacting scrutiny demanded by the First Amendment. *See McCutcheon*, 2014 WL 1301866 at *10

("Although *Buckley* provides some guidance, we think that its ultimate conclusion about the

constitutionality of the aggregate limit in place under FECA does not control here. *Buckley* spent a

total of three sentences analyzing that limit; in fact, the opinion pointed out that the constitutionality

of the aggregate limit "ha[d] not been separately addressed at length by the parties.")

      In *McCutcheon*, the court addressed a statute that "imposes two types of limits on

campaign contributions. The first, called base limits, restricts how much money a donor may

contribute to a particular candidate or committee. 2 U.S.C. §441a(a)(1). The second, called aggregate

limits, restricts how much money a donor may contribute in total to all candidates or committees.

§ 441a(a)(3)." 2014 WL 1301866 at *6.  Upholding the former while holding that the latter ran afoul

of the First Amendment, the Court observed that

> [t]his case does not involve any challenge to the base limits, which we have

previously upheld as serving the permissible objective of combatting corruption. The Government contends that the aggregate limits also serve that objective, by preventing circumvention of the base limits. We conclude, however, that the aggregate limits do little, if anything, to address that concern, while seriously restricting participation in the democratic process. The aggregate limits are therefore invalid under the First Amendment.

*Id.*, at *6.

Because "[u]nder exacting scrutiny, the Government may regulate protected speech only if such regulation promotes a compelling interest and is the least restrictive means to further the articulated interest[,]" *id.* at *8, the Court found that with regard to contributions having aggregate limits, even "*Buckley* acknowledged that aggregate limits at least diminish an individual's right of political association." *Id.* at *13. According to the *McCutcheon* Court,

The line between *quid pro quo* corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights. In addition, "[i]n drawing that line, the First Amendment requires us to err on the side of protecting political speech rather than suppressing it."

*Id., at *16 (quoting Federal Election Commission v. Wisconsin Right to Life,* 551 U.S. 449, 457 (2007) (opinion of Roberts, C.J.)).

Based on *McCutcheon*, because "the First Amendment requires us to err on the side of protecting political speech rather than suppressing it[,]" 2 U.S.C. §441f can no longer stand, absent a congressional fix. The statute ambiguously bans "contributions" in the name of another, without distinguishing between base limit contributions to any one specific candidate, which properly protects against *quid pro quo* corruption, and those contributions which, in the aggregate, could be provided to many candidates, and which have now been held to fun afoul of free speech. As seen, however, such a differentiation is vital if a congressional enactment is to pass constitutional muster because "there is not the same risk of *quid pro quo* corruption or its appearance when money

-5-

flows through independent actors to a candidate, as when a donor contributes to a candidate directly." *McCutcheon* at *17.

Given the foregoing, and the fact that the statute cannot be read without possibly prohibiting protected free speech, §441f newly fails the Supreme Court's "First Amendment overbreadth doctrine." Under that crucible,

> a statute is facially invalid if it prohibits a substantial amount of protected speech. The doctrine seeks to strike a balance between competing social costs. On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional—particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects. In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial,* not only in an absolute sense, but also relative to the statute's plainly legitimate sweep. Invalidation for overbreadth is " ' "strong medicine" ' " that is not to be "casually employed."

*United States v. Williams,* 553 U.S. 285, 292 (2008) (emphasis in original) (citing *Virginia v. Hicks,* 539 U.S. 113, 119–120, (2003); *Board of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 485 (1989); *Broadrick v. Oklahoma,* 413 U.S. 601, 615; *Los Angeles Police Dept. v. United Reporting Publishing Corp.,* 528 U.S. 32, 39 (1999)).

