UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

UNITED STATES OF AMERICA

                              Plaintiff.                    Case No. 1:14-CR-00034

                -against-
                                                            **HON. RICHARD**
                                                            **BERMAN**

DINESH D'SOUZA
                                                            **AFFIDAVIT IN SUPPORT**
                              Defendant.                    **OF THE PRETRIAL**
                                                            **MOTIONS OF THE**
                                                            **DEFENDANT DINESH**
                                                            **D'SOUZA**

-------------------------------------------------------------------x

**State of New York   )**
**                    )   SS:**
**County of New York )**


**BENJAMIN BRAFMAN** being duly sworn deposes and states:

1.      I am an attorney duly admitted to the practice of law in the state of New York and in the

United States District Courts for the Southern and Eastern Districts of New York.

2.      I am the principal of Brafman & Associates, P.C., a law firm located at 767 Third Avenue

in New York City.  I am counsel of record on behalf of the defendant, DINESH D'SOUZA, in

connection with the above-captioned matter.

3.      This affidavit is respectfully submitted upon information and belief, in support of Mr.

D'Souza's pre-trial motions, pursuant to Fed. R. Cr. P. 12(b), whereby he seeks an order

dismissing the indictment on various grounds. Such include a) the unconstitutionality of 2 U.S.C.

§441f, in light of *McCutcheon v Fed. Election Com'n*, 12-536, 2014 WL 1301866; b) the

unconstitutional vagueness of 2 U.S.C. §437g(d)(1)(D); and c) the failure of Count Two to

allege a valid offense in violation of 18 U.S.C. §1001. Based on the requisite showing, Defendant further seeks discovery from the Government of certain enumerated materials in furtherance of his potential claim that this indictment was improperly motivated by selective prosecution. The basis for my information and the grounds for my beliefs are information provided from numerous sources; the Indictment, Discovery materials provided by the Government; and those other records, documents and materials comprising counsel's file in this matter.

## I.   **INTRODUCTION**

4.     In a two Count indictment, Defendant DINESH D'SOUZA is charged with agreeing to reimburse <u>four</u> individuals who agreed to make campaign contributions to the unsuccessful campaign for United States Senate of Wendy Long (Count I § 2 USC 441(f)). In total, $20,000 of contributions were involved.

5.     Mr. D'Souza is not alleged to have acted with knowledge of the candidate or the campaign, or in an effort to gain any quid pro quo from the candidate. At worst, this was an act of misguided friendship by D'Souza, who knew Ms. Long personally from their days as students at Dartmouth.

6.     It is instead alleged, in substance, that Mr. D'Souza, a successful Republican/Conservative pundit requested of four individuals that they donate to the 2012 New York Federal Senate campaign of Wendy Long, with the understanding that Mr. D'Souza would reimburse them. It is also claimed that in furtherance of those contributions, Mr. D'Souza indirectly caused the campaign to fill out the required campaign finance forms incorrectly (Count Two §18 USC Sec. 1001).

7.    There is no allegation, nor will there be any proof whatsoever, that Mr. D'Souza had any criminal, or corrupt intent in connection with any of the activities charged in the indictment.[1]

**II.    THERE IS A REASONABLE AND CREDIBLE BASIS FOR CONCERN THAT THE DEFENDANT DINESH D'SOUZA WAS TARGETED FOR FELONY PROSECUTION IN THIS CASE SPECIFICALLY BECAUSE OF HIS CONSISTENTLY CAUSTIC AND HIGHLY PUBLICIZED CRITICISM OF PRESIDENT BARACK OBAMA.**

8.    For the reasons more fully discussed below, and based on such credible showing, counsel believes that there is good reason for concern that the defendant in this case was selectively targeted for felony prosecution because of his outspoken, vigorous and politically controversial criticism and condemnation of President Barack Obama and his administration.

9.    Indeed, there is nothing about how this case has been handled, which even suggests that it proceeded in the traditional manner in which virtually all other campaign finance investigations are investigated and routinely resolved without referral for criminal prosecution.

10.    Simply put, the timing in which the D'Souza case moved from campaign filings to formal FBI investigation and indictment is startling by itself when compared to all other comparable cases, when the funds involved are minimal and when there is no evidence whatsoever of official corruption or candidate involvement.

11.    In addition, the manner in which the government has resisted all efforts and inquiries from counsel for Mr. D'Souza and the Senate Judiciary Committee to determine "why" this case was singled out for criminal prosecution further suggests that the reasons for the prosecution may well have involved a prohibited selective process.

---

[1] The Government has provided counsel with certain Jencks material for the Government's principal witnesses. Accordingly, counsel is in a position to know what evidence will be introduced at trial.

