EF56DSOC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        14 CR 34(RMB)

5    DINESH D'SOUZA,

6              Defendant.

7    ------------------------------x

8                                       New York, N.Y.
                                        May 15, 2014
9                                       9:30 a.m.

10

     Before:
11
                       HON. RICHARD M. BERMAN,
12
                                        District Judge
13

14                       APPEARANCES
     PREET BHARARA
15        United States Attorney for the
          Southern District of New York
16   CARRIE H. COHEN
     PAUL KRIEGER
17        Assistant United States Attorney

18   BENJAMIN BRAFMAN, ESQ.
     ALEX SPIRO, ESQ.
19        Attorneys for Defendant

20

21

22

23

24

25

EF56DSOC

```
 1            (In  open court)

 2            THE COURT:  Please be seated.

 3            So what I thought for this morning was as follows, and

 4   I think the papers that have been submitted here are excellent

 5   for one thing from both sides and I have been over them

 6   thoroughly.  So I have some questions for you, but I don't want

 7   to cut you off if there is some point particularly perhaps that

 8   you haven't already made or you want to emphasize so I am happy

 9   to give you each a couple minutes to say whatever you would

10   like, in addition to what is in your papers if you wish to.

11   Otherwise, we can move right to some questions.

12            MS. COHEN:  Your Honor, Carrie Cohen for the

13   government, and with me at counsel table is Assistant United

14   States Attorney Paul Krieger and paralegal specialist Mary

15   Riverso.

16            I think the government feels like its position is

17   fully set forth in the papers and so is happy to answer any

18   questions your Honor might have and respond to defense counsel.

19            MR. BRAFMAN:  Good morning, Benjamin Brafman.  With me

20   at counsel table is Alex Spiro and Mr. D'Souza is present.

21            Your Honor, we too feel that our papers set forth our

22   position as well as they can be set forth and I took it from

23   the Court's reaction to the latest government filing, on this

24   order -- I concluded from the Court's decision order that no

25   addition filings be submitted, that your Honor had fully
```

 1   understand our respective positions and that the Court didn't

 2   need any further effort by us.  So I assume we will stand on

 3   our submissions unless the Court has specific questions.  Thank

 4   you, your Honor.

 5            THE COURT:  I do have if some questions for about each

 6   side.  About the filings, they are always, in my experience

 7   anyway, we get to a point where there is a trial scheduled and

 8   all of a sudden expedientially the filings start flying left

 9   and right so to speak.  I am not suggesting that is what is

10   happening here.  Normally I put out an order at an earlier

11   point than perhaps I did here saying sort of speak we have

12   enough.  That is also true during the trial.  If anybody wants

13   to make a submission, we should talk about it orally at side

14   bar first.

15            So here are a couple questions that I have, and I have

16   some for the government and some for the defense so why don't I

17   do one each.  First for you, Mr. Brafman, so if I understand

18   your papers, and I think I do, you are contending that

19   Mr. D'Souza acted out of you call it pure but misguided

20   friendship in asking the parties, that is to say somebody who

21   worked for him and someone with whom he had a relationship, to

22   make these per couple two 10,000-dollar contributions and he

23   indicated that he had would reimburse them?

24            MR. BRAFMAN:  That's correct, your Honor.

25            THE COURT:  That is conceded.  But at the same time

EF56DSOC

1    you argue in your papers that the case against him should be

2    dismissed because what Mr. D'Souza did was not illegal for

3    various reasons -- case law, statute, etc.  So the question is

4    though:  If the case should be dismissed, how and why was his

5    behavior misguided?

6         MR. BRAFMAN:  Well, I think at the end of the day even

7    if you don't intend to violate the law, which we submit

8    Mr. D'Souza did not, to the extent that there is a campaign

9    rule that perhaps was violated, then I think the statement that

10   this was an act of misguided friendship I still think holds

11   true.  Our position is the criminal charges should be

12   dismissed.  If the FEC feels that a fine or civil action is

13   appropriate and the issue is whether this was misguided

14   friendship that leads him to be civilly liable, we would deal

15   with that obviously in a different forum.  Our motion to

16   dismiss relates solely to the criminal charges.

17        THE COURT:  So you are saying that the criminal case

18   could and should be dropped even though something he did was

19   misguided in terms of asking two sets, two couples as it were,

20   to make these contributions?

21        MR. BRAFMAN:  Yes, your Honor.

22        THE COURT:  So the question for the government:  There

23   was an original -- I will call it original -- contribution by

24   Mr. D'Souza and his wife in I believe February of 2012 in the

25   total amount of $10,000 to the Long campaign and so the

EF56DSOC

1    question for you is was that contribution legal and/or was

2    Mrs. D'Souza, Dixie D'Souza, a straw donor?

3                MR. KRIEGER:  Your Honor, we moved under Rule 404(b)

4    to admit that conduct.  At this point we don't intend to call

5    Ms. D'Souza to testify about that contribution; but to your

6    point, if Ms. D'Souza did not in fact authorize that

7    contribution, did not consent to that contribution being made,

8    at least her 5,000-dollar portion, yes, it is not a permissible

9    contribution.  It is as much as a straw donation as the other

10   donations.

11               MR. BRAFMAN:  Your Honor, can I address that for the

12   record so the record is just complete?

13               THE COURT:  Yes.

14               MR. BRAFMAN:  I don't agree at all.  There are many

15   couples where one spouse or the other assumes sort of the

16   financial responsibility for signing tax returns, preparing

17   them, banking obligations.  In this case Ms. D'Souza, his wife

18   dixie were here to testify, I think in words or substance she

19   would say while she didn't know that it was being made on her

20   behalf at the time, she certainly implicitly authorized him

21   over the course of their marriage to handle all of the couple's

22   financial affairs.  To the extent that he signed the document,

23   which he believes to be truthful, and the amount in question

24   doesn't exceed the statutory amount, I don't believe that is

25   evidence of any criminal conduct and if that were the only

EF56DSOC

1    thing we were dealing with, I doubt that we would be here.

2              THE COURT:  Part of my next question to you, which is

3    this:  Going back to that 2012 Mr. D'Souza could only

4    contribute 5,000 to Ms. Long and so I guess it was crucial that

5    that 10,000-dollar contribution come from, be allocated evenly

6    to Mr. D'Souza and his wife; fair enough?

