UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**14 Cr. 34 (RMB)**

---

UNITED STATES OF AMERICA

-against-

DINESH D'SOUZA,

Defendant.

---

SENTENCING MEMORANDUM ON
BEHALF OF DINESH D'SOUZA

BRAFMAN & ASSOCIATES, P.C.
*Attorneys for Defendant*
*Dinesh D'Souza*
767 Third Avenue, 26th Floor
New York, New York 10017
(212) 750-7800

BENJAMIN BRAFMAN
MARK M. BAKER
ALEX SPIRO
     Of Counsel

# Table of Contents

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Dinesh D'Souza's Statement to the Court . . . . . . . . . . . . . . . . . . . . . . . 5

III. Dinesh D'Souza: A Young Immigrant's Extraordinary Success Story . . . . . . . . . 6

IV.  Additional Correspondence With the Court . . . . . . . . . . . . . . . . . . . . . . 9

     A.   Wendy Long's Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     B.   Dinesh D'Souza is Well Recognized as an Honest,
          Ethical, Moral and Humble Professional, Who Has
          Deeply Impacted Upon Those He Has Befriended . . . . . . . . . . . . . . . . . 11

     C.   Dinesh D'Souza Is a Devoted Son, Father, Brother,
          Uncle and Friend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     D.   Dinesh D'Souza's Aberrant Criminal Conduct, for Which
          He is Extremely Remorseful, Was More Owing to a
          Misguided Act of Friendship Than the Result Of
          Criminal Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V.   Guidelines Considerations (Stipulated Offense Level) . . . . . . . . . . . . . . . . . 30

VI.  After Considering the Guidelines, The Court Should
     Impose a Variant Sentence of Probation Based on
     the Criteria Delineated in 18 U.S.C. §§3553(a) and 3661,
     Together with a Condition of Community Service
     Which Dinesh D'Souza Has Already Begun to Undertake . . . . . . . . . . . . . . . 31

     A.   Applicable Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     B.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

          1.   History and Characteristics of the Defendant . . . . . . . . . . . . . . 36

          2.   Nature and Circumstances of the Offense . . . . . . . . . . . . . . . . 41

3.    Need to Protect the Public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

4.    Need for Deterrence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

5.    Need to Avoid Sentencing Disparities . . . . . . . . . . . . . . . . . . . . . . 49

6.    The need to provide restitution to any victims of the offense  . . . . 52

8.    Suggested Community Service . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### 14 Cr. 34 (RMB)

---

### UNITED STATES OF AMERICA

#### -against-

### DINESH D'SOUZA,

**Defendant.**

---

## PRE-SENTENCE MEMORANDUM ON
## BEHALF OF DINESH D'SOUZA

### Preliminary Statement

On May 20, 2014, pursuant to a plea of guilty arising out of a plea agreement with the Government, Defendant Dinesh D'Souza ("Defendant" or "Dinesh") was convicted in this Court of Count One of Indictment No. 14 Cr 34 (RMB), alleging violation of 2 U.S.C. §§441(f), 437g(d)(1)(D) and 18 U.S.C. §2. Through his counsel, Defendant now respectfully submits this memorandum to assist the Court in determining an appropriate sentence.

## I.    Introduction

Owing to his involvement in this case and his consequent plea of guilty, Dinesh D'Souza will soon stand before this Court as a convicted felon to receive its judgment. In so doing, in stark contrast to the life he had earlier led, the positive deeds he had accomplished and the sterling reputation he has well earned (and, in the eyes of many, still enjoys), Dinesh will present himself as a disgraced and humiliated man who could never have envisioned the situation in which he now finds himself.

As will be demonstrated in this pre-sentence memorandum, prior to his involvement in the decidedly aberrant conduct that gave rise to this indictment, Dinesh D'Souza has been -- and remains to this day -- universally regarded by those privileged to know him as a man of towering integrity, unyielding loyalty, abiding humility and uncommon industriousness. Indeed, it can easily be stated that Defendant's commission of the acts which resulted in the charged offenses is diametrically inconsistent with the public figure who is known to many, and whom he has always prided himself to be.

All that said -- and even if not available pursuant to the plea agreement as a downward adjustment under pertinent guidelines analysis -- Dinesh D'Souza has now unequivocally accepted responsibility for the uncharacteristic commission of a serious crime through which, it should be noted, he reaped no personal benefit, other than the misguided satisfaction of simply trying to help a friend. In this pre-sentence memorandum, therefore, after discussing Dinesh's background and presenting his own statement of profound contrition to the Court, we will review a number of testimonials from various correspondents whose words breathe life into these noted qualities. We will then urge that, regardless of the stipulated offense level between the parties and recommended by the PSR, the ultimate variant sentence which we herein advocate should be dictated by due constraints of mercy, leniency and this Court's recognition of the extraordinary life which Dinesh has otherwise led.

No doubt, in determining the appropriate sentence for any defendant, a sentencing court must "make an individualized assessment based on the facts presented,"

which includes "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall v. United States*, 552 U.S. 38, 50 & n.6 (2007). In the final analysis, therefore, the sentence imposed will be predicated upon the elements of 18 U.S.C. §§3553(a) and 3661.

In furtherance of such an "individualized assessment," we respectfully submit that Defendant's conduct, though serious, does not at all equate with the prison term contemplated by the offense level to which the parties have stipulated. We thus emphasize that the Court "may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views[.]" *Peugh v. United States*, 133 S.Ct. 2072, 2080 (2013) (*citing Pepper v. United States,* 131 S.Ct. 1229, 1247 (2011)). In this regard, we submit, with the greatest respect for the integrity and independence of this Court, that a sentence below the applicable Guidelines range with no jail component whatsoever is what is appropriate -- *i.e.*, a " 'sentence that is sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). We pray the Court will hopefully arrive at this conclusion after taking into account the fact that Mr. D'Souza acted bereft of any corrupt purpose or design, other than blind and misguided loyalty.

In addition, several other factors discussed more fully below distinguish Mr. D'Souza from other defendants appearing before your honor. It is our hope that after reading our sentencing memorandum, this Court will be persuaded to sentence Mr. D'Souza to probation with a condition that he perform community service under the supervision of the

Probation Department at the Boys and Girls Club of Greater San Diego, a not-for-profit organization that has already acknowledged Mr. D'Souza's involvement and suitability to its mission.[1]

To be certain, Mr. D'Souza's application for a non-custodial sentence is not a request for sympathy, but rather an appeal to reason and understanding. We are seeking a sentence that balances the crime he has regrettably committed with the extraordinary good Mr. D'Souza has accomplished as a scholar, as a community member, and as a family member. Further, as counsel maintained at the plea proceedings, for purposes only of a non-guidelines variance, we ask Your Honor to consider Mr. D'Souza's guilty plea and consequent acceptance of responsibility, while not formally credited by the Government, as it occurred almost immediately after your honor's decision on counsel's legal motions.

For these other reasons set forth below, it is our prayer that the Court will embrace the notion that, given the entirety of Defendant's life, all that he has accomplished, and the persons whom he has so positively influenced, incarceration is neither a necessary nor an appropriate penalty. Rather, an alternative to incarceration can also constitute a punitive sentence that, in the appropriate case, serves all of the goals of sentencing. *See Gall v. United States*, *supra*, 552 U.S. at 49-50.

---

[1]     As reflected in Exhibit 26, Mr. D'Souza has been accepted as a volunteer at this organization.

## II.   **Dinesh D'Souza's Statement to the Court**

Dear Judge Berman:

When I think about what I did, I am filled with a sense of sheer frustration, exasperation and regret. I cannot believe how stupid I was, how careless, and how irresponsible. I keep going back and trying to envision how I ended up here, asking myself, "What were you thinking?" I know that I was swamped, I know that Wendy Long was imploring me to help her campaign that was struggling financially, and I know that I should have called a lawyer and figured out a legal way to help her. Instead I took a short-cut, knowing that there was a campaign limit and trying to get around the limit.

I have already paid a price for this behavior in having the FBI investigate me, having handcuffs behind my back and being exposed to public disgrace and embarrassment. My credibility as a public figure who has consistently championed following the law has been questioned, and I am the one who gave them the fodder to do this. I have always known that actions, good and bad, have consequences, and this sorry attempt to evade and exceed the campaign finance limit is no exception. I did something wrong, and I deserve to be held accountable.

At the same time, I want you to recognize that this was a completely aberrant act on the part of a person who respects and follows the law, who has never done anything like this before, and I assure you will never do anything like this again. I allowed my affection for Wendy Long and my desire to help her in a difficult situation to override my good judgment and regard for the law. This should not have happened, and I am ashamed and contrite that it did happen.

I ask that you recognize that my motives here were not self-serving, that I am willing—even eager—to make amends for what I did. I realize that you have the power to send me to prison, but since I am no danger to the community, and there is a zero chance that I would do this again, no good purpose would be served by locking me up.

Rather, I urge that you give me community service. I am in touch with several service projects in southern California, where I live. Attached are a couple of letters from organizations that would be pleased to have me. I can teach after-school class or instruct new immigrants in English or work with the Boys and Girls Club. In this way I can repay my debt to society and be of use to the community.

Respectfully submitted,

s/      Dinesh D'Souza

Exhibit 1.

### III.   Dinesh D'Souza: A Young Immigrant's Extraordinary Success Story

Dinesh D'Souza was born in in Mumbai, India (prior to 1995, known as Bombay), on April 25, 1961. His father, Allan D'Souza, a chemical engineer, passed away at age 66 from kidney disease. His mother, Margaret D'Souza, age 79, still resides in India along with Dinesh's two siblings, a brother, Shashi D'Souza, a merchant navy captain and shipping company executive, and a sister, Nandini Viegas, a homemaker.

Dinesh's odyssey began in 1978. That year, after having attended private schools in Mumbai, he came to the United States on an exchange visa, as part of a Rotary International exchange program, to attend 12th grade at a high school in Patagonia, Arizona. Upon graduation, Dinesh successfully changed his status by obtaining a student visa and attending Dartmouth college, where he had been accepted and where he would major in English.

