```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA
                                 :     14 Cr. 034 (RMB)
           - v. -
                                 :
DINESH D'SOUZA,
                                 :
              Defendant.
                                 :
- - - - - - - - - - - - - - - - x
```

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

                               PREET BHARARA
                               United States Attorney for the
                               Southern District of New York,
                               Attorney for the United States
                                  of America

CARRIE H. COHEN
PAUL M. KRIEGER
Assistant United States Attorneys
     - Of Counsel -



U.S. Department of Justice

United States Attorney
Southern District of New York

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 10, 2014

**By ECF and Hand Delivery**

The Honorable Richard M. Berman
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

    Re:  **United States v. Dinesh D'Souza,**
          **14 Cr. 034 (RMB)**

Dear Judge Berman:

    The defendant Dinesh D'Souza ("D'Souza" or "the defendant") is scheduled to be sentenced in the above-referenced case on September 23, 2014 at 11:00 a.m. The Government respectfully submits this letter in advance of that sentencing and in response to the defendant's submission dated September 3, 2014 ("Def. Mem.").

    The United States Probation Office (the "Probation Office") in its draft Presentence Investigation Report, dated August 15, 2014 ("PSR" or "Presentence Report"),[1] calculates the sentencing range under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") correctly as 10 to 16 months' imprisonment. The defendant seeks a non-custodial sentence of probation with community service as a special condition. For the reasons set forth below, the Government believes that a sentence within the Guidelines range of 10 to 16 months' imprisonment is sufficient but not greater than necessary to serve the legitimate purposes of sentencing, especially in light of seriousness of the offense, the defendant's post-plea failure to accept responsibility for his criminal conduct, the need for general deterrence, and the need to avoid unwarranted sentencing disparities.

---

[1] As the final Presentence Report has not been completed, citations to it herein are to the draft report provided to the parties and include additional facts that the Government requested be included in the final Presentence Report.

## BACKGROUND

### A.  The Offense Conduct

Indictment 14 Cr. 034 (RMB) (the "Indictment") was filed on January 23, 2014 in two counts. Count One charges that in August 2012 the defendant violated federal campaign finance laws by contributing $20,000 to the Senate campaign of Wendy Long for New York (the "Long Campaign") in the names of other individuals, in violation of the Federal Election Campaign Act ("FECA"), Title 2, United States Code, Sections 441f and 437g(d)(1)(D). Count Two of the Indictment charges the defendant with causing the Long Campaign to file materially false reports with the Federal Election Commission ("FEC") about the source of the campaign contributions charged in Count One, in violation of Title 18, United States Code, Sections 1001(a)(2) and 2. (PSR ¶¶ 1-3).

The FECA limits financial influence in the election of candidates for federal office, including the Office of United States Senator, and provides for the public disclosure of the financing of federal election campaigns and specifically prohibits any person from making any contribution in the name of another, including reimbursing a third person, before or after that third person's contribution, as inducement to make that contribution. In 2012, the FECA limited both primary and general election campaign contributions to $2,500 for a total of $5,000 from any individual to any one candidate. (PSR ¶ 6).

In or about March 2012, D'Souza contributed $10,000 to the Long Campaign on behalf of himself and his wife. This $10,000 contribution was the maximum contribution that D'Souza and his wife were permitted to make to the Long Campaign for both the primary and general election. (PSR ¶ 9).

In or about August 2012, the defendant directed two individuals -- Tyler Vawser ("Vawser"), who worked for the defendant, and Denise Joseph ("Joseph"), with whom the defendant was living and romantically involved -- to make contributions to the Long Campaign on behalf of themselves and their respective spouses (collectively the "Vawsers" and the "Josephs") with the understanding and promise that the defendant would pay them back for their contributions, which he did. D'Souza paid back the $10,000 to Vawser and the $10,000 to Joseph in cash. Vawser -- who was the defendant's executive assistant at a college in New York City and who also assisted with scheduling D'Souza public speaking engagements -- was typically paid by check for his work

2

for D'Souza. Neither the Josephs nor the Vawsers would have made the $10,000 campaign contributions to the Long Campaign but for D'Souza's assurance that D'Souza would reimburse them for these contributions. (PSR ¶ 9).