Indeed, "[t]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Id.* But, as noted, we no longer know what 2 U.S.C. §441(f) covers. Hence, because it could likewise ban "pass through contributions," *United States v. Danielczyk,* 788 F. Supp. 2d 472, 479 (E.D. Vir. 2011), which may very well now amount to protected free speech under *McCutcheon,* it can no longer stand as constructed. This was obviously not a consideration in either *Mariani; O'Donnell; Danielczyk;* or even *United States v. Whittemore,* 944 F.Supp.2d 1003 (D. Nev. 2013),

all of which sustained the statute, pre-*McCutcheon*, absent consideration of the First Amendment challenges.

In short, although, if it were to be legislatively repaired, the statute might properly proscribe *base* limitations and thereby pass constitutional muster, as it currently reads, it also covers *aggregate* limits to contributions. But the Supreme Court has now determined that "the indiscriminate ban on all contributions above the aggregate limits is disproportionate to the Government's interest in prevention circumvention." *Id.* at *23.   As *McCutcheon*, concluded, therefore, "the aggregate limits on contributions do not further the only governmental interest this Court accepted as legitimate in *Buckley*. They instead intrude without justification on a citizen's ability to exercise 'the most fundamental First Amendment activities.' " *Id.*, at *27 (quoting *Buckley*, 424 U.S., at 14).

In sum, as presently constructed, §441f does not specify which type of "contribution" is now proscribed, one of which would be constitutional and the other of which would not, it can no longer stand until it is legislatively repaired. Accordingly, because the statute is constitutionally infirm, this indictment, which relies on the statute's legitimacy for its own vitality, must be dismissed.

<u>Point II</u>

**There Was Absent Fair Notice, in Violation of Due Process, that §437g(d)(1)(D) Could Be the Predicate for a Criminal Prosecution Where Defendant's Alleged Reimbursement of $20,000 Involved *Four* Persons, Amounting to a Mere Aggregate of an Allowable $5,000 as to Each; at the Least, the Statute Is Either Void for Vagueness or the Rule of Lenity Absolves Defendant of Any Criminal Wrongdoing**

As 2 U.S.C. §437g(d)(1)(D) reads, it criminalizes an otherwise non-criminal violation of 2 U.S.C. §441(f) where the aggregate amount exceeds $10,000. But the latter section specifically addresses, *inter alia*, making a "contribution in the name of another person," or "knowingly accepting a contribution made by *one person* in the name of another person" (emphasis added).[2] Based on this construction, the penalty contained in §437g(d)(1)(D), as implicating the First Amendment, is void for vagueness because a reasonable way of reading it is that, by necessarily incorporating the *actus reus* provision of §441f, the $10,000 threshold likewise applies to the same "one person."

---

[2] Although, to be sure, under 2 U.S.C. § 431(11) a "[p]erson" is defined as including "an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons],]" under 2 U.S.C. §441f, the statute specifically speaks of "one person," thereby precluding application of this broader definition. Indeed, "[a] well established canon of statutory interpretation succinctly captures the problem: '[I]t is a commonplace of statutory construction that the specific governs the general.' " *Arizona v Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2266 (2013) (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 566 U.S. ——, ——, 132 S.Ct. 2065, 2071, (2012) (quoting *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374 (1992); second alteration in original)".

On such an analysis, no criminal penalties can attach, where, as here, *four* people were each reimbursed for such contributions, with the result that only $5,000 -- *viz.*, the lawful threshold as to any one contributor -- was reimbursed to each individual "one person." Accordingly, Defendant was never placed on adequate notice that criminality would attach if $10,000 were exceeded in the aggregate as to all four. At the least, the rule of lenity should preclude Defendant from being prosecuted under this section, given his alleged conduct.

A.   **Void For Vagueness**

As explained in *Kolender v. Lawson*, 461 U.S. 352 (1983)

> As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of vagueness doctrine "is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."

461 U.S. at 357-58 (citing *Village of Hoffman Estates v. Flipside,* 455 U.S. 489 (1982); *Smith v. Goguen,* 415 U.S. 566 (1974); *Grayned v. City of Rockford,* 408 U.S. 104 (1972); *Papachristou v. City of Jacksonville,* 405 U.S. 156 (1972); and *Connally v. General Construction Co.,* 269 U.S. 385 (1926)).