III.   **DEFENDANT'S PERSONAL BACKGROUND**

      **A. MR. D'SOUZA'S EXTRAORDINARY WRITING AND FILM WORK IS CENTERED ON HIS ATTEMPTS TO UNDERMINE THE POLICIES AND PRINCIPLES OF BARACK OBAMA'S PRESIDENCY WHICH MADE HIM AN ATTRACTIVE TARGET FOR CRIMINAL PROSECUTION**

12.    DINESH D'SOUZA is, in many respects, a great success story, from his arrival in this country as a young immigrant to his position now as a respected political analyst. His is a story of relentless hard work and raw talent, which allowed him to eventually become one of the most successful and controversial conservative political commentators in the country.

13.    Mr. D'Souza has never been accused of any prior criminal conduct. The allegations in this case constitute a complete aberration from the excellent reputation for honesty he enjoys among his peers and colleagues. While his politics may be controversial, no one disputes his character, ability and work ethic.

14.    Born in Mumbai, India, Mr. D'Souza came to the United States as an exchange student. He subsequently graduated Phi Beta Kappa from Dartmouth College in 1983. After university, D'Souza flourished as a writer, acclaimed for his knowledge, political sophistication, wit, and candor. Mr. D'Souza has published twelve critically-acclaimed books.

15.    D'Souza's critically acclaimed writing has appeared in major magazines and newspapers, including the *New York Times*, *Wall Street Journal*, *The Atlantic Monthly*, *Vanity Fair*, *New Republic*, and *National Review*. He has also appeared as a political analyst on numerous television programs, including the *The Today Show*, *Nightline*, *The News Hour* on PBS, *The O'Reilly Factor*, *Moneyline*, *Hannity*, *Bill Maher*, NPR's *All Things Considered*, CNBC's

*Kudlow Report*, *Lou Dobbs Tonight*, and *Real Time with Bill Maher*. In recent years, his primary attention has turned to writing books and producing documentaries that have taken a very strong position attacking Presidenct Barack Obama..

### B.  A SHARP CRITIC OF THE OBAMA PRESIDENCY WHO HAS INCURRED THE PRESIDENT'S WRATH

16.     In the Fall of 2010, Mr. D'Souza published "The Roots of Obama's Rage". On September 9, 2010, Forbes magazine also featured him in a cover story, entitled "How Obama Thinks." Both publications argued that President Obama subscribes to an anti-colonial ideology that originated from his father, and that based on this ideology, Mr. Obama is anti-free-market and wants to reduce America's power in the world.

17.     Shortly after the article appeared, the White House complained about D'Souza to the Washington editors of Forbes magazine. As a result, Forbes published a correction, amending some details in its article.

18.     During the same time period, also in the Fall of 2010, Mr. D'Souza started the "George Obama Compassion Fund" to assist Obama's half-brother, George Obama, who was at the time apparently living in a hut in a Huruma slum of Nairobi, Kenya. Mr. D'Souza personally donated his own money to the fund and also publicly encouraged others to donate as well. George Obama was then contacted by the White House officials who pressured George Obama not to accept money from D'Souza.

19.     Then, in March 2012, further embarrassing and angering the current administration, Mr. D'Souza actually went to Kenya and visited George Obama where he interviewed him on film.

20.     Subsequently, in the Summer of 2012, Mr. D'Souza published yet another book, entitled

"Obama's America" which quickly became Number One on the New York Times best-seller list. That same Summer, Mr. D'Souza also released his film "2016", which included footage of the Obama homestead in Kenya and D'Souza's interview with George Obama. [2]

21.     On August 10, 2012, after the release of "2016", Mr. D'Souza received a phone call from George Obama in Kenya asking Mr. D'Souza to donate 1,000 dollars to help George's sick child. Mr. D'Souza wired the funds to assist the child and then wrote about the child's ordeal in a further attack on President Obama's character.  ("I Have No One Else to Ask," August 16, 2012, theblaze.com).

22.     In response to all of D'Souza's anti-Obama rhetoric, in September of 2012, the Administration denounced Mr. D'Souza, his film, as well as his earlier writings, in an article that ran on the President's website BarackObama.com.  The President's website referred to D'Souza's film as "an insidious attempt to dishonestly smear" him (Obama) by engaging in "subterranean conspiracy theories and false, partisan attacks."  The article also ran a link to a Columbia Journalism Review's negative critique of D'Souza's work, which made further and specific charges of error by D'Souza.  While the claims were wrong--as was pointed out in a published D'Souza rebuttal--there was no doubt that D'Souza's anti-Obama campaign had enraged the President, something in which D'Souza took great pride.  (See Dinesh D'Souza, "How I Earned Obama's Rage," September 13, 2012, thewrap.com).