7              MR. BRAFMAN:  That's correct.

8              THE COURT:  Otherwise it would be illegal.  Then you

9    do say in your papers as you have just said now that it is not

10   uncommon for one spouse to control the checkbook in a two-party

11   household so to speak.  Here is my question, and it is less of

12   a legal one I suppose than a practical one:  There are many

13   households where the husband is a Democrat and the wife is a

14   Republican or vice versa, and there are I suppose many

15   households where someone might have contributed to Senator

16   Gillibrand and someone to Ms. Long so how do we know that it is

17   it okay for one spouse to sign the 10,000-dollar check?  How do

18   you know that Mrs. D'Souza, for example, didn't prefer

19   Ms. Gillibrand to Ms. Long?

20             MR. BRAFMAN:  Your Honor, the government has made a

21   wise decision in not choosing to call the ex Mrs. D'Souza,

22   Dixie as she is referred to.  But had she been called as a

23   witness, I think we would be able to verify beyond question

24   that she shared much, if not all, of the husband's political

25   beliefs, and that she knew Wendy Long, that she knew the

1   defendant knew Wendy Long and to the extent that he had raised

2   the subject, I doubt very much that there would be evidence

3   that she would have opposed it.  If she opposed it, it would

4   have been for personal reasons not for political reasons.

5   Again, I think he had a good-faith basis to believe that on a

6   politics issue he was supporting a candidate that was more in

7   line with the married couple's collective political views.

8           THE COURT:  Thank you.

9           For the government with respect to 441(f) and the

10  McCutcheon decision, is there a severability or saving clause

11  that applies?  That is to say is it a matter of case law that

12  one aspect of a statute is declared unconstitutional and the

13  other aspects remain in full force and effect, or is that your

14  position that applies here with respect to aggregate versus

15  base limits?

16          MS. COHEN:  I mean, your Honor, in general that is a

17  proposition.

18          THE COURT:  Is that a matter of statute or case law or

19  both?

20          MS. COHEN:  I think, your Honor, it is a matter of

21  statutory interpretation and common law.  I think here the

22  statutes at issue cover a broad range of campaign finance laws

23  and the aggregate limits versus the individual limits are very

24  different from 441(f), which strictly prohibits making straw

25  donations, making donations in other people's name.  441(f)

EF56DSOC

1   does not deal with the dollar amount of the limit, whether it

2   is an individual versus an aggregate limit.  It is a strict

3   prohibition on any donation in anyone else's name.  I just

4   don't think it is at all related to McCutcheon.

5          THE COURT:  My two followups:  Is a straw donation in

6   the amount of $5,000 legal?

7          MS. COHEN:  No.  A straw donation in the amount of

8   anything is not legal.

9          THE COURT:  What is the penalty for a 5,000-dollar

10  straw donation?

11         MS. COHEN:  It depends how the penalty provision of

12  441(f) delineates between is the donation $200, 10,000 and

13  above, 20,000 and above, and it is prescribed different

14  penalties.  Some make it criminal and some do not make it

15  criminal.

16         THE COURT:  If someone makes a 5,000-dollar straw

17  donation, what penalty do they face?

18         MS. COHEN:  Your Honor, to be criminal it has to be

19  more than 2,000.

20         THE COURT:  So 5,000 is more than two.

21         MS. COHEN:  I believe it is a misdemeanor, your Honor,

22  when it is between two and 10.  Between two and right under 10,

23  9,999.  I think 10 and above becomes a felony punishable by two

24  years.

25         THE COURT:  Ms. Cohen, Mr. Brafman says somewhere in

EF56DSOC

1    his papers as I recall, maybe page 21 of the affidavit, that

2    there was some discussion between him and you about certain FBI

3    documents and I am not sure what that is about and whether

4    these are documents that you plan to turn over to him?

5              MS. COHEN:  Sure.  Your Honor, if I could correct one

6    thing.  It is more than 10,000 that makes it a felony.

7              So with respect to whatever documents related to the

8    underlying investigation, they are not documents that we would

9    typically turn over in any type of case.  We do not turn over

10   sort of all the underlying investigative documents unless of

11   course they are relevant under Rule 16 or they have some

12   *Giglio*, *Brady*.  Here they do not.  They are not documents that

13   we typically in any case would turn over.  Here, since there is

14   not an adequate showing of selective prosecution, they are not

15   documents that the government is prepared to turn over.

16             THE COURT:  Mr. Brafman, the last question I have for

17   you relates to the selective prosecution.  We know that here

18   you need to show some evidence of discriminatory effect and

19   discriminatory purpose.  I think that is right; right?

20             MR. BRAFMAN:  Yes.

21             THE COURT:  With respect to discriminatory effect,

22   under the cases, they talk about the different classifications

23   of individuals.  What is Mr. D'Souza's classification?  And

24   then relatedly who are from your point of view the similarly

25   situated persons of a different classification who were not

EF56DSOC

1   prosecuted?

2           MR. BRAFMAN:  Well, Judge, that begs the question

3   respectfully.

4           THE COURT:  No.  That is the question.  You may want

5   to answer a different one.

6           MR. BRAFMAN:  No.  I will answer that question.  I

7   want to respectfully point out that we believe that in order

8   for us to make the requisite showing so that the Court can

9   grant the motion to dismiss based on selective prosecution, we

10  need to know what prompted the investigation of Mr. D'Souza and

11  what prompted it in such an expeditious manner that in almost

12  every over case that doesn't have an element of corruption or

13  candidate involvement doesn't get handled this way.  So what we

14  have asked, and that is the only thing we have asked -- we have

15  preserved the issue -- but what we ask now is for the Court to

16  order that the government provide us with the FBI report.

17          THE COURT:  I understand that.  I do understand that.

18  Do you have any notion of what classification he is in and what

19  classification people who are not prosecuted?  Is men one class

20  versus women?  Is it people of some national origin?  People

21  who are billionaires versus people who --

22          MR. BRAFMAN:  Judge, if he were targeted because of

23  his political beliefs and if his political beliefs and writings

24  and his antiadministration position was what got him referred

25  for criminal prosecution and we could prove that, then I think

EF56DSOC

1   he would have a right to consider this a selective prosecution

2   even if it didn't specifically designate him a man or woman or

3   Republican or conservative.  The issue that we have raised and

4   I think we raised as best we can without getting the documents

5   in question --

6           THE COURT:  Right.

7           MR. BRAFMAN:  -- is I think we have made a showing

8   that this case was handled very differently and that most cases

9   with this amount of a threshold without candidate involvement

10  to quid pro quo get routinely handled by the FEC and as a

11  result of having that memo and suggesting that we cannot see

12  it, we would suggest at this point that if the government were

13  to provide it to the your Honor for in camera review and then

14  the Court would know that there is an issue or no an issue.  We

15  would accept your decision on that so that we don't lose the

16  issue entirely because your Honor has made an honest

17  assessment.