As best described by **Danielle D'Souza**, Dinesh's only child, in her letter to the Court, Dinesh D'Souza

> is an immigrant that came to this country at 17 having never been on a plane or out of India....He grew up in Mumbai, India and came to America with nothing but a suitcase. He received a full scholarship to Dartmouth College through the Rotary and bussed tables at a steakhouse in order to buy necessities like toothpaste. He left his family and came here seeking the American Dream. While he has become successful in his career, he has not gotten everything he wished for/ is still the boy that left on that plane at 17 [*sic*]. He gained things, but also lost things he could only have in India. Because he had no family here in America, his friends at Dartmouth became his family.

Exhibit 4.

Similarly, according to his brother, **Shashi D'Souza**, Dinesh,

> left home at the age of 17 to come to a strange country far away from his
> family, at a time when communication was limited and life was tough. He
> worked hard and never let us know of the difficulties that he faced during the
> formative years of his life. At that time India had a closed economy and
> Dinesh left India with USD 500 in his pocket.

Exhibit 7.

As **Laura Ingraham**, the lawyer and television commentator, who befriended

Dinesh in Dartmouth College, recalls:

> I have known Dinesh since 1982, when we were both students at Dartmouth
> College. Almost immediately upon meeting him, I was struck by his
> unpretentious and diligent approach to life as an undergraduate. When other
> students partied at frats, Dinesh worked as a stringer for a Catholic newspaper
> to make a few dollars. Having come to the U.S. as a 17-year-old exchange
> student from India, Dinesh didn't have "spending money." He made it all
> himself. Classmates teased him because he possessed exactly one pair of
> shoes (with huge holes in the soles!) I didn't care -- Dinesh was teaching me
> how to write a news story, edit copy, track down sources and most
> importantly, to stay firm in my principles.

Exhibit 11.

Following college, Dinesh worked for *Prospect Magazine* in Princeton, New

Jersey for about one and a half years between 1983 and 1985. While there, he applied for,

and received, a practical training visa which allowed him to labor in the field of study which

he had pursued at Dartmouth.

In 1985, upon leaving Princeton, Dinesh went to Washington, D.C., to become

the manager of Policy Review, a publication of the conservative-oriented Heritage

Foundation. It was at that time that he obtained a green card and became a permanent

resident. He maintained that position for about two years, until 1987, whereupon Dinesh

became a policy analyst in the White House under then President Ronald Reagan. He served

in that capacity until the end of that presidential term in 1988.

Upon leaving the White House, Dinesh went to the American Enterprise

Institute (AEI), a conservative think tank. He remained there from 1989-2001, serving as a

research scholar, writing books and delivering speeches, while becoming a naturalized

United States citizen in 1991.

Because family circumstances had required him to relocate to California in

1999, Dinesh ultimately joined the Hoover Institute at Stanford, University, in Palo Alto,

another conservative think tank, where he continued to conduct scholarly research. He

remained there for seven years, between 2001 and 2008.

After a year of free lance writing and debating on theological issues, from the

Fall of  2010 until October 2012, Dinesh served as the president of Kings College, a

Christian institution located in Manhattan. Since leaving Kings College, he has devoted all

his professional time to his writings, as the author of many books and articles. He has also

engaged in public speaking and debating, while becoming heavily involved in documentary

film production. Mr. D'Souza has made  myriad appearances in the national media and has

become a celebrated conservative political commentator.

Dinesh D'Souza is the author of thirteen books, seven of which became New

York Times bestsellers. Remarkably, in what is undoubtedly no small accomplishment,

*America,* Dinesh's latest book and the subject of his most recent documentary film, is

currently number one on the NYTimes Hardcover nonfiction best seller list.

## IV.   **Additional Correspondence With the Court**

### A.   **Wendy Long's Statement**

Perhaps most importantly,   **Wendy Long**, the former Republican candidate for United States Senate, whose campaign was the recipient of the subject donations in this case, has a strong and vital statement to make to the Court:

> Dear Judge Berman:
>
> I am a resident of the City of New York, a wife and a mother of two school-age children. I'm involved in home schooling now and am not practicing law, but in the past I have held various positions in public service and in private legal practice, including as a law clerk to Justice Clarence Thomas and to Judge Ralph K. Winter on the U.S. Court of Appeals for the Second Circuit.
>
> I also was the Republican and the Conservative parties' nominee for United States Senate here in New York in 2012, and it was my political campaign to which Dinesh D'Souza made the contributions that are the underlying subject of his guilty plea in your court.
>
> Dinesh and I have been very close friends since our days at Dartmouth College together about 34 years ago. I have worked with him in political, educational, and religious efforts, but mostly, we have just been personal friends as part of a close circle of people who grew up together as undergraduates from different places and backgrounds, but who all were in search of truth and intellectual honesty when we arrived at college. Dinesh has been like a brother to me.
>
> It is very painful to think that Dinesh could be punished for what I know was a well intentioned effort to help me, an old friend, in advancing the ideas that he and I share in the public arena. I want to be very clear that Dinesh never asked or expected anything in return for helping my campaign and did not seek any gain from this act of pure friendship.
>
> In fact, I am certain that his problem arose in part from his virtue of being an extremely generous person - in this case, to a fault - with others. He gives selflessly all the time, with no expectation of anything in return from anyone.

He came to this country with nothing but a desire to learn and a willingness to work hard. He was gifted academically, worked very hard, and rose to the top of his class at Dartmouth. He went on to have great professional successes, and when he did, it always struck me how much he reached out to those who had not experienced his success. He has always treated other human beings, even those with whom he's had the greatest disagreements, with kindness and respect.

We have individuals among our circle of old friends who were beaten up by this world in various ways. They experienced a range of trials including family suicide, disease, alcoholism, divorce, abuse, financial ruin, and depression. Dinesh was always there for them, as he was for me when my mother suffered for years with ALS and my siblings and I were caring for her in her completely paralyzed state, and when my father was dying after a long illness. He helped me in every way that a friend can. And he always helped others, whenever and however he could, with loans, housing, jobs, ideas, encouragement. When he experienced personal financial success, he was quick to share that with others, to encourage them to work and use the gifts they had to produce something of value. He would give gifts and loans just to help people out - again, never expecting anything in return for himself.

He is a good man, your Honor. He has admitted his mistake. He would be the first person to say this is a nation of laws and not of men. That's why he sought and gained citizenship in this country. I think his plea reflects that respect. He is truly sorry about what he did in giving these contributions to my campaign. I can see that he was just trying to help me, an old friend, in an extremely difficult political environment, to be able to make my case and make a competitive election for the voters of New York. He knows he should not have tried to help in this way, and I believe he has expressed his sincere remorse.

I hope that you will use your discretion to arrive at a sentence for him that does not involve prison. There are so many people that he has helped, and could continue to help in legal and moral ways, if he is not sent to prison. I respectfully ask you to exercise your discretion to give him the lowest possible sentence under our laws. Thank you for this chance to address the Court.

Very Truly Yours,

s/ Wendy Stone Long

Exhibit 2.

Other individuals who know Dinesh well, certainly echo Ms. Long's characterizations of his inherent goodness and generosity. In doing so, they likewise speak to various aspects of Dinesh's character, goodness and selfless generosity.

**B.    Dinesh D'Souza is Well Recognized as an Honest, Generous Ethical, Moral and Humble Professional, Who Has Deeply Impacted Upon Those He Has Befriended**

**C. Edward McVaney**, the retired founder, President and CEO of a very large multi-national software company with over 5,000 employees, prides himself in his "developed...ability to assess good character quickly." Exhibit 13. He has become close friends with Dinesh D'Souza, having known him since 1997, and has been a minor editor of Dinesh's last three books. In Mr. McVaney's view,

> Dinesh D'Souza is a gentleman's gentleman, a man of great integrity and wisdom. I can assure you of that. His daughter's book reflects the influence of a great father. I have *seen the fruits of Dinesh's labor, and it is superior*. Despite Dinesh's error in judgment, one cannot deny that he is a good, good man.

Exhibit 13 (emphasis in original).

**Gerard R. Molen** (the Academy-Award winning producer of *Schindler's List*) has produced two of Dinesh D'Souza's films over the last several years, and has come to know him well. Mr. Molen "continue[s] to be impressed by [Dinesh's] devotion to our country, his mission to reach out to the younger generations and his goal of making the world a better place." Exhibit 14. In Mr. Molen's view,

> Rarely during the course of a lifetime does a man have the opportunity to support and serve men and women of complete integrity and dedication to the noblest of causes. I am one of those rare individuals who's been blessed with

such service twice in my lifetime.

*Id.*

      **Donald Pease**, a professor of English and American literature at Dartmouth

College, has known Dinesh, his former student, since 1980, and is "writing as a witness to

Dinesh D'Souza's ethical and intellectual integrity." Exhibit 15. Noting that "during in-class

discussions[,] Mr. D'Souza improved the substantive quality of the conversation by engaging

issues that his classmates had either overlooked or avoided[,]"*id.*, Professor Pease adds that,

with respect to the characters appearing in Dinesh's literary works,

> [o]nly a handful of the undergraduates that I have taught over the last forty
> years have engaged the predicaments confronting these characters with
> Dinesh's acumen. I took it as a sign of his moral integrity that, despite his
> knowledge of their allure, Dinesh did not burden the characters he invented for
> his novel, *Where Elephants* Go *to Die,* with psychological complexities
> commensurate to Edmund Tyrone's or Maggie Pollitt's or Captain Ahab's. But
> in his novel, Mr. D'Souza did write quite movingly about a young man's desire
> to make good on his father's hope that sending him to America would open up
> opportunities that conditions in India had closed off.

*Id.*, at 2. Professor Pease closes his letter to the Court by noting that "[a]s these all too brief

remarks attest, I consider Dinesh D'Souza a gifted and insightful reader, a morally exemplary

father, and a valued former student and friend." *Id.*, at 3.