The defendant both instructed Vawser to lie about his contribution and lied to Wendy Long about the Vawsers' and the Josephs' contributions. Specifically, when the defendant asked Vawser to make the donation to the Long Campaign with the promise that the defendant would reimburse Vawser for the donation, Vawser asked the defendant if what the defendant was asking Vawser to do was permissible. The defendant responded, in sum and substance, that if anyone asked Vawser about his contribution, Vawser should tell them that Vawser knows Wendy Long and supports her candidacy. (PSR ¶ 9).

The defendant lied to Ms. Long as well. When Ms. Long questioned the defendant about the Josephs' contribution to her campaign as well as the Vawsers' contribution, in part because the Vawsers and the Josephs were not typical of other donors to her campaign and were connected to the defendant, the defendant responded, in sum and substance, not to worry and that they both had sufficient funds with which to make the contributions. Eventually, in or about the first half of 2013, after Ms. Long continued to press the defendant about the Josephs' and the Vawsers' contributions, D'Souza acknowledged to Ms. Long that he had paid for their contributions but that Ms. Long should not worry because she hadn't known about it. (PSR ¶ 10).

B. The Guilty Plea

On May 20, 2014, the day trial was to begin with jury selection, the defendant pled guilty to Count One of the Indictment pursuant to a plea agreement with the Government. Pursuant to the plea agreement, the defendant agreed that he was not entitled to a Guidelines reduction for acceptance of responsibility. (PSR ¶ 4).

C. The Probation Office's Guidelines Calculation

The Probation Office calculated a total Guidelines offense level of 12, the same as the defendant had agreed to in the plea agreement with the Government. (PSR ¶ 4, 25). This calculation was based on (1) a base offense level of eight pursuant to U.S.S.G. § 2C1.8; (2) a four-level increase based on the value of the illegal transactions (more than $10,000 but less than $30,000) pursuant to U.S.S.G. §§ 2C1.8(b)(1) and 2B1.1(b)(1)(C);

3

and (3) no adjustment for acceptance of responsibility. (PSR ¶ 16-25). The Probation Office calculated that the defendant's Criminal History Category was I, yielding a Guidelines range of 10 to 16 months' imprisonment. (PSR ¶ 28).

For the reasons set forth below, the Government believes that a sentence within the Guidelines range is necessary in order to serve the legitimate purposes of sentencing.

## DISCUSSION

Despite a Guidelines range of 10 to 16 months' imprisonment, the defendant seeks a non-custodial sentence of probation with a special condition of community service. (Def. Mem. at 3). The defendant bases his request primarily on (1) the nature and circumstances of the offense, specifically that his criminal conduct was motivated by the desire to help a friend rather than corrupt intent, (Def. Mem. at 24-30); and (2) his personal history and characteristics, namely, his "lifetime of devoting his time, talents and energy toward the betterment of others" and "impeccable personal background." (Def. Mem. at 48 and 11-23). Neither of these arguments, the defendant's purported acceptance of responsibility, nor any of the other 3553(a) factors, however, supports a non-Guidelines sentence, and sentences in comparable cases support a custodial sentence.

A.  The Seriousness Of The Offense

The defendant's crime is serious and strikes at the heart of our federal election system. Federal election laws, and specifically the law prohibiting straw donations, exist to provide transparency to the electoral process and to protect against corruption or the appearance of corruption. See McCutcheon v. Federal Election Comm'n, 134 S. Ct. 1434, 1442 (2014); United States v. O'Donnell, 608 F.3d 546, 553-54 (9th Cir. 2010). Accordingly, while the defendant may have acted without a desire to corrupt the candidate and with the motive to help a friend, (Def. Mem. at 42-43), his motivation for committing the crime does not bear on the seriousness of his offense.

As the Honorable Larry R. Hicks, United States District Judge, District of Nevada, explained in sentencing a defendant in a conduit contribution fraud case, election law offenses "go to the very heart of our electoral process and they go to the strength of our democracy and they go to the prevention of the appearance of corruption within our political process, the

4

seriousness of th[is] crime is of the utmost magnitude." (Transcript of Sentencing in <u>United States</u> v. <u>F. Harvey Whittemore</u>, 12 Cr. 58 (LRH) attached hereto as Exhibit A at 171-72) (imposing a term of 24 months' imprisonment and rejecting the defense request for probation because, among other reasons, such a sentence would not promote respect for the law).