In *Kolender*, the Supreme Court upheld the district court and the Ninth Circuit Court of Appeals which had ruled that a California statute, West's Ann.Cal. Penal Code § 647(e) which required a person who loitered or wandered on the streets to provide a "credible and reliable" identification, and to account for their presence when requested by a police officer, did not satisfy

this standard. In the Court's view, the statute was unconstitutionally vague on its face, in violation

of the Due Process Clause of the Fourteenth Amendment, because it failed to give fair notice as to

what was precisely contemplated by the requirement that a suspect provide a "credible and reliable"

identification. Consequently, because the statute gave "virtually complete discretion" to agents of

law enforcement as to who was in violation, it could not withstand constitutional scrutiny.

Indeed, the Court's "concern" over the enforcement of that statute was based upon

the "potential for arbitrarily suppressing First Amendment liberties ...." *Id.,* at 91, 86 S.Ct., at 213.

In addition, § 647(e) implicates consideration of the constitutional right to freedom of movement."

461 U.S. at 358. In this regard, the Court explained that the

> [v]agueness doctrine is an outgrowth not of the First Amendment, but of the Due
> Process Clause of the Fifth Amendment. A conviction fails to comport with due
> process if the statute under which it is obtained fails to provide a person of ordinary
> intelligence fair notice of what is prohibited, or is so standardless that it authorizes
> or encourages seriously discriminatory enforcement.

*United States v. Williams,* 553 U.S. at 303 (citing *Hill v. Colorado,* 530 U.S. 703, 732 (2000) and

*Grayned v. City of Rockford, supra.*

Moreover, "[a]lthough ordinarily [a] plaintiff who engages in some conduct that is

clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others,"

the Supreme Court has "relaxed that requirement in the First Amendment, permitting plaintiffs to

argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of

protected speech." 553 U.S. at 304 (quoting *Hoffman Estates, supra,* 455 U.S. at 494–495, nn. 6 and

7 (1982) and citing *Reno v. American Civil Liberties Union,* 521 U.S. 844, 870–874 (1997)) (internal

quotation marks omitted). To be sure, however, the Court has advised that "'perfect clarity and

precise guidance have never been required even of regulations that restrict expressive activity.'"

*Williams*, 553 U.S. at 304 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989).

Here, §441f, upon which the *mens rea* provision of §437g(d)(1)(D) depends for the governing *actus reus*, *see United States v. Danielczyk, supra*, 788 F. Supp.3d at 478, contemplates a reimbursed contribution to "another person" or the acceptance of a contribution "made by one person." It is simply impossible, therefore, to determine whether the latter, penalty section under §437g(d)(1)(D) prohibits *aggregate* contributions of $10,000 or more involving *more* than that one such conduit person, or whether the $10,000 threshold pertains to any one such person *alone*. Accordingly, because Defendant's alleged $20,000 reimbursement involved four separate individuals, he could not have knowingly and wilfully exceeded the $5,000 allowable threshold, as to any one individual.[3]

## B.   Rule of Lenity

Alternatively, the Rule of Lenity precludes Defendant's prosecution. The rule of lenity, described by the Supreme Court "as a sort of 'junior version of the vagueness doctrine,' " *United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting H. Packer, The Limits of the Criminal Sanction 95 [1968]), "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." 520 U.S. at 266. The rule is therefore well-embedded in federal

---

[3] If, despite the reasons stated in Point I, *ante*, §437g(d)(1)(D), along with §441f, would withstand analysis in light of *McCutcheon*, at the least, it now requires a heightened level of scrutiny. The *mens rea* state of wilfulness under §437g(d)(1)(D), therefore, should commensurately require a finding that Defendant was specifically aware that he would have been violating that particular provision, as determined in both *Ratzlaf v. United States,* 510 U.S. 135, 137(1994) and *Cheek v. United States,* 498 U.S. 192, 201 (1991) involving "highly technical statues." That is because, given the holding in *McCutcheon*, there is now likewise "presented the danger of ensnaring individuals engaged in apparently innocent conduct." *Bryan v United States*, 524 U.S. 184, 194 (1998). Because the contrary determinations in *Danielczyk and Whittemore* antedated *McCutcheon,* they should no longer be persuasive.

constitutional law.