23.     It is during this very same time period that the New York Senate Campaign of Wendy Long began and the FBI's investigation of D'Souza's role in that campaign initiated.

---

[2] Shortly after the film "2016" was released, Mr. D'Souza's partner in the anti-Obama film Gerald Molen, who is the academy-award-winning producer of "Schindler's List," was contacted and questioned about his taxes by the Internal Revenue Service (IRS).  Mr. Molen had never previously been contacted by any law enforcement agency and never before been audited.

## C.   D'SOUZA'S INVOLVEMENT IN THE WENDY LONG SENATE CAMPAIGN

24.   When Ms. Long announced her candidacy for United States Senate, she approached D'Souza about helping her raise money to fund her campaign and to also consider hosting various fundraisers. Thus, in February 2012, D'Souza contributed $10,000 for himself and his then wife Dixie. He chose not to create a Political Action Committee (PAC) for Ms. Long, or even host a fundraiser for her because of the fear that President Obama's rage against D'Souza would then engulf the Long Campaign.[3]

25.   Instead, several months after his own contribution, and in order to support Long, D'Souza, in an act of pure but misguided friendship, asked two individuals, and their spouses, to donate $10,000 to Ms. Long's campaign, with the understanding that Mr. D'Souza would fully reimburse them. The first arranged donation was made on August 18, 2012 and came from Mrs. Denise Joseph and her then husband Dr. Louis Joseph.[4]

26.   The second arranged donation, also on August 18, 2012, came from D'Souza's then personal assistant at Kings College, Tyler Vawser, and his wife.

27.   It is important to note that both couples who made the contributions at D'Souza's personal request were not coerced into making that decision. Indeed, from a review of their respective Government interviews, both Denise Joseph and Tyler Vawser agreed to help Long's candidacy as a favor to D'Souza with whom they were both very close.

28.   It is also important to note that neither Wendy Long, nor her campaign were in any way involved in organizing these contributions. Nor were they even aware that Mr. D'Souza had

---

[3] To be sure, Ms. Long was the long shot candidate, with nobody suggesting that she had any real chance of unseating the well-funded incumbent Kirsten Gillibrand.
[4] At the time, Mr. D'Souza was separated from his wife and engaged in a romantic relationship with Mrs. Denise Joseph. She later divorced Louis Joseph and became engaged to Mr. D'Souza. That engagement now too is over.

agreed to reimburse any contributors. Thus, there was no corruption whatsoever on the part of the campaign, or the candidate.[5]

29.     Despite knowing that Long's efforts to unseat Senator Gillibrand would be futile, D'Souza donated out of friendship. Mr. D'Souza did not, however, publicly endorse Long for fear that his public involvement in the campaign might further anger the Democratic president, with his personal animosity for D'Souza shifting to Long as well. Eventually and not surprisingly, Long lost the general election for United States Senate to Gillibrand by more than 40 percentage points.

30.     In the end, the total amount of the contributions, the unsophisticated manner of procuring the contributions from close friends, and the insignificant effect they had on a failing campaign confirm that Mr. D'Souza was simply trying to symbolically extend kindness and friendship to a friend, and was not trying to corrupt a candidate or her political campaign.[6]

## IV.   THE FEDERAL ELECTION COMMISSION – THE AGENCY PRIMARILY RESPONSIBLE FOR THE ENFORCEMENT OF CAMPAIGN FINANCE LAW VIOLATIONS DOES NOT REFER CASES SUCH AS THE D'SOUZA CASE FOR FELONY PROSECUTION

31.     It is clear that the Federal Election Commission has "exclusive authority and responsibility for the civil enforcement of…federal campaign finance laws" and primary jurisdiction over federal campaigns for the U.S. Senate and House of Representatives, the

---

[5] Dr. Louis Joseph, the then-husband of Denise Joseph, later asked the campaign to refund $5,000. He claimed his wife Denise donated the funds without his approval. His decision to ask for a refund was fueled in part by learning of the extramarital affair between his wife and D'Souza. In any event, the campaign did nothing illegal when they accepted the donation or when they returned half ($5,000) to Dr. Joseph. Dr. Joseph never said anything to the campaign about the fact that he had been reimbursed by Mr. D'Souza.

[6] We have been unable to find any advisory opinion of the Federal Election Commission in which criminal charges were brought on facts similar to the allegations against Mr. D'Souza.(See http://www.fec.gov/), absent an element of corruption or alleged candidate involvement. When the decision in this case to indict was made, it was absolutely clear that this case was devoid of any element of corruption.