18          I don't see any prejudice to the government whatsoever

19  in turning over a memorandum provided by the FBI, which may

20  quite frankly demonstrate that while this audit may have been

21  routine that the decision to submit it to the Southern District

22  for felony prosecution was because of who the defendant was and

23  what he had said not because of what he had done.

24          THE COURT:  Okay.

25          MR. BRAFMAN:  And when your Honor doesn't have any

EF56DSOC

 1    other questions, there is the 441(f) question that your Honor

 2    raised with the government.  Do you want any comment on that,

 3    just briefly?

 4              THE COURT:  You can.  Feel free.

 5              MR. BRAFMAN:  As we suggested respectfully in our

 6    memorandum of law on this issue, we believe that absent a

 7    congressional fix of the statute post the McCutcheon decision,

 8    we believe that it would be unconstitutional to prosecute

 9    anyone, and of course Mr. D'Souza, for violating 441(f) because

10    the statute bars "contributions" and doesn't classify which

11    contributions.  Since McCutcheon ruled that you cannot punish

12    someone criminally for making an aggregate contribution, there

13    is a notice issue and there is a vagueness issue that we have

14    briefed for the Court as to why 441(f) now is no longer a

15    viable criminal statute.

16              THE COURT:  I that McCutcheon left undisturbed the

17    base limits.

18              MR. BRAFMAN:  It did.

19              THE COURT:  Specifically.

20              MR. BRAFMAN:  Yes.  It did but I think because the

21    statute now only has the word "contributions" in it and not

22    "base contributions," it is very hard to understand when you

23    are using that statute that this complies with McCutcheon.  I

24    think post if McCutcheon the statute were changed to have the

25    word base, b-a-s-e, put in before contributions, I think we're

EF56DSOC

1    okay; but since it is not there and since McCutcheon ruled that

2    aggregate contributions cannot be the basis for criminal

3    prosecution, I think they need to fix the statute.

4              THE COURT:  So you think that that decision calls for

5    a statutory fix notwithstanding that the Court itself said

6    indeed undisturbed base contributions?

7              MR. BRAFMAN:  Yes.

8              THE COURT:  You don't think that is adequate?

9              MR. BRAFMAN:  No.  Because I think when one looks at

10   the issue of notice, fair notice, and due process I think the

11   statute needs to give the notice, not a Supreme Court decision

12   that may or may not have been read by most of the citizenry.  I

13   think having it in the decision now makes it absolutely clear

14   that as constructed it is not adequate.

15             Thank you.

16             MS. COHEN:  If I could be heard briefly about the idea

17   that there is no prejudice to government for your Honor to

18   review the FBI memorandum in camera.

19             THE COURT:  You going back to a different point that

20   Mr. Brafman made that you had some memorandum that he would

21   like to see in order for him to determine whether there was a

22   selective prosecution here or not?

23             MS. COHEN:  Specifically to his request that at this

24   point what he is seeking is just an in camera review of those

25   documents.

EF56DSOC

1          THE COURT:  Right.  In the first instance he is asking

2     you to give it to him and in the second, I guess, he is saying

3     I should look at it and make a determination whether we should

4     take it to the next step.

5          MS. COHEN:  Just to address that second point.

6          THE COURT:  Fair enough.

7          MS. COHEN:  Here you have to meet the adequate showing

8     in order to review it.  It is prejudiced to the government in

9     general in that in every case you need to make the showing

10    before the judge reviews it in camera otherwise in every case

11    the government would be required to turn over all sorts of

12    underlying investigative memos for the judge to review in

13    camera just because perhaps it might be easier.  The law is

14    clear here the defendant has a certain showing.  It is a high

15    burden on the defendant, especially in selective prosecution

16    because the --

17         THE COURT:  You are saying there is no showing of some

18    evidence as the law requires in order to go further on this

19    whole issue of selective prosecution?

20         MS. COHEN:  Correct, your Honor.

21         THE COURT:  You get the last word.

22         MR. BRAFMAN:  Thank you, Judge.

23         Most respectfully, Judge, to suggest that you

24    shouldn't look at the document in this case because that will

25    open the floodgates to every other case, I defy them to show me

EF56DSOC

1    a case that has so many unique facts that point to the

2    indictment of the defendant perhaps for unlawful reasons.  To

3    the extent that there is a memo which they can concede and it

4    is in their possession, I don't see any prejudice in handing it

5    up for the Court to look at.  It will take a couple minutes of

6    your Honor's time and then we can know what we are talking

7    about.  To suggest it opens it up to every other case, I have

8    done this for 37 years and I have never seen facts this

9    interesting to raise the issue.  So why not give it to the

10   Court?  How are they prejudiced in this case?  That is a

11   precedent for other cases.

12             THE COURT:  This is very helpful.  This Q and A has

13   been helpful as well.  I hope this is not too much of an

14   imposition on you, but I expect to have a ruling today at 3:00.

15   I will see you then and I will rule from the bench at that

16   time.

17             MS. COHEN:  Your Honor, because it is our final

18   pretrial conference --

19             THE COURT:  Yes.  There will be more conference at

20   3:00.

21             MS. COHEN:  So you would like us all back here at

22   3:00?

23             THE COURT:  Yes.

24             MS. COHEN:  At that time just to preview, would your

25   Honor be willing --

EF56DSOC

1          THE COURT:  I will be ruling on these various motions

2     and then depending on the outcome of those rulings, there will

3     be next steps or no next steps and we'll take them if there are

4     any.

5          MS. COHEN:  Thank you, your Honor.

6          THE COURT:  One point of clarification.  So you

7     mentioned that Dixie -- I am refer to Mrs. D'Souza.  I am not

8     sure if that is accurate -- is not going to be a witness in

9     this case?

10          MS. COHEN:  The government does not expect on its

11     direct case.  Depending on the defense case I suppose there

12     might be some issue for rebuttal, but the government will bring

13     it to your Honor's attention and seek a 404(b) type ruling in

14     advance.