      **Michael Shermer** is the Publisher of Skeptic Magazine, a monthly columnist

for Scientific American, and an adjunct professor at Chapman University and Claremont

Graduate University. He has known Dinesh for two decades, "primarily through a number

of public debates, panels, and discussions involving religion, politics, and other controversial

issues." Exhibit 18. Mr. Shermer notes that he is "the author of a number of science books

that are occasionally at odds with Dinesh's beliefs, especially with regards to religion, but I nevertheless provided an endorsement blurb for his book on the importance of religion. That is how high in regard that I hold Dinesh D'Souza." *Id.* Mr. Shermer adds:

> In fact, of all the people I have debated (dozens of prominent public intellectuals) Dinesh is the most formidable, forthright, and honest. He is unfailingly fair and polite, always courteous to me and our hosts, and even when no one is around he goes out of his way to be friendly toward me, even though we differ substantially on several issues. In other words, his character is genuine, his intentions are good, and I consider him a friend because of that. As well, our debates have occasionally involved the arrangement of honoraria by Dinesh, and he has made sure that I received the same amount as he, and that I am paid promptly, as any honest business colleague would.

*Id.*

Dinesh's brother-in-law, **Alphonsus Viegas,** who regards him "more like a brother and adviser," has known Dinesh for about 25 years. According to Mr. Viegas, Dinesh

> has always been an exemplary person and performer in whatever he says and does, righteous and a man of integrity. In spite of the huge successes he has achieved in his career he has always been a humble and forthright man and one who would never compromise on his integrity and Christian beliefs.

Exhibit 22. Noting that Dinesh "has made a serious lapse of judgment recently with regard to this case, Mr. Viegas "humbly implore[s] [the Court] to give him the minimum punishment as he is a good man of very high integrity and give him the opportunity to repent and continue with his American dream." *Id.*

**Jane Tompkins** is a Professor Emirita of English at Duke University who has known Dinesh for fifteen years on a social basis. In order to typify the type of gentleman she has come to know Dinesh to be, despite their disparate political views, she recalls a time

when she and her husband had dinner with him after he became president of King's college:

> I don't remember the subject of our conversation but, as always, we disagreed, the exchange was intense, and everyone...had a good time. That's the thing about Dinesh. He is passionately committed to his political beliefs, and at the same time, absolutely free from prejudice against people whose views are opposed to his. I am one of those people-a feminist literary critic, an advocate for opening the canon of American literature to writers not previously included, and an educational innovator, more interested in the process by which students learn than the content of their studies.

Exhibit 20.

Continuing, Prof. Tompkins is effusive in her admiration for, and praise of,

Denish D'Souza, as a generous, engaging, courteous and open-minded gentleman:

> Because of our intellectual differences, I always learn something new whenever I encounter Dinesh. He is friendly, engaging, able to outline ideas with startling clarity and trenchant wit. And ever good-humored in debate. He answers your questions. He takes the time to really explain what he means. He is, essentially, a generous person, willing to give you the benefit of the doubt, willing to listen, willing to engage on your terms, and able to see the silly side of things ready with a quip, or an ironic remark that takes the tension out of disagreement. An optimist, an entrepreneur, full of ideas and not afraid to put them into practice, he has a positive, hopeful, adventurous approach to life that is contagious. When he outlines his latest scheme, such as the one for an online college that teaches the great books which he pitched to us at our house in Delray Beach, Florida, I always find myself getting excited, even if it's not exactly my idea of what the world needs now.***

*Id.*

**Eric Bennett** is the Vice President for Student Development at the King's

College in New York City. He worked closely with Dinesh during Dinesh's tenure as

President, from 2010-2013. He notes:

> In over twenty years of work in the field of education, I have known other leaders with leadership ability equivalent to Dinesh's, yet many of them lacked

his good nature and humility, and few demonstrated the genuine kindness that Dinesh exhibited to me. For this reason, I ask that you impose the most lenient sentence the Court considers appropriate.

Exhibit 3.

      **Christopher E. Baldwin**, a Wall Street investment banker for the last twenty years, has known Dinesh since Baldwin was an eighteen year old freshman at Dartmouth. In support of his request that the Court In support of his request that your Honor "please temper your judgment of Dinesh D'Souza with mercy in light of his character, his demonstrable love for our country and his contribution to our nation's public life over the past decades[,] Mr. Baldwin states:

> I do not agree with Dinesh on most political issues and, funny to admit it, he has no idea of this as ours is a purely social friendship. What he probably knows, notwithstanding my private disagreements with him, is that I value his immense contribution to the public intellectual life of the United States, with his multiple best-selling books, his commitment to friendly and edifying public debate, and his service as a political appointee soon after he arrived to the United States as an immigrant.

Exhibit 27 .

      **Beth Wexler,** the mother of Dinesh's daughter's best friend, first met him in 1999. She writes:

> Of the many qualities Dinesh possesses, I think his ability to be a great listener is at the top of the list. Many people don't care what you have to say or they are thinking about what they are going to say while you are talking. Dinesh listens and when he responds it is with intelligence and a certain determination to persuade, but with respect and empathy for the other person's position.

> You see that in his TV appearances and his debates. He never cuts people off and he never talks over or down to them. He always shows utmost respect to whomever is speaking.

Through the years, we have enjoyed getting together with Dinesh because we always came away with more valuable insight than we had before.

Exhibit 25.

**Stanley Fish** is the Davidson-Kahn Distinguished University Professor and Professor of Law at Florida International University and Visiting Florscheimer Professor at Cardozo Law School. He has known Dinesh for over twenty years, having first met him when they were touring colleges and universities while debating "political correctness." Exhibit 8. His description of the sort of "public man" he has always viewed Dinesh to be is most illuminating:

> The terms of the debate were set by his best-selling book *Illiberal Education,* an attack on what he saw as a liberal-dominated academy. I was arguing the other side, and we had a great time and so, I think, did our audiences. As we toured we became good friends, in large part because of the generosity -- both personal and intellectual -- Dinesh extended to everyone when he was not on the stump. That to say, although Dinesh was (and is) a fierce and skillful debater, off the podium he was open, fair-minded, considerate and courteous. Even when he was in a forensic situation, he never resorted to rants, hyperbole, distortion, or defamation. He just knew more than his opponents and was better at putting together what he knew into a coherent statement. He is now applying these talents to the making of movies, with notable success. The message, with which I still disagree, is still the same and it is still being presented honestly and with conviction.

Exhibit 8.

Professor Fish's description of Mr. D'Souza, the "man," is no less enlightening:

> The previous paragraph attempts, inadequately, to take the measure of D'Souza the public man. Taking the measure of D'Souza the man would be a much lengthier undertaking. I would begin by noting his passion for education and

his concern that students receive the best instruction possible. I would add his dedication to Christian principles, evidenced both by his tenure at The King's College and the books he has written explaining and defending Christian doctrine. And most of all I would speak of the many kindnesses I have seen him perform, the loyalty he displays as a friend, the warmth he exudes in every human interaction. He is just a good man who has, by his own admission, done a bad thing.

**Sonia Pourmand** has known Dinesh for nine years, having married his ex-wife's brother-in-law. Recently, she worked with Dinesh on his new film, "America." She provides the Court with her unique insight into Dinesh's character:

> l love working with him as he has such creative mind, is passionate about his work, and allows everyone to grow into the best version of themselves. He values every individual's opinion no matter what their position is within the company. He treats people the way he wants to be treated.
>
> I have always thought of Dinesh as an understanding, compassionate, kind, intelligent, graceful and humble man. No matter who he encounters in life, he always treats them with respect and kindness. He has a great ability to listen and provide advice. He is a man of faith and his faith has been an intricate part of his life.***
>
> He has dedicated his life to education, making a difference in other people's lives , parenting, pursuit of a life that reflects dignity, love for his family, this country and his work.

Exhibit 16.

Laura Ingraham shares these observations. In her opinion,

> Dinesh is simply one of the finest human beings I have ever met. His generosity of spirit, philanthropy, keen sense of compassion, and devotion to country are what I hope my own children exhibit when they mature into adults. Until this recent unfortunate chapter, his life had been the quintessential immigrant success story.

Exhibit 11 .

**Bruce Schooley**, a close friend who speaks with Dinesh every day, has known him for 15 years. Stating that he knows Dinesh better than anyone apart from is family, Mr. Shooley recalls an extraordinary act of thoughtfulness and sensitivity, let alone of extreme (albeit typical) generosity:

> In 2012 when he was President of the King's College in New York City an African American student with mild cerebral palsy walked into his office and said he was withdrawing from King's due to financial hardship. At the end of that meeting Dinesh personally wrote a check for $10,000 to allow that student to continue his education. I mention this to show that Dinesh is fundamentally a kind and generous person. This is a trait that I have seen again and again and it defines him. Incidentally, this was at the same time he was making the last two $10,000 donations to Wendy Long. All of these contributions came out of the same impulse, the desire to help someone in need.

Exhibit 17.

Finally, **Tyler Vawser** (one of the conduit contributors in this case), notes that

> [i]n the years that I worked with Dinesh as his Executive Assistant, my appreciation and respect for Dinesh increased each day. He served not only as a kind boss who constantly looked for ways to further my own career and experiences, but also as my friend and mentor. Even in the most stressful situations, Dinesh is kindhearted, level headed, and respectful of people from every walk of life.

Exhibit 21.

Indeed, noting that "[o]n more than one occasion, I watched Dinesh give generously to support a student or even a complete stranger[,] Mr. Vawser, as did Bruce Schooley, likewise recalls that instance, in particular, when Dinesh financially supported the student who had incurred great debt in furtherance of his education:

> One example in particular serves as a window into the Dinesh D'Souza that I know and admire. While Dinesh was President at King's, an African American

student about to begin his senior year politely contacted the President's Office about a difficult financial situation. With more than $10,000 in unpaid bills, the student was unable to register for his final year of classes. Dinesh met with the student several times to assess the student's need and to find a solution to the student's predicament. Unable to find another solution, Dinesh used his own money to pay the student's outstanding debt and the student was able to graduate as scheduled in May 2013. How many other college presidents would take such a remarkable step with no obligation to assist this student? This is one of many examples that I can recall of Dinesh's unique generosity and service to those whom he can help.

*Id.*

### C.   Dinesh D'Souza Is a Devoted Son, Father, Brother, Uncle  and Friend

The marriage of Dinesh D'Souza (whom his 80 year old mother, **Margaret D'Souza**, describes as an "exemplary...son, father, citizen of the U.S.A and an upright human being," Exhibit 5) was a decidedly troubled one. Yet his faith, as impacted upon by his love for, and his devotion to the one issue of that union, his daughter Danielle, has been extraordinary. As Danielle explains,

I can honestly say that God could not have given me a better father. His sacrificial love, exceeding dedication, and abounding kindness have impacted me more than anything in this world, aside from God's love. I considered myself a Christian throughout my childhood, but only when I was older did I fully understand who Jesus was. This was because of a phone call my father and I had this past year/my father's example [*sic*].