The Honorable Lacey A. Collier, United States District Judge, District of Florida, also stressed the seriousness of conduit contribution fraud in sentencing another similarly situated defendant:

> [I]t is necessary to balance the good that you have done in your life with this particular offense. The offense, though, is one that goes to the very heart of our democratic system. If we cannot have faith and confidence in our election process, then we can't exist as a democracy. So it is a direct attack on the very basics of our system and is difficult.

(Transcript of Sentencing in <u>United States</u> v. <u>Jay Odom</u>, 12 Cr. 76 (LAC) attached hereto as Exhibit B at 2)(imposing a six month term of imprisonment).

B.  **The Nature And Circumstances Of The Offense**

The defendant's claim that his offense conduct is somehow mitigated because he did not "coerce[]" the straw donors also is without merit. (Def. Mem. at 43.) Indeed, the defendant had no need to coerce the straw donors because he exercised a position of trust, power, and control over them; a position that he took advantage of in carrying out this crime. Straw donor Vawser worked for the defendant as his executive assistant at the time of the offense and who, as reinforced by the letter Vawser submits on the defendant's behalf, (Def. Mem., Ex. 21), viewed the defendant as his "mentor." The other straw donor, Denise Joseph, was romantically involved with the defendant at the time of the offense and had moved from Michigan to New York to live with the defendant, who also supported her financially. The defendant took advantage of his relationship with Vawser and Joseph and his abuse of their trust aggravates, rather than mitigates, his offense conduct.

The defendant's encouragement to Vawser to lie about the contribution, combined with the defendant repeatedly misleading

5

Ms. Long about the contributions to her campaign, also undercut the defendant's contention that his conduct was "benevolent" and lacked "corrupt intent." (Def. Mem. at 43). By advising Vawser to lie to others about the nature and circumstances of the Vawsers' purported contribution to the Long Campaign, the defendant undoubtedly was intending for Vawser to deceive others about the true source of this $10,000 contribution. The defendant's false statements to Ms. Long about the Vawsers' and the Josephs' contributions similarly perpetuated the public's misunderstanding about the source of these campaign contributions and reflect the defendant's clear comprehension of the wrongfulness of this conduct. Accordingly, this is not a case where the defendant had a momentary lapse in judgment, which he corrected or attempted to correct shortly thereafter. It also is worth noting in this regard that the defendant reimbursed Vawser and Joseph with $20,000 cash and not with a check as D'Souza typically paid Vawser for Vawser's legitimate work on D'Souza's behalf. There simply is no legitimate reason for D'Souza to have reimbursed these individuals in cash, but for a desire to avoid creating a clear record, a paper trail, of his crimes. Such actions further belie D'Souza's attempts to minimize the nefarious nature of his actions.

The undisputed fact that the candidate, Wendy Long, is the defendant's close friend and submits a letter to the Court on his behalf, (Def. Mem. at 9-10, Ex. 2), also does not mitigate his offense conduct. Rather, Ms. Long's support of the defendant simply demonstrates the undisputed fact that they are close friends from college. Indeed, as mentioned above, the defendant also misled and lied to Ms. Long about the Vawsers' and the Josephs' contributions, claiming that they were actual contributions, although he later admitted to her that he had reimbursed them but told her not to worry because she had not been aware of his fraud.

Moreover, Ms. Long's characterization of the defendant's conduct as a mere "mistake," (Def. Mem., Ex. 2 at 2), supports the Government's argument below that a Guidelines sentence is necessary for general deterrence. As Judge Collier explained in imposing a term of imprisonment for straw donation fraud in the <u>Odom</u> case, it is necessary in "considering the seriousness of the offense" to disavow the "misunderstanding on behalf of apparently so very many people that [straw donations are] in fact <u>just a mistake</u> that's done all the time at no consequences as a result . . . clearly it violates the system that we all cherish and respond to." (Transcript of Sentencing in <u>Odom</u>, Ex. B at 2) (emphasis supplied).