Indeed, the Supreme Court made clear in 1931 that "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle v. United States*, 283 U.S. 25, 27 (1931). In *United States v. Bass*, 404 U.S. 336, 347-48 (1971), the Court explained that the principle articulated in *McBoyle*, and the interest in having legislatures, not courts, define criminal activity, form the basis of the longstanding rule that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Bass*, 404 U.S. at 347 (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952) (internal quotation marks omitted)).

More recently, in *United States v. Santos*, 553 U.S. 507 (2008), it was recalled that "[u]nder a long line of our decisions, the tie must go to the defendant. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *Id.* at 514. The Supreme Court has thus articulated and applied the rule of lenity time and again. *See, e.g., Hughey v. United States*, 495 U.S. 411, 422 (1990); *Crandon v. United States*, 494 U.S. 152, 160 (1990); *Liparota v. United States*, 471 U.S. 419, 427 (1985); *Rewis v. United States*, 401 U.S. 808, 812 (1971). *See also United States v. Polouizzi*, 564 F3d 142, 158 (2d Cir 2009) ("Thus, absent evidence of a contrary congressional intent, or an indication that the statutory structure precluded such a result, the rule of lenity requires the conclusion that a person who receives multiple prohibited images in a single transaction can only be charged with a single violation of [18 U.S.C.] §2252(a)(2)).

Indeed, the Supreme Court has recognized that, along with the vagueness doctrine and the due process prohibition on applying a novel construction of a criminal statute to conduct not clearly within its scope, the rule of lenity is but one of "three related manifestations of the fair warning requirement." *Lanier*, 520 U.S. at 266. "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.*

The Court's recent grappling with the rule in *United States v Santos*, *supra*, strongly influences dismissal of this indictment. There, the Court was called upon to settle the definition of the term "proceeds" in the money laundering statute under 18 U.S.C. §1956(a)(1)(A)(i), which, it was noted, absent a congressional-supplied definition, could mean either "receipts" or "profits." Applying the rule of lenity, the plurality found in favor of the defendant:

> This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead. Because the "profits" definition of "proceeds" is always more defendant-friendly than the "receipts" definition, the rule of lenity dictates that it should be adopted.

553 U.S. at 514.[4]

Here, the same result should obtain. There is clear ambiguity as to whether, under the

---

[4] Agreeing in this regard with the Plurality opinion by Justice Scalia, Justice Stevens stated: "This conclusion dovetails with what common sense and the rule of lenity would require. Faced with both a lack of legislative history speaking to the definition of "proceeds" when operating a gambling business is the "specified unlawful activity" and my conviction that Congress could not have intended the perverse result that would obtain in this case under Justice ALITO's opinion, the rule of lenity may weigh in the determination. And in that respect the plurality's opinion is surely persuasive. 553 U.S. at 528 (Stevens, J. Concurring) (footnote omitted).

provisions of 2 U.S.C. §437g(d)(1)(D), Defendant correctly confined his reimbursement to each person to the maximum amount of $5,000, amounting in sum to the $20,000 for which he was charged. Indeed, a reasonable reading of that *mens rea* section, given that it incorporates the need to have knowingly and wilfully violated the *actus reus* provision of §441f, suggests that any actionable criminality arises only out of the reimbursement of the aggregate $10,000 to any *single person*.[5]

On such analysis, Defendant would clearly not have been notice that he was violating the statute by reimbursing $20,000 to the *four people*, each of whom, to the reasonable reader of the statute, would not have invited criminal sanctions if viewed with respect to their individual $5,000 contribution reimbursements. And so, because "[w]hen interpreting a criminal statute, [courts] do not play the part of a mindreader[,]" *United States v. Santos*, 553 U.S. at 515, "[w]hen Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Id.* (quoting *Bell v. United States,* 349 U.S. 81, 83 (1955)) (internal quotation marks omitted).