Presidency and Vice Presidency.[7]

32.     The Commission has six members with no more than three who may be members of the same political party. They are nominated by the President and confirmed by the Senate. During the enforcement process, a vote of four commissioners is needed at every stage. They must vote to "(1) find reason to believe and initiate an investigation, (2) find probable cause that a violation has occurred or is about to occur, (3) settle a matter, or (4) authorize filing a lawsuit."[8]

33.     The General Counsel's Office of Complaints Examination and Legal Administration first reviews complaints, and, if all formal criteria are met, will then assign a Matter Under Review ("MUR") number to the matter. All actions regarding MURs are confidential, as required by law, until the matter is formally closed.

34.     The first step in an MUR is the First General Counsel's Report, in which the General Counsel recommends to the Commission whether or not there is "'reason to believe' [that] the respondent has committed or is about to commit a violation of the law."[9] The Commission may (1) find "reason to believe," that a violation may have occurred in which case there is an investigation or a pre-probable cause conciliation (i.e. settlement before investigating and finding probable cause); (2) dismiss the matter if it determines that it "does not merit further use of Commission resources" taking into account factors such as "the small dollar amount at issue, the insignificance of the alleged violation, [and] the vagueness or weakness of the evidence" (this is a cost-benefit analysis, and the Commission "may send a letter" to the respondent reminding him of his obligations under the law); or (3) find no "reason to believe" that a violation has occurred based on the complaint, any response filed by respondent, and "any publicly available

---

[7] Guidebook for Complaints and Respondents on the FEC Enforcement Process, Federal Election Commission, May 2012. Available: http://www.fec.gov/em/respondent_guide.pdf
[8] Id. at 5
[9] Id. at 12

information."[10]

35.     Civil penalties in conciliation agreements are also limited by statute. Thus, penalties for "knowing and willful" violations of Section 441(f), the statute charged in this indictment, are "not less than 300 percent of the amount involved in the violation and ... not more than the greater of [$60,000] or 1000 percent of the amount involved in the violation."[11] If the Commission determines that there is probable cause to believe that knowing and willful violations occurred, it may also refer such violations to the Department Of Justice for possible criminal prosecution. A conciliation agreement bars further Commission action. However, a violation of the conciliation agreement entitles the Commission to sue to enforce its terms.

36.     Counsel for D'Souza and our investigators have also reviewed FEC's Enforcement Query System ("EQS") for various matters since the passage of the Bi-Partisan Campaign Reform Act of 2002 (BCRA), involving or alleging violations of 2 USC § 441(f). That statute states that "[n]o person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution."

37.     Notably, during our review, counsel found many cases that involved similar conduit contribution as in this case (some for even much higher amounts), and yet to our knowledge, none were referred to the Department of Justice (DOJ) for felony prosecution. As merely an example, we reference five (5) cases so that the Court can better appreciate counsel's concern.

38.     James Chao (MUR Case #5405), the president and sole shareholder of Apex Healthcare, reimbursed 31 contributions totaling $77,000.  Chao directed donations through 14 individuals, including relatives, employees and spouses of employees. The Commission found that he and the corporation violated §441f, among others, and that the violations were "willful and knowing."

---

[10] Id. at 13
[11] Id. at 17

He neither admitted nor denied the Commission's conclusions. He and the corporation entered into a pre-probable cause conciliation agreement with the Commission which stipulated that he and the corporation were to pay $275,000 total in civil penalties. According to the conciliation agreement, Chao approached several Apex employees as well as his own family members to solicit funds for four separate elections in 2002 and 2003. He promised each individual that he would fully reimburse his or her contribution.

39.     In the Chao case, the Commission found "reason to believe" that Charissa Chao, Grace Chao, Philip Chao, Dawn Burdelik, Jeffrey Burdelik, Kin S. Cheung, Sharon Linares, Lawrence Yip, Amy Yuen, Monica Fletcher, Douglas Fletcher, Marion Steng, Frances Mattivi, and Mei Fung Choi violated 2 U.S.C. § 441f, but took no further action and merely sent an admonishment letter to each of the individuals. Like D'Souza, the individuals included family members, employees, and employee spouses.

40.     Interestingly, the General Counsel's report stated that it did not even recommend conducting a formal investigation to determine whether the candidate or the committee were involved because, "given the small amounts at issue," it is not an "appropriate use of commission resources to conduct a formal investigation." In our case, the FBI concluded that there was no involvement by the campaign and the amount in question ($20,000) was substantially less than in Chao ($77,000) and yet D'Souza faces Felony Indictment and prison.