15          THE COURT:  See you at 3:00.  Thank you.

16          (Recess)

17

18

19

20

21

22

23

24

25

1        THE COURT:  Please be seated.  So the outstanding

2   motions are resolved as follows -- this will take a little

3   while, probably 15, 20 minutes.  At the outset, let me make

4   this point very clearly, that in ruling on these various

5   motions, what I say in these rulings is limited to the motions

6   themselves, including the motion to or branches of motions to

7   dismiss the indictment, and what I'm saying bears no impact

8   upon the question of Mr. D'Souza's guilt in this case.  The

9   defendant is presumed, of course, to be innocent now and until

10  such time, if it comes, that a jury determines that he is

11  guilty beyond a reasonable doubt, and nothing that I say

12  changes that.  That's a fundamental principle of our legal

13  system.

14        So I've reviewed all of the submissions, which have

15  been very thorough and excellently done.  They include the

16  defense motion dated April 17, the government opposition dated

17  April 24, the defense reply dated May 2, the government's

18  motion in limine dated April 17, the defense response to that,

19  dated April 23, defense letter dated April 29, the government

20  letters dated May 8 and May 12 and also, as you're aware,

21  having conducted some relatively brief questions and answers

22  during oral argument this morning, these are my determinations.

23        First, by way of a little bit of background.

24  Mr. D'Souza is charged in a two-count indictment that alleges

25  the following:  Count One says that in or about August 2012, in

E5FPDSO2

1    the Southern District of New York and elsewhere, he willfully

2    and knowingly made and caused to be made contributions of money

3    aggregating more than $10,000 during the 2012 calendar year in

4    the names of others, and these considerations were made to the

5    campaign of Wendy Long, who was running in New York for United

6    States Senator.

7            Mr. D'Souza is alleged to have reimbursed others with

8    whom he was associated, and who he had directed to contribute a

9    total of $20,000 to Ms. Long's campaign.

10           In February, 2012 Mr. D'Souza distributed $10,000 for

11   himself and his wife, Dixie, also to that Wendy Long campaign.

12   Several months later, that is to say after his

13   $10,000 contribution, and in order to further support Long,

14   whom he knew from their days as students at Dartmouth, D'Souza,

15   according to the defense, in an act of pure but misguided

16   friendship, asked two individuals and their spouses to donate

17   $10,000 to Ms. Long's campaign, with the understanding that

18   Mr. D'Souza would fully reimburse them.

19           The first arranged contribution was made on or about

20   August 18, 2012, which involved Denise Joseph and her husband

21   Dr. Louis Joseph.  The second contribution was also made on or

22   about August 18, 2012, and it involved Mr. D'Souza's then

23   personal assistant at Kings College, an individual named Tyler

24   Vawser and his wife, Mr. Vawser's wife, that is.  And these two

25   couples were reimbursed for these contributions either the same

E5FPDSO2

1    day or the following day.

2              It is contended by the government that the defendant

3    instructed straw donor Vawser, who allegedly -- that is to say

4    alleged by the government -- feared that the defendant was

5    asking him to do something illegal or wrong, to lie to anyone

6    who asked about the donation by claiming that he, Mr. Vawser,

7    knew Ms. Long and supported her candidacy.  It is further

8    alleged by the government that Mr. D'Souza lied to the

9    candidate herself, Miss Long, to mask his actions.

10             Count Two of the indictment says that from in or about

11   August 2012 through July 2013, in the Southern District and

12   elsewhere, Mr. D'Souza willfully and knowingly caused the

13   submission of materially false, fictitious, fraudulent

14   statements, representations to wit, that he caused the

15   submission by an unwitting, authorized campaign committee of a

16   candidate for the United States Senate -- that's Ms. Long's

17   campaign -- to the Federal Election Commission of reports that

18   falsely reported the sources and amounts of contributions of

19   the campaign by certain individuals.

20             I'm not going to go into the arguments of each side.

21   They're in the submissions and in the papers.  Sometimes I may

22   mention an allegation by one side or the other, but for the

23   most part, it would not do those arguments justice to repeat

24   some of them here and not all.  They're quite extensive and

25   comprehensive.

E5FPDSO2

1          But the first issue, so to speak, concerns the

2     constitutionality of a statute called 2 United States Code

3     Section 441F, that is the Federal Election Campaign Act, and it

4     provides, among other things:  That no person shall make a

5     contribution in the name of another person.  So that is what is

6     alleged here that Mr. D'Souza has done.  It also provides:  Or

7     knowingly permit his name to be used to effect such a

8     contribution and no person shall knowingly accept the

9     contribution made by one person in the name of another.

10          Section 441F -- this is a quote from *U.S. v*

11     *O'Donnell* -- "prohibits straw donor contributions in which the

12     defendant solicits others to donate to a candidate for federal

13     office in their own names and furnishes the money for the gift

14     either through an advance or pre-arranged reimbursement."  The

15     cite is *U.S. v. O'Donnell* 608 F.3d 546, a Ninth Circuit case

16     from 2010.

17          And the defense submission acknowledges that the

18     statute we're talking about has been construed to prohibit

19     straw donor contributions in which a defendant solicits others

20     to donate to a candidate for federal office in their own names

21     and furnishes the money for the gift either through an advance

22     or pre-arranged reimbursement.  That is a conclusion that the

23     defense does not challenge.

24          This morning you heard and, of course, there's been

25     extensive coverage of the Supreme Court decision on April 2,

E5FPDSO2

1    2014, in the case of *McCutcheon v. The Federal Election*

2    *Commission*.  The cite is 134 Supreme Court 1434.  In that

3    case -- and this doesn't do the case justice, it's a condensed,

4    very abbreviated summary for our purposes only, that is to say

5    the issues we're looking at -- the Supreme Court stated:  The

6    right to participate in democracy through political

7    contributions is protected by the First Amendment, but that

8    right is not absolute.  Our cases have held that Congress may

9    regulate campaign contributions to protect against corruption

10   or the appearance of corruption.

11          The Supreme Court in *McCutcheon* invalidated so-called

12   aggregate contribution limits, but it did not aggregate what

13   are called base limits.  And we, in this case, are dealing with

14   base limits.  The Supreme Court itself, in McCutcheon, said

15   that this case does not involve any challenge to the base

16   limits, which we have previously upheld as serving the

17   permissible objective of combating corruption.  That's found at

18   *McCutcheon* at Page 1442.