While I was in college, after getting off the phone with my dad, I broke down and cried uncontrollably. We talked about his coming to America, his unshakeable immigrant nature, failed marriage, and how he trusted God to send him the right partner. My parents had a broken marriage for a long time and unfortunately my father did not understand my mother's abusive nature before marrying her. For this I wept for him. But then he told me that he would marry her 20 times over just to have me, because I am the joy of his life. I was immediately overtaken by emotion. I felt so undeserving of this kind of love,

a love I did nothing to earn. Firstly, I am a sinner. Additionally, I do nothing for him. Yet he only suffers and gives to me. And would die for me. In a way like Jesus did.

Exhibit 5.

> **Michael Hirshman** is a family friend who served as an intern to Dinesh while a teenager. Similarly, he recalls the following with respect to Dinesh's love and caring for his daughter, who was always his priority:

> In his home office in San Diego, Dinesh would keep Danielle's desk just steps away from his own. During the summer, when Danielle was home from grade school, she would spend much of the day in his office. I would marvel at the fact that even while Dinesh was working in the midst of a busy day, Danielle wouldn't hesitate to interrupt him for anything she needed. It might be taking the dog outside. It might be taking her to visit a friend down the street. It might be explaining to her a book she was reading. No matter how busy he was, Dinesh would do his utmost to oblige his daughter. His care as a father impressed me, even though I was then a summer intern just a few years older than Danielle.

> Dinesh has been tireless about his daughter's education and development. I remember how Dinesh would devote himself to tutoring Danielle in math. I attended Danielle's former school, and we would often talk about her education. He would talk with as much interest about her schooling as he did anything else. Danielle's success in earning admission to Dartmouth last year is just a small reflection of the care she received from her father over these many years.

Exhibit 10.

> Dinesh's devotion to his siblings is likewise most worthy of note. **Dr. Sandira D'Souza**, his sister-in-law who has been married to Dinesh's brother for 21 years, and who had long known Dinesh beforehand, writes that her husband, **Captain Shashi D'Souza**,

> always spoke of Dinesh as a loving, caring brother and an exceptional person, who was in the United States and one he missed dearly. In the eighties we

were not blessed with the great technology we have today and so they did not get an opportunity to speak or even see each other regularly as is today, so they depended on his visits to Mumbai. In spite of the distance and the difficulties, the bond of the siblings and the families is so very strong and unshakeable.

Dinesh is a very gifted person but his accomplishments have emerged out of a lot of hard work and many sacrifices. To me his most endearing qualities are his humbleness, generosity and extreme love for his family and friends.

Exhibit 6.

In turn, Dinesh's brother, **Shashi,** explains to the Court:

We have been a very close knit family and Dinesh has been a source of pride for all of us. Dinesh has been the ideal image of the American dream where if one is willing to work hard, one can succeed.

During our growing up years Dinesh was always the mature one who helped my sister and me in our studies and guiding us with all our problems.

During my dad's illness when he had to undergo dialysis it was Dinesh who reassured them that all financial commitments would be borne by him. He has been the rock of our family.

Dinesh has a daughter who is currently in college and depends on her dad. He is the best dad, brother and son that we could ever have.

Exhibit 7.

Notably, Dineh's divorce did not at all impact negatively on his characteristic generosity. Sonia Pourmand adds:

During the years of getting to know the family I realized that he has been a big supporter of his ex-wife's family and in a way their rock in life. He was kind to them, spent a lot of family time whenever he could regardless how busy he was writing or traveling for business, He also helped them financially whenever they needed help. He is one of the most generous human beings I have met.

Exhibit 16.

Moroever, according to Laura Ingraham,

Of course it is true that Dinesh went on to become a successful writer, lecturer and filmmaker—but his most important contribution and achievement has been raising his smart, delightful, sweet daughter Danielle.   She is just about to enter her first year at her dad's alma mater, and would be devastated not to have him actively present as she navigates her new life.

Exhibit 11.

According to Dinesh's sister, **Nandini Viegas,**

Dinesh, as my older sibling has been the epitome of kindness, generosity and more than anything been the rock of our family even though we reside in different continents.

From our childhood days Dinesh would teach me math's [*sic*] and science, both subjects being my weak points, with patience and calmness.

Dinesh's nephew, **Warren Viegas,** speaks of how he personally benefitted from his uncle's beneficence:

I have known my uncle since I was a little kid. Some of my most memorable childhood experiences can be attributed to my uncle's acts of kindness and generosity. My relationship with my uncle grew stronger ever since I followed his footsteps and came to America, at the age of 17, just like he did. Since arriving in America, my uncle has been like a father to me, welcoming me into his home and playing an instrumental role in helping me grow both spiritually and professionally.

I understand the difficulty of immigrating to a new country at a young age. I fortunately had my uncle to help me acclimate to America, but my uncle did not have that. He has always been generous and helpful in guiding me through my college years in America.

My uncle is a very ambitious man and he works harder than anyone I've met. He has a real zest for life and learning. My uncle's endless pursuit of truth has inspired me to love learning. As someone fortunate enough to benefit from his mentorship, I can say that my uncle is a man with sound moral principles who has great respect for law and order.

Unlike most men of his stature, my uncle has always made time to spend with his family. I think back to my junior year in college when I was going through the most difficult time in my life. My uncle took time off from his very busy schedule to be with me when I most needed someone, and for that I am eternally grateful. It's in my uncle's nature to put those he loves first.

Exhibit 24.

Christopher E. Baldwin shares his additional insight:

I came to know Dinesh when, as an eighteen-year-old, I was involved in a difficult, traumatic controversy of national profile during my freshman year at Dartmouth College. Despite Dinesh's status in Washington, D.C. as a rising political and polemical star, he took interest in my predicament and helped me. The reputational risk he took in doing so was rooted in his good heart and strength of character. Over the years, as people come and go through my life, , can say that Dinesh has been a constant friend, albeit from afar (as we have pursued different paths: his a public life, mine one of strictly private pursuits, while both of us lived on different coasts of the country). This notwithstanding, the ensuing decades have been punctuated by bouts of renewed camaraderie. When he moved to New York City a few years ago, I had the good fortune to more actively reconnect with Dinesh and to come to know his then-teenage daughter, Danielle, who is now a rising sophomore at Dartmouth College. Dinesh has had some personal setbacks, as we all have, but his are of a more public nature due to his life's pursuits. What is perhaps not appreciated, except by those who know him, is that Dinesh has tirelessly dedicated himself to being a superb and loving father to this young lady. This is but one example in a long catalog of Dinesh pursuing lithe good" in private, while few are looking and far from public accolades.

Exhibit 27.

Finally, **Madison Sparber**, Danielle D'Souza's closest friend, views Dinesh as a father, noting that he treats her as he does his own daughter:

As a child, I often traveled with the D'Souza family abroad to places such as New York, the Bahamas, Italy, France, and Spain on cruises where Dinesh would speak about politics and religion. From a very young age, Dinesh fostered an intellectual curiosity in me by posing questions about current

issues to me. This led to my growing interest in foreign policy and different cultures. For example, when we were in Florence, Italy, in the summer of 2009, Dinesh brought me to late Italian writer Dante's house. Dinesh dedicated the day to teaching us about the significance of Dante and his work. On our trips he was always engaged with his family no matter how busy he was with his work.

He deeply cares about me like a dedicated father and demonstrates his love for me through his dedication to my growth. I know if I am confronted with an issue, I can always go to Dinesh for help. For example, Dinesh spent an entire day with me discussing my college options. I realized then that he wanted the best future possible for me like he would for his own daughter.

Now a sophomore studying International Relations at Boston University, with his help, I have continued my love for learning and other cultures. I continue to keep in contact with Dinesh and Danielle, who are both very important people in my life.

Exhibit 19.

**D.      Dinesh D'Souza's Aberrant Criminal Conduct, for Which He
        is Extremely Remorseful, Was More Owing to a Misguided
        <u>Act of Friendship Than to the Result Of Criminal Intent</u>**

Dinesh D'Souza did not set out to violate our nation's laws as the motivation, in and of itself, for his decidedly aberrant criminal conduct. Indeed, while acknowledging his awareness that what he had done was unlawful, his intent was not to seek any personal benefit from his contemplated transgression. Rather, according to those who know him best, upon exercising what Dinesh is the first to concede was the poorest of judgment, *see* Exhibit 1, *ante*, his sole motivation -- amounting to the hallmark of his existence in so many other positive pursuits -- was simply a blind, albeit totally misguided loyalty to help out a friend.

As explained by Dinesh's daughter, Danielle,

Wendy Long was one of his first friends at Dartmouth who included him in

family gatherings and treated him with kindness. I have met Wendy frequently
as I grew up and have seen what a good friend she has been to him. When she
asked him for help while running for the Senate in 2012 he could not refuse.
I understand his giving nature and can see how my father made the mistake of
giving too much to her campaign.

Exhibit 4, at 1-2.

Nonetheless, while recognizing her dad's poor judgment, Danielle -- who

knows him best and who attests to her father's great remorse -- asks the Court to understand

the adverse circumstances under which Dinesh's acts were perpetrated:

I acknowledge that my father is not innocent. He has pleaded guilty to his
crime. However, you should know that my father regrets what he did. He has
expressed his regret to me numerous times and I know that his regret is
genuine. He made this mistake while not only making the documentary, "2016:
Obama's America," but he was also dealing with many personal issues. A few
weeks after making the mistake of violating New York's campaign finance
laws my parents filed for divorce. He was very stressed during this time as my
parents had been married for 20 years. He was also very sad because my
mother had an affair with multiple people. This all weighed on him greatly and
I can confidently say that this would impair anyone's judgment. My father has
had to endure a lot of suffering in the last few years and I humbly ask that you
give him a lenient sentence.