6

### C. The Defendant's Personal History And Characteristics Do Not Mitigate His Offense Conduct

The Government does not dispute that the defendant may be a good father, friend, and colleague, as well as a successful author and film producer. (Def. Mem. at 19-24, 37-40). Such history and characteristics, however, do not support a non-Guidelines sentence. To the contrary, the defendant's educational and work history actually aggravate his illegal conduct as he is a sophisticated individual who rather than follow the law, chose, in his words, to take a "short-cut," (Def. Mem. at 5, Ex. 1), and break the law. As Judge Hicks stated in sentencing Whittemore who had education and training comparable to the defendant, "[n]o one is above the law [] [a]nd there simply must be just punishment for criminal conduct involving intentional felony offenses such as these, which many would argue that the Court should not depart from the Sentencing Guidelines." (Transcript of Sentencing in Whittemore, Ex. A at 175 and see 173).

Moreover, the defendant has not presented any evidence of "'exceptional' good works," (Def. Mem. at 38), such as extraordinary charitable work or public service, that would help mitigate his offense conduct. To the contrary, as set forth in the Probation Report, the defendant has spent his career in the private sector as a research scholar, author, and film producer and has been extremely successful both professionally and financially. (PSR ¶¶ 39-47). Accordingly, the defendant's work history and assistance to others (even as set forth in the letters submitted on his behalf) are distinguishable from the mitigation cases relied on by the defendant, (see Def. Mem. at 38), in which the defendants had performed extensive charitable work or community service (e.g., legal guardian to children so they could attend better schools; paying for private school for troubled youth; volunteering at school), or had a history of military or government service (e.g., six years in the Marine Corps and seven years a firefighter; service as an elected official).

### D. The Defendant's Failure To Accept Responsibility

The defendant argues throughout his submission and in a supplemental letter dated September 2, 2014 ("Def. Ltr."), that he merits a non-Guidelines sentence because he "unequivocally accepted responsibility" for his crime. (Def. Mem. at 2). The Court should reject this argument. The defendant pled guilty at

7

the last possible moment before trial began, not because he actually accepted responsibility for his conduct, but because he was in fact guilty and he had no defense or excuse for his criminal conduct. See Exhibit C hereto at 2 (video and transcript of the defendant's appearance on a television news show the day of his guilty plea in which the defendant states that he pled guilty because all his legal arguments had failed and so he was "going into a trial with in a sense, no defense"). The Court should not accord the defendant leniency now for accepting responsibility when, in order to avoid a conviction after trial, D'Souza acknowledged in his plea agreement that acceptance of responsibility credit is not warranted under the Guidelines.

The defendant seeks leniency from the Court because he asserts that he had "serious non-frivolous" motions that "would have resulted in a dismissal of the Indictment" had they been granted, (Def. Ltr. at 2), and he pled guilty "within 48 hours after this Court's" denial of such motions. (Def. Mem. at 41). As an initial matter, the defendant pled guilty five days after the Court denied his motions, and after the Government produced 3500 material and exhibits. Accordingly, the defendant waited until he had a full opportunity to scrutinize and evaluate the entirety of the Government's intended trial evidence against him before deciding to plead guilty. That is not the hallmark of an individual who never considered contesting the underlying facts of his actions or "most assuredly accepted responsibility for his criminal conduct." (Def. Ltr. at 2).

In addition, the Government does not agree that the defendant's pretrial motions had any merit beyond providing, among other things, the defendant with a platform to make baseless allegations that he was selectively prosecuted. Indeed, the Court completely rejected the defendant's selective prosecution motion finding that D'Souza, "has presented no evidence that he was selectively prosecuted. The burden, at this motion stage, is some evidence. I determine that there is no evidence. There is no evidence of discriminatory effect nor of discriminatory purpose." (Transcript of May 15, 2014 Court Proceeding at 30-31, a copy of which is attached hereto as Exhibit D).

Importantly, the defendant's public statements after his guilty plea also reflect his lack of acceptance of responsibility, belie his supposed "heartfelt" claims to the Court now that he has "profound contrition," (Def. Mem. at 2, 35), and undercut his claims that he has great "regard for the

8

law," and is "eager [] to make amends." (Def. Mem. at 5) . Following the defendant's guilty plea, in his public appearances and on his website, the defendant was not "ashamed" or "contrite" as he now writes to the Court. (Def. Mem. at 5). Instead, D'Souza continued to advance the selective prosecution argument soundly rejected by this Court and went so far as to suggest he lacked criminal intent, but was being unfairly blocked by a pre-trial ruling by the Court from raising an intent defense. It is difficult to understand how the defendant's supposed acceptance of responsibility can be reconciled against (baseless) claims that he acted unintentionally. (See Ex. C (video and transcript of the defendant's appearance on a television news show the day of his guilty plea); Exhibit E hereto (printout of the defendant's website about his television appearance the day of his guilty plea); and Exhibit F hereto (video and transcript of the defendant's appearance on a television show two days after his guilty plea).