Because, to find Defendant culpable under this ambiguous provision, it is impossible to conclude that he could not have reasonably believed he was acting well under the criminal

---

[5] *Cf. United States v $35,520 U.S. Currency More or Less*, 87 Cv. 6838 (CSH), 1990 WL 80054 (SDNY June 1, 1990) (where two individuals in the same family traveling together each transport $10,000, albeit in a single container, the Government argued that one is required to report currency in excess of $10,000 even when one is transporting it for the benefit of another. Rejecting that claim as concerns the reporting requirements under 31 U.S.C. §5316(a)(1)(B), court Judge Haight stated that "[i]n respect of the $20,000 brought into the United States by Cohen and his wife, as a family they were entitled to bring in precisely that amount of currency without reporting it. The statute provides that each individual may transport $10,000 into the country. While each family is only required to fill out one customs form, that does not change the statutory allowance of $10,000 for every member of that family. Thus, Cohen was not statutorily required to report the funds which he and his wife brought into the country.") (footnote omitted).

-14-

threshold, this prosecution cannot be sustained. The indictment, therefore, insofar as accusing him of violating 2 U.S.C. §437g(d)(1)(D), must be dismissed.

## Point III

**Because Count Two, Alleging a Violation of 18 U.S.C. §1001, Relies on Statements that Were Literally True, even if Misleading, it Must be Dismissed Under Controlling Case law**

In *Bronston v United States*, 409 U.S. 352 (1973), addressing the question as to "whether a witness  may be convicted of perjury for an answer, under oath, that is literally true but not responsive to the question asked and arguably misleading by negative implication[,]" the Supreme Court ruled that such a conviction could not lie. In *United States v. Mandanici,* 729 F.2d 914, 921 (2d Cir.1984), the Second Circuit recognized that the rule in *Bronston* was applicable to prosecutions involving violations of 18 U.S.C. §1001. *See also United States v. Mahaffy*, 285 Fed. Appx 797, 798 (2d Cir 2008); *United States v. Vesaas,* 586 F.2d 101, 104 (8th Cir.1978); *United States v. Lozano,* 511 F.2d 1, 5 (7th Cir.), *cert. denied,* 423 U.S. 850 (1975).

Indeed, ten years before *Bronston*, the Second Circuit had even determined that simply omitting information that was not necessarily called for in the question to which the allegedly false answer was responsive was not actionable under §1001. Thus, as far back as *United States v. Diogo,* 320 F.2d 898, 905 (2d Cir.1963), the  Court of Appeals, addressing certain language in the Supreme Court's decision in *Lutwak v United States*, 344 U.S. 604 (1953), cautioned that

> [w]e do not read the quoted passage to suggest that a prosecution for false representations can be grounded upon the omission of an explanation, which omission only carries with it 'implications of a state of facts which were not * * * true.' To so hold would distort the language of the statute and assimilate the separate offense of concealment into the different one of false representations solely because of a similarity of prohibited objectives.

-15-

*United States v. Diogo*, 320 F2d 898, 905 (2d Cir 1963).

In *Diogo*, the defendants, who had entered into marriage solely for the sake of avoiding deportation, had been accused of falsely reporting to the Immigration authorities that they had been validly married, in violation of 18 U.S.C. §§1546 and 1001. The Government theorized that because the defendants had entered into sham marriages, they had falsely reported their marital status.

Noting that §1001 "encompasses within its proscription two distinct offenses, concealment of a material fact and false representation[,]" 320 F.2d at 902, the *Diogo* Court advised that "[w]hat must be proved to establish each offense, however, differs significantly. False representations, like common law perjury, require proof of actual falsity; concealment requires proof of wilful nondisclosure by means of a 'trick, scheme or device.'" *Id.* In alleging affirmative falsity, the Government theorized that "for the purposes of a criminal prosecution such as this one, if two persons, as part of an effort to circumvent the immigration laws, agree to a marriage 'only for the sake of representing it as such to the outside world and with the understanding that they will put an end to it as soon as it has served its purpose to deceive,' they were never married at all." *Id.* at 903.