41.     In yet another case, Bank of America (MUR Case #5849), the bank made a sua sponte submission stating that it became aware that an employee had authorized reimbursement of campaign contributions using bank funds. The amount in question was approximately $10,000. Kathleen Cannon, the Bank's Senior Vice President of the Student Banking Division, appears to have been responsible for soliciting contributions from employees and authorizing approximately

$7,700 in reimbursements.

42.     Cannon directly supervised eight managers and appears to have solicited contributions from them as well as other employees. Indeed, she appears to have reimbursed individuals for small political contributions dozens of times. It is unclear exactly how many separate individuals she recruited, but from the filings it is clear that there were at least six. Another individual, Robert Rubio was also to have been involved. Cannon signed a pre-conciliation agreement, under which she was to pay $15,000 to the Commission. The bank was fined $1,800. We did not find any evidence that Cannon, Rubio or the bank was ever criminally charged.

43.     So too did Dr. Jose Valdez (MUR Case #5955) escape criminal prosecution. Valdez was an authorized fundraiser for a political committee.  He initially tried to pay for a number of colleagues with a company check, but the campaign committee rejected it. Valdez then personally reimbursed his colleagues after they paid individually to attend a political fundraiser. The total amount in question was $11,500. Despite being a part of a political committee, Valdez entered into a pre-probable cause conciliation agreement with the Commission and agreed to pay a $30,000 civil penalty. We found no evidence that he was criminally charged. According to General Counsel, this was "in accordance with past practice."

44.     In a fourth case, Sammy Joe Russo (MUR Case #5652) contributed an aggregate of $15,000 during the 2002 election cycle, exceeding contribution limits by $13,000. He signed a pre-probable cause conciliation agreement requiring him to pay a $5,000 civil penalty.  On June 20, 2007, four years later, the Commission voted four to zero to take no action other than admonish Russo regarding a §441f violation in the D'Souza case. The FBI was already conducting a criminal investigation within months of D'Souza's contribution.

45.     Finally, in FEC v Kazran (2012), the Commission's complaint alleges that Kazran and

other defendants arranged for others to make $67,900 in contributions to the Vern Buchanan for Congress Committee and then reimbursing them. The complaint further alleges that Kazran and other defendants violated 2 U.S.C 441a(a) during the election cycles in 2006 and 2008. After finding probable cause to believe the above described violations occurred over and over again, the Commission attempted to reach a conciliation agreement with Kazran and the other defendants. Even after the conciliation agreement failed, the Commission, based on serious facts of a far more and greater duration and value than the amount at issue in the D'Souza case still authorized a civil suit rather than referring the matter to the DOJ.

46.     Counsel could cite many additional cases that further confirm that the D'Souza case was treated differently. The point however, we believe, is made. The question of why D'Souza's case took a different and as more fully set out below, far more expedited path, remains unanswered.

## V.    THE FEC STANDARDS FOR CRIMINAL PROSECUTION WERE IGNORED IN THIS CASE

47.     Section 2 of the 1977 Memorandum of Understanding (MOU), between the DOJ and FEC, provides that the FEC will refer violations of the FECA to the DOJ when it finds (presumably by an affirmative vote of at least four Commissioners pursuant to 2 U.S.C. 437(c)), that such violations were committed "knowingly and willfully," and then only when a particular violation is "*significant and substantial and which may be described as aggravated in the intent with which [it was] committed, or in the monetary amount involved.*"[12]

48.     To date, to our knowledge, the FEC has not established a bright line rule regarding the

---

[12] In view of the significant enhancements to the criminal penalties for knowing and willful violations of FECA that Congress enacted through the Bi-Partisan Campaign Reform Act of 2002 (BCRA), the commission has exercised sensible discretion in not referring cases that do not warrant felony prosecution.

"monetary amount involved." Presumably, the Commission hesitated to create a framework in which contributors would know that improper contributions above the maximum but below a certain threshold would not be referred for criminal prosecution. However, the high volume of cases presented *to the Commission*[13] *has created a de facto numerical cutoff whereby violations under the threshold of $25,000 dollars are not generally referred for felony criminal prosec*ution[14].

49.    The FEC, which exists as the primary enforcer of campaign finance laws, has both vast experience and bi-partisan mandates. It is in the best position to make the determination of whether enforcement, and what kind of enforcement, should be taken in a given case. And yet, in the instant matter, Mr. D'Souza's case was not even seen by the Commission until after his indictment. No good reason has been given as to why he was treated differently.

50.    To be sure, the DOJ, in its prosecutorial discretion, may commence a felony prosecution for a violation of FECA even when the FEC itself would not believe such a case warrants prosecution. There are several categories of cases that arguably warrant felony prosecution[15].