19          Further, it is an element -- this not McCutcheon, this

20   is *Brockett v. J-R Distributors* -- where the Court held as

21   follows, or determined, that it is an elementary principle that

22   the same statute may be, in part, constitutional and, in part,

23   unconstitutional and that if the parts are wholly independent

24   of each other, that which is constitutional may stand while

25   that which is unconstitutional will be rejected.  That's

E5FPDSO2

1   *Brockett v. J-R Distributors*, 472 U.S. 491 Supreme Court

2   decision from 1985.

3           So the determination here, of this Court, is that

4   where, as in our case, the defendant is alleged to have engaged

5   in so-called conduit contributions or straw donor contributions

6   and/or where base limits, as opposed to the aggregate limits,

7   are involved, the statute is constitutional and *McCutcheon* does

8   not change that.

9           Now, moving on to the section 437g claim, that

10  437g(d)(1)(D) provides, among other things, that any person who

11  knowingly and willfully commits a violation of section 441f of

12  this title -- that was the section we had been discussing

13  immediately before this -- involving an amount aggregating more

14  than $10,000 or less than $25,000 during the calendar year

15  shall be in prison for not more than two years.  So that

16  provision makes that behavior a felony, and that is the section

17  that is implicated in this case.

18          In the Court's view, that is to say my view,

19  437g(d)(1)(D) is not unconstitutionally vague.  It sets forth

20  penalties to be imposed if one is found to have knowingly and

21  willfully committed a violation of 441f and if, as here, the

22  amount aggregated amount was more than $10,000 but less than

23  $25,000 during a calendar year.  And as we've said before, the

24  amount in this case is alleged to be $20,000; that is to say,

25  the two $10,000 contributions that are said to be straw donor

E5FPDSO2

contributions.

So if the defendant is found to have contributed between more than ten and less than $25,000 -- in this instance, $20,000, through the four aggregated straw donors during the 2012 calendar year -- he will be subject to punishment set forth in 437g(d)(1)(D).

This is a quote from *United States v. Abdi*:  To satisfy due process, the criminal statute must be sufficiently clear to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited.  And I believe that standard is met here.  The cite is *U.S. v. Abdi*, Westlaw cite is 2007 Westlaw 2153-23-4.  It's a Ohio District Court case from July of 2007.  To satisfy this requirement, the legislature need not define an offense with mathematical certainty but need only provide relatively clear guidelines as to the prohibited conduct.

So the upshot of what I've said so far is that the defense motion to dismiss Count One of the indictment is respectfully denied.

Turning to Count Two, Count Two alleges a violation of statute called 18 United States Code Section 1001(a)(2) and that section provides that whoever, in any matter within the jurisdiction of the executive branch of the United States, knowingly and willfully makes any materially false, fraudulent or fictitious representation is guilty of a crime.  Here, in

E5FPDSO2

1    this case, the government is alleging that Mr. D'Souza caused

2    materially false information to be provided on campaign finance

3    forms that were filed with the Federal Election Commission.

4    The Federal Election Commission has indicated, specifically

5    states, that no person shall make a contribution in the name of

6    another person.

7         I point out that attached to the defense affidavit,

8    Mr. Brafman's affidavit, are the forms alleged at issue and, as

9    background, I advise you of the following.  These forms state,

10   among other things, that the signing parties state that they

11   authorize their contributions to the Wendy Long for New York

12   Committee to be attributed as follows.  There are two relevant

13   forms.

14        One says they should be attributed to Louis T.

15   Joseph II, $5,000, and Denise D. Odie Joseph, $5,000, and that

16   they authorize their contributions to the Wendy Long for

17   New York Committee to be attributed as follows.  This is the

18   other $10,000 contribution.  Tyler G. Vawser, $5,000, and

19   Alyssa D.Vawser, $5,000.

20        These forms, incidentally, also state that it is

21   illegal for any person to reimburse another for making a

22   contribution to a political campaign.  It appears, from these

23   forms supplied to the Wendy Long campaign -- it appears that

24   these forms supplied to Wendy Long campaign or the information

25   contained in the FEC forms, which, in turn, appear to have been

E5FPDSO2

1    prepared by the treasurer of the Wendy Long for New York

2    Committee, a man named Cabell Hobbs, in that form, the latter

3    form, Hobbs certifies that he has examined the report and to

4    the best of his knowledge and belief, it is true, correct and

5    complete.

6           And there's a further certification on the form which

7    bears Cabell Hobbs' signature, which states:  Submission of

8    false, erroneous or incomplete information may subject the

9    person signing this report to the penalties of 2 United States

10   Code Section 437g.

11          It's clear to this Court that the responses and/or the

12   information in the forms submitted by the Josephs and the

13   Vawsers were not true and are not true.  They are not the

14   actual, real contributors.  The defendant, Mr. D'Souza is

15   alleged to have been.  The forms quite clearly notify donors

16   and potential donors that it is illegal to reimburse another

17   for contributions and that the submission of false, erroneous

18   or incomplete forms would subject one to criminal penalties.

19          The text -- this is a quote from *United States v.*

20   *O'Donnell*:  "The text, purpose and structure of section 441f

21   all support the conclusion that the statute applies not only to

22   false name, but also to straw donor contributions.  441f

23   unambiguously applies to a defendant who solicits others to

24   donate to a candidate for federal office in their own names and

25   either advances the money or promises to and does reimburse

1    them for gifts."  That's *U.S. v. O'Donnell*, 608 F.3d 546, the

2    Ninth Circuit case that I mentioned from 2010.

3              I refer you all also to *United States v. Hopkins* at

4    916 F.2d 2007, a Fifth Circuit case from 1990, where the Court

5    stated the following:  "The Hopkins also contend that if false

6    reports were made, they did not make them or cause them to be

7    made.  While it may be true that the Hopkins themselves did not

8    make the reports, it is clear that they deliberately caused

9    those reports to contain false information.  The evidence

10   showed that by keeping him unaware of their scheme, the Hopkins

11   caused another individual, the treasurer of their political

12   action committee, to report to the Federal Election Commission

13   that the contributions to the political action committee were

14   from individuals."

15             It is well established that 18 United States Code

16   Section 2(b) was designed to impose criminal liability on one

17   who causes an intermediary to commit a criminal act, even

18   though the intermediary who performed the act has no criminal

19   intent and, hence, is innocent of the substantive crime

20   charged.

21             So consequently, the defense motion, respectfully, to

22   dismiss Count Two of the indictment is also denied.

23             So the next issue to resolve is the defense motion for

24   discovery based upon what is called selective prosecution.