*Id.*

Other persons, who know him almost as well, while beseeching the Court's

mercy, further attest to Dinesh's profound sense of humiliation and remorse. Tyler Vawser

who has a "unique perspective" into Dinesh's conduct, insists that

[t]he crime to which Dinesh pled guilty is fundamentally inconsistent with the
man that I know and respect. I know that Dinesh greatly respects the American
judicial system. And I know firsthand that Dinesh had no intent to corrupt the
political system when he engaged in the conduct that led to his guilty plea. At
worst, Dinesh's conduct was a foolish attempt to help a friend during an
extremely stressful and busy time. The actions that led to his plea happened

quickly and without premeditation. I believe that Dinesh was caught up in the demands of running a college, launching and promoting a film, and the desire to help a friend in her efforts to become a senator.

Nonetheless, Mr. Vawser, who, along with others who know him, "know[s] that [Dinesh] is remorseful and deeply regrets the actions he took which led to his guilty plea[,]"s, adds that

Dinesh has expressed his remorse and admitted his mistake to those that are closest to him. The consequences of his actions have already been felt in ways that serve as significant punishment for Dinesh.

Exhibit 21.

According to Christopher Baldwin, Dinesh clearly

did wrong, in my mind a wrong rooted in friendship and one best characterized for its uncharacteristic stupidity. He knows this, which is why he admitted his wrongdoing without any hint of public excuse that so often accompanies such situations. Dinesh is a good man and a good father. He loves his country and has done much to make it a richer place. I ask, most respectfully, in light of all that is before you, to temper justice with mercy.

Exhibit 27.

Dr. Sandira S'Souza, Dinesh's sister in law, notes that she is

quite sure that his intentions were never to break the law of the land that he so very loves, but was driven by his need to help out a friend. I have seen him being generous on so many occasions and yet he himself leads a simplistic life.

Exhibit 6 Therefore, says Dr. D'Souza, her

special request to you and your good court, is to take into consideration the circumstances under which he acted, which was under no malicious intent. He is deeply repentant about his actions and along with him we beg your forgiveness

*Id.*

Dinesh's close friend, Bruce Schooley, offers his own insight:

> Since I know Dinesh so well I can tell you why he did what he did regarding this case. His generosity got the better of him and he did something very foolish. I know for certain that he had no intention of committing a felony. He was merely trying to help a very good friend and he did it in a shortsighted and wrong way. I also know that Dinesh's schedule at the time was truly insane. He was running a college, giving speeches around the country, and promoting a film and book. Pressed to help Wendy in any way he could, he chose the wrong way. He cannot believe he did this and he will never do it again.

Exhibit 17. Asking for the court's mercy, Mr. Schooley adds:

> Dinesh has a profound love for this country and a deep respect for the law. Dinesh is a good guy with a lot to contribute to society and I cannot imagine what social benefit could be achieved by locking him up. I humbly ask that you not give him jail time but give him community service and a fine.

*Id.*

Warren Viegas, Dinesh's nephew adds that "[s]ince coming to America, apart from my uncle and cousin, my college friends became like family. From what I understand, my uncle shares this experience. Wendy Long was like a sister to my uncle. And it's in his nature to help those he loves." Exhibit 24. Accordingly, he states:

> I am aware of my uncle's current predicament, and his error fills him with remorse. In spite of my uncle's error in judgment, I still have utmost respect for him. Everyone makes mistakes and my uncle is not above the law. However, I plead with you to consider his virtuous nature and exemplary prior record while sentencing him. I plead with the Court to impose the most lenient sentence permitted under the law.

*Id.*

As noted, Madison Sparber has known Dinesh since she was five years old and views him as a father figure. She states:

I am fully aware of Dinesh's crime. Although he has admitted to his wrongdoing, I still have great respect for his virtues and nature. He has never doubted my ability as an intelligent individual, and has always encouraged me to pursue God's plan for me.

I plead with the Court to consider imposing the lowest sentence permitted under the law. It should be acknowledged that while Dinesh made an unwise decision, he is a humble man who will do everything he can to redeem his actions. I have known Dinesh for most of my life, and while I am perplexed by his misconduct, I believe Dinesh has learned from this mistake. Thank you for your consideration.

Exhibit 19.

Beth Wexler, Madison's mother, concurs:

We were very sorry to hear of Dinesh's campaign violation. We heard it first from him. He was very regretful and honestly embarrassed. We admired that he took responsibility for his actions and made no excuses.

In delivering Dinesh's sentence I respectfully request that you consider the character of the man and his contributions to society and our culture, let alone the considerable positive influence he has had on our family.

Exhibit 25.

According to C. Edward McVaney,

[w]hen Dinesh first told me about his reckless mistake, he knew he was guilty. His loyalty to a friend caused him to be hasty.

Exhibit 13.

Other correspondents similarly attest to Dinesh's profound and heartfelt contrition. *See* Letter of **Jim Hanon**, Exhibit 9 ("Dinesh has pleaded guilty to his crime. It's in his character to take responsibility for his own wrongdoing. In judgment please remember grace. When he comes before you for sentencing I plead with the court to impost the most

lenient sentence the court considers appropriate."); Letter of Gerald R. Molen, Exhibit 14 ("I feel my relationship with [Dinesh] is based on honesty, integrity and trust. I know his contrition to be most sincere and his desire to move forward and continue his work on behalf of those less fortunate to be sincere and magnanimous."); Letter of Jane Tompkins, Exhibit 20 ("Dinesh's can-do, take-charge spirit, and the enthusiasm and generosity that fuel it, seem to have led him into overreaching in the case at hand. I hope that the court will find it possible to treat him gently and, taking into consideration his good character and well-motivated intentions, spare him a prison sentence."); Letter of Nandini Viegas, Dinesh's sister-in-law, Exhibit 23 ("He is as good as gold and in this case made a serious lapse of judgment letting his personal friendship with Wendy override his normally cautious behavior of always adhering to the Law."); Letter of Margaret D'Souza, Dinesh's mother, Exhibit 5 ("My son has made an error and is extremely sorry for it. I hope you consider his past exemplary behavior as a son, father, citizen of the U.S.A. and an upright human being."); and Nandini Viegas, Dinesh's sister, Exhibit 23 ("Dinesh is a role model to my three children ant to many here in India. He stands up for what he believes and he knows he made a serious error of judgment here.").

Beth Wexler also weighs in on Dinesh's remorse, noting that "[w]e were very sorry to hear of Dinesh's campaign violation. We heard it first from him. He was very regretful and honestly embarrassed. We admired that he took responsibility for his actions and made no excuses." Exhibit 25. Asking your Honor for mercy, she adds:

In delivering Dinesh's sentence I respectfully request that you

consider the character of the man and his contributions to society and our culture, let alone the considerable positive influence he has had on our family.

There is no doubt that he should answer for violating the law. However, I strongly believe that incarceration is not an appropriate sentence for his conduct. Dinesh will be more of a benefit to society if, for instance, he is required to contribute his time towards the education of underprivileged children. In a teaching capacity he can repay his debt to society in a much more positive way than would be achieved if he were incarcerated.

Exhibit 25.

According to Sonia Pourmand:

Dinesh has a heart of gold and he helps people in any way he possibly can. This character and his willingness to help a friend might have contributed to his wrong doing.

He has always been a logical individual and he handles conflicts in a rational manner. He admits when he is wrong and he learns from his mistakes. He has expressed his sincere regret and remorse for his poor judgment and recognizes what he did wrong. I believe this mistake does not define who he is as a person and I have gotten to know the true Dinesh over the years and have great respect for his values and the true gentleman that he is.

Exhibit 16.

Finally, Professor Fish's comment sums Dinesh up in a nutshell: Dinesh D'Souza is " just a good man who has, by his own admission, done a bad thing." Exhibit 8

## V.     **Guidelines Considerations (Stipulated Offense Level)**

As per the plea agreement, we agree with the Probation Office's calculation of Mr. D'Souza's sentencing guidelines in this case. Pursuant to U.S.S.G. § 2C1.8(a), the base offense level is 8. PSR ¶17. Four levels are added pursuant to §§ 2C1.8(b)(1) and 2B1.1(b)(1)(C). PSR ¶18. Thus, Mr. D'Souza's total offense level is 12. *Id.* ¶ 22. Because

Mr. D'Souza has no criminal record, he is assigned Criminal History I, *id* ¶28, bringing his Guidelines range under Zone C to between ten and sixteen months' imprisonment.

**VI.  After Considering the Guidelines, The Court Should Impose a non-Guidelines Variant Sentence of Probation Based on the Criteria Delineated in 18 U.S.C. §§3553(a) and 3661, Together with a Condition of Community Service <u>Which Dinesh D'Souza Has Already Begun to Undertake</u>**

### A.  <u>Applicable Principles</u>

In reality, weighing all those factors delineated in 18 U.S.C. §3553(a)(2), which, in this post *United States v. Booker*, 543 U.S. 220 (2005) regime, "acquire[] renewed significance," *United States v. Crosby*, 397 F.3d 103, 111 (2nd Cir. 2005), we respectfully submit that incarcerating this highly regarded defendant for any period of time would be inimical to the ends of justice. The fact is, because "the punishment should fit the offender and not merely the crime[,]" *Pepper v. United States*, *supra*, 131 S.Ct. at 1240, *quoting Williams v. New York*, 337 U.S. 241, 247 (1949) (internal quotes omitted), given the unique circumstances attending this particular defendant, we believe that the Court should grant a variance from what the guidelines otherwise prescribe.

Indeed,

> post- *Booker* opinions make clear that, although a sentencing court must "give respectful consideration to the Guidelines, *Booker* permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks and citation omitted). Accordingly, although the "Guidelines should be the starting point and the initial benchmark," district courts may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in § 3553(a), subject to appellate review for "reasonableness." *Gall*, 552 U.S., at 49-51.

*Pepper*, 131 S.Ct. at 1241.

To be sure, a sentencing court must begin the process of determining an appropriate sentence for a criminal defendant by calculating the applicable Guidelines range. However, it "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States, supra*, 552 U.S. at 49-50; *see also Peugh v. United States, supra*, 133 S. Ct. at 2080 ("Under the resulting scheme, a district court is still required to consult the Guidelines.  But the Guidelines are no longer binding, and the district court must consider all of the factors set forth in § 3553(a) to guide its discretion at sentencing." (citations omitted).