For example, during the defendant's television appearance two days after his plea, D'Souza repeatedly asserted that this case was about whether he was selectively prosecuted: "The case revolved really on . . . the issue of selective prosecution . . . [was I] being selectively or excessively prosecuted for something that normally doesn't get this kind of treatment." (Ex. F at 1-2). The defendant made various other statements during that interview in which he portrayed himself as a victim of an "administration systemically us[ing] the government to prosecute its critics," lamented the "misuse of the judicial system," and claimed "we'll never know who decided to prosecute me and when." (Ex. F at 4). In this same interview, D'Souza further sought to minimize the nature of his crime and his criminal intent by, in essence, faulting the Court for his decision to plea: "Did I intend to commit a crime? Did I intend to break the law? What really changed in the case is that the Judge ruled that the selective prosecution issue could not be. . . . introduced in Court . . . [and the Court] defined intent in a quite narrow way that made it almost impossible for me to launch a defense based on that." (Ex. F). In sum, based on the defendant's own post-plea statements, the Court should reject the defendant's claims of contrition on the eve of sentencing.

E.  The Need For General Deterrence

The defense, not surprisingly, gives short shrift to the need for general deterrence. (Def. Mem. at 49). A Guidelines sentence, however, is necessary to afford adequate deterrence to similarly situated defendants, namely well-heeled individuals who

9

are tempted to use their money to help other candidates. A Guidelines sentence will help promote respect for the law and deter future abuses by other individuals who seek to improperly influence the election process. Accordingly, it simply is not true that "no good purpose would be served by," (Def. Mem. at 5), a term of imprisonment.

With respect to specific deterrence, while there may or may not be "zero chance" that the defendant will commit the instant crime again, (Def. Mem. at 5), his claim that he "already paid a price for this behavior in having the FBI investigate me, having handcuffs behind my back and being exposed to public disgrace and embarrassment," (Def. Mem. at 5), should not be credited by this Court. The defendant was investigated for committing the crime for which he pled guilty and was permitted to surrender. The defendant's claim of public embarrassment is significantly undercut by his self-generated publicity surrounding this case, including his voluntary television appearances and internet postings. (See Exs. C, E, F).

### F. The Need To Avoid Unwarranted Sentencing Disparities

While sentencing is an individualized determination, the defendant claims that similarly situated individuals have received non-custodial sentences. (Def. Mem. at 50-51). Again, noting the individualized nature of sentences, the Government provides the following list of comparable election law cases in which, contrary to the cases cited by the defendant, imprisonment was part of the imposed sentence:

- United States v. Jenny Hou & Oliver Pan, 12 Cr. 153 (RJS)(S.D.N.Y.): On May 2, 2013, Hou and Pan were found guilty by a jury of straw donor fraud in connection with donations made to a Democratic candidate for New York City Mayor. Pan, a fundraiser for the candidate, was responsible for eight donors totaling approximately $8,000 in matching funds. Hou served as the candidate's campaign manager and also was convicted for lying to federal agents and obstruction of justice. On October 10, 2013, Judge Sullivan sentenced Hou to ten months in prison and Pan to three months in prison.

- United States v. Jay Odom (M.D. Fla.) On February 12, 2013, Odom pleaded guilty to one count of causing a presidential campaign to make a false statement to the FEC. Odom solicited ten donors who were employees of his business entities and their family members to each

10

make the $2,300 maximum allowable contribution to a Presidential candidate's campaign committee and then used his personal funds to reimburse the contributions totaling $23,000. Odom was sentenced to six months in prison. (See Ex. B (Transcript of Sentencing)).

- United States v. Joseph Bigica (D.N.J.): On May 9, 2012, Bigica pleaded guilty to one count of conspiring to violate the FECA by using 19 straw donors, including family members, business associates and others, to make $98,600 in illegal contributions to the campaign committee of a federal candidate (and one count of failing to pay personal income taxes). Bigica reimbursed the straw donors using checks drawn on accounts in the name of his spouse or companies he controlled. Bigica was sentenced to 60 months in prison.