The Court of appeals, however, recognized that "[w]hen he claimed to be the 'spouse of' or to be 'married to' an American citizen, each appellant purported to state the legal significance of a fact situation. Each representation was rendered ambiguous, however, by the quite understandable failure of appellants to specify the jurisdiction to which their legal conclusions referred." *Id.*, at 905. But, "[i]n construing these statements it is well established that we must look to the meaning intended by the appellants themselves, rather than to the interpretation of the statements which the immigration authorities did in fact make, or even to the interpretation which

-16-

the authorities might reasonably have made." *Id.* at 906. Thus, noting that "[u]nder the law of New York a defective marriage may be either void or voidable. Voidable marriages are valid for all purposes until annulled by a court of competent jurisdiction[,]" *id.*, at 905-06, the Court dismissed the indictment, given that it was only based on false representations. The Court held that "the Government has failed, as a matter of law, at the trial below, to sustain its burden of there proving that the marriages were void at the time appellant's representations concerning marital status were made." *Id.* at 909.

Diogo dictates the same result in this case. Defendant is likewise here charged with affirmative falsification, not concealment. *See* 320 F.2d at 910. Yet, as demonstrated in the accompanying affidavit and exhibits, the actual reports filed were certainly true as far as they went. The named persons did indeed contribute the amounts specified in their own name. That was all the forms required.

The fact that Defendant reimbursed them would only have been germane if there had been another box to check, asking the signatory whether the funds had either been lent by another, or reimbursed. The failure to disclose that information, in the absence of such a specific request, therefore, was certainly not false. It was also not an actionable concealment that is charged in the indictment, based on "wilful nondisclosure by means of a 'trick, scheme or device.'" 320 F.2d at 902. At best, because the actual sources of the funds were simply not called for, the questions answered can be viewed as "fundamentally ambiguous," *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir 1986), likewise precluding a valid prosecution.

This is only more so the case, given the ambiguity in §441f, as outlined in Point II, *ante,* and because Defendant had a reasonable belief that he had been acting within the parameters

-17-

of the law. Under all such premises, just as *Bronston* precluded as a basis for prosecution,

> [i]t is no answer to say that here the jury found that petitioner intended to mislead his examiner. A jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner; the state of mind of the witness is relevant only to the extent that it bears on whether "he does not believe (his answer) to be true."

409 U.S. at 359. Rather,

> to hold otherwise would be to inject a new and confusing element into the adversary testimonial system we know. Witnesses would be unsure of the extent of their responsibility for the misunderstandings and inadequacies of examiners, and might well fear having that responsibility tested by a jury under the vague rubric of "intent to mislead" or "perjury by implication."

*Id.*

It follows that the charges in Count Two cannot stand, and should not even be considered by a jury. It should, therefore, be dismissed upon this motion.

-18-

Point IV

**Defendant Has Made a Credible Showing of Some Evidence Regarding the Different Treatment of Other Individuals Similarly Situated Persons so as to Warrant Discovery from the Government In Furtherance of a Potential Motion to Dismiss the Indictment on the Ground of Selective Prosecution**

A.   **Applicable Principles**

In *United States v. Armstrong*, 517 U.S. 456, 464 (1966), while emphasizing that a claim of selective prosecution "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution[,]." *id.*, at 463, the Supreme Court nevertheless accepted the premise that

> [o]f course, a prosecutor's discretion is "subject to constitutional constraints." One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, is that the decision whether to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification[.]" A defendant may demonstrate that the administration of a criminal law is "directed so exclusively against a particular class of persons ... with a mind so unequal and  oppressive" that the system of prosecution amounts to "a practical denial" of equal protection of the law.