51.    Thus, the DOJ has authorized the prosecution of cases due to the monetary amount of the contributions or complexity of the schemes involved. In <u>U.S. v. William Danielcyz and Eugene Biagi</u> (E.D. Va.), the defendants' crime spanned several years and totaled over $200,000. In <u>U.S. v. Christopher Tigani</u> (D. Del.), the defendant perpetrated a more

---

[13] The law, as listed on the FEC website, contains the provisions that existed prior to the BCRA, with a footnote amending the content found on the website. As written, the conduct alleged herein would only constitute a misdemeanor.

[14] This numerical cutoff finds legislative support in BCRA Section 12 which raised all "knowing and willful" violations of the Act that involve aggregate values of at least $25,000 in a given calendar year to the status of federal felonies. In addition, federal law allows for up to $37,500 of contributions to candidates and the authorized committees of candidate for a two year period under 2 U.S.C. 441a(3)(A).

[15] The cases counsel cites in this affidavit are the very cases the U.S. Attorney's Office relied on when denying defendant's request for a deferred prosecution.

expansive fraud in which the contributions also totaled over $200,000.

52.     So too has the DOJ authorized the prosecution of campaign finance violations in cases where politicians, officials or other individuals with a fiduciary duty (lawyers, accountants etc.) committed violations of FECA. See for example, U.S. v. Justin Lamar Sternad (S.D. Fla), the defendant, a politician, received over $80,000 dollars in improper contributions to fund his campaign. In U.S. v. Joseph Bigica (D.N.J.), the defendant, a government official used over $100,000 in conduit contributions in what was more than a 2.5 million dollar fraud. In U.S. v. Joseph Vas and Melvin Ramos (D.N.J.), the defendants, a politician and government official, not only violated FECA, but also embezzled funds from a government agency and engaged in a massive cover up in which they provided false documents to the FEC. And in U.S. v. Jerry Pierce-Santos (D.D.C.), a government official and attorney who had previously been involved in FECA cases in the past, was understandably prosecuted for arranging conduit campaign contributions.

53.     So too have other individuals with special skills been prosecuted. Thus, in U.S. v. Pierce O'Donnell (C.D. CA.), the defendant, an attorney with a *previous conviction* for violations of campaign finance laws, used over 13 donors as conduits for the instant offense. In U.S. v. Timothy Mobley and Timothy Hohl (N.D. Fla.), an accountant, helped disguise over $85,000 in conduct campaign contributions. And in U.S. v. Evan Snapper (C.D. Cal.), the defendant, a trusted fiduciary of an unknowing public figure, arranged for over $48,000 in conduit contributions through 20 different donors.

54.     Finally, the DOJ has of course, also authorized prosecutions in "political corruption" cases in which the contributors seeks some direct or indirect future benefit

from their contribution. In <u>U.S. v. Jian-Yun Dong</u> (D.S.C.), for example, the head of a company was motivated by a desire to benefit from the appointment of sympathetic politicians. In <u>U.S. v. John Junker</u>, et al. (D. Az.), the defendant, in a scheme that encompassed 11 donors, $40,000, and several elections, attempted to gain influence over the allocation of funds to build and enhance a sports stadium. In <u>U.S. v. Jay Odom</u> (M.D. Fla.), the contribution was made to "secure a legislative appropriation to fund" a hanger at an airport. In <u>U.S. v. Marybeth Feiss</u> (S.D. Fla.) the contributions were made to influence the appointment of judges. And in <u>U.S. v. George Tirado and United States v. Benjamin Hogan</u> (D. Conn.), members of a cigarette company contributed to secure their candidate and halt tax increases in their industry. Finally, in <u>U.S. v. Paul and Mark Magliochetti</u> (E.D. Va.), the defendants, political lobbyists, arranged for well over a $100,000 of contributions during a period in which they procured well over a $100,000,000 in political earmarks.

55.     As becomes readily apparent from the cases cited, the defendants, in these cases, engaged in larger, more sophisticated schemes and also exploited their positions as Government or campaign officials with special skills to advance corrupt schemes. Each of these cases involve far more sinister acts than the D'Souza case[16].

---

[16] The cases we cite were provided to counsel for D'Souza in response to our claim that he was being prosecuted for conduct that normally does not warrant felony indictment. We explained to the prosecution and we respectfully submit to the Court that <u>all</u> of those cases are clearly distinguishable from the D'Souza case.