25   This motion is submitted in furtherance of a potential motion

E5FPDSO2

```
1    to dismiss based upon selective prosecution.  So this is an

2    anticipatory motion.  It's not a substantive motion itself and,

3    respectfully, this defense motion is denied.

4            Selective prosecution, substantively, is defined as an

5    independent assertion that the prosecutor has brought the

6    charge for reasons forbidden by the Constitution.  That

7    definition is found in United States v. Armstrong, 517 U.S.

8    456, 1996 decision.

9            Further, this is a quote, again, about the substantive

10   charge of selective prosecution:  "To make out a claim of

11   selective prosecution, a defendant confronts a deliberately

12   rigorous standard.  He must provide evidence that the

13   prosecutorial decision or policy in question had both a

14   discriminatory effect and was motivated by a discriminatory

15   purpose.  The discriminatory effect prong, in turn, requires a

16   showing that similarly situated individuals of a different

17   classification were not prosecuted.

18           "The defendant seeking to show discriminatory purpose

19   must show that the decisionmaker selected or reaffirmed a

20   particular course of action, at least in part, because of its

21   adverse effects upon an identifiable group."

22           That quote comes from the United States v. Alameh, 341

23   F.3d 167.  It's a Second Circuit case from 2003.  And, again, I

24   underscore that those quotes, while pertinent to our

25   discussion, relate to the substantive charge of selective
```

E5FPDSO2

prosecution.  We're talking about a motion for discovery in anticipation of such an application.

Defense counsel acknowledges that the Department of Justice, in its prosecutorial discretion, may commence a felony prosecution for a violation of the FECA even where the FEC -- that is to say, the Federal Election Commission -- itself would not believe such a case warrants prosecution.

So the defense here asserts -- and, again, this is a, I don't want to say a crude summary, but it is a condensed summary, and you should look at the submissions in their entirety.  But, in short, the defense asserts that it has made a credible showing with more than just some evidence -- some evidence is the standard of burden in a motion seeking discovery in anticipation of a substantive motion to dismiss -- some evidence that, one, compared with others similarly situated, he, Mr. D'Souza, was selectively treated; and, two, that such selective treatment was more likely than not based on the impermissible consideration of punishing him for exercising his First Amendment right to criticize, as severely as he chose fit, the President, his administration and his policies.

The government correctly, in my view, points out that over the last few years the Department of Justice and the United States Attorney's Office for this district and the U.S. Attorney's Office for the Eastern District of New York have prosecuted so-called conduit contribution cases against

E5FPDSO2

1     democrats and Republicans alike.

2              So some of those cases include the following.  One is

3     *U.S. v. Jenny Hou and Oliver Pan*; that's 12 CR 53.  That's a

4     Southern District case before Judge Sweet.  In that case,

5     defendants are charged with straw donor fraud in connection

6     with Democratic candidate for New York City office, and with

7     Pan allegedly responsible for eight donors, totaling

8     approximately $8,000 in matching funds.  That's one such case.

9     So that is a 2012 case.  We know that from the caption.

10              Another case is *U.S. v. Baldeo*, the S1 is 13 CR 125.

11     It's a case before Judge Crotty of this district, which the

12     defendant is charged with conduit contribution fraud or

13     soliciting approximately $15,000 in straw donations from seven

14     individuals for a Democratic candidate for New York City

15     office.

16              The third case is *United States v. Durand*, an Eastern

17     District case from 2013.  The defendant is charged with conduit

18     contribution fraud or soliciting $14,000 in straw donations

19     from two individuals with whom she was friendly, and one

20     individual to whom she was related, for a Republican candidate

21     for the United States House of Representatives.

22              And another case from the Eastern District before

23     Judge Glasser, a 2014 case, *U.S. v. Chatwal*, 14 CR 143, where

24     the defendant pled guilty for making 188,000 in straw donor

25     campaign contributions to three Democratic candidates for

E5FPDSO2

1    federal office, including the offices of President, Senator,

2    and Member of the House of Representatives.

3           The government also states in its papers the

4    following, this is a quote:  "This investigation" -- meaning

5    the instant case that we're concerned with here -- "began as a

6    public source review by the Federal Bureau of Investigations'

7    New York office of the most recent federal campaign in

8    New York, which was the 2012 Senate race in which Ms. Long ran

9    against Senator Kirsten Gillibrand.

10          "The publicly available Federal Election Commission

11   filings readily revealed red flags about donations made by the

12   defendant" -- that would be Mr. D'Souza -- "and those publicly

13   associated with him that, with minimal followup, established

14   proof of a crime."  This is all a quote from the government's

15   submission.

16          And the quote goes on to say:  "Indeed, it is

17   absolutely routine, and the defendant does not present evidence

18   to the contrary, that public corruption cases brought by this

19   office are initiated not only following referrals from

20   regulatory agencies, but based upon investigative work of

21   various law enforcement agencies, in particular the FBI, as

22   well as the office's own criminal investigators."

23          The Court concludes that the defense, respectfully,

24   has presented no evidence that he was selectively prosecuted.

25   The burden, at this motion stage, is some evidence.  I

E5FPDSO2

1    determine that there is no evidence.  There is no evidence of

2    discriminatory effect nor of discriminatory purpose.  The

3    defendant is, for example, unable to say what classification he

4    is in and whom, if anyone, is similarly situated in a different

5    classification that has not been prosecuted.  That the case is

6    interesting or high profile, is insufficient to constitute some

7    evidence of selective prosecution.

8            I refer you to the transcript of proceedings held this

9    morning and also to *United States v. Alameh*, the case I cited

10   before A-l-a-m-e-h, at 341 F.3d 167, a Second Circuit case from

11   2003; also, *United States v. Fares*, F-a-r-e-s, 978 F.2d 52, a

12   Second Circuit case from 1992.  I also refer you to *United*

13   *States v. Manuel*, 64 Fed. Appx. 823, a Second Circuit case from

14   2003; and *United States v. Thompson*.  The 2013 Westlaw cite is

15   624, 64, 89, a Southern District case from that year, 2013.

16           And, finally, *United States v. Hunter*, 13 F.Supp.2d

17   586, a case from Vermont, where the Court stated the

18   following:  "Permitting discovery of the reasons for criminal

19   prosecution is an extraordinary step delaying the criminal

20   proceeding and compromising the government's ability to

21   prosecute effectively."

22           So that resolves the motions.  There are some motions

23   in limine.  Before I turn to them, I just want to make sure

24   that I am on the same page as the government and the defense

25   here as to what motions are still open.  So my understanding is

E5FPDSO2

1    that there's still the government's motion to preclude

2    Mr. D'Souza from arguing motives for his conduct; is that

3    right, that motion is still on the table, as it were?