Well after *Booker,* therefore, the Supreme Court has since re-emphasized that the Guidelines are not only advisory, but they are not presumed to be reasonable:

> Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. In [*United States v.*] *Rita* [551 U.S. 338, 351 (2007)] we said as much, in fairly explicit terms: "We repeat that the presumption before us is an *appellate* court presumption. . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."  And in [*Gall*] we reiterated that district judges, in considering how the various statutory sentencing factors apply to an individual defendant, "may not presume that the Guidelines range is reasonable."
>
> . . . . The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.

*Nelson v. United States*, 555 U.S. 350, 352 (2009) (citations omitted).

Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to

accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101 (citing the sentencing

goals set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)). The statutory factors include the following:

1.  The nature and circumstances of the offense and the history and characteristics of the defendant;

2.  The need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3.  The kinds of sentences available;

4.  The advisory guideline range;

5.  Any pertinent policy statements issued by the Sentencing Commission;

6.  The need to avoid unwarranted sentence disparities; and

7.  The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7); *see also Booker*, 543 U.S. at 224.

Although a court may impose a Guideline-authorized downward departure in

an appropriate case, such downward departure is no longer required in order to justify a

below-guidelines sentence. After *Booker*, a sentencing court need not find that a particular

§ 3553(a) factor is "extraordinary" or sufficient to take a case out of the "heartland" in order

to justify a below-guidelines sentence. *See Gall*, 552 U.S. at 47, 128 S. Ct. at 595; *United

States v. Rita, supra*, 551 U.S. at 351.

Moreover, even those factors that would *not* necessarily result in the granting of a downward departure -- or that were expressly prohibited or deemed irrelevant by the Sentencing Guidelines -- must now be considered under the mandate of § 3553(a).  *See United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) ("[J]ust as we may not bar a district court from considering facts simply because they were also considered by the Commission, the district court 'may not presume' the reasonableness of the Commission's Guidelines sentencing ranges.  Rather, in every case, the district court 'must make an individualized assessment' of the appropriate sentence 'based on the facts presented' and the factors detailed in § 3553(a)." (citations omitted)); *United States v. Smith*, 445 F.3d 1, 5 (1st Cir. 2006) ("That a factor is discouraged or forbidden under the guidelines does not automatically make it irrelevant when a court is weighing the statutory factors apart from the guidelines. The guidelines–being advisory–are no longer decisive as to factors any more than as to results.").

It is for this reason that, in this case, although *for guideline purposes*, the plea agreement precludes Defendant from advocating a downward adjustment based on his acceptance of responsibility, nevertheless, *for purposes of considering a variant sentence outside the guidelines*, the fact that Defendant spared the Government a trial by pleading guilty, even at a later time than might have otherwise been the case, may well be considered by the Court. As counsel noted at the time of plea with the court's express understanding,

> I just want the record to reflect that we have agreed that the defendant will not seek a two-level adjustment of the guideline level for acceptance of responsibility, not seek it from the government or from the Court or Probation.

-34-

It is understood that the fact that the defendant has agreed to plead guilty will
be an issue that we are able to brief for the Court, to the extent that your Honor
wants to consider the fact that he did plead guilty, in determining what the
appropriate sentence should be.

Transcript of plea, at pp. 18-19.

Indeed, Defendant's guilty plea is buttressed by his heart-felt statement of

contrition, as recognized in the letters included herein by those who know him best. So too,

even if not for purposes of a downward departure in order to initially arrive at the total

offense level, the Court may well consider -- certainly for purposes of §3553(a) factors -- the

reality that Dinesh D'Souza's aberrant criminality in this case was so completely alien to his

normal character.

A non-Guidelines sentence is also warranted where a sentencing judge finds

that a particular Guideline or Guideline range fails to properly reflect §3553(a)

considerations, reflects "unsound judgment" or when "the case warrants a different sentence

regardless." *Rita*, 551 U.S. at 351, 357.  The Supreme Court clarified this point:

> Even when a particular defendant . . . presents no special mitigating
> circumstances, such as no outstanding service to country or community, no
> unusually disadvantaged childhood, no overstated criminal history score, no
> post-offense rehabilitation, a sentencing court may vary downward from the
> advisory guideline range. . . . The only fact necessary to justify such a variance
> is the sentencing court's disagreement with the guidelines . . . ."

*Spears v. United States*, 555 U.S. 261, 263-64 (2009) (per curiam) (quoting *United States v.*

*Spears*, 533 F.3d 715, 719 (8th Cir. 2008) (Colloton, J., dissenting); *see also Peugh*, 133 S.

Ct. at 2080 ("The district court 'may not presume that the Guidelines range is reasonable,'

and it 'may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views.'" (citation omitted)).

**B.**    **Discussion**

We respectfully submit that, after considering the Guidelines, this Court should impose, in its discretion, a lesser, non-guidelines sentence of probation. After weighing all those factors delineated in 18 U.S.C. § 3553(a), which, in this post *Booker* regime, "acquire[] renewed significance," *United States v. Crosby*, *supra*, 397 F.3d at 111 we respectfully submit that any period of incarceration would be inimical to the ends of justice. The fact is that, if indeed "'the punishment should fit the offender and not merely the crime,'" *Pepper v. United States*, *supra*, 131 S. Ct. at 1240, the suggested sentence of probation, along with community service in educating others, is wholly appropriate.

**1.**    **History and Characteristics of the Defendant**

Under Section 3553(a), the court must consider "the history and characteristics of the defendant" when imposing a sentence. 18 U.S.C. § 3553(a)(1) (2006). As Judge Rakoff so eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-514 (S.D.N.Y. 2006); *accord: Gall v. United States*, *supra*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); *see also* 18 U.S.C. § 3661; U.S.S.G. § 1B1.4 (sentencing court not limited with respect to the information concerning a defendant's background, character and conduct that it may consider for the purpose of imposing an appropriate sentence).

This factor permits sentencing courts to consider many aspects of the defendant's life when fashioning a fair and just sentence and Mr. D'Souza's life story strongly supports a lenient sentence in this case. First, Mr. D'Souza is a self-made man who rose from humble roots to achieve a significant degree of professional and personal accomplishment. Along the way, as the letters herein attest, his demeanor was selfless, community oriented, and devoted more to the betterment of others than for any purposes of self-aggrandizement.

Second, Mr. D'Souza has had a distinguished and heretofore unblemished career as a scholar. Third, notwithstanding his professional success, Mr. D'Souza has continually placed a priority on caring for friends, family and neighbors in the myriad ways described herein. These are qualities which speak to his fundamental decency and his personal integrity.

For comparison purposes *only*, given the restrictions carved out in the plea agreement, and even from a guidelines standpoint, several courts have granted a defendant a downward variance or departure based on the defendant's "exceptional" good works. These concerns work just as fittingly with regard to non-guidelines sentences under §3553. As an extreme example, the defendant in *Canova* served six years in the Marine Corps (mostly in active reserves) and seven years as a volunteer firefighter. *United States v. Canova*, 412 F.3d 331, 358-59 ( 2d Cir. 2005). After noting that the defendant had saved several people by administering CPR, the Second Circuit ruled that the District Court properly relied on the "exceptional degree" of the defendant's public service and good works in granting a downward departure. *Canova*, 412 F.3d at 358-59.

But even to a lesser degree, in *United States v. Serafini*, 233 F.3d 758, 773, 774 (3d Cir. 2000), the Third Circuit upheld the District Court's downward departure where many of the letters supporting Serafini, an elected official, "contain[ed] substantive descriptions of Serafini's generosity with his time as well as his money." *Serafini*, 233 F.3d at 773. Indeed, "several constituents and friends described situations in which Serafini extended himself to them in unique and meaningful ways during times of serious need." *Id.*, at 773. The Third Circuit specifically noted three letters describing Serafini's good works: (1) a letter from a friend who sought and received from Serafini a $300,000 guarantee to secure treatment for a family member's brain tumor; (2) a letter from Serafini's constituent who, having sustained serious injury in an accident that rendered him incapacitated, was hired by Serafini and who credits Serafini with "turning his life around"; and (3) a letter from

a widow who approached Serafini because she was about to lose her home and to whom Serafini gave a check for $750 with no expectation of repayment. *Id.* at 773-74. Finding that Serafini was "an exceptionally giving person," the Third Circuit upheld the District Court's downward departure for community and charitable activities. <u>Id.</u> at 774, 775.

Accordingly, whether it is categorized as a downward departure or the basis for a non-guidelines variance owing to the criteria delineated in 18 U.S.C. § 3553(a), a life of extraordinary good works towards one's fellows remains a vital factor for a sentencing court to consider. *See also United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (affirming variance to a sentence of probation from a recommended range of imprisonment of between twelve and eighteen months due largely to the defendant's "exceptional" charitable acts and good works); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming a sentence of three months' incarceration and 24 months supervised release from a recommended guideline sentence of 60 months' imprisonment based in part on the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *United States v. Ali*, 508 F.3d 136, 150, n.19 (3d Cir 2007) (upholding downward departure where the defendant, *inter alia*, "helped organize fundraising banquets for the [school where she worked], contributed her 'personal assistance from leading to scrubbing floors,' spent several hours 'counseling and comforting' a student's parent who was struggling to overcome drug-addiction, and became the 'legal guardian' to two nieces to ensure that they attended better schools." (record citation omitted)); *United States v. Cooper*, 394 F.3d 172, 177, 178 (3d Cir. 2005) (noting that

"[d]ownward departures for good works . . . are permissible when the works are exceptional," and  upholding the departure where the defendant's good works included "hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of others"); *United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998) (upholding defendant's downward departure for charitable activities, which included bringing two troubled young women into her home and paying for them to attend a private high school, as well as helping to care for an elderly friend").

Tellingly, many of the courts that have addressed a defendant's good works have recognized that the defendant's contribution of his time is even more valuable that his monetary contributions. *See e.g. Tomko*, 562 F.3d at 572 (describing how the defendant's "charitable acts that involved not only money, but also his personal time."); *Cooper*, 394 F.3d at 177 (noting that personal sacrifices "are qualitatively different from the detached donation of money"); *Serafini*, 233 F.3d at 775 (nothing that Serafini's contributions "weren't acts of just giving money, they were acts of giving time, of giving one's self"). As reflected in the numerous letters recalled above, many of these traits are reflective of the life and efforts of Dinesh D'Souza, who has positively impacted upon so many individuals in so many ways.