- United States v. Marybeth Feiss (S.D. Fla.): On February 17, 2012, Feiss pleaded guilty to one count of engaging in a conspiracy to violate the FECA. Feiss, an administrative assistant to an attorney, helped the attorney organize political events and assisted with the collection of campaign contributions made at those events. Feiss also made a $2,500 contribution to a Presidential candidate's campaign committee and the attorney then reimbursed her using money from his law firm. Feiss was sentenced to six months in prison.

- United States v. Pierce O'Donnell (C.D. Cal.): On February 4, 2011, O'Donnell pleaded guilty to a misdemeanor count of making illegal conduit contributions. O'Donnell solicited ten employees of his law firm and at least one relative to make individual contributions of $2,000 each to a Presidential candidate's campaign committee, which he then reimbursed. O'Donnell was sentenced to two months in prison.

- United States v. Christopher Tigani (D. Del.): On June 9, 2011, Tigani pleaded guilty to violating the FECA by soliciting employees of his company to make $219,800 in political contributions to candidates running for various federal and state offices. Tigani used company non-payroll checks to reimburse his employees for their straw donations. Tigani was sentenced to two years in prison.

- <u>United States</u> v. <u>F. Harvey Whittemore</u> (D. Nev.): In May 2013, Whittemore was found guilty by a jury on three counts, including violating the FECA by causing 29 straw donations to a federal candidate for a total of $133,400. Whittemore was sentenced to 24 months in prison. (<u>See</u> Ex. A (Transcript of Sentencing)).

- <u>United States</u> v. <u>George Tirado & Benjamin Hogan</u> (D. Conn.): On April 19, 2013, Tirado and Hogan each pleaded guilty to one count of engaging in a conspiracy to make false statements to the FBI and to impede the FEC's enforcement of federal campaign financial laws. Tirado, Hogan, and others engaged in a scheme to direct conduit contributions to a candidate for the U.S. House of Representatives. Tirado caused two illegal $2,500 conduit contributions and Hogan recruited three conduits and reimbursed those conduits in cash. Tirado was sentenced to 26 months in prison and Hogan was sentenced to 21 months in prison.

Finally, and more generally, contrary to the assertions in the defendant's sentencing memorandum, the Guidelines, are by no means arbitrary; rather, they are the product of deliberate, evolving, and thoughtful consideration of crime and appropriate punishments. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," <u>Gall</u> v. <u>United States</u>, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. <u>Id.</u> at 596. <u>See also</u> <u>United States</u> v. <u>Crosby</u>, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that <u>Booker/Fanfan</u> and Section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").

As Judge Hicks explained after weighing the 3553(a) factors in <u>Whittemore</u>:

> But the backdrop of all of that [referring to the defendant's "extreme accomplishments of this defendant in the community, what he has given, what he represents to his family"] is the criminal offense which is committed here. These offenses go to the very heart of our electoral processes. If we cannot have faith – and this was said by one of the other

12

> judges in one of the cases that was cited, words to the effect that: If we cannot have faith in our election process, then we can't have faith in the strength of our democracy. That's true. That's why these offense are viewed as so serious and why even a man of no criminal background, respected in the community, intelligent, strong peer group, strong business support, is no less responsible when he has done something that goes to the very heart of our democratic process, when there's criminal undermining of the electoral process."

(Transcript of Sentencing in Whittemore, Ex. A at 164-65).

As in Whittemore, Odom, and other cases cited herein, the Guidelines remain a fundamental starting point for determining a defendant's sentence; they should not be disregarded particularly where, as here, the nature and seriousness of the offense support a Guidelines sentence. In addition to recognizing the nature and seriousness of the offense, a Guidelines sentence here also would serve the purposes of affording adequate deterrence to similarly situated defendants and avoiding unwarranted sentencing disparities between similarly situated defendants.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the applicable Guidelines range, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
Carrie H. Cohen/Paul M. Krieger
Assistant United States Attorneys
Tel.: (212) 637-2264/1084

cc: Benjamin Brafman, Esq. (by ECF and FedEx)

13