517 U.S. at 464-65 (quoting *United States v. Batchelder,* 442 U.S. 114, 125 (1979); *Oyler v. Boles,* 368 U.S. 448, 456 (1962); and *Yick Wo v. Hopkins,* 118 U.S. 356, 373(1886), and citing *Bolling v. Sharpe,* 347 U.S. 497 (1954)).

"In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'" 517 U.S. at 465 (quoting *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15 (1926)). Because "[t]he requirements for a selective-prosecution claim draw on 'ordinary equal protection standards[,]'" 517 U.S. at 465 (quoting *Wayte v. United States,* 470 U.S. 598, 608 (1985)), "[t]he claimant must demonstrate that the federal prosecutorial policy "'had a discriminatory effect and that it was

-19-

motivated by a discriminatory purpose.'" *Id.* Thus, "[t]o establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." 517 U.S. at 465.

Otherwise stated,

> The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated be treated alike." "In order to establish a violation of equal protection based on selective enforcement, the plaintiff must ordinarily show (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as ... intent to inhibit or punish the exercise of constitutional rights."

*LaTrieste Restaurant v. Village of Port Chester*, 188 F3d 65, 69 (2d Cir 1999) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985) and *Lisa's Party City, Inc. v. Town of Henrietta,* 185 F.3d 12, 15-17 (2d Cir.1999) (quotations and citations omitted)).

To be sure, as to the first element, it must be demonstrated that the enforcing authority had knowledge of others similarly situated since "[a]bsent such proof, LaTrieste would be hard-pressed to show that it was singled out for selective treatment." *LaTrieste Restaurant*, 188 F.3d at 69. Thus, in *LaTrieste* the Court of Appeals recalled that in *United States v. Fares,* 978 F.2d 52, 60 (2d Cir.1992) it had rejected a criminal selective prosecution claim because the defendant had failed to introduce "evidence as to large numbers of similarly situated persons known to the government."

With regard to the issue of when discovery may be demanded of the Government, the *Armstrong* Court noted that

> If discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim. Discovery thus imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution. It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy. The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous

-20-

standard for discovery in aid of such a claim

517 U.S. at 468.

Accordingly, as concerns such "rigorous standard," the *Armstrong* Court recognized that "[t]he vast majority of the Courts of Appeals require the defendant to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not, and this requirement is consistent with our equal protection case law." *Id.*, at 469.  Accepting that premise, which should not amount to an "insuperable task," *id.*, at 470, the Court concluded that "the required threshold -- a credible showing of different treatment of similarly situated persons -- adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." *Id.*[6] *See also United States v Bass*, 536 U.S. 862, 863 (2002); *United States v. Alameh*, 341 F.3d 167, 174 (2d Cir 2003).

In this regard, however, "it may be that the amount and kind of evidence that suffices to meet the requirements of 'some evidence' justifying discovery is case-specific, and that courts must consider what evidence a defendant can obtain with due diligence in the absence of discovery." *Id.*  In any event, "[s]uch purpose may, however, be demonstrated through circumstantial or statistical evidence." *Id.*, at 173 (citing *Arlington Heights v. Metropolitan Housing Devlopment Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent

---

[6] The Second Circuit later recognized that *Armstrong* "seriously undermines our holding in *United States v. Berrios,* that "the decision to permit a hearing and, in anticipation thereof, to authorize a subpoena of evidence in the government's possession, lies largely in the trial judge's discretion." 501 F.2d 1207, 1212 (2d Cir.1974)." *United States v. Al Jibori*, 90 F.3d 22, 25 (2d Cir 1996).

as may be available."); *Gomillion v. Lightfoot,* 364 U.S. 339 (1960); and *Yick Wo v. Hopkins, supra.*

**B.    Discussion**

As demonstrated in the accompanying affidavit, Defendant has made a credible

showing, with more than just "some" evidence, that (1) compared with others similarly situated, he

was selectively treated; and (2) that such selective treatment was more likely than not based on the

impermissible consideration of punishing him for exercising his First Amendment right to criticize,

as severely as he chose fit, the President, his administration, and his policies. Because such showing

demonstrates further that this hasty indictment -- which unlike most other cases involving such

relatively small amounts of money, even bypassed the Federal Election Commission's routine

procedures -- certainly makes it most probable that Defendant was being "punish[ed] [for] the

exercise of constitutional rights." *LaTrieste Restaurant v. Village of Port Chester, supra,* 188 F.3d

at 69.