VI.   THE D'SOUZA INVESTIGATION, THE SMALL TOTAL SUM OF THE CONTRIBUTIONS, THE LACK OF ANY CAMPAIGN INVOLVEMENT, AND THE ABSENCE OF POLITICAL CORRUPTION, DISTINGUISH THIS CASE FROM VIRTUALLY ALL OTHER CASES PROSECUTED CRIMINALLY AND FROM THOSE SIMILARLY SITUATED WHERE NO PRESECUTIONS WERE UNDERTAKEN

A.  THE FBI BEGINS A CRIMINAL INVESTIGATION OF D'SOUZA IN WHAT APPEARS TO BE RECORD TIME

56.   In April of 2013, the FBI had already initiated a criminal investigation of D'Souza[17].

57.   Shortly thereafter, when D'Souza became aware of the FBI investigation, he retained this firm. Counsel met with representatives of the United States Attorney's Office in the hope of discussing a Deferred Prosecution (DP), given the absence of any evidence of political corruption and no candidate involvement and the small amount of contributions involved.

58.   Following the denial of the DP, counsel inquired of the Government whether any other individual, absent large contributions, campaign involvement, or evidence of political corruption had ever been prosecuted on facts such as the case at hand. In response, the Government provided counsel with the cases we cite infra – at paragraphs 51 – 54. Counsel then requested a meeting with the Southern District of New York DP Committee.

59.   At the DP committee meeting, counsel again urged the United States Attorney's Office to defer prosecution and carefully distinguished every case the Government provided as support for their position. Counsel's request for a DP was denied.

60.   Then, counsel asked that the Government to at least consider resolving this case with a Misdemeanor prosecution. Counsel reiterated the fact that there was really no other similarly

---

[17] The Jencks material confirms that the investigation had already accelerated by April 11, 2013 when the FBI interviewed Mr. Tyler Vawser.

situated case with facts exactly like this case had ever been prosecuted as a Felony. The request for a Misdemeanor prosecution was also denied.

## B. **THE TIMING OF THE CASE SUGGESTS THAT MR. D'SOUZA WAS "SELECTED" FOR PROSECUTION**

61.     As previously outlined, the contributions at issue in this case were given to the campaign on August 18, 2012. According to the original October Quarterly Report, the contributions were received on August 30, 2012. (Exhibit 1).

62.     Subsequently, the campaign formally filed documents related to these contributions on October 15, 2012. As stated publicly in the U.S. Attorney's press release: "The Indictment is the result of a routine review by the FBI of campaign filings with the FEC by various candidates **after** the 2012 election." (Exhibit 2). The election occurred on November 6, 2012. Thus, the earliest the FBI could have even begun to review the filings was after November 6, 2012.

63.     And yet by April 11, 2013 federal agents were already interviewing Tyler Vawser. By the summer, counsel was informed by the U.S. Attorney's Office that the prosecutors were in a position to indict D'Souza.

64.     The speed with which the authorities responded to the conduct in this case is virtually unprecedented. In fact, a review of the cases provided by the U.S. Attorney's Office, and outlined supra and set out in the chart infra, indicates that the average similarly situated case involving conduit contributions takes at least several years from the time of contribution to the time of discovery and indictment. Outside of two cases that involved civilian informants[18], none of the cases proceed within months of the filing. Most cases proceeded several years later.

---

[18] The contributions in this case were discovered, according to the government, by a routine review as opposed to a civilian informant.

65.     As is readily apparent by comparing the timing of this prosecution and the cases that the

prosecutors described as similar, the D'Souza case was indeed fast tracked.

| CASE[19] | CONTRIBUTION DATE | INDICTMENT DATE |
|---|---|---|
| United States v. Jay Odom (M.D. Fla.) | December 1, 2007 | November 13, 2012 |
| United States v. Marybeth Feiss (S.D. Fla.) | January 2008 contribution and reimbursement (conspiracy from June 2007 to October 2009) | December 1, 2011 |
| United States v. Pierce O'Donnell (C.D. Ca.) | March 27-31, 2003 | July 24, 2008 |
| United States v. George Tirado and Benjamin Hogan (D. Conn.)* | November 2011 - May 2012 | July 25, 2012 |
| United States v. Justin Lamar Sternad (S.D. Fla.)* | April - August 2012 Conspiracy (specific contribution May 25, 2012 should have been reported July 10, 2012) | February 22, 2013 |
| United States v. Jian-Yun ("John") Dong (D.S.C.) | June 28, 2005 - late December 2009 | April 20, 2011 |
| United States v. William Danielczyk and Eugene Biagi (E.D. Va.) | September 2006 - September 2007 (false statement to FEC in December 2007) | February 16, 2011 |
| United States v. Timothy Mobley and Timothy Hohl (N.D. Fla.) | March 2006 - October 2008 | September 11, 2012 |
| US v. Timothy Hohl | same conduct as above | September 11, 2012 |
| United States v. Joseph Bigica (D.N.J.) | April 2005 - May 2009 | May 9, 2012 |
| United States v. John Junker, et al. (D. Az.) | September 2003 - October 2010 | March 13, 2012 |
| United States v. Christopher Tigani (D. Del.) | October 2003 - December 2008 | May 3, 2011 |
| United States v. Evan Snapper (C.D. Cal.) | June 2007 to May 2008 | December 3, 2010(Plea agreement signed November 29, 2010, filed January 3, 2011) |
| United States v. Joseph Vas and Melvin Ramos (D.N.J.) | May/June 2006 (contribution); other conduct through January 2007 | May 19, 2009 |
| United States v. Paul Magliocchetti and Mark Magliocchetti (E.D. Va.) | January 2003 - November 2008 | August 4, 2010 |
| US v. Mark Magliocchetti (E.D. Va.) | 2002-2008 | August 5, 2010 |
| United States v. Jerry Pierce-Santos (D.D.C.) | June - December 2003 | January 16, 2009 |