4              MS. COHEN:  Yes, your Honor.

5              THE COURT:  Okay.  And then there's the government's

6    motion to preclude the defendant from arguing the government's

7    alleged motives in charging the defendant.  That has been

8    resolved on consent, I believe?

9              MR. BRAFMAN:  That's correct, your Honor.

10             THE COURT:  Then there is the government's motion --

11   Well, is there the government's motion for permission to

12   authorize 404(b) evidence, the fact -- or as alleged by the

13   government, that D'Souza violated Federal Campaign Finance laws

14   in connection with his own contribution -- that is to say, the

15   $10,000 contribution to Wendy Long made in February of 2012 --

16   is that still on the table?

17             MS. COHEN:  Your Honor, I think the government stated

18   this morning, at this point, I don't think the Court needs to

19   decide it.  It is likely that will not be an issue during this

20   trial.  If that changes during this trial, we will advise the

21   Court in advance of any such testimony being presented.

22             THE COURT:  Okay.  And then the only other motion that

23   I'm aware of was the motion for permission to introduce

24   portions of an audio recording of an anticipated witness at

25   that time, Dr. Louis Joseph, made of an October 30, 2013,

E5FPDSO2

1    conversation with his wife, Denise Joseph.  I understand that

2    that is also withdrawn; is that right?

3         MS. COHEN:  That's correct.  The government and

4    defense have set forth in the government's letter to the Court,

5    they have agreed that neither party will seek to introduce the

6    tape or refer to its existence or the fact that the tape was

7    made.

8         MR. BRAFMAN:  And even though this is not in the

9    letter, there was a follow-up discussion, I think we're also in

10   agreement that should the defendant testify, he will not be

11   cross-examined about anything that is on that tape.

12        MS. COHEN:  That is correct, your Honor.

13        MR. BRAFMAN:  Thank you.

14        THE COURT:  Let's then turn to the one motion that is

15   still ripe, so to speak, for resolution, which is the

16   government's motion in limine dated April 17, 2014.  The

17   defense response to that motion is dated April 23, 2014.

18        So the government's motion to preclude the defendant

19   from arguing, suggesting or offering motives for his conduct is

20   respectfully denied.  It's appropriate, in the Court's view, to

21   give the defendant in a criminal case leeway to assert a

22   defense.

23        At the same time, you are all aware, I put you on

24   notice, that issues concerning the legal significance, if any,

25   of a defendant's reasons for his conduct can and will be

E5FPDSO2

1  resolved in the jury instructions, which we have not gotten to.

2  But I do give you all a heads up that usually there is an

3  instruction in criminal cases that if the guilt of the

4  defendant is shown beyond a reasonable doubt, it is immaterial

5  what defendant's motive for the crime may be or whether the

6  defendant's motive was shown at all.  So there's a fuller

7  instruction, which I think you're all familiar with, but I just

8  mention that in resolving that motion.

9          So there's one other piece of business that I want to

10  cover that I think will help you prepare for the trial on

11  Tuesday, and that is there's been considerable back and forth

12  on the issue of "willfully."  And the government arguing for, I

13  don't want to call it a more traditional definition.  It's a

14  definition that's been commonly used and has been used by me,

15  as well, of "willfully," and the defense arguing for a more,

16  let's say rigorous standard, a more precise definition.

17          So I do intend to use this charge for "willfully" and

18  that would be:  "An act is done willfully if it is done with an

19  intention to do something the law forbids or with a bad purpose

20  to disobey the law or with a specific intent to fail to do

21  something the law requires to be done.  The defendant need not

22  have known that he was breaking any particular law or any

23  particular rule.  He need only have been aware of the generally

24  unlawful nature of his actions.

25          "Accordingly, it is not necessary for the government

E5FPDSO2

1    to prove that the defendant was aware of the specific provision

2    of the law that he is charged with violating.  Rather, it is

3    sufficient for the defendant to act knowing that his conduct is

4    unlawful, even if he does not know precisely which law makes it

5    so."

6              And in support of that definition, I'm relying upon,

7    among others, these cases, several, if not all, of which the

8    defense contends -- and that objection is noted in the

9    record -- are called into question.  The cases are *United*

10   *States v. Whab*, 355 F.3d 155, Second Circuit case from 2004,

11   authored by Judge Cabranes.  Another case is *United States v.*

12   *George*, 386 F.3d 382, a Second Circuit case from 2004 authored

13   by Judge Sotomayor, and another -- and I'm sure there are

14   others in addition to these, but these are the citations --

15   *United States v. Carrasquillo*, 239 Fed.Appx. 634, Second

16   Circuit case from 2007.

17             Another case that you may find instructive is *United*

18   *States v. Braddock*, the Westlaw cite is 2003 Westlaw 441, 1531,

19   District of Connecticut case from 2013.

20             So that's all I have for you today, unless you have

21   any questions for me with respect to the trial which starts

22   Tuesday morning.

23             MS. COHEN:  Sure, your Honor.  Just before I get to --

24   We have, I think, just two issues to address for the trial, one

25   question and one issue I wanted to put on the record.

E5FPDSO2

1          But just with respect to your Honor's ruling regarding

2     1001, the second count, I believe your Honor, in reciting your

3     Honor's decision to deny the motion, said that the Josephs'

4     form was submitted to the campaign.  That form was actually

5     sent to the Josephs but was never completed by them and sent

6     back.  I don't think that that changes your Honor's decision in

7     any way, and the checks at issue were made out under -- by the

8     Vawsers and the Josephs and submitted to the campaign in their

9     name; so I don't think it changes your analysis.

10          THE COURT:  I stand corrected, but I think you're

11    right, the analysis is the same.

12          MS. COHEN:  And the *U.S. v Pan* case was in front of

13    Judge Sullivan, not Judge Sweet.  I believe they have the same

14    initials.

15          THE COURT:  You're absolutely right.

16          MS. COHEN:  Just with respect to the trial, just a

17    procedural issue.  I don't know -- we're starting on Tuesday,

18    and we wanted to know if the Court, if the trial goes that

19    long, would be sitting on Friday.

20          THE COURT:  Yes.

21          MS. COHEN:  Just noting that's the Friday before

22    Memorial Day.

23          THE COURT:  Yes.

24          MS. COHEN:  Thank you, your Honor.

25          THE COURT:  What I typically do on a Friday is have a

E5FPDSO2

1   shortened day, perhaps start a little earlier but perhaps not.