Finally, as noted, Mr. D'Souza, who pleaded guilty and accepted the responsibility for his actions, is sincerely remorseful for his conduct. Initially, upon learning of the charges against him, Mr. D'Souza surrendered to law enforcement. Throughout the

case, neither D'Souza nor his attorneys have ever disputed D'Souza's factual guilt, merely challenging the charges based on complex legal principles, later rejected by this Court.

Specifically, subsequent to his indictment, Mr. D'Souza, through his counsel, submitted motions which argued that, for reasons separate and apart of factual innocence, the case against him should not proceed. Counsel's own affidavit conceded the vast majority of the Government's case and at no time did Defendant or his counsel deny the factual allegations.

Within 48 hours after this Court's decision on the voluminous and complicated series of motions was rendered, Mr. D'Souza pleaded guilty before your Honor, thereupon fully allocuting to, and accepting complete responsibility for, his wrongful conduct. His contrition has been oft expressed. To be sure, although counsel is well aware that, under the plea agreement, "defendant agrees that he will not seek a two-level reduction in the stipulated Guideline's offense level for acceptance of responsibility," nonetheless, for purposes of a variant, non-guidelines sentence, we urge the Court to consider the fact that Mr. D'Souza accepted responsibility for his conduct soon after all legal challenges were rejected. This, coupled with the heartfelt contrition that he has repeatedly stated to the Court, to counsel and to all those who know him best, should certainly enable your Honor to believe in his inherent goodness as a selfless human being.

2.      **Nature and Circumstances of the Offense**

As noted, 18 U.S.C. §3553(a)(1) requires the Court to consider the "nature and circumstances of the offense" in determining an appropriate sentence. While we do not in

any way question the seriousness of the conduct at issue, we respectfully submit that the particular circumstances surrounding Mr. D'Souza's offense clearly call for leniency.

In 2012, Mr. D'Souza wrote and directed a political documentary that thrust him into the public spotlight. The film, and its financial demands, brought him back to his network at Dartmouth and his longtime friend and former classmate Wendy Long. Ms. Long proved to be an invaluable asset and introduced Dinesh to an individual who would later become the principal financial underwriter of his film. Upon completion of the film, the loan and interest was fully repaid by Dinesh, but Ms. Long's kindness could not be quickly forgotten. Unfortunately, however, Dinesh's desire to repay that kindness severely clouded his judgment and left him desperately seeking a way to repay her, an objective that eventually culminated in this criminal prosecution.

It is with that backdrop that Dinesh D'Souza eagerly contributed to Ms. Long's political campaign for United States Senator from of New York. Thus, in February 2012, he and his then wife contributed $10,000 to Long's campaign, the maximum allowable contribution. In the months that followed, while Mr. D'Souza's documentary film flourished, Long's campaign to unseat Senator Kirsten Gillibrand floundered. And so, in the summer of 2012, *well appreciating that it would not make any political difference*, Dinesh convinced two individuals and their spouses to donate the same $10,000 contribution to Ms. Long's campaign, with the understanding that he would fully reimburse them. The first arranged

donation was procured from Mrs. Denise Joseph and her then husband, Louis Joseph[11]. The second arranged donation was procured from Dinesh's  then personal assistant, Tyler Vawser, and his wife. Notably,  neither couple was coerced into making their donations. Rather, the contributions were unquestionably made at D'Souza's personal request with the understanding that the donors would be reimbursed by him.

Perhaps most important is the fact that Wendy Long's campaign was not involved in organizing these contributions. Nor were any participants therein aware that Mr. D'Souza was behind the contributions and had agreed to reimburse the contributors. Consequently, there was no corruption on the part of the campaign whatsoever. In fact, the campaign ultimately returned $5,000 dollars to Louis Joseph who claimed his wife Denise had donated his funds without his approval.

In the end, the contributions, the unsophisticated manner of procuring them, and the insignificant effect they had on a failing campaign confirm that Dinesh D'Souza was simply trying to symbolically extend characteristic -- albeit, decidedly misguided -- kindness to a friend, Ms. Long, and not in any way trying to corrupt a candidate or a political campaign. In short, Wendy Long's campaign was the unknowing recipient of a unilateral act of unequivocally proscribed benevolence, with the result that there was no corrupt intent. Again, Dinesh D'Souza well knew that it was wrong to do what he did; but he was not motivated by any effort to buy influence or obtain a benefit.

_____

[11]      At the time, Mr. D'Souza, who was separated from his wife, had been engaging in a romantic relationship with Mrs. Joseph. Denise Joseph has since divorced Louis Joseph.

### 3.    **Need to Protect the Public**

We respectfully submit that, given his good character, prior unblemished history and compliance with the terms of his pretrial release, Mr. D'Souza poses no risk of recidivism. 18 U.S.C. §3553(a)(2) further states that a sentencing court should also consider whether the sentence imposed is enough "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). This concern is also met with a sentence of probation. Notably, the only criminal conduct which Dinesh has committed during his 53 years of life was his unfortunate involvement in this episode with Wendy Long's campaign. He is not in the position to commit such or similar misconduct again, a) because there is no longer any campaign; and b) because, as his sincere statement of contrition demonstrates, he well recognizes the criminal and wrongful conduct in which he engaged.

Thus, given that Dinesh cannot and will not re-commit his crime, and there is no reason to believe that he will commit any other crimes, a sentence of probation is sufficient to protect society from any potential recidivism. After all, there are "two purposes of the probation system: the effective rehabilitation of criminals and protecting the public from harm created by recidivism." *United States v. Trujillo*, 404 F.3d 1238, 1242 (10th Cir. 2005) (citing *United States v. Knights*, 534 U.S. 112, 119 591 (2001)).

To be sure, as the Supreme court has recognized, although "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms[,]" *Gall v. United States, supra*, 552 U.S. at 48, that is not to say that a term of probation amounts to a free ride. Rather,

[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights*, [*supra*, 534 U.S. at 119] ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " [quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)])...[footnote omitted]. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer. App. 109.

552 U.S. at 48-49.

As explained, Dinesh D'Souza, who did not personally profit from his actions, is revered for his honesty and integrity and is unquestionably extremely remorseful for his misconduct. Morover, the conduct involved in this case, on balance, appears to represent an aberration within an otherwise law-abiding history. Thus, while apparently not satisfying the threshold for a downward departure -- even were Mr. D'Souza permitted one pursuant to his plea agreement and USSG § §5K2.20, *see United States v. Castellanos*, 355 F.3d 56 (2d Cir. 2003) -- the conduct in this case was certainly not indicative of, and was unquestionably contrary to, the exemplary life which Dinesh D'Souza has otherwise led for his 53 years.

Indeed, unlike someone of that age, the Sentencing Guidelines acknowledge that younger defendants (defined as those in their early 20s or younger) who have previously received leniency may pose a greater risk of recidivism than older defendants. *See* U.S. Sentencing Guidelines Manual § 4A1.3 cmt. background (2010). Compare that provision to

*United States v. Lucania*, 379 F. Supp.2d 288, 298 (E.D.N.Y. 2005) (Sifton, J.) (stating that "Section 3553[a][2][C] also requires the Court to specifically consider the need for specific deterrence, that is to deter these particular defendants from committing similar offenses in the future. Post-*Booker* courts have noted that recidivism is markedly lower for older defendants. *E.g.*, *United States v. Eberhard*, 03 CR. 562, 2005 WL 1384038 [S.D.N.Y. June 9, 2005]; *United States v. Coleman*, 370 F.Supp.2d 661, 681 [S.D.Ohio 2005]; *Simon v. United States*, 361 F.Supp.2d 35, 48 [E.D.N.Y.2005]; *United States v. Hernandez*, 03 CR. 1257, 2005 WL 1242344, at *5 [S.D.N.Y. May 24, 2005]; *United States v. Carmona-Rodriguez*, 04 CR 667, 2005 WL 840464, at *5 [S.D.N.Y. Apr.11, 2005]; *United States v. Nellum*, 2:04-CR-30, 2005 WL 300073, at *3 [N.D.Ind. Feb.3, 2005])," *affirmed in part, vacated in part and remanded, sub nom.*, *United States v. Cavera*, 505 F.3d 216 (2d Cir. 2007), *opinion vacated on rehearing en Banc and affirmed*, 550 F.3d 180 (2d Cir 2008); *see also United States v. Ward*, 814 F. Supp 23 , 24 (E.D.Va. 1993) ("the length of time a person refrains from the commission of crimes, which is invariably tied to a person's age, is a factor that is critical to a court's determination of the sentence it should impose.").

Similarly, the nature of these offenses and the character of the offender certainly suggest that any chance of recidivism for this 53 year old, owing to the aberrant nature of the his conduct, is non-existent. *See United States v. Carmona-Rodriguez*, 2005 WL 840464 (S.D.N.Y. April 11, 2005) (Sweet, J.) (applying non-guideline sentence to post-*Booker* sentencing, district court noted that "[t]wo recent courts have declined to impose Guidelines sentences on defendants who, like Carmona-Rodriguez, were over the age of forty

on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants. *See Simon v. United States*, 361 F.Supp.2d 35 [E.D.N.Y. 2005] [Sifton, J.] [imposing a term of incarceration of 240 months on a 43-year-old defendant where the Guidelines recommended a minimum of 324 months]; *United States v. Nellum*, 2005 WL 300073, at *3 [N.D. Ind. Feb.3, 2005] [imposing a term of incarceration of 108 months on a 57- year-old defendant where the Guidelines recommended a minimum of 168 months]"). 2005 WL 840464, at *4.