There is simply no question but that we have demonstrated that there is "evidence as

to large numbers of similarly situated persons known to the government." *United States v. Fares,*

978 F.2d at 60. As shown in the affidavit, many individuals, having contributed through conduits,

amounts far greater than the $10,000 in this "case-specific" matter, *United States v Alameh,* 341 F.3d

at 174, saw their FEC "MUR"s routinely settled civilly, with nary a referral to the DOJ for any

criminal prosecution. Moreover, even in those instances when cases were eventually referred, they

first went through normal FEC processes. Only thereafter, if in fact referred to the DOJ at all (which

certainly does not happen with any significant frequency), they did not result in prosecution until

many months, and even years had passed, owing to lengthy criminal investigations.

Not so here. This case resulted in a criminal prosecution in one fell swoop. It

bypassed the FEC completely, and certainly did not result from any considered or protracted criminal inquiry on the part of the FBI. Rather, the timing demonstrates clearly that it resulted almost contemporaneously with administration officials' public utterances, including that of the President on his website, which noted their disdain for, and dissatisfaction with, Defendant's extraordinarily hostile political criticisms.

Indeed, the very fact that the FBI elected even to blatantly refuse the request of members of the Senate Judiciary Committee, charged with overseeing that agency's activities, certainly does not pass the smell test. Rather, it suggests that the investigators, rather than having to manufacture a valid jurisprudential rationale behind this hasty and politically-motivated prosecution, simply elected to remain silent. The same can be said for its refusal to respond to Defendant's FOIL request.

Moreover, when the Government was consulted in furtherance of our seeking a deferred prosecution, it provided counsel with a number of cases where, it claimed, criminal prosecutions resulted. But, as counsel demonstrated, in each of those cases there was involved either a) clear evidence of corruption; b) the egregious breaching of the defendants' fiduciary responsibilities; c) prior convictions, or d) extraordinary amounts of money. Here, on the other hand, we have $5,000 contributions by four different people, amounting to $20,000, where Defendant allegedly violated §441(f), not out of any corrupt motive, but simply to protect the subject candidate, a personal friend, from political retribution should it have become known that, given his high anti-Obama profile, he had personally been involved. *Indeed, the subject campaign in this case did not even know that Defendant had been reimbursing the four named contributors.*

All things considered, Defendant has met "the required threshold." *United States v.*

*Armstrong,* 517 U.S. at 468. He has made a "credible showing of different treatment of similarly situated persons. " *Id.* And because this showing "adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution[,]" it is respectfully submitted that discovery should be ordered in furtherance of his demonstrating the potential reality that this prosecution has deprived this controversial citizen of equal protection of the law.

### Conclusion

**For the Reasons Stated in Points I, II, and III the motion Should be Granted in all Respects and Counts One and Two of the Indictment Should Be Dismissed; Alternatively, for the Reasons Stated in Point IV, The Government Should be Directed to Provided the Defense With the Requested Discovery in Furtherance of a Possible Dismissal of the Indictment On the Ground of Selective Prosecution**

Dated:      New York, New York
            April 17, 2014

                              Respectfully submitted,

                              **BRAFMAN & ASSOCIATES, P.C.**
                              *Attorneys for Defendant Dinesh*
                              767 Third Avenue, 26th Floor
                              New York, New York 10017
                              212 750-7800

            By:    _____
                   BENJAMIN BRAFMAN
                   BB2285

MARK M. BAKER
ALEX SPIRO
            Of counsel

-24-