[19] The two cases marked by an asterisk on the following chart involved civilian informants thus explaining quick discovery and prosecution.

## VII.   THE DECISION TO INDICT DINESH D'SOUZA

66.   Upon D'Souza's indictment in January 2014, the United States Attorney's Office issued a press release, which read, in pertinent part: **"The Indictment is the result of a routine review by the FBI of campaign filings with the FEC by various candidates after the 2012 election for United States Senator in New York."** (Exhibit 2).

67.   The initial question is <u>why</u> the FBI was interested in a relatively small campaign donation that lacked any evidence of corruption and <u>why</u> the FBI did not refer the case to the FEC for a civil resolution, which more often than not is how these cases proceed. These questions remain unanswered, despite specific inquiry by counsel for D'Souza <u>and</u> the Senate Judiciary Committee.

68.   Thus, by letter dated February 19, 2014, Senate Members of the United States Senate Committee on the Judiciary, apparently concerned that D'Souza was targeted because of his politics, sent a letter to the Director of the FBI, Honoroable James B. Comey Jr. In that letter four Senators asked the FBI "to explain the details of these routine reviews and to provide context to those who may be skeptical of the origins of this investigation." The letter requested a response to the Senators' twelve questions by March 5, 2014. (Exhibit 3)

69.   In a letter dated April 3, 2014, the FBI responded to the Senator's by refusing to answer <u>any</u> of the questions posed and without shedding any light on its investigation, or why Mr. D'Souza was targeted. (Exhibit 4).

70.   During this same time period, counsel also submitted Freedom of Information Law (FOIL) requests to the FBI to disclose documents key to understanding this investigation and why other similarly situated individuals have apparently never been criminally prosecuted. That

request remains unanswered as well.

71.     The Court should also note that counsel has been informed by Assistant United States Attorney Carrie Cohen, that she now is in possession of FBI documents that relate to the investigation of Mr. D'Souza, but despite the request of counsel for D'Souza, refuses to turn over the documents.[20]


## VIII.     COUNT TWO §18 USC SECTION 1001

72.     In Count two, it is also claimed that in furtherance of those contributions, Mr. D'Souza "willfully and knowingly caused the submission of materially false, fictitious, and fraudulent statements and representations, to wit, D'SOUZA caused the submission by an unwitting authorized campaign committee of a candidate for United States Senate to the FEC of reports that falsely reported the sources and amounts of contributions to the campaign by certain individuals (Count Two §18 USC Sec. 1001).

73.     However, the forms at issue do not contain false statements. (Exhibit 5). At the time of the contributions in question, it was, in fact, Tyler Vawser and Louis Joseph making the contributions. Whether or not the contributors were then reimbursed by D'Souza is not a question posed on the forms.

74.     Accordingly, the responses in the forms are literally true even if the government finds them misleading.

---

[20] Counsel thus turns to the Court for relief on this issue as the Motion for Dismissal of the Indictment for Selective Prosecution cannot be fully considered without these materials.

## IX.    CONCLUSION

75.    The above analysis leads to a single irresistible conclusion; It is certainly more likely than not that Mr. D'Souza was selected for prosecution because of what he said and who he is, and not because his actions warranted felony prosecution.

76.    The requests by counsel to gain information regarding the nature of the investigation into Mr. D'Souza have been met with resistance at every turn.

77.    We must now turn to the Court to order the requested discovery based on what we submit is a credible showing.


Respectfully Submitted,

Benjamin Brafman
BB 2285
Attorney for Defendant
767 Third Avenue, 26th Floor
New York, New York 10017


Sworn to before this
17 Day of April, 2014


Notary Public

MAYO SCHREIBER JR.
Notary Public, State of New York
No. 02SC4971959
Qualified in New York County
Commission Expires Nov. 17, 2006 /14