2   But in any event, let people go by 1:00, 1:30, something like

3   that.

4            MS. COHEN:  Thank you, your Honor.  And the other

5   thing I wanted to put on the record is that there has been no

6   plea offer in this case.  The government had previously sent a

7   Pimentel to the defense.  I have been informed by the defense

8   that he has had discussions with his client and his client does

9   not wish to plead to the indictment at this time.

10           MR. BRAFMAN:  Your Honor, when you are impaneling the

11  jury, may I assume that the Court will use the struck method?

12           THE COURT:  Yes.

13           MR. BRAFMAN:  May I ask one other question?  Simply so

14  we do not lose prospective jurors who may have plans for the

15  Memorial Day weekend, could you tell them -- I think we both

16  pretty much estimate that the length of the trial is not going

17  to be very long, and that's, obviously, dependent on when we

18  begin.  But it's inconceivable to me that it's actually more

19  than two full days of testimony; so....

20           THE COURT:  So I will also probably discuss that that

21  weekend is impending, and we all think we'll be done by then,

22  but I guess they should bear that in mind, in the meantime.

23           MR. BRAFMAN:  And for jurors who have plans for the

24  holiday, we would not be sitting on the 30th, I'm sorry, on

25  Monday?

E5FPDSO2

1          THE COURT:  No.

2          MR. BRAFMAN:  So if the deliberations continue, they

3     would be able to continue their plans?

4          THE COURT:  They would come back Tuesday.

5          MR. BRAFMAN:  Thank you very much.

6          THE COURT:  The next week instead.

7          MR. BRAFMAN:  Thank you.

8          MS. COHEN:  Your Honor, there were several issues that

9     the defense raised with respect to voir dire, and I didn't know

10    if your Honor wanted to address those now.  Specifically, are

11    you --

12         MR. BRAFMAN:  I can capsulate.

13         MS. COHEN:  It's the defense's argument, maybe the

14    defense can mention --

15         MR. BRAFMAN:  Your Honor, we submitted a request

16    pursuant to rule 24, suggested questions that we asked the

17    Court to consider including among the general questions, and I

18    didn't note an objection from the government.  Indeed, I

19    thought it was considered a joint submission.

20         But as a practical matter, the defendant is well known

21    among some circles.  There's been a lot of publicity about him

22    in the past, books that he's written and speeches he's given,

23    there are many members of the media in the courtroom, and the

24    real questions were, do they know the defendant, have they read

25    anything that he has authored, and to the extent that they have

E5FPDSO2

```
 1    a political bias that would prevent them from being fair.  I

 2    think it's an appropriate inquiry for The court to make, given

 3    the tension that exists between this defendant and the current

 4    administration.

 5              THE COURT:  I think we will elicit that, and if at the

 6    time you feel we haven't, just slip me a note or something, but

 7    I think we'll cover that.  I think it's a fair point.

 8              MR. BRAFMAN:  Thank you, your Honor.

 9              MR. KRIEGER:  Your Honor, the government doesn't

10    object to that voir dire of the jury.  It's the middle

11    suggestion by the defendant in his submission of April 23rd.

12    We do have issues with two other requests that were made.

13              THE COURT:  Well, you know, what I normally do is I

14    sort of take it all under submission, and then use my best

15    judgment.  I usually don't get into big debates in advance

16    about these kinds of questions.

17              MR. KRIEGER:  That's fine, your Honor.  We just wanted

18    to note our objection to that.

19              THE COURT:  Yes, fair enough.  For the voir dire, I

20    was hoping you could provide me with a little more detail.

21    There's an entity called Compliance Consulting.  Did I get that

22    right?

23              MS. COHEN:  You did, your Honor.

24              THE COURT:  So is that an entity in New York or in

25    some other venue?  So that the jury might have a sense of if
```

E5FPDSO2

1    they know about it or what it is.

2           MS. COHEN:  Sure.  It's an entity that is in Virginia.

3    Although, it also has employees or consultants who work in

4    Florida, but it is primarily based in Virginia.  It is the

5    entity that Wendy Long hired to do the necessary campaign

6    filings and to --

7           THE COURT:  So it is essentially as described by its

8    title, Compliance Consulting.  If I said of Virginia, do you

9    think that would be adequate?

10          MS. COHEN:  That is adequate, your Honor.  I would

11   just also add --

12          THE COURT:  Mr. Brafman, would that be okay?

13          MR. BRAFMAN:  Yes, your Honor.

14          THE COURT:  And then there was a mention of -- I must

15   confess my ignorance -- the Henry Ford Hospital is located

16   where?

17          MR. KRIEGER:  It's in Detroit.

18          THE COURT:  Okay.  I think I was able to identify --

19          MS. COHEN:  I think there's an additional sort of

20   names of places, if you could just add the law firm Kirkland

21   and Ellis.  Wendy Long, for part of her career, was an

22   associate and a partner there; so it may come up in her

23   background, in her expected testimony.

24          THE COURT:  Okay.  So we usually do a pretty quick

25   trial.  We try to keep the jurors engaged, so to speak.  As a

E5FPDSO2

1  practical matter, probably on Tuesday we won't get to voir dire

2  before 10:30.  Even though we want to start at 9:30 it's

3  probably not likely.  Could get them at 10:00, but just so you

4  know.

5           And I try not to have many sidebars.  We try to move

6  things along as expeditiously as we can.  So Tuesday,

7  Wednesday, Thursday, I'm prepared to, as I said before, be here

8  on Friday.  It depends on how things go.  You are the best

9  judges of that, but I will, as I said before, have that

10 discussion just to keep it in everybody's mind that Memorial

11 Day is approaching.  So that's it.  It's nice to see you all.

12 See you on Tuesday.

13           MR. BRAFMAN:  Thank you, your Honor.

14           MS. COHEN:  Thank you, your Honor.

15           THE COURT:  You bet.  Counsel, Christine mentioned

16 that she has mentioned to you if you wish to come by Monday

17 afternoon to try out any of the acoustics or equipment or

18 arrangements, you're certainly welcome and free to do that.

19           MS. COHEN:  Yes, thank you.  We'll arrange that.

20           MR. BRAFMAN:  Thank you, Judge.

21           THE COURT:  You can call chambers anytime, yes.

22           MS. COHEN:  Thank you, your Honor.

23           THE COURT:  Thanks again.

24           (Adjourned)

25