This is not an insignificant consideration. For, as *Pepper* recalled, "the likelihood that [a convicted defendant] will engage in future criminal conduct...[is] a central factor that district courts must assess when imposing sentence. *See also* §§ 3553(a)(2)(B)-(C); *Gall*, 552 U.S. at 59...[.]" 131 S.Ct. At 1242. Thus, because Congress has mandated that a sentencing court "shall impose a sentence sufficient, but *not* greater than necessary," to comply with the sentencing purposes of punishment, deterrence, protecting the public from further crimes, and providing the defendant with needed educational, medical, or other correctional treatment in the most effective manner, 18 U.S.C. § 3553(a), we respectfully submit that a balancing of the equities in this case certainly favors the imposition of a sentence no greater than probation. *See also Pepper, supra* (noting that "[t]he Sentencing Commission, moreover, expressly incorporated §3661 in the Guidelines: 'In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, *without limitation,* any information concerning the background, character and conduct of the defendant, unless otherwise

prohibited by law. *See* 18 U.S.C. §3661.' USSG § 1B1.4 (2010)) (emphasis added by the Supreme Court)." 131 S.Ct. at 1240.

In sum, weighing the circumstances surrounding Dinesh D'Souza's offense against 1) a lifetime of devoting his time, talents and energy toward the betterment of others; 2) his impeccable personal background; and 3) the fact that he still has much to contribute to society, we respectfully submit that the public is wholly protected and, hence, leniency at sentencing is surely warranted. We ask, therefore, that he be afforded the opportunity to continue contributing toward the betterment of his fellow citizens by the imposition of a sentence of probation, and perhaps a condition of community service as a condition thereof, as discussed more fully below.

Respectfully, in the final analysis, as reflected in the highly laudatory letters accompanying this memorandum, the sort of man which Dinesh D'Souza has always been, and continues to be, extricated from the otherwise inexplicable conduct which underlies the offense of which he has been convicted, should be the Court's ultimate focus of attention. For, as *Pepper* reminds us,

> [i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

131 S. Ct. at 1239-40 (quoting *Koon v. United States*, *supra*, 518 U.S. at 113 (internal quotes omitted)).

### 4.   Need for Deterrence

Another factor is the need to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B) (2006). A prison sentence is clearly not needed here to achieve deterrence in light of the substantial penalties and punishments Mr. D'Souza already faces. Mr. D'Souza now stands as a convicted felon. In addition, Mr. D'Souza also potentially faces an array of parallel proceedings which carry substantial financial, administrative and civil penalties. Finally, Mr. D'Souza may, due to his criminal record, may well suffer adverse consequences in his attempts to both travel and raise funding for his scholarly projects.

Given the nature of the offense, Mr. D'Souza, a very public person, has clearly already paid a high price for his transgression. We submit that the imposition of a prison term would not serve any additional deterrent effect on those who might contemplate committing a similar crime. The typical offender in this type of regulatory violation would certainly be amply deterred by fear of the financial and reputational punishments already meted out on Mr. D'Souza. Accordingly, for all of these reasons, a prison term would not serve any legitimate goal of deterrence.

### 5.   Need to Avoid Sentencing Disparities

Under 18 U.S.C. § 3553(a)(6), courts must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." We respectfully submit that a sentence of probation for Mr. D'Souza would ensure that he is treated fairly by comparison to similarly situated defendants.

First, as far as we can ascertain, in numerous recent cases wherein the defendants were involved in conduit campaign contribution schemes broadly similar to this one (or, indeed, involving more serious conduct), they have received no more than probationary sentences. *See, e.g.*, *United States v. Acevedo-Vila*, 08-cr-00036 (D.P.R. 2008) (Avanzato sentenced to probation and a fine in connection with scheme to reimburse approximately $100,000 of conduit contributions aimed at gaining influence over a gubernatorial candidate); *United States v. Collier*, 1:07-cr-00182 (D.D.C. 2007) (sentencing lobbyist to probation in connection with a scheme to funnel $65,000 in conduit contributions funded by a Native American tribe client seeking to advance its gaming interests); *United States v. Cuza*, 2:05-cr-00344 (C.D. Cal. 2005) (sentencing defendant, a corporate executive in charge of government affairs, to probation in connection with the reimbursement of $102,214 of donations using corporate funds); *United States v. Schwartz*, 1:05-cr-00157 (D.D.C. 2005) (sentencing defendant, a lobbyist and consultant, to probation and fine in connection with Cuza scheme described above); *United States v. Boucher*, 1:06-cr-00062 (D.D.C. 2007) (sentencing defendant, director of government relations for a health care company, to probation and a fine for his role in illegally contributing $50,000 of corporate funds to federal campaigns); *United States v. Feldman*, 09-cr-75 (E.D. Pa. 2009) and 08-cr-36 (D.P.R. 2008) (fining defendant, a prominent Philadelphia political consultant and fundraiser, $6,000 for his role in a scheme to reimburse approximately $100,000 of contributions to the governor of Puerto Rico); *United States v. LeBlanc*, 06-cr-091 (D.D.C. 2007) (probation for defendant, a former chief executive of a private health care company,

who pled guilty to a misdemeanor for illegally contributing approximately $50,000 of corporate funds to federal campaigns); *United States v. Spears*, 1:03-cr-00096 (D.D.C. 2003) (probationary sentence for personal assistant of a former state senator, who pled guilty to obstruction and conspiracy in illegal donations to a congressional campaign); *United States v. Stipe*, 1:03-cr-00128 (D.D.C. 2003) (sentencing defendant who committed perjury and obstruction in connection with investigation of scheme involving approximately $250,000 in conduit contributions to five years' probation).

These cases demonstrate that even those defendants convicted of making conduit contributions as a means of advancing private lobbying interests, funneling prohibited sources of funds, or even involving perjury and obstruction, have routinely received probationary sentences. The conduct of which Mr. D'Souza's has now been convicted, in contrast, did not involve any of these aggravating factors.

Second, putting aside the issue of how similarly situated defendants have been treated, it is also worth noting that Mr. D'Souza was the only individual to be criminally (or, to date, even civilly) charged for his role in this case. And Mr. D'Souza was required to plead to a felony.

Thus, under all of the circumstances, we respectfully submit it would be grossly unfair to sentence Mr. D'Souza to anything more severe than probation. Accordingly, in the interest of fairness, and to avoid unwarranted sentence disparities among similarly situated defendants, the Court should impose the requested sentence, together with the suggested condition of community service.

6.   **The need to provide restitution to any victims of the offense**

This factor is obviously inapplicable. There are no victims in this case. *See* PSR at ¶11.

7.   **Suggested Community Service**

Dinesh D'Souza, to all who know him, sincerely respects this country, its institutions and its judicial processes. Indeed, as seen above, by all accounts of those who know him best, he is a man who, in the great tradition of this mighty democracy, unequivocally respects the opinions of others with whom he may find himself in disagreement. In this regard, even more than his love to educate, Dinesh relishes the banter and give and take over those American values that different individuals, from distinct walks of life, hold near and dear.

Toward this end, it is respectfully submitted that Dinesh would be of far greater value to his fellow citizens (and perhaps even non-citizens) as an instructor, tutor and mentor, rather than as an inmate in a federal correctional institution. It is accordingly requested that, as a condition to a term of probation, the Court direct that Dinesh D'Souza engage in a sufficient amount of community service by which he can help educate others, perhaps less fortunate, and thereby enable them to benefit from those lessons learned as a result of his own mistakes in general, and this criminal prosecution in particular. One suggested organization for volunteer work in this regard is the Boys and Girls Club of Greater San Diego, which he has already contacted and where "[h]e would be welcome to do so." Exhibit 26.

Perhaps Tyler Vawser, in his letter to your Honor, says it best:

> I ask you to please consider a probationary sentence, instead of a prison sentence, for Dinesh that will allow this kind-hearted and intelligent man to continue his service to others. Specifically, a probationary sentence that requires him to engage in community service and the education of others will, in my view, best serve the interests of society while deterring others from engaging in similar conduct.
>
> It is indisputable that Dinesh has a unique platform that can serve the millions of Americans who respect his opinion and perspective, as well as countless others who respect his intellect but do not share his political views. The film that he created has been seen by millions and offers a unique perspective in the political debate. The film (and its sequel) show that Dinesh is interested in contributing to America and the preservation of the ideals that make her great.
>
> Please allow him to use his greatest assets - public speaking and writing - to educate others in America about the importance of transparency and honesty in the election process. I firmly believe, as do hundreds of others who know Dinesh, that such a punishment is the best way for him to continue to serve society while atoning for his crime.

Exhibit 21

*          *          *

All things considered, it is beyond dispute that Dinesh D'Souza is a man of many qualities. He has achieved a remarkable degree of personal and professional success through perseverance and a sterling reputation -- not even disturbed even by this conviction -- for candor, honesty and integrity. From an early age he learned the value of hard work and self-reliance. He is a devoted father who has always gone the extra mile for friends and family, as well as members of extended communities in which he has sojourned, professionally or otherwise.

Viewed in the context of this remarkable life story, we submit that this offense reflects an isolated instance of singularly poor judgment that has virtually no chance of being replicated. Certainly, Mr. D'Souza egregiously erred in agreeing to facilitate the reimbursements of the contributions at issue. Just as certainly, however, he fully understands and appreciates that his conduct was wrong and illegal.

Nonetheless, we respectfully submit that the Court should bear in mind that, unlike many others convicted of similar crimes, Dinesh D'Souza did not commit this offense in furtherance of some inappropriate political agenda. Nor did he seek to throw his weight around or act with intent to curry favor with a politician. Rather, though decidedly misguided, all he sought to do, given the selfless person he has always been, was to demonstrate kindness to an old friend whose campaign, all knew, was destined to failure. *That misguided devotion was the only motivation for this crime.*

As things now stand, however, Mr. D'Souza has paid, and will continue to pay, a heavy price for his lapse of judgment. For, indeed, a felony conviction is an albatross with which one becomes burdened for life on so many levels.

**Conclusion**

**For All the Foregoing Reasons, Dinesh D'souza Should Be Sentenced to Probation, with the Suggested Condition of Community Service**

Dated:  New York, New York
    September 3, 2014

       Respectfully submitted,

          **BRAFMAN & ASSOCIATES, P.C.**
          *Attorneys for Defendant*
          *Dinesh D'Souza*
          767 Third Avenue, 26th Floor
          New York, New York 10017
          (212) 750-7800

By:       _____
          Benjamin Brafman (BB2285)

          _____
          Mark M. Baker (MB5365)

          _____
       Alex Spiro (AS6078)