1

<pre>
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF NEVADA
 2             BEFORE THE HONORABLE LARRY R. HICKS
                  U.S. DISTRICT COURT JUDGE
 3

 4
   UNITED STATES OF AMERICA,        :
 5                                   :
           Plaintiff,               :
 6                                   :No. 3:12-cr-58-LRH-WGC
        vs.                         :
 7                                   :
   F. HARVEY WHITTEMORE,             :
 8                                   :
           Defendant.               :
 9  _____:

10

11
                TRANSCRIPT OF IMPOSITION OF SENTENCE
12

13

14
                     September 30, 2013
15

16                     Reno, Nevada

17

18

19

20

21

22  Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
                           Certified Realtime Reporter
23                         400 South Virginia Street
                           Reno, Nevada  89501
24                         (775) 329-0132

25
</pre>

2

1  APPEARANCES:

2  For the Plaintiff:

3  **STEVEN W. MYHRE**
   Assistant United States Attorney
4  100 West Liberty Street
   Suite 600
5  Reno, Nevada 89501

6
   **ERIC G. OLSHAN**
7  Trial Attorney
   Public Integrity Section
8  United States Department of Justice
   1400 New York Avenue, NW
9  Suite 12100
   Washington, DC 20005
10

11

12 For the Defendant:

13 **DOMINIC P. GENTILE**
   Gordon Silver
14 3960 Howard Hughes Parkway
   Ninth Floor
15 Las Vegas, Nevada 89169

16 **JUSTIN J. BUSTOS**
   Gordon Silver
17 100 W. Liberty Street
   Suite 940
18 Reno, Nevada 89501

19

20

21

22

23

24

25

3

```
 1            RENO, NEVADA, SEPTEMBER 30, 2013, 1:33 P.M.
 2                            --oOo--
 3                    P R O C E E D I N G S
 4
 5            THE COURT:  Good afternoon.  Have a seat,
 6    please.
 7            THE CLERK:  Today is the date and time set for
 8    imposition of sentence in criminal case
 9    3:12-cr-58-LRH-WGC, United States of America versus F.
10    Harvey Whittemore.
11        Dominic P. Gentile and Justin Bustos are present on
12    behalf of the defendant.
13        Steven Myhre and Eric Olshan are present on behalf
14    of the government.
15            THE COURT:  I'd like to welcome everyone here
16    this afternoon.  This matter has been scheduled for the
17    sentencing of Mr. Whittemore following the entry of
18    guilty verdicts by the jury following the jury trial
19    which was conducted in this matter over the middle two
20    weeks of May 2013.
21        At that time the guilty verdicts were for the
22    offenses of:  Count One, Making Excess Campaign
23    Contributions; Count Two, Making Contributions in the Name
24    of Another; and, Count Three, False Statement to a Federal
25    Agency and Aiding and Abetting.
```

4

1    There was a fourth count upon which the jury did

2 not reach a verdict and has been subsequently dismissed by

3 the Court.

4    Following the entry of those guilty pleas, a

5 presentence investigation and report was ordered by the

6 Court, and that has been completed.  And the Court has

7 before it the date of the revised report, September the

8 5th, 2013.

9    I also have before me many documents in this case.

10 First of all, the defendant's -- I'm going to refer to it

11 as sentencing memorandum and objections.  It's actually a

12 600-page-plus document containing many items that have

13 been argued and presented by the defense in this case.  I

14 am thoroughly familiar with it.

15    A significant part of that same package was some 67

16 letters I received from friends of Mr. Whittemore, many

17 family members, certainly all of his direct family

18 members, members of the business community and Nevada

19 residents acquainted -- familiar with Mr. Whittemore in

20 one capacity or another.

21    I have read everything that has been filed,

22 including those letters as well as several letters that

23 were sent to me outside of that particular package that

24 was provided by the defense, those letters being in

25 support of Mr. Whittemore.

1      I also have in front of me the government's

2  sentencing memorandum and the related documents that have

3  followed from that, the response on behalf of

4  Mr. Whittemore, the reply on behalf of the government, the

5  surreply on behalf of Mr. Whittemore.

6      There have been at least a couple of applications

7  to allow some of those filings, which are not particularly

8  routine, to be made in this case.  I approve all of those

9  filings.  I am familiar with all of those documents.

10      Mr. Gentile, have you and Mr. Whittemore been able

11  to review and fully discuss the presentence report in this

12  matter?

13          MR. GENTILE:  Yes, Your Honor.

14          THE COURT:  All right.  And, Mr. Whittemore,

15  have you been able to read the entirety of the report

16  and discuss it fully with Mr. Gentile?

17          THE DEFENDANT:  I have, Your Honor.

18          THE COURT:  All right.  Thank you.

19      It's evident from the filings which have been made

20  here that there are various objections to some of the

21  factual statements set forth within the presentence

22  report.  I also have some objections to the calculations

23  and so forth.

24      And so I think what we will need to do is start to

25  address, first of all, the factual objections which have

1   been raised on behalf of Mr. Whittemore.

2       Mr. Gentile?

3       MR. GENTILE: Your Honor, before we go any

4   further, although I will absolutely abide by the Court's

5   directive, to the extent that the Court has received

6   letters that were sent directly to the Court, have they

7   been made part of the record?

8       THE COURT: No, they have not. I -- if you

9   would like them to be made part of the record, I will

10   have them made part of the record.

11       MR. GENTILE: I would.

12       THE COURT: The package of letters I received

13   from the United States Attorney's Office which were

14   identified as victim impact statements, at least

15   superficially, which the government forwarded, I

16   reviewed those. I did not read them. I returned them

17   to the government. I do not have them, and they are not

18   part of the record.

19       MR. GENTILE: I see. Are there any other

20   letters that were received -- here's the problem. This

21   letter writing on behalf of Mr. Whittemore almost became

22   viral in -- and I don't mean virulent, I mean viral, in

23   the sense that it appears to me that some people learned

24   that people were sending letters, and it spread.

25       So without us contacting people they provided

7

letters. And to the extent that those letters that we
don't have a copy of them or don't know what they say, if
the Court still has them, I would ask that they be made
part of the record.

        THE COURT: I would tell you, Mr. Gentile, to
allay your fears, there's only three letters. Each one
of the three were in favor of Mr. Whittemore. One was
from his uncle, one was from a practicing lawyer here in
the community, and the other one was from a relative, as
well, and I forget the relationship.

        MR. GENTILE: All right. Well, I have another
concern, then, because I learned about, maybe 10 days
ago -- and when I say I learned, I mean, this is really
information and belief. I don't know that it actually
happened. But it is my understanding that a letter from
Senator Reid was sent to you.

     And to the extent that that did, in fact, happen, I
can assure you that it was not anything that we sought.
And if it has, in fact, been sent to you, out of an
abundance of concern on my part, I'd ask that it be made
part of the record. If it has not, then great.

        THE COURT: Well, let me tell you, I have
received no letter from Senator Reid. I have received
absolutely no communication from him of any kind. There
is no letter that I know of.

8

1          MR. GENTILE:  Thank you.  That relieves me to

2     an extent that you will never be able to appreciate.

3          Okay.  In that case, then, I will proceed.

4          We made basically two types of objections.  One

5     type of objection were just general objections that dealt

6     with certain language that was used in certain of the

7     paragraphs of the presentence report.  I would like to

8     address those first and explain to you my concern --

9          THE COURT:  All right.

10          MR. GENTILE:  -- and just to make the record

11     clear.

12          This is my 42nd year of doing this for a living.

13     This was not my first criminal case, although at times it

14     might have appeared as though it were.  And it has -- it

15     is certainly not my first federal sentencing.

16          But what I have come to realize over the years is

17     that the presentence report has a life of its own.  And it

18     follows the person about whom it is written throughout the

19     entire period of time that that person is under the

20     supervision of the Court and other agencies that may

21     intervene.  That most certainly will happen here.

22          And so to the extent that some of the objections

23     are made to general language, the purpose is not because I

24     think it's going to influence you in your decision

25     making -- I don't think it will, frankly.  You sat through

1    the trial.  You've got all of the pleadings.  You've seen

2    all of the letters.  You've read all of the arguments with

3    respect to sentencing.  And I'm sure that a phrase here or

4    a word there isn't going to matter at all to you.

5         But it will in terms of the longevity of this

6    document.  Because you are going to sentence

7    Mr. Whittemore today, and he will be under the supervision

8    of the Court the moment that you do that.  My concern is

9    that this document might come to be read by somebody who

10   has no knowledge at all of what happened in this courtroom

11   other than the verdict and the sentence that was imposed.

12        And it's because of that concern that I address

13   certain language that I found to have been pejorative or

14   not necessarily fact based but, shall we say, opinion.

15   And I say that as a preface to what I'm about to address

16   right now.

17        In paragraph 11, we objected to -- paragraph 11 of

18   the presentence report, we objected to the conclusion that

19   somehow Mr. Whittemore's success was due to his long-term

20   personal relationship with Senator Harry Reid.

21        Judge, there's no evidence in this record

22   whatsoever about that.  And to the extent that the

23   presentence report relies on punditry and the media, it

24   doesn't belong in the report.  It's not like I'm saying

25   that the media didn't say those things or that the pundits

1   didn't say those things.

2        But there is an inference that comes from the

3   inclusion of that kind of language in this report that to

4   somebody who knows nothing about this case may give rise

5   to a belief that was never contended by the government and

6   that the Court has no evidence at all before it that

7   somehow the acts of the donations to the Friends for Harry

8   Reid were somehow connected with something sinister that

9   either had happened in the past or was going to happen in

10  the future.  And that gives me grave concern.

11       So I know that you're not going to base the

12  sentence on that, at least unless you tell us that you

13  did.  But that is the reason that I am concerned about the

14  enclosure of that kind of language.

15       We objected to paragraph 13, but the presentence

16  report was cured.  The author of the report removed the

17  word tout and replaced it with something else that was

18  benign.  So I thank her for that.

19       In paragraph 16 -- and, you know, I'm not sure that

20  we made an objection to that, but I'd like to make a

21  reference to it anyhow.  It makes it clear, it makes the

22  observation that the investigation of this case commenced

23  November of 2011, and that is accurate.

24       What it does not include is the fact that

25  Mr. Whittemore, after a stipulation to extend the statute

11

1     of limitations -- which I think will become pertinent

2     later when we argue some of the specific factors under the

3     3553(a) and under the guidelines themselves.  Because at

4     the time that the investigation started, there was only

5     four months left.  As you know, the end of March would

6     have been the five years on the statute of limitations.

7           The observations in paragraph 21 and 22, that there

8     were 17 checks made out to individuals and 29 checks made

9     out by them to the Friends for Harry Reid, we don't

10    disagree with.  We will address those when we get to the

11    question of over 30 transactions.  And we will also

12    address those when we get to the question of the

13    application of the 2B1.1 chart to this case at all and to

14    the calculation.

15          In paragraph 27 the presentence report makes

16    reference to countless hours having been spent by the

17    government on the theory that Mr. Whittemore somehow said

18    something at his interview that caused those countless

19    hours to have been spent.

20          I suggest to the Court hours can be counted.  And

21    so I'm not -- I'm not -- I don't believe that a term such

22    as countless hours can do anything to aid the Court one

23    way or the other.  And, again, I'm concerned about this

24    document following Mr. Whittemore through his period of

25    supervision by the Court.

1          In paragraph 28 we made an objection to an

2    observation that was made by the author of the presentence

3    report, that somehow the activity of Mr. Whittemore that

4    leads to him being before the Court, because of his being

5    found guilty, was done to ingratiate himself to a powerful

6    individual; that being Senator Reid.

7          Again, that has been moved now to the sentence

8    justification part.  And because it was moved to the

9    sentence justification part, that's helpful because it

10   will appear there more clearly to not be a finding of fact

11   but more of an opinion.

12         But I still say, Your Honor, that with respect to

13   the effect that this document might have in the future,

14   that opinion is not fact based.  And because of that, I'm

15   concerned about inferences that might be taken by anybody

16   who reads this document in the future during the period of

17   time that Mr. Whittemore is under the supervision of the

18   Court.

19         If I may have a moment.

20         So that is, for the most part, the objections that

21   we have to the general aspects that are not specific parts

22   of the measure and assessment of the guideline range.

23         Do you want me to now proceed to the specifics?

24              THE COURT:  Well, I don't want to go to your

25   legal arguments yet.  Let's cover these factual points.

1    And for the benefit of the record, I -- let's

2  address each paragraph that you are concerned about.

3    First of all, I -- I know you're aware, but

4  perhaps -- and we have a large number of people here in

5  the courtroom.

6    None of this presentence report becomes a public

7  document.  It's submitted to the Court for its purposes on

8  sentencing.  The defense has an opportunity to review it

9  and object to it, as does the government.

10    And classically there are a number of small changes

11  that are made in the course of any of these reports.  And

12  they lead to the revised report which is ultimately before

13  the Court.

14    But there is significance to the factual history

15  that's set forth within the report that describes the

16  history of the event and history relevant to the defendant

17  because, of course, it bears on the Court's rulings in

18  this case.

19    So you started with paragraph number 11.  I'm going

20  to read number 11 because I don't see anything there

21  that's deserving of some added concern about privacy.  It

22  states:  Wingfield Nevada Group, led by Whittemore,

23  successfully resolved many of the regulatory impediments

24  that threatened the actualization of the Coyote Springs

25  project.  Whittemore's triumphs became controversial and

1  came under scrutiny.  Many journalists, pundits, and

2  advocacy groups claimed that Whittemore's success was due

3  to his long-term personal and financial relationships with

4  political figures, most especially Senate Majority Leader

5  Harry Reid.

6        Now, I will -- I haven't heard from the government

7  on this yet.  So let me hear the government's general

8  response to this line of argument that's just been raised

9  challenging the factual statements in the report.  I

10 realize it goes on to other paragraphs, but this is a good

11 jumping-off point.

12        So, Mr. Myhre.

13        MR. MYHRE:  Yes, Your Honor.  The

14 government -- that's fine.  Can you hear me fine, Your

15 Honor?

16        THE COURT:  Yes, I can.

17        MR. MYHRE:  Your Honor, the government's

18 position with respect to paragraph 11, if there's

19 nothing factually incorrect about that particular

20 statement, the Court can consider virtually anything in

21 sentencing as the Court is well aware.  This particular

22 paragraph is pertinent to the background leading up to

23 the offense of conviction.  It provides background and

24 context.

25        And as the Court has already indicated, this is a

1    document that is confidential in nature.  To the extent

2    this becomes a matter of public record, it does not.

3         But it is for the Court's consideration in

4    sentencing.  And, again, it's not factually inaccurate,

5    and we believe it's pertinent to the background leading to

6    the offense of conviction.

7              MR. GENTILE:  May I address that?

8              THE COURT:  Go ahead.

9              MR. GENTILE:  I'm not saying it's factually

10   inaccurate.

11        But when you're going to put into a report such as

12   this what the media and pundits and advocacy groups say,

13   while it might be factually accurate that they said those

14   things, there's an inference that comes from it to a

15   reader that will have access to this -- I'm not talking

16   about the public at large, I'm talking about this document

17   following Mr. Whittemore throughout the period of time

18   that he's under the supervision of the Court.

19        And so what I guess I'm saying is that its

20   surplusage.  It's not going to assist you at all -- I

21   can't believe that it would assist you at all in accessing

22   a sentence.  And how is it going to help anybody later on

23   who is charged with supervising Mr. Whittemore?

24             THE COURT:  All right.  First of all, I want

25   to state for the record when objections are made to

1    factual accounts which are set forth within the report,

2    the Court is placed in the position of making a ruling.

3    And pursuant to Rule 32(i)(3), as to disputed portions

4    of the report, the Court shall rule on the dispute or

5    determine that a ruling is unnecessary either because

6    the matter will not affect sentencing, or because the

7    Court will not consider the matter in sentencing.

8         First of all, I can state for the record that

9    ruling is not necessary from the Court because this matter

10   will not affect the sentencing whatsoever in this case.

11   This case -- unlike many cases where there's a negotiated

12   guilty plea entered by the defendant in the courtroom,

13   this case actually involved a two-week-long trial.  The

14   evidence relevant to this trial is a matter of public

15   record.  And any person who saw or heard any part of it

16   undoubtedly formed their own impressions one way or

17   another, which may or may not be the same as others.

18        I recognize that your concern, Mr. Gentile, is that

19   this particular paragraph really has very little to do

20   with the sentencing that will be considered by the Court

21   in this matter.  I, however, have -- and I agree with

22   that.  But by the same token, this provides some

23   background and context that arguably could be applied by

24   someone familiar with the case.

25        All I can say is that this will not affect, in any

1   way, the Court's ruling on sentencing in this matter.  And

2   I'm not going to strike that portion of paragraph number

3   11.

4        Now, in doing so, I want to fast forward a little

5   too.  I know you've identified other paragraphs.

6        But paragraph 28 is significant to the Court

7   because it is the last of the information relative to the

8   offense.  And it states:  Additionally, during contact

9   with the FBI, it was discovered that while actions such as

10  those undertaken by Whittemore are usually intended to

11  cause a quid pro quo reciprocity, evidence was not adduced

12  at trial to substantiate that any federal benefit was

13  granted as a result.

14       The -- that is the fact.  And the Court certainly

15  confirms that there was no evidence of any kind of quid

16  pro quo reciprocity which was involved in this case.  And

17  I don't mind telling you, Mr. Gentile, it was also very

18  clear to the Court that Mr. Whittemore was actively

19  involved in a regular basis in political fundraising.

20  And -- in this case -- that's what this case concerned

21  about too.  And I see it as basically that.

22       But I think with the context given by that last

23  paragraph 28, it's clear what was being discussed here.

24  And -- or what was at issue here.  And I'm going to deny

25  your objections because I do feel that they offer some

1  background and context.

2       But I will certainly assure you that the reaction

3  of any -- by a journalist, pundits, or advocacy groups to

4  the Whittemores' success or lack of success, or to this

5  trial, for that matter, will have no impact or effect upon

6  the Court's ruling whatsoever.

7            MR. GENTILE:  Judge, if there's a judge in

8  this district that understands what a quid pro quo is,

9  you do.

10            THE COURT:  Guaranteed.

11            MR. GENTILE:  Okay.  So what do you want me to

12  do, move on to the next objected paragraph?

13            THE COURT:  Well, the bottom line is with

14  regard to those paragraphs that you identified, the

15  Court will deny the objections on the ground that

16  nothing stated within the contents of those paragraphs

17  would have any effect upon sentencing by the Court.

18            MR. GENTILE:  Your Honor, I think we're going

19  to do them paragraph by paragraph because there are --

20            THE COURT:  All right.

21            MR. GENTILE:  -- quite a few objections.  And

22  if the record isn't clear as to what you ruled on --

23            THE COURT:  Well, I want --

24            MR. GENTILE:  -- it's going to be problematic.

25            THE COURT:  I want the record to be clear.

1          MR. GENTILE:  Okay.

2          THE COURT:  Go ahead with your next one.

3          MR. GENTILE:  Objection number two dealt with

4     paragraph 12.  And paragraph 12, just so that I

5     reference it correctly, speaks in terms of the Coyote

6     Springs project becoming a source of controversial

7     attention.

8          Again, I'm not suggesting that -- although,

9     frankly, I don't know, but -- because it didn't come to my

10    attention that it was controversial.  But to the extent

11    that it says that in here, it still feeds into this

12    concern that someone might read it as being connected to

13    some sort of a favor seeking or a payment for a favor.

14         THE COURT:  All right.  Well --

15         MR. GENTILE:  Now, you've just made it really

16    clear --

17         THE COURT:  -- let me fast forward here.

18         And, Mr. Myhre, if you feel strongly about

19    commenting on this one, I would allow you to do so.  But I

20    am inclined to strike the word controversial here.

21         MR. MYHRE:  No objection from the government,

22    Your Honor.

23         THE COURT:  The sentence reads:  Not only did

24    the Coyote Springs project become a source of

25    controversial attention, it also fell victim to the

1    faltering economy.

2         I will strike the word controversial.  And the

3    objection is sustained to that extent.  And the sentence

4    will now read:  Not only did the Coyote Springs project

5    become a source of attention, it also fell victim to the

6    faltering economy.

7         Mr. Gentile, next paragraph?

8              MR. GENTILE:  Yes, Your Honor.

9         Focusing on paragraphs 13 and 14.  This is very

10   problematic.  And without getting into the -- necessarily

11   the narrative of it, this goes right to the civil

12   litigation that could very well have been a part of this

13   case but for pretrial rulings where the Court found it to

14   be irrelevant to the case.

15        And because the Court found it to be irrelevant to

16   the case, and because we're really talking about civil

17   litigation that was actually before your -- this Court,

18   part of it was, a very substantial part of it was.  And

19   you know that it was settled as a matter of a settlement

20   and was voluntarily dismissed.

21        It just seems to me, once again, that there's an

22   inference that might be taken, not by you but by someone

23   who accesses this document in the time to come, while

24   Mr. Whittemore is under the supervision of the court, with

25   respect to the sentence that you impose later on today.

1          And because of that, it has a tendency -- it can

2     have a tendency to influence all kinds of things in terms

3     of what those supervising might take from it.

4          So I do not suggest that there was no lawsuit.  But

5     without getting into a narrative here and relying on my

6     written pleading, it seems to me that there's really no

7     place for this in this document.  I mean, they're talking

8     about the allegations of a lawsuit that were never subject

9     to proof and that were ruled upon by the Court to be

10     irrelevant to the case.

11          THE COURT:  Well, the paragraph number 13

12     reads:  In 2010, Whittemore and the Seenos suffered a

13     falling out after the Seenos claimed that Whittemore had

14     embezzled funds from Wingfield Nevada Group and had

15     misappropriated many of Wingfield Nevada Group's

16     resources to support the Whittemore Peterson Institute.

17          I think that's the sentence that draws the most of

18     your objection.

19          MR. GENTILE:  Right.  If that sentence --

20          THE COURT:  And I am willing to strike the

21     claims of the Seenos.  I think there is some context

22     here and background.

23          I'd be willing to hear from the government.  But my

24     sense is that, for purposes of everything we're doing

25     here, all we need to identify is that there was a falling

1  out with the Seenos which resulted in subsequent

2  litigation between the parties and concerned, to some

3  extent, in a relationship between Wingfield Nevada Group

4  and Whittemore Peterson Institute.

5  MR. MYHRE:  Yes, Your Honor.  With respect to

6  all the objections made by Mr. Gentile on these factual

7  matters, these background matters, we will defer to the

8  Court.

9  It is our position that everything contained that

10  the probation officer did is appropriate, is pertinent,

11  and is factually correct.

12  But as the judge who has the sentencing authority

13  in this case, if the Court feels that it's not going to

14  relate to the sentence that the Court ultimately imposes

15  or decides upon, then we defer to the Court in terms of

16  its rulings on those matters.

17  THE COURT:  Well, once again, as I've

18  indicated, this will have no effect on the Court's

19  sentencing in this matter.

20  But I am concerned that the paragraph refers to

21  some of the charges between the Seenos and the Whittemore

22  interests and refers to an embezzlement of funds and

23  misappropriation of money.  Those were allegations.

24  The Court is thoroughly familiar with the

25  underlying civil litigation because a large part of it,

1 probably the largest at one time, was pending before me.

2          But deferring to the objection, I -- I'm going to

3 change this first line to just read, suffered a falling

4 out after the Seenos -- suffered a falling out and

5 resulted in subsequent civil litigation between Whittemore

6 and the Seenos which concerned in some ways the Whittemore

7 Peterson Institute.

8          Is there any objection to that change?

9          MR. MYHRE:  None from the government, Your

10 Honor.

11          MR. GENTILE:  Just a moment.

12          Needless to say, and I'm sure you don't doubt it,

13 Mr. Whittemore is very, very protective of the Whittemore

14 Peterson Institute.  And I recognize that this is not a

15 public document.  But it would seem to me that the

16 entirety of paragraph 13 is unnecessary.

17          However, may I suggest to the Court that if you

18 would put a period after the word out, just a period after

19 the word out, in other words, falling out, period, and

20 then go to the next sentence, that would probably

21 alleviate any problems at all.

22          The case was dismissed.  It was settled.  Whatever

23 allegations might have been made as to the Whittemore

24 Peterson Institute have never been anything other than

25 allegations by a biased plaintiffs -- excuse me, by biased

plaintiffs.

THE COURT: Well, I'm not going to get involved further in changing this language. My view is that the language is pretty benign when the most it says results in a civil litigation which concerned in some ways the Whittemore Peterson Institute. I'm going to leave it at that.

MR. GENTILE: So could I hear how you're going to have it read, please. I know you've said it once --

THE COURT: Well, I'm going to do my best because I can't see the transcript of exactly what I said.

But suffered -- in 2010, Whittemore and the Seenos suffered a falling out which resulted in civil litigation and concerned in some ways the Whittemore Peterson Institute, period.

MR. GENTILE: Okay. Well, my record's made. Thank you, Judge.

THE COURT: All right. Next paragraph?

MR. GENTILE: All right. I believe that objection number four, which focuses on paragraphs 26 through 28 inso- -- and, again, this is preliminary language in these paragraphs, but they later become important when the presentence report recommends adding two points to the calculation, the guideline's

1  calculation for obstruction of justice.

2      There is a conclusion here made by the author of

3  the report that Mr. Whittemore did, in fact, make

4  materially false statements that were designed and

5  intended to mislead investigating agents.

6      I don't need to remind the Court that that was

7  fully tried, that it was one of those rare occasions when

8  a 1001 prosecution is forthcoming for a statement made to

9  two FBI agents where the person accused of making the

10 statement actually had other people there --

11     THE COURT:  Let me cut you off, Mr. Gentile.

12     MR. GENTILE:  Yes.

13     THE COURT:  What I'd like to do, what you're

14 concerned about here is obviously -- the paragraph

15 speaks for itself.

16     But for the benefit of any number of people who may

17 be listening to this and have no idea what we're talking

18 about, paragraph 26 reads:  The sham contributions went

19 undiscovered until a few years later when documents

20 obtained by adverse parties in an unrelated civil suit

21 suggested the criminal acts of making excessive campaign

22 contributions and making contributions in the names of

23 others.  Upon receipt of the information, the FBI

24 initiated an investigation.

25     As part of that investigation, on February 9th,

1    2012, the FBI agents questioned Whittemore regarding what

2    appeared to be conduit contributions.  Whittemore made

3    materially false statements that were designed and

4    intended to mislead investigating agents.

5         Some of those false statements included that

6    Whittemore never made a request for campaign

7    contributions; never asked his employees to make campaign

8    contributions to Senator Harry Reid's re-election

9    campaign; never provided funds to anyone with the

10   expectation that they would use the money as a

11   reimbursement for any campaign contribution; never spoke

12   to Senator Reid about raising money for him; and never

13   gave money to relatives to make campaign contributions.

14        That's referring -- I'm not -- end quote.

15        I recognize that part of your objections to the

16   guideline calculation concerns the alleged material false

17   statements.  And so I'm going to reserve ruling on this

18   last portion of paragraph 26, essentially the last half of

19   it, until such time as we have full argument on the

20   obstruction portion of the calculation.

21        MR. GENTILE:  Just to make it clear, Your

22   Honor, with respect to paragraph 26, to narrow down the

23   objection, the specific language, it would be -- my

24   objection would commence with the words Whittemore made

25   materially false statements.

27

1          THE COURT:  Yes.

2          MR. GENTILE:  And it would be the remainder of

3     the paragraph.

4          THE COURT:  Yes.  I understand.

5          MR. GENTILE:  Okay.  With respect to 27, I

6     object to the totality of it.  I'm not saying that

7     that's not what the FBI told the investigator, but I'm

8     saying that those are not objective facts.

9          And with respect to number 20 --

10         THE COURT:  Well, same ruling.  I'll reserve

11    on this until such time as we've had full argument on

12    the false statements portion of the calculation.

13         MR. GENTILE:  The same with paragraph 28?

14         THE COURT:  Yes.

15         MR. GENTILE:  Okay.

16         THE COURT:  Paragraph 28 is going to stay.

17    Unless I'm missing something.  To me, I don't see

18    anything that's objectionable about that to either side.

19         MR. GENTILE:  No, you're right.  You're right.

20         To the extent that we had an objection to paragraph

21    28, I will tell you that in the framework of this

22    objection we grouped 26, 27, and 28 because they were all

23    dealing with the same subject.

24         If the Court -- depending upon how the Court rules

25    with respect to paragraphs 26 and 27, I do not -- I cannot

28

1    say at this moment that I would ask that paragraph 28 be

2    taken out.

3              THE COURT:  All right.

4         So for the benefit of the record, we'll address 26

5    and 27 at such time as we address the guideline

6    calculation based upon the alleged false statements to the

7    investigating agents.

8         All right.  Are there any other paragraphs that you

9    have factual objection?

10             MR. GENTILE:  No.  Our objection number five,

11   it seems that the probation officer in response to the

12   objection recognizes that this is a decision that the

13   Court has to make.

14        And given your holding 26 and 27, until that is

15   addressed, there's no need to address it now.

16             THE COURT:  All right.

17             MR. GENTILE:  With respect to objection six,

18   this goes now to the calculation.  It really -- in the

19   sense that this addresses -- let me say it a little

20   differently.

21        The presentence report and its author has concluded

22   that because of the allegations in 26 and 27, paragraphs

23   26 and 27, and the fact that he put the government through

24   its burden of proof, that Mr. Whittemore is not eligible

25   for acceptance of responsibility.

1    And so I think you need to look at this objection

2  in context with the others.  And if you want to -- if you

3  want to defer this as well --

4         THE COURT:  Well, we'll be coming back to 26

5  and 27.  And I'll do so at such time as we've exhausted

6  the issues concerning the obstruction of justice

7  enhancement and the acceptance of responsibility

8  enhancement.

9         MR. GENTILE:  Thank you.  So that's objection

10  six.

11    All right.  Objection seven, Your Honor, goes right

12  to the calculation.  And this is a pretty sophisticated --

13  I shouldn't say sophisticated.  It's complex.  This is a

14  complex argument.

15         THE COURT:  Well, I'd rather do these one at a

16  time.

17    Your first objection was objection five, which you

18  objected to the enhancement for obstruction of justice

19  concerning the false statements to investigating -- the

20  alleged false statements to investigating agents.  Why

21  don't we exhaust that one first.

22    I'd like to hear your argument on why you think

23  that's an inappropriate portion of the calculation.

24         MR. GENTILE:  Well, I think it's an

25  inappropriate portion of the calculations because,

1    first, the jury did not find beyond a reasonable doubt

2    that that was, in fact, the case.

3         Now, I recognize that it now, by default, becomes

4    an issue for the Court.

5         And it is my position that given the testimony of

6    Mr. Bowen, Ms. Hall, and Scott Whittemore at this trial,

7    that the government has not proven that by a preponderance

8    of the evidence.

9         Also, the fact is that while there was the -- you

10   know, here's the analytical problem.  We have four -- we

11   have five people, we have six people that were either part

12   of or overheard the conversation.  We had the ability to

13   make a voice recording of it, but it did not happen.  I

14   recognize that the FBI only records surreptitiously.  They

15   don't record interviews.  And that's by policy.

16        You can't change their policy, but you're not bound

17   by it either.  And I can't imagine that there wouldn't be

18   a preference, by you and everybody else that's going to

19   have to decide what was said, to have a voice recording of

20   it or a transcript.  That's why we do them.  But we don't

21   have that.

22        And so in this instance, given the record, given

23   that we are exclusively relying on memory of an event that

24   happened, now, 18 months ago, but at the time of trial I

25   think 16 months prior, and that there was such a

1   divergence of memory in terms of what was said by whom,

2   that it simply doesn't rise to the level of a

3   preponderance of the evidence.

4        I can -- there's also another witness that was

5   available by the government.  I asked for a missing

6   witness instruction.  You didn't give it because you said

7   I could have called her.

8        I understand I could have called her.  I also

9   understand what the Code of Federal Regulations requires

10   for me to do that.  But I guess I could have asked the

11   government to waive that.  I didn't because the burden of

12   proof isn't on me.  And it wasn't at this trial.  It

13   wasn't on -- I say me, because, Judge, I'm the lawyer.

14   I -- the buck does stop here.  And I did not put her on.

15        So what you have is you have one government witness

16   and you have two other people, neither of whom is the

17   defendant, who testified that their memory of events --

18   and certainly Dan Bowen and Ann Hall did not seem to be

19   wavering on their position on what was said and what was

20   not said.

21        So under the circumstances, given that we have such

22   a divergence in the evidence, it just doesn't rise to the

23   level of beyond a reasonable doubt.  This is one time when

24   we did put evidence into the record.

25        So it could be a preponderance if the only person

32

 1   who testified was the federal agent and nobody else

 2   testified about it.  But that's not what happened here.

 3        Under the circumstances I do not -- especially in

 4   the absence of a recording, you really don't know what was

 5   said, Judge.  None of us do.  What we know is what

 6   different people testified about and what their memories

 7   were.

 8        That's my position.

 9        THE COURT:  All right.  Let me hear from the

10   government.

11        Ladies and gentlemen who are in the courtroom, just

12   to assist you with some understanding of what we're

13   arguing, or what is being argued to the Court at this

14   point in time, under the sentencing guidelines the Court

15   ultimately makes a calculation under the guidelines and

16   establishes the recommended sentencing range under the

17   sentencing guidelines and other lesser information.

18        Every offense starts with a base level offense to

19   calculate these guidelines.  And then there are different

20   factors that can result in increasing that score, which

21   will lead to an ultimate guideline score.

22        Now, in this case, we start with a base level which

23   happens to be eight in this particular case.  And the

24   question becomes whether there should be increases to that

25   number eight for different factors.

1       At the present time, the Court's considering the

2   objection to the obstruction of justice enhancement, which

3   would result in the level going up two points from an

4   eight, plus two, it would therefore go to a ten at that

5   point in time.

6       There are other factors here that will ultimately

7   affect the final calculation by the Court.  I say that

8   only -- all of this only as a matter to help inform a

9   courtroom full of people who probably have never sat

10  through a guideline calculation before.

11      So at this time we're considering the enhancement

12  that's based upon obstruction of justice.  The question

13  for the Court would be whether I find by a preponderance

14  of the evidence that there was an obstruction of justice

15  here that should be added to this score.

16      And I'll hear from -- Mr. Olshan, I see you

17  standing.  So I'll allow you to address this objection on

18  behalf of the government.

19      MR. OLSHAN:  Thank you, Your Honor.  The

20  government's position is that the two-level enhancement

21  for obstruction of justice should apply and that the PSR

22  got this one right.

23      Your Honor, there's no doubt, as Mr. Gentile has

24  conceded, that for the Court's purposes the Court does not

25  have to determine whether or not the obstruction occurred

1    beyond a reasonable doubt, it's just whether there is a

2    preponderance of the evidence to support that enhancement.

3         And the government's view is that there is.  Both

4    Mr. Bowen and Special Agent Lovedahl testified to various

5    versions of the interview.  And while there were certain

6    distinctions between their two -- the testimony from both

7    witnesses, there were certain statements that they both

8    agreed upon.  Both Mr. Bowen and Agent Lovedahl took notes

9    during this interview, and both had notes that testified

10   about statements made by Mr. Whittemore that they agreed

11   upon.

12        For example, there was testimony from both

13   Mr. Bowen and Agent Lovedahl about this bonus theory, that

14   the defendant said during his interview that he gave

15   employees bonuses based on their value to the company.

16   Both witnesses agreed on that.

17        Both witnesses also agreed that when it came to

18   money that Mr. Whittemore's family would use to make

19   contributions, the family members had their interest in a

20   family trust and that, as a result of that, this money was

21   theirs.  Both witnesses agreed that Mr. Whittemore made

22   statements about the family's money and the family trust.

23        In addition, both Mr. Bowen and Special Agent

24   Lovedahl testified that Mr. Whittemore said during his

25   interview that he never checked as to whether or not

1    anybody had actually made contributions after he gave them

2    the money.  Your Honor, so there's significant agreement

3    as to what was said with respect to those particular

4    statements.

5         Now, the question becomes did these statements

6    significantly impede the administration of justice?  And

7    the answer there is yes.  The guideline speaks to

8    significant impediment to both the investigation and the

9    prosecution of a case.

10        Here the government's position is that because of

11   those statements that both witnesses agree on that

12   Mr. Whittemore said during his interview on February 9th,

13   2012, the government had to go out and investigate and

14   ultimately at trial put on evidence to disprove these

15   straw-man defenses that the jury saw right through.

16        So, for example, the government had to put on

17   evidence at trial about this bonus theory, had to go

18   through with each of the conduit witnesses who were

19   employees who testified about what their bonus structure

20   was, whether they had gotten bonuses before, what amounts,

21   when, what did the defendant say about the bonuses.

22        If the defendant hadn't put forward that statement

23   in his interview, it's unclear whether we would have to

24   prove it at trial, Your Honor.

25        The same goes for the source of the defendant's

1  children's money.  Both witnesses, again, testified that

2  he said that his children used their own money.

3      Now, the Court heard testimony from Russ Bradshaw,

4  whom the government called, the defendant's own personal

5  accountant, to testify about the structure of their family

6  trust, I think it's the Lakeshore House Limited

7  Partnership, about how much interest each child had in

8  that limited partnership, whether during the period in

9  question there were any disbursements from that limited

10 partnership to any of the children, who controlled that

11 limited partnership.

12     The government had to put that evidence on, was

13 forced to put that evidence on at trial in the prosecution

14 of this case because of the statements the defendant made

15 during his interview with Special Agent Lovedahl and

16 Special Agent French.  Both Mr. Bowen and Ms. -- excuse

17 me, and Special Agent Lovedahl agreed that the defendant

18 said that.

19     Also the defendant said, and both witnesses

20 corroborated, that he said he never checked whether or not

21 anybody made contributions after he gave them money.

22     The government had to put on testimony at trial

23 from Roxanne Doyle, have her look at a copy of the

24 transmittal memo that she sent at the defendant's

25 direction to the campaign so that she could identify the

1  margin where Mr. Whittemore's handwriting appears, and he

2  tallied up how much money had actually been bundled and

3  sent off to the campaign, to prove that he did check.

4      So as a result of those statements that both

5  witnesses agree the defendant made, the government had to

6  expend significant resources in order to prove at trial

7  that those were lies.

8      And that served as a significant impediment to the

9  administration of justice, which is why the obstruction

10  enhancement applies.  And the cases that the government

11  cited in its sentencing memo on page 17 provide useful

12  examples of other cases in which courts imposed this

13  two-level obstruction enhancement based on unsworn

14  statements of testifying agents that force the government

15  to expend resources that it otherwise would not have been

16  forced to expend.  Thank you.

17      THE COURT:  Thank you.

18      Brief rely, Mr. Gentile?

19      MR. GENTILE:  I would suggest to the Court the

20  following:  Number one, let's put the event in context.

21  It took place almost one month short or six weeks short

22  of five years after these events.

23      So one of the things you have to take into

24  consideration, when you're making a preponderance

25  judgment, is how much weight to give something that is a

1   response to an unexpected interview, and it's inquiring

2   not of a specific event, even, although we don't really

3   know what was said, but it wasn't limited to Friends for

4   Harry Reid.

5       It was brought -- and under those circumstances the

6   law is clear that if it's as a result of a mistake in

7   memory or of an uncertainty that somebody makes a

8   statement -- and in no way am I conceding that those were

9   the statements that were made, then that goes to the

10   weight of it.  That's number one.

11       Number two, again, with respect to bonuses, there

12   was a lot of evidence in this case about bonuses that had

13   been paid in earlier years to people.  And without hearing

14   the precise question and answer, we don't know what

15   bonuses they're talking about.

16       I think counsel made a valid point, we don't know

17   if the government would have had to prove these things,

18   even if Mr. Whittemore would have had -- remained silent.

19   And if I wasn't in a courtroom when the phone call was

20   made, that's exactly what I would have told him to do, and

21   you know that.  But that's not what happened.

22       So what I'm saying to you -- and by the way, I

23   don't remember the testimony of the agent at trial, but I

24   do remember that the witnesses that were called by the

25   government, many of whom are in the back of this room

1   today, because they care about what happens to

2   Mr. Whittemore, the witnesses, some of them said it was

3   gifts, some of them said it was bonuses.  And what we know

4   for a fact is that no deductions were taken for anything

5   that was related to this case.  So they couldn't have been

6   bonuses, they had to be gifts as a matter of -- or there

7   was statute fraud, also.  One or the other.

8         With respect to the family trust, there is no doubt

9   about the fact, okay, it's not a family trust, it's a

10  limited partnership.  It's a family limited partnership.

11        And what testimony you have in this record is

12  that -- and it came from D.J. Whittemore.  You actually

13  have a document in this record, perhaps two of them, where

14  subsequent to this year, but well before, in 2008, well

15  before any government investigation, an adjustment of the

16  interests of the children was made.

17        And you have documentation with respect to the D.J.

18  Whittemore one.  The government -- to the extent that the

19  government called or didn't call other witnesses that

20  were, in fact, the children, there was no need to put

21  those documents in at that point in time.

22        I could tell you, as a proffer to the Court, that

23  we have at least four of them.

24        Mr. Bradshaw testified that in the following year

25  adjustments were made.  But, you know, we're really

1   getting down to arguing about what the evidence in the

2   trial was. And we shouldn't be arguing about that. What

3   we should be arguing about is what was really said at that

4   interview. And how good is Mr. Whittemore's memory,

5   almost five years later, when he's had no time to refresh

6   it, no time to reflect, and there's no specific timeframe

7   that the interview was covering.

8        When you use the word never, never is an absolute.

9   Do we know that he used the word never? That's certainly

10  what the indictment charged, that he said never.

11       And you know, Judge, I think, based on some of

12  those statements that he was charged with having made with

13  the word never before them, it would have been ludicrous.

14  He would have had to have been a lunatic to have said

15  that.

16       And so what I'm saying to you, I guess, is -- and

17  let me cover one more thing, the question about never

18  checked to see if anybody made a donation. Again, we have

19  no idea what Mr. Whittemore's actual words were. But we

20  do know that it was five years after the events. And we

21  do know that human memory fails. And without the ability

22  to refresh recollection, it's not very trustworthy.

23       So under the circumstances, it just doesn't rise to

24  a preponderance of the evidence when you're going to

25  assess weight to these circumstances.

1  An audio recording would have made it real simple.

2  Unfortunately, it's not simple.

3  So that's my argument.

4  THE COURT: All right.

5  Donna, let me tell you, I'm not getting the

6  realtime on my screen here.

7  (Brief pause in the proceedings.)

8  THE COURT: Thank you. That's why I tell her.

9  I'm going to rule on these to the extent I can

10  while we go through the individual objections.

11  Mr. Olshan, you're standing. Is there something

12  that you wanted to say further? Something new only.

13  MR. OLSHAN: One additional point. The

14  government just wanted to note that the defendant did

15  speak. He didn't say he didn't remember, he didn't just

16  say exculpatory notes. He say spoke for, by the

17  defendant's estimation, at least 15 minutes. He did

18  talk. These weren't just simple denials. Thank you.

19  THE COURT: The effect of one of these

20  adjustments under the guidelines is classically six to

21  nine months of time under the sentencing guidelines. I

22  don't think that's hard and fast. But it gives some

23  guideline.

24  I'm going to sustain this objection. I do not

25  believe that the prospective sentence should be enhanced

42

1    for -- on the basis of the obstruction of justice

2    enhancement because I candidly am not satisfied by a

3    preponderance of the evidence that there, in fact, were

4    numerous false statements of the nature that created, in

5    fact, an impediment to the investigation which resulted in

6    new and supplemental and renewed investigation having to

7    be conducted.  That really is the test.

8          Specifically, the question is whether the alleged

9    misstatements resulted in significant impediments and a

10   greater expenditure in resources which complicated the

11   investigation.

12         In this case what the Court's most impressed with

13   is that this was the count, Count Four of the Indictment,

14   upon which the jury did not reach a verdict.  In other

15   words, there was no finding that the evidence had been

16   proven beyond a reasonable doubt that these kind of false

17   statements were made.

18         But in the background of all of that, the context

19   is significant -- I'm sure it was to the jury and it is

20   also very significant to the Court -- and that is that

21   essentially what happened here was the original

22   contributions, which are the substance of this case,

23   occurred in March of 2007.  There was a period of years

24   which followed because the investigation that was later

25   conducted by the FBI did not start until late 2011 and

43

1    then extended into the early part of 2012.

2         So there was nearly five years which passed from

3    the time of the conduit contributions until the defendant,

4    Mr. Whittemore, was being questioned about those

5    contributions by the FBI.  That passage of time is

6    significant to the Court also within the context of which

7    the questioning occurred.

8         On the date in question, when the questioning

9    occurred, Mr. Whittemore knew nothing about the pendency

10   of the criminal investigation.  He was at that time

11   dealing with the FBI out of some concerns over what had

12   been perceived as threats to a family member which were

13   believed to have arisen as a result of the civil

14   disagreements between Mr. Whittemore and other persons.

15   Mr. Whittemore had been attempting to reach the FBI to

16   speak with them, and he was very concerned about his

17   family member's safety and had not heard back.

18        What happened was the FBI called for to meet with

19   Mr. Whittemore on the morning in February of 2012.  There

20   was no statement about the reasons why.  And it was

21   believed -- as I recall the evidence, at least, it was

22   believed by Mr. Whittemore and his attorneys that the FBI

23   were coming over -- the agents were coming over to discuss

24   with him this matter of concern about family safety.  And

25   once everyone had sat down in Mr. Whittemore's lawyer's

44

1   offices, he was informed that it was not about that but

2   rather concerned these contributions which had been made

3   almost five years earlier.

4       It was clear to the Court that Mr. Whittemore was

5   taken aback by this total shift in the purpose of the

6   questioning and the meeting with the FBI.

7       It also concerned a matter that was almost five

8   years old.  And the whole interview took no more than --

9   the accounts varied as to the length of the interview.

10   But it was my impression, as I listened to the evidence,

11   that the substantive part of the interview did not exceed

12   30 minutes and may have been as short as 15 or 20 minutes.

13       And it's the Court's view that under those

14   circumstances to enhance a perspective prison sentence,

15   something more needs to be shown.  I'm not satisfied by a

16   preponderance of the evidence that there was an

17   intentional concealment to the extent and degree, of

18   course, that was being argued by the government.

19       And, of course, the jury, as I mentioned earlier,

20   did not return a verdict on that charge.  That charge was

21   ultimately dismissed without prejudice.

22       The Court simply doesn't feel that the obstruction

23   of justice enhancement should be added to the sentencing

24   guideline under these circumstances.

25       I would also say that I do not believe it changed

1    the investigation very much at all.  I could not see any

2    significant impediment to the FBI's investigation.  They

3    did conduct a thorough investigation.  They wound up

4    speaking to many witnesses and gathering many records and

5    doing what needed to be done.

6         But I don't think that any of that was done because

7    of something that may not have been considered to be

8    truthful was stated by Mr. Whittemore.

9         So on two grounds -- I'm not satisfied by a

10   preponderance of the evidence that the allege statements

11   were made, and I also do not believe that it resulted in a

12   significant impact upon the government's investigation.

13   So I am going to rule in favor of the defense on this

14   objection.

15        And in light of that, I'll go back to paragraphs 26

16   and 27, where we talked about the factual objections.  So

17   when we started our session here this afternoon -- and I

18   am going to strike from paragraph 26 the second half of

19   the paragraph that states:  Whittemore made materially

20   false statements that were designed and intended to

21   mislead investigating agents.  Some of those false

22   statements included that Whittemore never made a request

23   for campaign contributions; never asked his employees to

24   make campaign contributions; never provided funds to

25   anyone with the expectation they would be used as a

1    reimbursement for a contribution; never spoke to Senator

2    Reid about raising money for him; and never gave money to

3    relatives to make campaign contributions.

4         I'm going to strike that.  In striking that,

5    though, that is not to be construed as a criticism of any

6    kind of what I consider to be an excellent presentence

7    report that was prepared by the agent in this case.

8         I'm striking it only because I am not satisfied by

9    a preponderance of the evidence that that is what occurred

10   or, secondly, that that had a negative effect upon the

11   investigation which was conducted here.  And that would,

12   therefore, make it irrelevant to the presentence report.

13        With regard to paragraph 27, I'm going to strike

14   that as well for the same reasons.

15        The entirety of 27 will be stricken; the second

16   half of 26 will be stricken.  And that will be the Court's

17   ruling.

18        The next objection relevant to the guideline

19   calculations is the objection number six by the defense

20   concerning adjustment for acceptance of responsibility.

21        Mr. Gentile, I'll hear from you on that.

22        MR. GENTILE:  Okay.  Well, half of the

23   foundation for it has now been stricken.  If you'll

24   recall, the acceptance of responsibility was eliminated

25   as a possibility for two reasons.

1    Number one, Mr. Whittemore put the government to

2 its burden of proof, which, of course, black-letter law is

3 that you cannot deprive somebody of acceptance of

4 responsibility for exercising a constitutional right.  And

5 in the context of this case, when the defendant did not

6 himself testify, that's even more important to recognize

7 that.

8    And so what we're really doing now is saying that

9 because he went to trial and put the government to its

10 burden of proof, Mr. Whittemore did not accept

11 responsibility.  That is the rationale that's left.

12    So I would like to address that.  The defense in

13 this case was set out before the opening statement, was

14 set out when the Court read to the jury the statement of

15 the case that the Court asked both sides to submit.

16    And, Your Honor, I'm not certain of this, but I'm

17 fairly certain that the one that we submitted you might

18 have read verbatim to the jury.  I mean, you'd know better

19 than I as to whether you made any changes to the one that

20 we submitted or not.

21    THE COURT:  Substantively it was what you had

22 provided.  There may have been a tweak here or there.

23    MR. GENTILE:  All right.  Now, let's remember

24 a couple of things.  We went to trial in this case, and

25 he was acquit -- well, he wasn't acquitted, I'll give

1    you that.  But he wasn't convicted on Count Four.  It

2    was all one trial.

3          So at least to the extent that the government did

4    not prove its case beyond a reasonable doubt as to Count

5    Four, there was no alternative but to go to trial on that

6    count.  And it was all one case.

7          So you could see -- separate and apart from the

8    theory and the value of the constitutional right to go to

9    trial and to put the government to its burden, you could

10    see that in this case there was, in fact, efficacy.

11    Because the government didn't meet its burden with this

12    jury.

13          And so the statement of the case was really -- and

14    the defense of the case was, first, as we filed pretrial,

15    during the trial, and after the trial, a constitutional

16    challenge to the three FEC counts.  And without -- and I

17    agree with you, you can't predict anything in terms of

18    what any court's going to do.

19          But I think you need to -- all of us need to

20    recognize that this is one of the most fluctuating areas

21    of law today.  The supreme court seems to have an appetite

22    to consider campaign contribution laws certainly more

23    frequent on a percentage basis than other areas of the

24    law, and they're going to do it again this term, next

25    month.  Actually are we in October yet?  No, tomorrow is

49

1   October.  This coming month.

2         And so to preserve that constitutional issue, which

3   very well might be ripe for decision, there was no way to

4   do that.  And that was the first prong of the defense.

5         The second prong of the defense was that the facts

6   of the case, which was the 17 checks and the testimony of

7   the people that received those checks and what they did

8   with those checks and why they did it and whether they

9   felt compelled or not to do it, they were really not much

10  of a contest on that.

11        Our theory was twofold.  With respect to the

12  children's contributions to Senator Reid's campaign, our

13  theory was that because of the structure of the Lakeshore

14  trust, the structure of the way the Whittemore family has

15  treated family assets for now at least a third generation,

16  that -- and because of the reconciliation that occurred in

17  the following year, which gave us some substantive support

18  for it, that at least that segment of these contributions

19  was made with the own -- with the wealth of the

20  contributors.

21        Yes, Mr. Whittemore advanced the money to them.

22  There's no doubt about that.  The testimony in the case

23  was overwhelming that these kids, just like their parents,

24  and like their aunts and uncles, have been politically

25  active since they were babies almost.

1        And so that was the first -- the second prong of

2   the defense.  In other words, these facts, which are not

3   contested, do not violate the law.

4        The other aspect of the facts not violating the law

5   was the inference that we took, we meaning his defense

6   team, because, again, Mr. Whittemore did not testify in

7   this case.  His defense team analyzed *O'Donnell*.  And the

8   Court has now -- and the Court read the statement of the

9   case which set out our interpretation of *O'Donnell.*  It

10  didn't cite *O'Donnell*, but it set out our interpretation,

11  read it to the jury.  And that was that if you make an

12  unconditional inter vivos gift to someone while at the

13  same time suggesting to that person that they consider

14  making a contribution to a political candidate for federal

15  office, that that provided a safe harbor from the law.

16       Because our interpretation of *O'Donnell* was that

17  the moment that you relinquish dominion and control, then

18  your First Amendment right is still preserved.  You could

19  still say to that person, look, that's your money, but

20  would you give some consideration to making a contribution

21  to Senator Reid.  That was our defense.

22       As it turned out at the end of the case, during the

23  jury's instructions aspect of the case, we learned that

24  the Court did not agree with us.  We learned from

25  instructions number 21, which the Court gave that dealt

1  with when a person provides a gift to another person for

2  the purpose of causing that other person to make a

3  contribution in that other person's name, and instruction

4  number 22, that a contribution is any gift made by any

5  person for the purpose of influencing any election for

6  federal office, including contributions which are in any

7  way earmarked or otherwise directed, that that vitiates

8  our interpretation of the dominion and control issue.  And

9  the Court, despite the fact that we submitted instructions

10  asking the Court to instruct the jury on what the elements

11  of an unconditional inter vivos gift were, the Court did

12  not give those instructions.

13       And the Court in -- recently in -- and really for

14  the first time, because I do not remember your saying this

15  during the settlement conference.  I can be corrected on

16  that.  My memory of four months ago isn't all that good.

17  So five years ago would be a whole other story.

18       But I do know that in denying our motion for a new

19  trial the Court made it clear that the interpretation that

20  Mr. Whittemore's defense team made of *O'Donnell*, with

21  respect to the dominion and control issue being the

22  governing issue, was a misinterpretation because in the

23  Court's interpretation the word gift means a gift to

24  anyone, whereas our interpretation pretty clearly meant --

25  pretty clearly was that the word gift, as used in the

1    statute, meant a gift to the candidate.

2          Now, the Court did instruct with respect to the

3    other aspect of our theory, the use of one's own funds --

4    with respect to the kids I'm talking about here -- did

5    provide a defense because in number -- in instruction

6    number 20, you said that the person named as a

7    contributor -- in order to violate the law, the person

8    named as a contributor was not the true source of the

9    money.

10          So I find that to be consistent with our theory,

11    and we argued it that way with respect to the children.

12          Also paragraph 7 -- excuse me, instruction 17 you

13    said you must unanimously agree on which contributions, if

14    any, aggregate to a total amount of $25,000 in excess.

15          The problem that we're facing here is that we don't

16    know what aspects of the case, which specific

17    contributions the jury found to have made up the 25,000.

18    There was no special verdict form given to the jury that

19    required them to identify those contributors.

20          There was one submitted to the Court, but the Court

21    didn't accept it.

22          And so under the circumstances of the case, it is

23    at least possible that this jury may have found that the

24    children -- and under the instructions that the Court

25    gave, the jury might have found that the children's

Case 1:14-cr-00014-RMG Document 52-2 Filed 09/10/15 Page 53 of 188
Case 1:11-cr-00034-RMG Document 226 Filed 09/01/13 Page 53 of 188

53

1   contributions were not among the 25,000 but that the other

2   ones where the judge -- where the Court basically did not

3   instruct on an inter vivos unconditional gift being a

4   defense, that the jury found him guilty on that aspect of

5   the case.

6       That's where we found ourselves, and that's why

7   when we're addressing the calculation with respect to --

8   and that is what we're dealing with here.  When we're

9   dealing with a calculation with respect to how much to

10  include, how much to enhance that base level of eight,

11  that's the dilemma that we're facing.

12      Now, we're doing this in the framework of

13  acceptance of responsibility.  And I haven't lost track of

14  that, okay?  But here's my plea for the Court.

15      Having said what I just said, all of that, all of

16  that, was made by Mr. Whittemore's lawyers.

17  Mr. Whittemore did not testify in this case.  The defense

18  in this case was a legal defense except to Count Four.

19  Count Four is not before you now, nor should it be, for

20  purposes of determining whether he should have gone to

21  trial on that count.  He clearly should have gone to trial

22  on that count.  And so what you're left with is the other

23  three.

24      Your Honor, if you were to hold in this case, on

25  these facts, that by going to trial and putting the

54

1    government to its burden of proof with respect to the
2    facts equalling a violation of the law, it would do
3    substantial disservice to the Sixth Amendment right to go
4    to trial and put the government to its burden of proof
5    without getting on the stand and perjuring yourself or
6    testifying.

7           And it would really send a message, candidly, to
8    the criminal defense attorneys in the criminal defense
9    bar.  And that would be that zealous advocacy, even if you
10   feel that your interpretation of the law is correct --
11   and, Judge, we did until you told us it wasn't -- until
12   you told the jury it wasn't and told us it wasn't, zealous
13   advocacy may be at the expense of your client, even if you
14   don't put them on the stand.

15          And it ought not to be that.  And there's lots of
16   case law that deals with the not punishing somebody
17   because of the exercise of a constitutional right.

18          In the instance here, the exercise of that right
19   was at least 25 percent correct because the government did
20   not meet its burden.  And with respect to the other three
21   counts in which the jury found guilt, the defense was
22   based on a constitutional challenge and a question of
23   whether the facts amounted to a violation of the law, not
24   that the facts didn't happen.

25          And so because of that, it seems to me that the

1  ability of the defendant to claim acceptance of

2  responsibility and get a -- either an adjustment in the

3  guidelines themselves, in the calculation, or later, after

4  you make that guideline calculation, to be recognized as a

5  3553(a) factor should not be foreclosed.

6      If I have misinterpreted the law, if his defense

7  team misinterpreted *O'Donnell*, it should not be held to

8  Mr. Whittemore's having being punished for it.

9      And by the way, he will address the Court at the

10  end of this matter.  I know that you're going to give him

11  an opportunity for allocution.  And he will take that

12  opportunity.

13          THE COURT:  All right.  Thank you,

14  Mr. Gentile.

15      May I hear from the government, please.

16          MR. OLSHAN:  Your Honor, the government's

17  position is that a two-level reduction for acceptance of

18  responsibility is completely unjustified based on the

19  record in this case.

20      This case was not about a simple challenge to

21  whether the law applied to undisputed facts.  From the

22  inception of this prosecution through today, the record is

23  completely devoid of any shred of acceptance of

24  responsibility.

25      Mr. Whittemore has disputed not only the law and

1   what the law means and what it says, but he's also

2   contested his conduct, what his conduct was.

3        Witness after witness who took the stand was

4   subject to repeated cross-examination about what

5   Mr. Whittemore said, how they interpreted it, what they

6   thought he meant, whose money it was.

7        In fact, Mr. Gentile, when he just addressed the

8   Court on this enhancement, said that the -- part of their

9   defense was whether or not this money for the children was

10  the defendant's money or whether it was their money that

11  was somehow accounted for.

12       Your Honor, that's a factual dispute.  That is the

13  defendant saying the money that I gave to these people so

14  that they would make contributions to Senator Reid was not

15  my money, it was their money, it was an advance on my --

16  the money that I owed them -- or, excuse me, that they

17  owed to me.  That's a factual dispute.

18       At no point has the defendant admitted any of its

19  conduct.  In fact, in the government's sentencing memo we

20  referenced the fact that he did not dispute that the money

21  that he wrote -- the account that he wrote the checks from

22  and made the wire transfers from was his account and that,

23  other than that, he disputed everything else.

24       Well, in reviewing the transcript for this trial,

25  Your Honor, he even disputed that.

57

1        His wife, Annette, testified, and the defense

2    argued that because Mrs. Whittemore had signature

3    authority over that account, that some of that money was

4    equally hers and that somehow the government had to prove

5    that because the defendant didn't have total dominion over

6    the account he could not be held accountable for these

7    crimes.

8        In fact, in the defendant's moving papers

9    post-trial, that was an argument they made to challenge

10   the sufficiency of the evidence in calling for a new

11   trial.

12       The guideline at issue here, 3E1.1, speaks to when

13   a defendant clearly demonstrates acceptance of

14   responsibility for his offense, clearly.

15       If there's anything in this case that's clear, it's

16   that the defendant has not accepted a shred of what he

17   did.

18       In the commentary to this guideline, there are a

19   number of factors that are listed.  A review of a couple

20   of them, as we've indicated in our memo, makes clear that

21   this is an inappropriate adjustment for the defense.

22       One of the factors is truthfully admitting the

23   conduct comprising offense of conviction.  That hasn't

24   happened.

25       Voluntary termination or withdrawal from criminal

1  conduct or associations.  The conduct here occurred in

2  March of 2007.  The Court and the jury heard evidence that

3  even after the defendant executed his scheme to support

4  Senator Reid in March of 2007, he reimbursed additional

5  contributions from Carli Kinne and Roxanne Doyle later

6  that same year.  That factor doesn't apply.

7        Voluntary surrender to authorities promptly after

8  commission of the offense.  Now, in connection with the

9  obstruction enhancement, the Court mentioned that a period

10 of years had passed between when the offense was

11 undertaken by the defendant and when he was finally

12 interviewed by the government.

13       And the reason that number of years passed, Your

14 Honor, is because the defendant, after committing his

15 crimes, he just sat on them.  He didn't call up law

16 enforcement and say I just broke the law.  He didn't come

17 in with his tail between the legs and say, you know what,

18 in my zeal to keep my promise to Senator Reid, I broke the

19 law.  And that's why five years passed, almost, before he

20 ever sat down with the FBI about this conduct.

21       Voluntary resignation from the office or position

22 held during the commission of the offense.  The defendant

23 continued to work at WNG and occupy his position of power

24 there for a number of years following the conduct here.

25       And, again, the timeliness of the defendant's

59

1  conduct in manifesting the acceptance of responsibility.

2  That still hasn't happened, Your Honor.  It's September

3  30th of 2013.  He committed these crimes in March of 2007.

4  Better than six and a half years later there has been no

5  indication that he's accepted any responsibility for his

6  conduct.

7       Now, the government wants to make clear as to this

8  enhancement that no one is seeking to punish the defendant

9  from exercising his constitutional right to put the

10 government to its burden of proof to prove his guilt.

11 That's what he did, and he did it zealously.  But it's

12 disingenuous to walk into court at sentencing and say I

13 never contested the facts, ever, when all throughout trial

14 and all the pretrial litigation and the motions in limine

15 to exclude or introduce evidence, that's what those

16 arguments were about: the facts; what the defendant did.

17      The commentary also suggests that when a defendant

18 chooses to exercise that constitutional right and go to

19 trial, determination of whether the enhancement or, excuse

20 me, the reduction would apply, should be based on --

21 primarily upon pretrial statements and conduct.

22      Your Honor, the government's position is based on

23 everything that happened pretrial, there's not been any

24 indication of acceptance of responsibility.  And, in fact,

25 that's continued post-trial.

1      Within about an hour of the jury's verdicts in this

2  case, the defendant held a press conference.

3               MR. GENTILE:  Objection, Your Honor.

4  That's -- it's a post-trial statement.

5               MR. OLSHAN:  Your Honor, post-trial conduct is

6  relevant to this guideline as much as pre-trial.  Or

7  it's certainly relevant.

8               THE COURT:  The Court's ruling is the

9  objection is overruled.  As it goes to the issue of

10  acceptance of responsibility, I think this is

11  appropriate argument.

12               MR. OLSHAN:  Thank you, Your Honor.

13      While the emphasis under the guidelines is pretrial

14  conduct and statements, certainly the fact that the

15  defendant held a press conference -- and during the press

16  conference he chose to say very little.  But what he did

17  say suggested he has a complete lack of appreciation for

18  what it is that he did and what that jury decided that he

19  did beyond a reasonable doubt.

20      The sum of what he said broke down to something

21  along the lines of after all this is over he would hold

22  another press conference and he would tell, quote,

23  everyone the complete and true story of exactly how this

24  happened, why this happened, who was behind this, and how

25  it got started.

1    Those are not the words of somebody who has never

2  disputed anything other than whether the law applies to

3  the facts.  Those are the words of somebody who, even

4  after a jury determined that he was guilty beyond a

5  reasonable doubt, refuses to acknowledge that what he did

6  was illegal and that at the time he knew it was illegal

7  and decided to do it anyway.

8    The government's view is that based on all of the

9  evidence in the record, pretrial, during trial, and

10  subsequent to trial, a two-level reduction for acceptance

11  of responsibility would be completely inappropriate, and

12  it would encourage future defendants to make the argument

13  that as long as I don't say anything, if my lawyers

14  contest all the facts at trial, I should still be

15  blameless.

16    Thank you, Your Honor.

17    THE COURT:  Thank you, Mr. Olshan.

18    Mr. Gentile, brief reply?

19    MR. GENTILE:  Yes.  If there's one thing we

20  know for sure, it's that Mr. Whittemore has not spoken

21  at all about the facts of this case.  He didn't do it in

22  this courtroom and he didn't do it in a press

23  conference.

24    What he said in a press conference was not that he

25  was not responsible.  What he said in a press conference

1  was that when it was over, "I'll be very expansive in

2  terms of giving details about this."  That's a lot

3  different than not accepting responsibility.

4       Let's remember where we're at from the standpoint

5  of procedure and juncture here.  My objection is to -- is

6  because of the presentence report foreclosing the

7  possibility of acceptance of responsibility.

8       And I'm going to ask you right now to only rule on

9  one thing, and that is that it's not foreclosed because of

10  the fact that we went to trial.  Because that's all that's

11  left in terms of the support.

12       You're going to hear from Mr. Whittemore.  And I'm

13  going to ask you to -- if you can, if procedurally you're

14  willing to do so, I'm going to ask you to withhold the

15  determination as to whether you're actually going to give

16  it to him or not.  My objection was that it be foreclosed.

17  And I don't think it should be foreclosed based on the

18  arguments that I've just made.

19       But in response to some of the things that

20  Mr. Olshan just said, something about a -- you know, the

21  absence of coming forward and immediately saying I broke

22  the law and trying to voluntarily surrender.

23       When Mr. Whittemore tried to voluntarily surrender

24  in this case, when I asked the government to let me bring

25  him into open court and let him surrender, the government

1   insisted that that was not possible, he had to come in

2   here in waist chains and leg irons.  That's what they

3   wanted.  They refused to allow anything other than that to

4   happen.  And that, in fact, is what happened.

5        Mr. Whittemore kept all of the records.  That is

6   not -- the government used them all in this case.

7        I don't want to argue that he didn't commit an

8   offense here.  I'm just trying to respond to some of the

9   things that Mr. Olshan brought up.  Because -- and it's

10  really important that you don't take what I'm saying to

11  you -- it's important to me, at least, otherwise tell me

12  to shut up, but I don't want you to take what I'm saying

13  to you as somehow I brought it up in the first place and

14  I'm arguing that he should have been acquitted or that

15  he's not guilty.  I'm not doing that.  But since he opened

16  up the door, I have to respond to these things.

17       He did keep all the records.  Okay?  Now, keeping

18  all of the records for all of those years is not

19  indicative of thinking that you broke the law.  I mean,

20  that's certainly one inference that you could take from

21  it.

22       And then -- and so under the circumstances, all I'm

23  saying to you is that the presentence report forecloses

24  the possibility of acceptance of responsibility now for

25  only one justification.  There were two.  Now there's one.

64

1   And that one is that he went to trial and made the

2   government meet its burden of proof.

3           Your Honor, I think -- I mean, you have the power

4   to do whatever you want to do.  But I think the law is to

5   the contrary.  I think the law is that you can't foreclose

6   acceptance of responsibility because someone went to trial

7   and put the government to its burden of proof.

8           THE COURT:  All right.  With regard to this

9   particular objection, I would say this.  First of all, I

10  don't know how many hundreds of trials I've sat through

11  since I've been on the bench.  Most of them, of course,

12  have been criminal cases.  And, of course, I've taken

13  thousands of guilty pleas from defendants who negotiated

14  a guilty plea and who clearly, by definition, accepted

15  responsibility in one way or the other.

16          At the same time, the exercise of one's

17  constitutional right to go to trial and put the government

18  to its proof is a fundamental right that's recognized in

19  our constitution.  And the fact that any defendant has

20  done that is not grounds, in the Court's view, to deny

21  that defendant eligibility for acceptance of

22  responsibility relief.

23          But in this case, this case was fought tooth and

24  nail from the very beginning.  I have received as many

25  pretrial motions and pretrial disputes as any case I can

1   recall, including cases that were far more complex than

2   this.

3       I received motions both before and after trial

4   challenging fundamental factual issues, challenging legal

5   issues.  And, in fact, we went through a two-week jury

6   trial where every witness who testified was subject to

7   some kind of a challenge, even the ones who were -- and

8   there were a number who were family members and who were,

9   one, uncomfortable being here, and, two, placed in a

10  difficult position.  But the challenge to them didn't just

11  come from the government, it also came from the defense

12  team.

13      Mr. Whittemore is not insulated from his attorney's

14  professional judgment on how they want to handle the case.

15  Some part of that, of course, is going to spread to him.

16      This simply is not a case where this defendant

17  accepted responsibility.  He challenged intent from the

18  beginning until the end.  There was a constitutional

19  challenge.  But at no time was there ever any evidence

20  from anyone, by inference or otherwise, that these

21  contributions were made because someone felt that it was

22  their constitutional right to do so.

23      That simply was not this case.  This was a

24  hard-fought case.  There was absolutely no acceptance of

25  responsibility demonstrated before this Court that would

66

1  warrant the granting of acceptance of responsibility

2  relief, and that part of your objection is denied.

3       All right.  The next objection that I have is

4  objection number seven, relative to the specific offense

5  characteristic.

6       Going back, somewhat for the benefit of the

7  audience, in the criminal sentencing guidelines the point

8  calculations are controlled by a number of things as

9  everyone has just heard.  But one of those factors is the

10 specific offense characteristic.

11      And classically we start in the calculation with a

12 base offense level, and then certain characteristics may

13 or a may not be applied which will result in increasing

14 that base offense level.

15      In this case there has been a 10-level increase

16 which is contemplated by sentencing guidelines 2C1 and 2B1

17 that has been proposed in the presentence report on the

18 basis that the illegal contributions in this case, the

19 total amount that were attributable to the 29 identified

20 contributors, was $133,400.  Because that exceeds the

21 threshold amount of $120,000 under the guidelines, a

22 10-level increase is proposed to be applied.

23      That has been objected to by the defense.

24      Mr. Gentile, go forward, please.

25           MR. GENTILE:  Well, Your Honor, in the written

1  pleadings I think -- and you said you have read them,

2  you are familiar with them.  I think we made a rather

3  expansive argument with respect to this.  But let me

4  kind of distill it.

5       First of all, 2B1.1 doesn't fit.  Now, we're not

6  disputing that the base level of this offense could be an

7  eight.  Because in the big picture of things, it's not all

8  that important.  Okay?  But we are disputing that in the

9  situation where the presentence report recognizes that

10  there is no identifiable loss and where 2B1.1, by its own

11  terms, deals with situations in which there are -- there

12  is larceny and fraud that is for the purpose of gain and

13  there is a loss calculation, that it just simply doesn't

14  fit this situation.

15       There are a number of reasons.  Number one, all of

16  the crimes that are set out in the title of 2B1.1 are all

17  malum in se offenses.  This, the case that Mr. Whittemore

18  is convicted of, is not a malum in se offense.  It is a

19  malum prohibitum offense.  Were there no statute, there

20  would be nothing about this case that would be malum in

21  se.

22       And so that is the first point.  There's no loss

23  determination, and the guideline -- excuse me, the

24  presentence report says that.

25       This offense can be committed by anybody, but it

68

1    appears that the use of 2B1.1, as a way of measuring the

2    guidelines on an offense such as this, gives a greater

3    penalty to a person of means than a person that does not

4    have the means.

5         If you have the ability to give more, even though

6    the result is the same, there's an absence of

7    transparency, the public is not able to see who is

8    supporting a candidate.  Because you gave more, somehow

9    there is a greater penalty that attaches to it.

10   Notwithstanding the fact that there is no monetary loss.

11        Now, that argument that I just made cannot be made

12   when you're stealing money from people, which is what

13   2B1.1 is about.  And so I would submit to the Court that

14   it does not fit.  Also, in this instance, this verdict

15   form was not specific.  We do not know if the jury found,

16   beyond a reasonable doubt, 133-4 or 90 or 50.  What we

17   know is they found more than 25.  We don't even know who

18   they found to have been the conduit contributors.

19        Now, as I said to you earlier -- and some of the

20   argument that I made with respect to acceptance of

21   responsibility feeds into this one.  If you take a look at

22   instruction number 20, the jury may very well have made

23   the determination based on the testimony of Mr. Bradshaw

24   and on the documents that showed a reconciliation in their

25   accounts with respect to the Lakeshore House family

69

1    partnership -- limited partnership, that those were not

2    included as conduit contributions.

3          So if you're going to use 2B1.1, the other problem

4    with the way the analysis went from the -- in the

5    presentence report is that it just lumped them all

6    together.  It made $133,400 the calculation when, from a

7    standpoint of the way the facts were presented to the jury

8    and what we're left with with respect to the jury's

9    verdict, the uncertainty that we're left with does not

10   necessarily flow from this verdict.

11         So this is one time -- there will be more, but this

12   is one time that it rests exactly on you, if you're going

13   to use 2B1.1, to make a determination really specifically

14   as to whether the contributions that were made by the

15   Whittemore children were, in fact, conduit contributions

16   as the law applies and as you gave it to the jury.

17         We don't know if the jury found that they were not

18   conduit contributions.  And you gave the jury an

19   opportunity to make that finding based on the way you

20   instructed them about if it's somebody's own money, if

21   they're the true source of the funds, if it came from

22   their wealth, then it's not a conduit contribution.

23         So I disagree with the use and employment of 2B1.1

24   in its entirety because I don't think it fits.  And the

25   Court does have latitude post-*Booker* to make the

1    determination that, as a policy matter, it doesn't fit.

2         And separate and apart -- if you're going to use

3    it, then I suggest to you that at least that part of these

4    contributions that were made at this point and that had

5    been made before and that had been made subsequent to this

6    point by the Whittemore children under these same

7    circumstances were not covered by this statute and,

8    therefore, were not conduit contributions.

9         The effect of that is obvious.  It would reduce the

10   guideline calculation by the amount of money -- it would

11   reduce the section of 2B1.1 by the amount of money that

12   the Whittemore children contributed.

13        With respect to the other aspect of the case, once

14   the theory of an unconditional inter vivos gift, coupled

15   with a suggestion, was taken away by the instructions of

16   the Court in not instructing that, I don't have as strong

17   an argument.  I can't make that argument.  Because if the

18   law is such as the Court instructed the jury, and it is

19   until somebody says otherwise, if that ever happens, well,

20   then, that argument doesn't apply to the non-family

21   members.

22        But I think that there's a separate issue there,

23   and that is the question of because they were family

24   members and because of the history of political

25   involvement and because of the history of being advanced

1  money and later having the accounts reconciled, we have a

2  qualitatively different situation with respect to the

3  children's contributions.

4          That's my argument.

5               THE COURT:  Mr. Olshan?

6               MR. OLSHAN:  Your Honor, a couple --

7               THE COURT:  You know, actually, I'm looking at

8  the clock.  And we need to take an afternoon break at

9  some point, and this probably is as good a point as any.

10         When I'll do is I'm going to take a 10-minute

11  break.  I'm going by the clock here in the courtroom that

12  says 3:25.  We will resume at 3:35.

13               THE CLERK:  Please rise.

14                     (A recess was taken from

15                     3:25 p.m. until 3:37 p.m.)

16               THE COURT:  Have a seat, please.

17         All right.  Mr. Olshan.

18               MR. OLSHAN:  Thank you, Your Honor.

19         First, as to whether or not a loss table in 2B1.1

20  applies, the government would just note that by its

21  express language in 2C1.8(b)(1), the guideline says:  If

22  the value of the illegal transactions exceeded $5,000,

23  increase by the number of levels from the table in 2B1.1,

24  theft, property, destruct -- property destruction, and

25  fraud, corresponding to that amount.  The guideline which

1   applies to these offenses directly references and

2   cross-references the loss table.

3        Not to mention the fact that the offenses listed in

4   2B1.1 do involve deceit, just as the defendant's crimes

5   here.

6        As to the appropriate level within the loss table,

7   the government's position is that the PSR is correct and

8   that a 10-level enhancement should apply for a loss

9   between $120,000 and $200,000.

10       The evidence at trial was consistent that all 29 of

11  these individuals made their contributions with money that

12  the defendant provided.

13       The law is clear, Your Honor, that a contribution

14  is any gift, subscription, loan, advance, or deposit of

15  money or anything of value made by any person for the

16  purpose of influencing any election for federal office.

17       That's the definition in the statute regardless of

18  whether the defendant called what he gave these people a

19  loan, an advance, a gift, whatever.  The question is was

20  it made for the purpose of influencing the election so

21  that those people would make contributions?  The evidence

22  was uniform, Your Honor, from one conduit to the next, all

23  29 of them, including the defendant's family members, that

24  that's exactly what the defendant did.

25       *O'Donnell* says that section 441f prohibits

73

1    straw-donor contributions in which a defendant solicits

2    others to donate to a candidate for federal office in

3    their own names and furnishes the money for the gift

4    either through an advance or prearranged reimbursement.

5    That's what the evidence at trial proved beyond a

6    reasonable doubt and, as such, by a preponderance of the

7    evidence.

8          Each of these individuals, all 29 of them, received

9    money from the defendant within a day.  It was all money

10   from his personal account.

11         Most of these individuals had no intention of

12   contributing to Senator Reid.  And, in particular, none of

13   them had an interest in doing it at that time.  No one

14   said no to the defendant when he approached them in March

15   of 2007.  None of them would have made a maximum

16   contribution or planning to on that day and yet all of

17   them did.

18         The government's view is without a doubt the

19   evidence clearly supports a finding that he solicited his

20   family employees and their respective spouses to donate to

21   Senator Reid's campaign in their own names and that he

22   personally funded the money for their contributions either

23   through an advance or a prearranged reimbursement, all 29

24   individuals beyond a reasonable doubt and certainly to the

25   preponderance -- with a preponderance of the evidence --

1    by a preponderance of the evidence.

2         Thank you.

3         THE COURT:  The Court's ruling is to overrule

4    the objection raised by the defense.  This specific

5    offense characteristic is expressly contemplated by the

6    sentencing guidelines.  The fact is that the threshold

7    amount of anything in excess of $120,000 but less than

8    $200,000 is identified as receiving a 10-level increase.

9         Part and parcel of that, of course, is a finding by

10   the Court as to what is the amount.  And it is the Court's

11   finding, and I believe it was very clear at the trial, at

12   least it was to the Court, that the amount of all the

13   illegal transactions here was, in fact, $133,400.

14        Those were the $4,600 contributions that were

15   obtained from each one of the 29 people who were either

16   family members or employees or spouses of either family

17   members or employees.  I reach those findings -- that

18   finding based on the evidence that was, in the Court's

19   view, overwhelming in the trial.

20        I cited some of the most significant parts of that

21   evidence in my order denying the motion for new trial, but

22   I repeat them here for purpose of citing the actual

23   evidence upon which the Court makes the finding.

24        The undisputed testimony that was presented in this

25   case was that Defendant Whittemore was the source of over

1    $133,000 in cash that was contributed to the senator's

2    campaign in the names of 29 contributors, all of whom were

3    either employees, family members, or their respective

4    spouses.

5        Secondly, most named contributors had no intention

6    of contributing to the campaign before they received the

7    money from Defendant Whittemore.

8        Three, all the contributions were made shortly

9    after solicitation and funding from Defendant Whittemore,

10    most of them within one day.

11        Four, most of the individuals and their spouses

12    would not have made any contribution without the money

13    provided by Whittemore.

14        Five, all the individuals contributed the maximum

15    legal contribution of $4,600.

16        Six, Defendant Whittemore paid most of the named

17    contributors an additional $400 each, $800 per couple,

18    over and above their contribution amounts.

19        And, seven, none of those who were solicited and

20    funded by Defendant Whittemore refused to contribute the

21    money that he had provided them.

22        Based upon all those reasons and that undisputed

23    evidence having been received in this case, the Court

24    clearly found that there was a conduit contribution

25    violation in the full amount of all of the contributions,

1    and, therefore, this is simply the threshold that applies.

2         And the Court deems that this is what the

3    sentencing guidelines provides, and it's the Court's

4    intention to follow that insofar as establishing the

5    guideline calculation.

6         That will take us to the next objection by the

7    defense, objection number 28, which challenged the

8    specific offense characteristic.

9         Again, by way of explanation, another part of the

10   guideline calculation, another characteristic in this case

11   is based on the number of illegal transactions.  Here

12   there were 29 contributors.  The amount of their

13   contributions, as I've just indicated, was $4,600 each.

14        But that $4,600 amount represented essentially two

15   contributions, one for the primary election and one for

16   the general election because the federal laws in force at

17   the time set maximums of $2,300 for each of the two

18   election periods which could be combined for a total at

19   that time of $4,600.

20        The question before the Court, and perhaps I'm

21   oversimplifying it here, is is the Court to calculate this

22   characteristic based on the fact that there were 29 named

23   contributors, which would, therefore, be less than 30

24   illegal transactions, or is the Court to calculate this

25   based upon the fact that each contribution represented two

1  contributions, essentially one for the primary and one for

2  the general?

3       Mr. Gentile?

4            MR. GENTILE:  Yes, Your Honor.

5            THE COURT:  Go ahead, please.

6            MR. GENTILE:  I think you just said something

7  that I think is controlling.  And here's what it is.

8       If you were to recognize this enhancement, then

9  you've just made a finding that $133,400 was the 2B1.1

10  threshold.  You've just stated that each of the

11  contributions was, in fact, a maximum amount of money that

12  could be given.  So you can't get to 133,400 without 29

13  contributions.

14       Given that fact, this is basically doubling up on

15  that.  You're not talking about a situation here where

16  there were 40 or 50 or 60 people that reached 133,400.

17  We're talking about 29.  And there was no other way to

18  reach that number and give the maximum contribution.

19  That's how it happened.

20       So under the circumstances here, to now split it

21  into two contributions, which is something that the Reid

22  campaign did -- I recognize that as a matter by

23  operational law, the Reid campaign had to do that, but it

24  would be an improper use of it on the facts of this case,

25  Your Honor.

1    You have 29 transactions.  You have 29 checks.  You

2  actually have 17 on the part of Mr. Whittemore.  But

3  because of the Court's ruling that all of them that were

4  made to -- in $10,000 amounts were intended to be split up

5  between spouses, that gets you to the 29 checks that those

6  people cut.  To impose -- and it would be an artificial

7  creation of an excess of 30 people under the circumstances

8  of this case to split it.

9    And it would run into -- you would, in fact,

10  encounter a double counting.  You would be doing it twice.

11  You would be doing it for the $133,400, and then you would

12  be doing it again two more levels because of really

13  nothing.  It required that many people to reach $133,400

14  on the facts of this case.

15    So on the facts of this case, to impose that

16  additional two-level increase would be inappropriate.

17         THE COURT:  Thank you.

18    Mr. Olshan?

19         MR. OLSHAN:  Your Honor, first, as to

20  impermissible double counting.  The Ninth Circuit has

21  been clear that when the sentencing commission seeks

22  to -- or intends to prohibit double counting, they do so

23  expressly.  And there's no prohibition in 2C1.8 that

24  says that you can't apply both provisions (b)(1) and

25  (b)(4) in the same case.  In fact, it makes little sense

1    for why the sentencing commission would have enacted a

2    guideline if two of the subsections could not be used

3    concurrently.

4          So the government's view is based on the lack of an

5    express prohibition against using both, and the fact that

6    it would have made no sense to do that, to implement both

7    and have them be mutually exclusive, that they both should

8    apply.

9          Under the merits -- as to the merits of

10    2C1.8(b)(4), the commentary is very clear as to the

11    definition of an illegal transaction.  It's the definition

12    of a contribution under the -- under FICA.  And under

13    FICA, a contribution is what Pat Young testified to at

14    trial, which is that under the law each check was two

15    contributions.

16          And that makes sense, Your Honor, because those are

17    two separate elections.  Candidates fight different fights

18    in the primary election and in the general election.  And

19    so when an individual makes a contribution that is the

20    maximum as to both elections, they're influencing two

21    different fights, potentially, the primary election and

22    the general election.

23          The guideline's commentary could not be clearer

24    that in order to determine whether (b)(4) applies, the

25    definition of illegal transaction requires reference to

1  FICA, which defines contributions by election.  Here each

2  $4,600 check was, by definition, two contributions under

3  FICA.  As a result, the government's view is that (b)(4)

4  and its two-level enhancement applies under the plain

5  language of the guideline.

6          THE COURT:  Brief reply?

7          MR. GENTILE:  Your Honor, on the facts of this

8  case, Counsel's incorrect.  There was no way to --

9  because of the fact that they were maximum

10 contributions.

11         If it had taken more than 30 people, 30 checks to

12 get to the $133,400 level, then you could have both.  You

13 could have the $133,000 enhancement increase and you could

14 have the over 30 because, in fact, there were over 30.

15 Here there were not over 30, and you've already used the

16 $133,400 number.

17         Separate and apart from that, the -- well, the Reid

18 campaign clearly had the duty to do what it did.  The

19 contributors didn't do that.  The contributors gave the

20 Reid campaign the money, in single checks of $4,600

21 apiece.

22         So, I mean, you have two reasons why it ought not

23 to be applied on the facts of this case.

24         THE COURT:  The Court's ruling on this

25 objection is to overrule it.

1    I agree with the government, but I -- what turns

2 the Court's mind on this one in favor of the government's

3 position the most strongly was the intent of the

4 defendant.

5    The defendant clearly intended maximum

6 contributions.  The maximum legal contributions were

7 $4,600, which were composed of $2,300 for the primary

8 portion of the contribution and $2,300 for the general

9 portion of the contribution.  Each one of those would be

10 separate contributions.

11    And there's no question that under the evidence of

12 this case that the intention of Mr. Whittemore was to

13 cause these contributions to appear to be complying with

14 the law, to appear to be legitimate contributions of

15 $2,300 twice from each contributor, for a total of $4,600,

16 so that those contributions would be accepted without

17 question by the Federal Election Commission and also by

18 the committee for Senator Reid.

19    That, in fact, is what occurred.  I have no doubt,

20 no question in my mind that had Senator Reid's

21 committee -- contribution committee, or had the Federal

22 Election Committee felt that there was some part of --

23 some other allocation of these contributions which would,

24 therefore, render one of them clearly illegal and in

25 violation of the law, the contributions would not have

1   been accepted, questions would have been raised.

2       And the point is that every contribution was

3   disguised to appear that it consisted of two different

4   transactions totalling $4,600 comprising contributions to

5   the primary of $2,300, into the general of $2,300.

6       That was the intention of all the parties here.

7   That's how it was interpreted by the Federal Election

8   Commission.  I assume that's how it was interpreted by the

9   Reid campaign.  And I know that's how it was intended by

10  Defendant Whittemore.

11      What this means is with 29 sham contributions,

12  there effectively were 58 contributions that were made,

13  and that is well above the threshold level of 30, which

14  the 10-point characteristic is based upon.  So the

15  objection is overruled.

16      That will take us to the objection number nine, the

17  role adjustment.  Another part of the sentencing guideline

18  calculation is whether two points should be added based

19  upon, under the sentencing guidelines, an abuse of a

20  position of trust, which arguably was held by Defendant

21  Whittemore.  And that has been the proposal for the

22  guideline calculation here.  It has been challenged by the

23  defense.

24      Mr. Gentile, go ahead, please.

25      MR. GENTILE:  Your Honor, I disagree with the

1  government's interp- -- reading of *Contreras*.

2        The Ninth Circuit, while it has recognized the

3  amendment to the commentary, and has done so uniformly --

4  that's been uniformly done throughout the country, so that

5  now the interpretation would be did the defendant have a

6  professional or managerial role.  Because that's now a

7  sine qua non.

8        I would not dispute that he had a managerial

9  relationship with the people that worked for him.

10 However, what *Contreras* has not done, and all of the other

11 circuits that have considered this issue post-amendment,

12 they have not abandoned that this relationship of being a

13 professional or in a managerial role has to be vis-à-vis

14 the victim of the offense.  And you still have to use

15 this -- use that perspective, from the perspective of the

16 victim of the offense, to make the determination as to

17 whether this applies, whether this guideline applies.

18       Under the circumstances of this case, clearly, now

19 that you have found that the family members and the people

20 that work for him were not the victims of the offense, and

21 they were not, this guideline cannot apply.

22       And I believe, Your Honor, with all humility, that

23 that is as a matter of law because the circuit has not

24 addressed that issue, and the other circuits that have,

25 have preserved it.

1            THE COURT:  Thank you.

2       Mr. Myhre?

3            MR. MYHRE:  Your Honor, our position is fairly

4   well set out in our sentencing memorandum.  However,

5   with respect to the issue as far as what *Contreras* did

6   or did not decide, in looking at the -- *Contreras*

7   itself, and the post-*Contreras* decision in the Ninth

8   Circuit, I believe it's *de la Renta*, basically the court

9   said we have decided what needs to be proven to show

10  abuse of trust.

11           And that is precisely what is set forth in the

12  commentary to the 3B1.3, and that is occupy a position of

13  managerial discretion, which Mr. Gentile has conceded

14  Mr. Whittemore did; and, secondly, that the use of the

15  managerial discretion in some way, in a significant way,

16  facilitated the commission of a crime.

17           And in this the evidence of facilitation is very

18  clear.  He used his position as the boss, as the head of

19  the Wingfield Nevada Group, to bend the will of the

20  employees to make these contributions that they,

21  otherwise, many of them testified, were not going to make.

22           He did it in the workplace.  He did it under

23  circumstances where he was their boss.  He used his

24  employees to collect the money and to bundle it and

25  forward it on to the Reid campaign.

85

1          So clearly his ability, his ability as the boss,

2     his position at WNG, allowed him to facilitate the

3     commission of that offense.  And I don't think that

4     Mr. Gentile disagrees with that.

5          The issue is is it -- does the victim have to stand

6     in a position of trust with the person who exercises the

7     managerial discretion.  And *Contreras* doesn't say that.

8          In fact, many of the cases that Mr. Gentile even

9     cites in his brief don't say that.  In particular, Your

10    Honor, we cite to *United States versus Jinwright*, the

11    Fourth Circuit out of -- excuse me, the 2012 decision out

12    of the Fourth Circuit, 683 f.3d 471, 488 to 489.

13         And there in -- this was a case involving tax

14    offenses.  Clearly the defendant there was in a position

15    with the company where they were not in a position of

16    trust, vis-à-vis the United States Government when

17    committing the tax offense.

18         Nevertheless, the person there -- excuse me, the

19    defendant there used the employees to help commit that

20    offense.  There the Court said that the abuse of trust

21    enhancement enables the sentencing court to punish those

22    who wield their power to criminally take advantage of

23    those who depend upon them most.

24         Here Mr. Whittemore used his power to take

25    advantage of his employees criminally.  He embroiled them

1    in his criminal scheme.

2           And the employees testified, and the evidence

3    fairly showed, that from their standpoint they were

4    unwittingly brought into this scheme.  They depended on

5    him as the boss to know what the law was.  They knew he

6    was an attorney.  They knew what the law was.

7    Nevertheless, he took advantage of them to criminally

8    involve them in that scheme.

9           So as the *Jinwright* case makes clear, that you

10   don't have to stand -- the defendant does not have to

11   stand in a position of trust vis-à-vis the direct victim

12   in this case, which would be the voting public and would

13   be the FEC in the sense that they were deceived as to who

14   actually made these contributions.

15          But he brought -- the fact that he brought them

16   into the criminal scheme, we believe, justifies the abuse

17   of trust enhancement in this case.

18          THE COURT:  I'm going to apply the enhancement

19   and overrule the objection.  Perhaps -- the one argument

20   that hasn't been made but the one that influences the

21   Court greatly in this position, there's no question that

22   there was some kind of a trust relationship that was

23   abused between Mr. Whittemore and the employees of

24   Wingfield Nevada Group and related entities.

25          He was in charge.  He was the managing partner.

1   Their livelihood was dependent upon the company and the

2   company as it was run by him.

3         And in the background of all of that was the fact

4   that this company was approaching -- it was entering the

5   economic pitfall that was occurring in the latter part of

6   2006 and well into 2007.

7         We had at least, as I recall, several employees who

8   felt that their -- it was very important that they --

9   their positions not be jeopardized in any way with the

10  company, that it was very important to not even think

11  about not accepting this money or not making the

12  contribution, as suggested, because of the fact that their

13  economic livelihood was somehow related to this.

14        That was abundantly clear as to all of the

15  employees and inferentially clear as to their spouses.

16  These were employment and economic ties to the max.

17        The next step is the one that gives me some pause,

18  and that's the family one.  But I speak as an observer of

19  this family and having observed the Whittemore children

20  testify and the Whittemore relatives testify.

21        This is a family that the patriarch and the

22  managing person was, without question, Harvey Whittemore.

23  Every one of these children and their related spouses

24  were, for lack of a -- I don't mean to insult them in any

25  way, but I use the word control, but in the sense that

1   it's positive in a family.  They were going to do what

2   their dad wanted them to do.  He was in control of their

3   economic well-being in many ways.  He was a devoted

4   father.  They were all devoted family members.

5        In the Court's view that's a level of trust which

6   goes far beyond the economic employment test that we've

7   just spoken about.  These same contributors who were in

8   the family were so strongly economically tied to

9   Mr. Whittemore.  It's to his credit.

10        I mean, I -- there's another part of this

11   sentencing that this Court will certainly recognize the

12   solid, united, and enviable family that was established by

13   Mr. Whittemore and his wife, Annette Whittemore.

14        But if you're talking about control as a result of

15   a position of trust, the trust of this patriarch of this

16   family, which exuded and extended to all of the children

17   of his family who are involved in this case, very

18   reluctantly and with some great amount of stress, as every

19   member of the Whittemore family experiences, there was a

20   position of trust which was violated as to them, and it's

21   even a stronger one, in the Court's view, than the

22   position of trust which exists by virtue of the employment

23   relationship.

24        I realize that they're not -- none of the people

25   are the victims of these offenses.  And there has been

1    some expansion of the case law and limitations of the case

2    law that has been focused upon classic victims versus

3    others.

4         But the Court's view -- and I think the suggestion

5    clearly to the Court from the Ninth Circuit, is that this

6    would be a position of trust.  And it -- this is also a

7    sentencing factor which the Court would take into

8    consideration, regardless of the guideline calculations.

9    And we'll get to some of that later, obviously, when we

10   reach allocution and cover those points.

11        But the Court is of the view that under the

12   circumstances and the evidence before the Court in this

13   case -- and I'm also in agreement with the government's

14   arguments on this, that the role adjustment enhancement

15   should apply.  The defense objection to that is overruled.

16        MR. GENTILE:  Your Honor, may I inquire of the

17   Court?  When you reference a sentencing factor, I take

18   it it's not an adverse one because, frankly --

19        THE COURT:  Oh, no.

20        MR. GENTILE:  Okay.

21        THE COURT:  Oh, no, it's not at all.

22        MR. GENTILE:  That's what I thought it meant.

23        THE COURT:  I mean, as it may hurt him here,

24   it helps him in the Court's consideration of his general

25   character.

1        I don't mind giving anyone a heads-up.  I give

2 Mr. Whittemore and his wife, Mrs. Whittemore, great credit

3 and great admiration for the family they have and the

4 relationships they have within their family.  And we'll

5 get to that later.

6        But, in any event, I am where I am.  Let's go --

7        MR. MYHRE:  Your Honor, may I just ask one

8 question of the Court?

9        THE COURT:  Yes.

10        MR. MYHRE:  Just so we understand the Court's

11 ruling.  Would the Court apply the two-level enhancement

12 independently as to each basis, one for the employees,

13 and one for the --

14        THE COURT:  Yes.

15        MR. MYHRE:  -- family members?

16        THE COURT:  Yes.

17        MR. MYHRE:  Thank you.

18        MR. GENTILE:  He said that to you because the

19 case law is clear that a family is exempt from that.

20        THE COURT:  No, I realize that.  I'm just --

21 to the extent I may be disagreeing with the case law,

22 I'm disagreeing with it.  But there's no question that

23 it applies to the employees here.  And I'm applying it

24 in that fashion.

25        And I think that it would be independently

1   attributable just because of the number of employees who

2   were involved in these conduit contributions.

3           MR. GENTILE:  I do believe that the only thing

4   left to discuss with respect to the presentence report

5   really will factor in later.  Page 27 -- oh, wait, there

6   are still 10, 11, 12, and 13 objections; right?

7           THE COURT:  There were.  They're your

8   objections, so I'll let you speak to them.

9           MR. GENTILE:  Well, they basically deal

10  with --

11          THE COURT:  I think they were general, as I

12  recall.

13          MR. GENTILE:  They deal with statements that

14  are in the sentencing justification.

15          THE COURT:  Right.  Well, that will --

16          MR. GENTILE:  Given that the guidelines are

17  calculated, I'm going to submit this one.  Why waste an

18  oral argument on it?  I'll deal with it in the 3553(a)

19  part.

20          THE COURT:  All right.

21          MR. GENTILE:  But there is one thing I would

22  like to comment on, and that is that whereas the -- at

23  page 27, the presentence report, speaks in terms of

24  having considered all the 3553(a) factors in her

25  recommendation.

1    There is nothing in this report that deals with

2    disparity.  Not even addressed.  And so under the

3    circumstances, I would suggest that we deal with that when

4    we deal with the 3553(a).

5              THE COURT:  Well, I'll hear from you on it.

6              MR. GENTILE:  Okay.

7              THE COURT:  But at this point, the Court needs

8    to enter its findings with regard to the guideline

9    calculations, with the exception of the modifications

10   that were earlier identified in the first portion of

11   this hearing this afternoon.

12        The Court adopts the factual findings as set forth

13   within the presentence report subject to those specific

14   modifications which I indicated.

15        That, therefore, indicates to me that the offense

16   level is a -- and, Ms. Beckner, please correct me -- why

17   don't you give me your calculations first, and then I'll

18   see if they jive with mine.

19             MS. BECKNER:  Your Honor, can you hear me?

20             THE COURT:  Yes, I can hear you.

21             MS. BECKNER:  Thank you, sir.  The

22   calculations are as follows:  As the Court already

23   noted, the base offense level for this offense is eight

24   pursuant to the Sentencing Guideline Chapter 2C1.8(a).

25        Additionally, the Court found that as the value of

1  the illegal transactions exceeded $120,000 but were less

2  than $200,000, a 10-level increase was applied pursuant to

3  United States Sentencing Guideline Chapter 2C1.8(b)(1),

4  cross-referenced to 2B1.1(b)(1)(F).

5       Additionally, two levels were added as the

6  defendant engaged in a total of 30 or more illegal

7  transactions as defined in 2C1.8(b)(4).

8       As the defendant was found to have abused his

9  position of trust, an additional two levels were added,

10  pursuant to United States Sentencing Guideline 3B1.3.

11       This then results in an adjusted offense level of

12  22.

13       There was no reduction for acceptance of

14  responsibility, resulting in a total offense level of 22.

15       Would Your Honor like the applicable ranges?

16       THE COURT:  Yes, please.

17       MS. BECKNER:  Yes, sir.  I'm sorry.

18       The applicable guideline sentencing range for a

19  total offense level of 22, in combination with a criminal

20  history category Roman numeral one, would be 41 to 51

21  months.

22       The applicable fine ranges for Counts One and Three

23  would then be $7,500 to 75,000.  And as to Count Two, the

24  fine range would be $400,200 to a maximum of $1,334,000.

25       And a special assessment of $300 for each of the

1    three counts total.

2           THE COURT:  All right.  The Court so finds.

3    And that does agree with the Court's calculations, which

4    I was contemplating when I asked Ms. Beckner to stand.

5           That will take us to allocution.

6           Mr. Gentile.

7           MR. GENTILE:  Allocution.  Aren't we going to

8    address the 3553(a) first?

9           THE COURT:  Well, that's part of allocution in

10   the Court's view.

11          MR. GENTILE:  Oh, okay.  All right.

12          Then let me allocute.  Obviously I -- at this point

13   the question becomes not what are the guidelines, because

14   you've made a determination, but what sentence, under

15   3553(a) and *Booker* and all of the case law that has

16   followed it, would be sufficient but not greater than

17   necessary to carry out this Court's obligations under

18   3553(a).

19          Necessary is the touchstone.  And so with that, I

20   will approach, sequentially, the 3553(a) factors, with

21   your permission.

22          Your Honor, this is not a mine-run case.  And I ask

23   you to keep that in mind.  I think you've already kind of

24   indicated that at least with respect to the character of

25   the defendant, it's not an ordinary situation.

1    But the -- it will be -- it is our position, and it

2    is our prayer, if you will, that as between 3553(a)

3    factors and the avoidance of disparity, which is one of

4    those factors, and Mr. Whittemore's extraordinary history

5    of both charitable and community activity, not just with

6    his money but with his time, that the appropriate

7    necessary -- not greater than necessary sentence would be

8    a noncustodial one, with substantial conditions and with

9    community service as one of those substantial conditions.

10    And one of those conditions should also be -- and I

11   do believe it would be constitutionally appropriate that

12   he not become involved in campaign fundraising while he is

13   on -- under the supervision of the Court on a noncustodial

14   sentence.

15    And whereas we were talking about departure factors

16   when we were dealing with the United States Sentencing

17   Guidelines, I am now going to be addressing, as I go

18   through the 3553(a) factors seriatim, variance.  Because a

19   variance basically means, as you know, that the United

20   States Sentencing Guideline range that you have determined

21   is greater than necessary.

22    And so all of the remarks that take place from this

23   point forward will be addressed to hopefully persuading

24   you that that guideline range is greater than necessary.

25    The first section deals with the nature and

96

1   circumstances of the offense.  That's the first section of

2   3553(a)'s analysis.

3        Now, there's no question about the fact that there

4   is a serious felony.  And so, you know, we concede that.

5   At the time that it was committed, the laws were not as

6   they are today with respect to how someone would get

7   153 -- $150,000 to a friend of his that he made a promise

8   to.  And we never dispute the government's theme in this

9   case that -- the government's theme -- we disputed that he

10  consciously broke the law.  We did do that at the trial.

11       But we never disputed that he had a choice between

12  keeping his promise or breaking the law, in the sense that

13  while we disputed that he intentionally broke the law,

14  there's no question that he was motivated by keeping his

15  promise.  Sometimes -- most of the time that's a good

16  thing.  Sometimes it's not.

17       And that's what happened here.  There was no quid

18  pro quo.  The Court has recognized that.  The Court has

19  modified the presentence report to recognize that.  And

20  there should be no hint of such stuff.

21       But I think it's important -- there seems to be a

22  theme throughout not just the presentence report, but

23  throughout the government's presentation, that somehow the

24  appearance of influence or access is one of the things

25  that is problematic here and one of the purposes for the

1  statute.

2      And I would remind the Court that in *Citizens*

3  *United*, the language that I'm about to quote appears:  The

4  appearance of influence or access will not cause the

5  electorate to lose faith in this democracy.  That comes

6  right out of *Citizens United*.

7      And so while I submit to you that it's a serious

8  offense, since this offense was committed, there are now

9  ways in which somebody can get way more than $150,000

10  under the same set of circumstances through somebody's

11  campaign for the benefit -- for the purpose of influencing

12  the outcome of a federal election.

13      You know what those are.  They're addressed in our

14  brief.  I don't intend to go on forever.  But we know that

15  just right even here in the state of Nevada there are

16  people that are contributing millions of dollars under

17  such circumstances, and they're able to do it lawfully,

18  and they're able to do it under circumstances where

19  they're not even identified until post-election filings.

20      And I ask you to take that into consideration

21  because whereas the seriousness of this offense at the

22  time that it occurred was truly serious, there's going to

23  be a point, when you're thinking in terms of a general

24  deterrent effect, where I will be addressing that

25  specifically, to suggest to the Court that this is not the

 1    case for that general deterrent effect to occur because of

 2    a harsh sentence imposed upon Mr. Whittemore.  So we

 3    concede that it is a serious offense but with those

 4    comments attached to it.

 5         The history and character of Harvey Whittemore.

 6    Well, I think you know, from what you heard and from what

 7    you've read in the submissions with respect to letters and

 8    other things, that he has a law-abiding nature.

 9         To the extent that you're a member of this

10    community, my best guess is that well before the civil

11    litigation and the criminal case you have heard of Harvey

12    Whittemore.  And while I'm sure that it's been -- there's

13    been some controversy associated with it at times, you

14    have not heard that he's not a law-abiding person.  And I

15    think that that's important, and I think it's a benefit

16    under the circumstances of this sentencing.

17         He's also a productive citizen when you're going to

18    consider the second factor, the history and character of

19    Harvey Whittemore.

20         You've already commented about the nature of his

21    family.  I have been influenced by the fact that Harvey

22    talks to each one of his kids every day.  And I've been

23    with him when that happens.  You know, I really feel

24    guilty to say that I don't.  But I am more often now.  And

25    so to that extent, he's had an impact on me.

1    He has clearly lived a life that has been focused

2    on his community and the less fortunate in it.  And I'm

3    going to address that when I get to the end of this.  And

4    I'm talking about basically the *Serafini* case and what you

5    can do because of it, what you're permitted to do.  And

6    *Serafini* was a guidelines case.  Under 3553(a) you can do

7    much more.

8    He truly has demonstrated an extraordinary and

9    exceptional charitable and community activity.  The thing

10   about that, again, that I think needs to be honored --

11   needs to at least be understood, is that, you know, a

12   truly good person doesn't do those things to get

13   recognition, he does them because they're the right thing

14   to do and because they make him feel good.  They are, in

15   fact, their own reward.

16   Your Honor, I cannot begin to explain to you the

17   difficulty that I have had in pulling from Harvey

18   Whittemore the charitable and community activities that he

19   has been involved in.  He is actually embarrassed to

20   reveal them.  And I think you're going to hear him say

21   that when he stands before you.  Because they have been

22   going on for decades.  They didn't get started recently.

23   You have in our submission, at page 30 and 31, a chart

24   that deals just with the money part.

25   Starting in 1992, Mr. Whittemore made charitable

1    contributions of almost 12 percent of his annual salary

2    and wages.  In no year since then has it ever fallen

3    below -- the next year, 1993, it was 8.6 percent.  And it

4    stayed pretty much at that around 12 percent level until

5    1996.  And from that point forward it has varied between

6    15 percent and 276 percent; in other words, almost three

7    times his wages and salary he has given in terms of

8    writing checks to charitable institutions in this

9    community and some others.

10            To summarize that chart, which is, of course, in

11   the public domain, from 1992 until 2012, last year when he

12   was under indictment and clearly no longer had the kind of

13   cash flow that he had during the Wingfield Nevada years,

14   Mr. Whittemore, in that timeframe, had salaries and wages

15   of a little bit over 11 million dollars.  Now, that's a

16   lot of money.  There's no question about it.

17            But during that same timeframe, his charitable

18   contributions exceeded it.  It was $12,123,808.06.  And

19   you have an affidavit in the submission from Mr. Bradshaw

20   in terms of how he calculated that.  And, moreover, the

21   government didn't challenge it in any kind of an

22   opposition.

23            And so if you cumulate the 20-year span, from '92

24   to 2012, which I think is actually 21 years,

25   Mr. Whittemore gave 110 percent of his salaries and wages

1    to charity; 110 percent.  Now, that's - that says

2    something about Harvey Whittemore and Annette Whittemore.

3         But what I think needs to be focused on is that

4    that was spread out among 116 charities.  And you also

5    have a submission, Exhibit 33 to our sentencing memo, that

6    details what those charities are.  And with your

7    permission, I'd like to read a few of them into the

8    record.  May I?

9         THE COURT:  It's a part of the record.  I'd

10   ask that you be brief.  But go ahead, please.

11        MR. GENTILE:  Okay.  I mean.  The City of

12   Refuge, Abused Women and Children of Douglas County.

13   UNR, of course.  St. Catherine of Siena Episcopal

14   Church.  Covenant Presbyterian Church.  Spanish Springs

15   Presbyterian Church.  St. John's Episcopal Church.

16   Bishop Manogue School, on a couple of different types of

17   donations.

18        Food banks.  Babe Ruth Leagues.  Baseball leagues.

19   Boy Scouts.  Girl Scouts.  Junior Achievement.  The YMCA.

20        And you've got letters that deal with those things.

21   116 of them are set out in this list.  And they are

22   verified by Mr. Bradshaw because that's how he came up

23   with the numbers.

24        Law schools.  Colleges.  Food banks.  Scholarships.

25   Drug rehab centers.  Salvation Army.  I mean, it's just --

1  it's amazing.  It's amazing.

2        More importantly, he has given up his time.

3        Your Honor, may I ask, did you view Exhibit 5?  I

4  don't know because, you know --

5              THE COURT:  I did, and I should have stated as

6  a matter of the record.

7        For the benefit of the record, Exhibit 5 is the

8  videotape that was submitted in connection with the

9  defense exhibits and position in this matter of the --

10             MR. GENTILE:  I take it that it is part of

11 the --

12             THE COURT:  -- the sentencing memorandum.

13       And I will make it part of the record.  The Court

14 did review it.

15             MR. GENTILE:  Okay.  Well, you know, you saw

16 in there the non-financial giving side of Harvey

17 Whittemore as well.  This is a man who cares about

18 people.

19       And until this sentencing, until he had to, because

20 I told him he had to give this up, he didn't.  He never

21 revealed it.  And that is the sign of a truly charitable

22 and community-interested person.  He gave with a warm hand

23 and a closed mouth, whereas a whole lot of people are just

24 the opposite.

25       So that's the person that you have before you when

1   we're dealing about the character of Harvey Whittemore.

2   He truly does believe that that kind of giving and that

3   kind of community activity is its own reward.  And he was

4   raised that way.

5          I have Ellen Whittemore here.  We have submitted

6   her affidavit to the Court, her declaration.  I assume

7   that you received that.

8                  THE COURT:  I did.  And I have reviewed it.

9                  MR. GENTILE:  And we filed a notice of our

10  intention of calling her as a witness.  And with your

11  permission, I'd like to do that.  Because there seems to

12  be a lot of controversy here about the reason that

13  Harvey Whittemore did what he did.  And he's been

14  described as greedy and a liar and things of that

15  nature, and she is prepared to address those issues.

16                 THE COURT:  All right.  I'll allow her just to

17  address it in a summary from the podium.  She need not

18  be sworn.

19                 MR. GENTILE:  Okay.

20                 MS. WHITTEMORE:  Good afternoon, Your Honor.

21                 THE COURT:  Good afternoon.

22                 MS. WHITTEMORE:  For the record, I'm Ellen

23  Whittemore.  I'm Harvey Whittemore's younger sister.

24         It has been suggested that Harvey was greedy, that

25  he was greedy for money and that he was greedy for power.

1       And I will tell you that that is so far from the

2  truth it is ridiculous.  Harvey has been an incredibly

3  hard-working individual since the time I was a child and

4  he was a young teenager.

5       If you take a look at his high school career, he

6  was in the top 10.  He was the mostly likely to succeed.

7  He was the senior class president.  He was the senior boy.

8  He played football.  He worked.  He went to church.  In

9  college he worked.  He painted to help support his way

10  through school.

11       In law school he worked.  He was married.  He

12  worked every second he wasn't at school.

13       He continued on throughout our young adult to work

14  so hard that the only complaint that I've ever heard from

15  Annette about my brother is that he was working too hard.

16       And I have personal knowledge of it.  Since 1989 I

17  have been with the same law firm that Harvey was in.  And

18  consistently Harvey Whittemore was the person who worked

19  the hardest, the longest.

20       And when many of our fellow attorneys left the law

21  firm because they didn't feel that they were being

22  compensated enough for the work that they had done, Harvey

23  showed such an incredible loyalty to the people who

24  brought him into the practice of law, that he continued to

25  take far less than he would have taken at any other

1    location or any other law firm or even on his own.

2         But what really impresses me about Harvey is his

3    loving nature and his giving nature.  He gives when it

4    hurts.  He gives beyond measure.  He gives when anybody

5    asks him to give.

6         And what has surprised me during this entire

7    process are the number of charities and the amount that he

8    has contributed because he hasn't bragged about it.  We

9    were taught that if we were successful through hard work

10   and we were financially successful, we had an obligation

11   to give back to our community.

12        And I will tell you of all of the siblings he has

13   done far more than any of us.  And I have started to try

14   to be better and be more like him because of his example.

15        He doesn't just give to charities.  He gives to

16   people who are down on their luck, who need a helping

17   hand.  And if there were the ability to go out into the

18   community and say if Harvey Whittemore ever gave you a

19   dollar because you were broke or if Harvey Whittemore ever

20   bought you lunch because you were broke, there would be

21   thousands of people here because Harvey is the most

22   generous, giving individual I know.

23        Thank you.

24        THE COURT:  Thank you.

25        MR. GENTILE:  Your Honor, in that chart,

1   Exhibit 33, where we're talking about his activity that

2   is not dollars and cents, you know, writing checks --

3   because if you have a lot of money, you could write

4   checks.  There's no question about it.  He's not going

5   to be facing that anymore anytime soon.

6        But the bottom line is that historically, when he

7   gave away that 12-million-plus dollars, he had the ability

8   to do it.

9        But time -- I heard a judge in San Diego -- excuse

10  me, San Antonio, a federal judge, Dorwin Suttle was his

11  name, and it's many years ago, back in the '80s, I would

12  say, who said to me in open court:  Mr. Gentile, time is

13  our precious commodity.  Once it's gone, it's gone

14  forever.

15       I think he was making a comment about an argument

16  that I was making that was taking too long, but that's

17  neither here and there.  The words were wise, okay?

18            THE COURT:  Let me write that down.

19            MR. GENTILE:  The words were wise.

20       And so when we give of our time, we are, in fact --

21  we are, in fact -- you know, I could make more money.  I

22  can't make more time.  And so when one gives of their

23  time, that is true charity.

24       And you have a list that we were able to compile of

25  volunteer activity where Harvey Whittemore gave of his

time, at the University of Reno Foundation, at the Arizona
State University Legal Services.  He was a board member
and president of the South Reno Babe Ruth League, coach of
the South Reno Babe Ruth League, Reno YBA Basketball, Pop
Warner, Sparks Little League, YMCA of Sparks, on the board
of directors since he was 17 years old, the YMCA of the
Sierra board of directors, Airport Authority of Washoe
County, Athletic Association of the University of Nevada.
He was the chairman of that.

That takes time.  I know that you, prior to
reaching the bench, gave of your time because I shared
your time when we were on the board, and I know that you
appreciate that kind of charity and that kind of volunteer
work.

University of Nevada Student Aid Foundation,
Chairman of the UNR Reno Foundation, Member of the Reno
Air Race Association, White House Counsel on Tourism.
Washoe County Honorary Deputy Sheriff's Association.  And
it goes on.

And so when we're dealing with that first 3553(a)
factor, that is the Harvey Whittemore that you have before
you for sentencing.

We also gave you a list of awards that he's
received.  But he has forbidden me from reading those into
the record because he finds that to be embarrassing, not

1  in the sense that -- I think you know what I'm trying to

2  say, in the sense of humility as opposed to he shouldn't

3  have been doing it or he shouldn't have received it.

4        He's not the kind of guy to ask for that kind of

5  recognition.  But he's going to be before you today asking

6  you to at least take that into consideration when you are

7  taking -- when you are making the punishment fit the crime

8  and the individual, which is what *Gall* case says you have

9  to do.

10       The next aspect of 3553(a) requires you to take the

11  seriousness of the offense and -- into consideration along

12  with your sentence creating respect for law and yet -- and

13  being a just punisher.

14       I repeat that this is a serious offense, and I

15  repeat that there was no appearance, even, of any kind of

16  a trade-off.

17       Harvey Whittemore, Your Honor, when we're going to

18  deal with respect for the law and just punishment, he

19  suffers and has suffered since this investigation started

20  and certainly since the indictment was returned, without

21  any kind of need for incarceration.  You know, so far he

22  has only been in waist chains and leg irons one day.

23       And that was quite a wake-up call for a person with

24  his background.  But he has been subject, ever since then,

25  to public disgrace and humiliation.  This is a

1  high-profile case.

2       The Whittemore name -- to the people that are

3  sitting back there, the Whittemore name hasn't been

4  damaged one iota.  But to the people who don't know Harvey

5  Whittemore, the people who don't know his kids, the people

6  that don't know his family, the Whittemore name has been

7  sullied and damaged.  And that hurts Harvey Whittemore.

8  And he will tell you that.

9       His privilege to practice law, as you well know, is

10  in jeopardy.  Is that fair to say, it's in jeopardy.  Most

11  likely he will lose that privilege, at least for some

12  period of time.

13       But it's in jeopardy.  And this man has lived the

14  life of a lawyer.  That's an important thing.

15       You heard Dan Bowen's testimony on this stand.  I

16  guarantee you that hit home with you and I guarantee it

17  hit home with me and it hit home with any lawyer who takes

18  what he does seriously.  It's the last thing on earth you

19  want to give up because we like it and we worked hard to

20  get it, and we worked hard for the reputation behind it.

21  And that's gone.

22       He's lost his voting privilege.  He's going to be

23  convicted as a felon because of his activity in elected

24  politics, and he's never going to be able to vote.  That's

25  a big deal to a guy like Harvey Whittemore.

1    I venture to say that the vast -- well, I don't

2  know that.  But a substantial percentage of people who

3  come before you couldn't care less about that as a

4  sentencing issue.  I think you know that that's not the

5  case with respect to a man from this background,

6  particularly how he got into this problem in the first

7  place.

8    He has been politically active since high school.

9  He will no longer have a voice in government.  He is, in

10  fact, a political leper.  That hurts.  That's a punishment

11  for a man like him.

12    He's lost his right to bear arms.  Now, to some

13  Americans that doesn't mean anything.  But it means a lot

14  to me.  And it means a lot to a lot of people.  And that

15  will not be the case.

16    Even without a condition from you, he will be a

17  convicted felon, which is a -- it is a crime for him to

18  have a weapon.  And to some of us, that would seriously

19  impact what little free time we have.

20    He has to register as a felon in Nevada.  And in

21  some other states within a period of 24 hours of getting

22  there, he's going to have to do that.  Now, that's true

23  for everybody.  But when you have the fall from grace that

24  Mr. Whittemore did, that hurts even more.  That's a sting.

25    Now, I know that I'm going to hear the argument he

1  should have thought of that when he got into the trouble.

2  And, yes, that's true.  But it doesn't make it any less

3  punitive.  Especially to a person of Harvey's background.

4       And with respect to privileged licenses, not just

5  his privilege to practice law but all privileged licenses,

6  it is highly unlikely that he will ever be able to get

7  one.  I suppose it depends on the nature of the privileged

8  license.  But certainly the ones that one would want to

9  have, the ones that one would want to have a greater

10  desire to be in possession of, he will either not get at

11  all or will have a horrible time trying to.

12       Now, in the *Gall* case the supreme court said that

13  harsh punishment for its own sake promotes not respect but

14  derision of the law.  And so you need to take that into

15  consideration when you're dealing with this part of

16  3553(a).

17       Now, let's talk about the terms and public

18  protection.  Well, the government concedes in its written

19  pleadings that the likelihood of recidivism on the part of

20  Harvey Whittemore is nonexistent.  I don't think they say

21  nonexistent.  But they do say that it's not an issue.  And

22  I think you know that.

23       If it took him -- let's see.  He's 61 now.  So six

24  years ago he was 55 years old.  It took him 55 years to

25  commit a crime.  And now that he has seen what the result

of that is, in terms of specific deterrence, in terms of
his individually being deterred from violating the law
again, it's not there. And in *Pepper versus the United
States,* the United States Supreme Court says that that is
a central factor when applying this part of 3553(a).

And our circuit in the *Edwards* case said it might
be -- it may very often be that release on probation under
conditions designed to fit the particular situation will
adequately satisfy any appropriate deterrent or punitive
purpose. And I submit to you that if deterrence is what
you're thinking about, this is that case that *Edwards*
speaks about.

And by the way, that was a quotation right out of
the -- in *Edwards* right out of the legislative history of
the sentencing guidelines as they dealt with the question
of imposing probation.

So I submit to you that in terms of adequate
deterrence and public protection, a sentence of
incarceration of any type is greater than necessary.

If you additionally attach a condition that
prohibits him from fundraising or participating in
campaign fundraising -- frankly, I doubt that any elected
official in the state of Nevada will take money from
Harvey Whittemore at this point. And I won't make any
comment on anything in terms of their judgment. It is

1  what it is.

2      And, of course, he doesn't have any money, as you

3  see from his financial disclosure.  Although he certainly

4  is not going to be without money forever.  And as the

5  presentence report indicated, he does have the ability to

6  pay a fine given the time to do it.

7      And clearly if you do not impose a custodial

8  sentence on him, then the second count of this conviction

9  is going to require a fine in the neighborhood of about

10  $400,000, just to comply with the minimum aspect of it.

11      But he would -- knowing his work ethic, knowing the

12  support that he's got in the community, knowing that he

13  would be a disbarred lawyer but certainly has a

14  skill-set -- and I say disbarred.  I mean, I don't want to

15  anticipate that, okay?  But he's going to be sanctioned

16  somehow.  He still has the ability to earn a living and to

17  be able to pay a fine.  And so that would be a condition.

18      Now, let's talk about general deterrence because

19  that's always a question.  You know, if I place Harvey

20  Whittemore on probation, is that going to encourage more

21  people to violate this law, or is it going to let them

22  know that they ought to think twice?

23      Well, this man has fallen from a lofty position.

24  Those who know -- those who don't know him and have never

25  heard of this case, whatever you do to Harvey Whittemore

114

1   is not going to make any difference at all.  Those who do

2   know him know the price that he has paid for where we're

3   at with this.

4        But I want to read into the record, when we're

5   talking about general deterrence, something that was said

6   about a month before this trial started in a senate

7   hearing.  And it was said by -- and I don't know how to

8   say her name.  It's spelled M-y-t-h-i-l-i.  Her last name

9   is Raman.  She is an acting assistant attorney general.

10  And she gave this testimony before the Senate Subcommittee

11  on Crime and Terrorism.

12       And it directly addressed the issue before this

13  Court.  And I'm going to quote:  We anticipate seeing

14  fewer cases of conduit contributions directly to campaign

15  committees or parties because individuals or corporations

16  who wish to influence elections or officials will no

17  longer need to attempt to do so through conduit

18  contribution schemes that can be criminally prosecuted.

19  Instead they are likely to simply make unlimited

20  contributions to Super PACs or 501(c)s.

21       Now, why is that important?  Why is that so

22  important that I read that into the record?  It's

23  important on the question of general deterrence.  That is

24  a high-ranking official of the United States Department of

25  Justice telling a senate subcommittee that you're not

1    going to see this offense.  They anticipate seeing it very

2    little.

3          And I would suggest to you, Judge, that the only

4    time somebody in the future would ever want to use a

5    conduit would be if they needed to completely disguise and

6    hide their having any contact with the contribution at

7    all.

8          If they don't want to do that, then they will

9    submit to a PAC or a 501(c) however much money they want

10   to do.  Even if they're a corporation.

11         Now, one of the central facts of this case was that

12   at the time you couldn't make a check to Harry Reid for --

13   out of Wingfield Nevada Group for $150,000.  And so

14   Mr. Whittemore did it from his own personal funds and did

15   not take deductions for it; did, in fact, comply with the

16   IRS law.  It doesn't matter how you want to characterize

17   it, whether it was a gift or whether it was a bonus.

18   People's memories fade after six years as to what was

19   said.

20         But the bottom line is that with respect to the

21   need for incarceration to provide general deterrence, you

22   have it coming out of the mouth of a high-ranking

23   Department of Justice official that there won't be that

24   need and a sentence of incarceration of Harvey Whittemore

25   will not serve that need in terms of the amount that may

1    still be out there that would want to do it.

2         I submit that this -- his fall from grace, as seen

3    by the people who know him, who may have the financial

4    wherewithal to do what he did, well:  A, they don't need

5    to do it anymore; and, B, what happened to him without an

6    incarceration is enough to prevent them from doing not

7    just this violation but any violation of federal law.

8         Let's talk about medical care, education, and

9    training.  That's the next factor.  He has a serious

10   medical condition.  The PSR recognizes it.  The government

11   doesn't address it.  They don't contest that he has a

12   serious one.

13        This factor is designed to have the Court decide

14   whether his medical condition needs to be taken into

15   consideration with respect to his punishment.  So, for

16   example, if you were thinking in terms of punishing him

17   and placing him on a prison sentence, then you would have

18   to take that into consideration in terms of where -- if

19   the facilities exist and where to put him.

20        I submit to you that on the facts of this case,

21   because of his background and because of the absence of a

22   need for general deterrence or specific deterrence, it

23   makes no sense to incarcerate him under this factor.

24        He clearly has insurance to cover his medical

25   needs.  And there's good medical care in northern Nevada.

1  I won't comment on southern Nevada.  But there's good

2  medical care in northern Nevada where he lives.

3       With respect to education, which that factor

4  addresses, he doesn't need incarceration for training.

5  He's going to be employable.  He may not be able to walk

6  into a courtroom.  He may not be able to advocate on

7  behalf of somebody.  He may not even be able to have

8  direct client contact.  But he is going to be employable.

9  And so he certainly doesn't need training as part of a

10 prison sentence under 3553(a).  This is not that case.  I

11 said before, it's not the mine-run case.

12       Types of sentences available.  Well, the

13 presentence report recognizes that probation is available

14 and that the statutes do not require, as a mandatory

15 component, an incarceration.

16       In the *Gall* case the supreme court says that

17 3553(a)(3) directs the judge to consider sentences other

18 than imprisonment.  And so I know that you know that, and

19 I know that you will address that.

20       But as you have said before, while you and I may

21 know it, there are people in this courtroom that may not.

22 And so I'm beating you to the punch on that one.

23       And in *United States versus Menyweather*, a Ninth

24 Circuit 2006 case, the Ninth Circuit said that probation

25 with conditions is as strenuous as any other sentence the

1    Court could impose, in certain circumstances.  We have

2    proposed those conditions.

3         Now, let me address sentencing disparity.  You have

4    read the submission that we made.  I believe we gave you

5    over 30 other cases involving these same statutes so that

6    you could see and judge for yourself whether the

7    guidelines or a guideline sentence would, in fact, result

8    in a disparity.  And I think the only conclusion that you

9    could reach is that they would.

10        I want to comment on just a few of those.  There

11   are many that we submitted.  *Rhodes* is the closest analogy

12   factually.  In the *Rhodes* situation Mr. Rhodes made

13   contributions to Dario Herrera and Harry Reid, the same

14   campaign entity, Friends for Harry Reid.  He hid them by

15   making phony entries on corporate checking ledgers.  He

16   took business deductions for them, and he signed off that

17   he knowingly and willfully violated the act when he signed

18   the agreement with the FEC.  He was fined.  He was not

19   even criminally prosecuted.

20        The *Mobley* case was sentenced just before our

21   trial.  In that case, Mr. Mobley made over $70,000 in

22   conduit contributions over three calendar years, although

23   it was reduced because it was a plea.  He had corporate

24   reimbursements and bonuses as a way of getting the money

25   to the conduits.  And he took the deductions.

1      Now, you remember the book -- the book.  We are

2  talking about the Lobbying, PACs, and Campaign Finance, 50

3  State Handbook 2005 edition that was entered into evidence

4  in this case.  And that book makes it clear at page 247:

5  The prohibition against contributions to federal

6  candidates and federal committees by individuals who are

7  federal contractors is discussed in a different section.

8      And we'll get to that because one of these people

9  was a federal contractor.

10      An individual may not make a contribution in the

11  name of another person or knowingly permit his name to be

12  used to effect such a contribution.  441f.  This means

13  that an individual who makes a contribution may not seek

14  or receive reimbursement from his or her employer.

15      So clearly the *Mobley* case -- by the way, it means

16  more than that now.  And, of course, we know that.  But at

17  the time, in 2005, that's what it meant.  In 2007 that's

18  what it meant.

19      It wasn't until the *O'Donnell* case, which came

20  three years later, that some clarity and a gloss was put

21  on that in terms of what else it meant besides that.

22      And, of course, that didn't exist when

23  Mr. Whittemore engaged in the conduct that brings us here

24  today.

25      In the *Mobley* case the guideline level was a level

1  16 after the acceptance of responsibility, and it was a

2  21-to-27-month guideline range.

3      The prosecutor in that case, when addressing the

4  Court, said that what they normally see -- and he asked

5  for that 21-to-27-month range.  He said what they normally

6  see is minimum incarceration.  You'll find that at page 17

7  of Exhibit 1.

8      In reality what happened in that case is the judge

9  imposed three years probation, a $200,000 fine, and 200

10  hours of community service.  I submit to you that, while

11  the numbers may be different, the components should be the

12  same in this case: probation, a fine, community service,

13  and some other conditions.

14      The *Erickson* case.  Mr. Erickson made over $250,000

15  in conduit contributions over five years because he wanted

16  to become engaged in Indian gaming.  He was lobbying for

17  Indian gaming.  He used corporate checks to do a

18  reimbursement.  His sentence was 18 months probation and a

19  $5,050 fine.

20      Let's look at the *Cuza* case at Exhibit 21.  He made

21  over $120,000 in conduit contributions just as in this

22  case.  He was the vice-president of Mattel Toys, and he

23  used conduits for four years.  To hide it he used an

24  intermediary billing service that would submit invoices to

25  Mattel and that they would then pay.  But in reality that

1   billing service was then funneling money to the conduits.

2   He wound up with $188,000 civil penalty and a two-year

3   probation.

4        The *Stipe* case, Mr. Stipe was an elected official

5   himself.  And in trying to help out another elected

6   official, he made almost -- he was $500 short of a quarter

7   of a million dollars in conduit contributions over a

8   period of a few months.

9        To hide them he wound -- he created a phony cattle

10  sale, a phony option contract, a phony advertising bill, a

11  sale of a stock trailer, a phony art auction, used 39

12  conduits; denied it all.  He was given a civil penalty of

13  $267,000 and five years probation.  And he was charged

14  criminally with perjury, conspiracy to obstruct the FEC

15  investigation and conspiracy to violate the Federal

16  Election Campaign Act.

17       At the end of the day, in addition to the five

18  years probation, he was given six months of home

19  confinement as a condition to it and ultimately paid a

20  fine of $735,567 and was required to surrender his license

21  to practice law.

22       But, again, we're talking about disparity here.

23  And we're talking about the man that you have before you

24  who did none of those things in terms of trying to hide

25  conduit contributions.

1          Mr. O'Donnell, the famous Mr. O'Donnell.  Now, I

2    have to tell you something.  According to the documents

3    that you have before you, which were the documents created

4    by the FEC, the conciliation agreement with O'Donnell,

5    that document says at -- the court's stamp would be page 6

6    of 18, document 200-6 filed 9/23/13.  At page 15, it says

7    that O'Donnell was indicted for three felony violations of

8    federal campaign law after a jury trial and lengthy

9    appellate process.

10          In August 2011 O'Donnell entered a guilty plea to

11   two misdemeanor violations of federal campaign laws and

12   was sentenced to two months in federal prison and four

13   months in a halfway house.

14          Now, you're going to tell me that case wasn't

15   litigated?  Well, I don't mean it that way, Judge,

16   obviously.  Clearly that case was litigated.  And

17   litigated hard.

18          And that document was filed before the Federal

19   Election Commission.  The title of it is In the Matter of

20   Pierce O'Donnell.  And it is signed off by Daniel Petalas,

21   Associate General Counsel for Enforcement of the FEC.

22          I must tell you, out of candor with the Court, I

23   don't know if it's true if that case went to trial.  This

24   is the first that I'm hearing about that.  But,

25   nevertheless, I can't believe that the FEC would have made

123

1  such an error.

2       Now, there have been people that have been

3  sentenced to substantial incarceration.  And I'm not going

4  to deny that.  But every one of those cases is

5  distinguishable.

6       Mr. Danielczyk, a case that we brought before you

7  in our pleadings at times until -- Mr. Danielczyk wanted

8  an ambassadorship.  The facts of the case are clear.  He

9  wanted an ambassadorship.  And so he made $200,000 in

10  conduit contributions to Hillary Clinton when she was

11  running for senate and when she was running for president.

12       He also withheld evidence from the government.  He

13  falsely identified the purpose of checks on the legend

14  aspect of the checks.

15       He falsified and backdated letters, once the

16  investigation started, to try to cover his tracks.  He

17  falsely characterized payments and falsely reported to the

18  FEC that these payments were bonuses.  In spite of all of

19  that, he received a 28-month incarceration and was fined

20  $50,000.

21       And perhaps the most egregious of them is

22  Mr. Magliocchetti.  And for the record, I will spell that.

23  M-a-g-l-i-o-c-c-h-e-t-t-i.  And I may be the only guy in

24  this room that can say that the way I said it.

25       But Mr. Magliocchetti was a lobbyist seeking to

124

1   increase his business.  He sought, on a regular basis,

2   defense industry funding and earmarks from the elected

3   officials that he was funneling conduit contributions to.

4        Between 2003 and 2008, according to the

5   government's position in the *Magliocchetti* matter, he made

6   scores of campaigns and PAC contributions -- excuse me, he

7   caused scores of campaigns and PACs to file false reports

8   with the FEC.

9        The government memo in that case, which is part of

10  the record before you, says that funneled almost $400,000

11  in conduit contributions during that time.  He reimbursed

12  them through corporate funds for which he took deductions.

13       He made people phony members of a board.  He

14  made -- he gave them board seats so that he could have a

15  reason to cut a check to them.  They did nothing for the

16  board.  They didn't even live in the same state that his

17  business was located in.

18       He overtly pressured -- overtly pressured his

19  employees by threatening them with the loss of their jobs

20  if they did not, in fact, assist him.

21       And he directed -- probably the most egregious

22  fact, is that he directed the destruction of evidence once

23  the investigation got started.  Despite all of that -- his

24  sentencing guideline range, by the way, was 46 to 57

25  months.  He was sentenced to 27 months and a $75,000 fine.

1          So -- by the way, that was giving him a three-level

2     acceptance of responsibility credit.  His guideline range

3     without that would have been 63 to 78 months.  So in

4     reality, he went from a 63-to-78-month to a 27-month

5     sentence.

6          His son, who entered a plea for the exact same

7     amount of money involved in this case, more than 120 and

8     less than 200,000, received 14 days in jail and five and a

9     half months home confinement as conditions to probation.

10         Now, there are many others, but I've made my point.

11         To incarcerate Harvey Whittemore in light of the

12    guidelines, in light of his background, in light of the

13    3553(a) factors, would -- one of which is avoiding

14    disparity, would, in fact, not honor that 3553(a) factor.

15         The government has characterized Mr. Whittemore as

16    a greedy person, greedy for power.  I understand advocacy.

17    But I think that the record before you and our submissions

18    refute that.

19         That is not the nature of this man.  Has he sinned?

20    Has he violated the law?  The answer to that is yes.  He's

21    going to stand up and talk to you about that.  But I

22    submit to you that given the *Serafini* case, which was a

23    guideline case; given the post-*Booker* empowerment of a

24    district court once again -- you know, I practiced for 17

25    years prior to the guidelines in federal criminal cases.

1    Today I'm very much reminded of those days.  And it feels

2    good.  Because judges no longer are strapped by the

3    guidelines.

4          And I suggest to you that to give these facts a

5    just punishment really requires a non-custodial sentence,

6    with some conditions, no doubt.  And no one's in a better

7    position to determine what those conditions should be than

8    you.  You have sentenced, as you said, hundreds of people.

9    You know who has come before you in the past.  No one

10   knows more about the system, certainly not I, than you do.

11         But I believe that a probationary sentence with

12   conditions of a fine, conditions requiring Harvey to do

13   things such as community service, part of which maybe

14   should be having him hold classes or do lectures on

15   speaking to groups about campaign laws and campaign

16   contributions and what happened to him because of

17   transgressing them.  That will do some good, Judge.

18         Warehousing Harvey Whittemore isn't going to do any

19   good for anybody, and certainly not for this community.

20   So it's my hope that the only time that Harvey Whittemore

21   is going to have to have waist chains, leg irons, and

22   handcuffs has passed.  It was on the day that he appeared

23   in court the first day of this ordeal.

24         If I may have just a moment.

25         If the Court wants to hear from Mr. Whittemore now,

127

1   or the government?

2        THE COURT:  I would hear from Mr. Whittemore.

3        And I will remind him this is his opportunity.

4        THE DEFENDANT:  Thank you, Judge Hicks, for

5   the opportunity to make a statement this afternoon.

6        I come before you standing alone as a convicted

7   defendant, a felon.  None of the people in the courtroom

8   who are here to support me are responsible in any way for

9   what has transpired and the activities which got me here

10  today.

11       I am solely responsible for the activities which

12  have been -- that I took.  The choices that I made were

13  mine.  In 2007, March -- February and March of 2007, I

14  made a decision, looking back, that has caused

15  extraordinary pain.

16       But to repeat, I know that a jury of my peers has

17  found me guilty of a crime, has determined that I was

18  wrong, and that my activities did not meet my own standard

19  of conduct.

20       Looking back, Your Honor, it was arrogant and naive

21  of me to believe that my conduct was lawful.  But I cannot

22  change that decision today.

23       Your Honor, I erred as a lawyer, by giving myself

24  bad advice.  But I did not hide my actions then.  I'm not

25  hiding my actions today.  I did not destroy records.  I

128

made a promise, and I kept it.  And the prosecution is right, I am an honorable man and a man of my word.

As a defendant lawyer, Your Honor, I respect the time that the jury spent on this case, the extraordinary commitment that they made to try to give me a fair trial. And I respect their judgment.

Today, after you sentence me, I will respect your verdict as well.

I can't say it in any other words other than I am responsible for my actions.  Solely responsible.  There wasn't anybody else who had any impact in making those decisions.  I reviewed what I thought was appropriate, made a decision, went forward with what I felt was appropriate, and it ended me up here today.  But I'm not going to blame anyone else.  It's me.

I am sorry for the suffering and shame that my family has endured as a result of these choices.  And I'm sorry to my friends who had to endure these months with me.  The anguish that they have felt and felt for me has been difficult for me to comprehend, and I empathize fully with them.

I have said I am sorry to everyone personally.  And I don't think it's appropriate to make a spectacle and say I'm sorry to everybody here.  This is not some sort of award ceremony.

1    The embarrassment that my children have felt has

2  shamed me in ways that no public commentary could ever do.

3    My little girl's back there crying.  Slow down.

4    Excuse me, Your Honor.

5    Please do not discount these three words:  I am

6  sorry.

7         THE COURT:  It's all right.  Take your time.

8         THE DEFENDANT:  I will.

9    The spirit in which I convey those three words is

10  genuine.  And I hope that you can appreciate the

11  sincerity.  I convey them with a deep respect for your

12  position.  And I do so knowing the role that you find

13  yourself in.

14    I am sincerely, wholly sorry for my wrong

15  decisions.  And I'm here in a state of utter shame, just

16  humiliated and disgraced.  To hear the suffering of my

17  friends when they see me or when they call is so hard to

18  accept.  And when I run into those friends, it's even

19  harder.

20    But the hardest thing, Your Honor, is what happens

21  in the middle of the night when my poor wife wakes up

22  crying.  And I will carry the hurt that I've caused her

23  for a lifetime.

24    Now, I need to set the record straight.  I was

25  stunned, mad, and overwhelmed when I was called greedy.

1    I'm not greedy.

2         I have been blessed in my life beyond my wildest

3    dreams.  And I was able, with Annette, to share those

4    blessings with others and those in need and help worthy

5    projects in need of funds.  And I have never, other than

6    in the context of these proceedings, had to disclose what

7    I've done.

8         But to put it in reference for those who want to

9    know, for 2100 -- for 21 years, Annette and I gave $1,500

10   a day, on average, every day for those 21 years.  I had

11   never calculated the amount.  I had never cared.  I was

12   not interested in the personal recognition for these

13   gifts, Your Honor.  And the reason why I did it was

14   because it made me feel good.

15        While I've been very, very happy to help the

16   worthwhile organizations that needed money, the most

17   significant thing that I've ever done is to help families

18   in need.  And those are the real Nevadans I care about

19   most.  Some of them are here, and I appreciate that.

20        I know you've read about or seen the video about

21   some of the families that we helped with as simple as

22   things as paying for all their college kids' education.  I

23   know you've read the letters about young men I've helped

24   when they didn't expect it.

25        I did these things, Your Honor, because I believe

1  that giving of treasure and talent should be the most

2  important part of a person's life.  I have shared these

3  gifts spontaneously and generously, and I believe that

4  that's a blessing from God to give me joy.

5        It's very hard when family cries.

6        Your Honor, I turned 61 years old last month.  And

7  I have lived a life that has been one of honest work,

8  honest activity.  I've been a fair and law abiding

9  citizen.  I have been an ethical attorney.  I've had an AV

10 rating for as long as I could remember.  I've never had a

11 bar complaint.  I've never had a client sue me.

12        I've always treated my partners better than I treat

13 myself.  If someone made a decision within a partnership

14 this is the way it should be divided up, I accepted it,

15 even though it was more likely than not that I deserved

16 more.  But I was fair.  I was fair under all

17 circumstances.

18        As Ellen relayed to you, I was a partner who billed

19 extraordinary hours, brought in big fees, divided them up.

20 And I specifically took less so that other partners in my

21 office could get more.

22        Although I became publicly prominent, Your Honor,

23 it's not what I ever intended.  If I had an appetite for

24 success, it was because I spent my childhood dreaming of

25 being able to provide a wonderful life for a future wife

132

1  and children.  I have never, ever been given anything of

2  material consequence in my life.  I've had to earn it.

3       I worked probably from the age of 12.  I baby-sat

4  for the Suttons on Rock Boulevard.  I cut lawns.  I

5  learned how to make pizzas, raviolis, meatballs before I

6  learned how to drive.

7       I became a manager at McDonald's after my hard

8  work.  And at the same time I learned a building trade by

9  becoming a painter.

10      I would come home after Annette and I got married,

11  and I would be dirty.  I wasn't afraid of hard work, Your

12  Honor.

13      I unloaded thousands of pounds of furniture as a

14  day laborer from Mayflower moving lines.  But I earned

15  everything.  And I gave it away.

16      There's going to be people who are cynical, who are

17  going to say how in the world, if you only earned 11

18  million dollars could you give away 12.  Well, during that

19  time I had some investments and I sold some property and

20  gave it away.

21      I don't have the luxury of those assets today.

22  We're upside down.  But I'm happy to pay a fine as the

23  Court deems appropriate.

24      I was raised to believe in the three Fs:  Faith,

25  family, and friends.  I've had to listen with -- I guess

1    the way my mom put it was to bite your tongue.  But I've

2    had to listen with my tongue bitten to people disparage my

3    life and my career unfairly and untruthfully, repeating

4    things that cast a prejudicial light upon me.

5            And through all of this, Your Honor, through the

6    innumerable newspaper stories, the heartache, the daily

7    grind, and the days of doubt, I have not lost my faith, my

8    family, or my friends.

9            I've raised my children to be good Christians.

10   Your Honor, you made mention of the strength of my family.

11   All of my brothers and sisters are here, my nieces and

12   nephews, they could be in town, friends who are like

13   family.

14           And you're absolutely right.  It was my job to keep

15   them in line and help them out, not because my other

16   brothers and sisters avoided it, it was just because I was

17   centrally located around grandpa.

18           They are good people and good Christians.  They

19   respect other religions immensely.  I think my family

20   might have a world record of going to a Lutheran service,

21   Baptist service, Catholic service, and a Mormon baptism.

22   We are ecumenical, to say the least.

23           I have been and tried to be a kind and decent man

24   as I was taught by my parents.  And I've always tried to

25   help those in need.  And I've even helped some people who

134

didn't ask.  I always felt that it was appropriate that if someone needed something, you did it, which translates into if I had the capacity to say yes, I did.  I never said no.

So today I want to make it very clear that I have accepted responsibility for my actions.  I was the one who wrote the checks.  I was the one who believed that it was lawful.  I respect your decision and the jury's decision that that was wrong.

That is acceptance of responsibility.  But -- I respect the decisions you've already made.  But I think it's important for me to tell you, Judge, how I feel.

I -- these actions have altered the trajectory of my life.  I can no longer even contemplate making the amount of money I once made.  It's not going to change my attitude about giving.  It's going to change the amount I can give.

I ask that you look at the life I built in Nevada raising children and grandchildren and helping those less fortunate.

I ask that you now take into account all of my life, not just two months or two days in 2007.  I am not the person that has been described by the prosecution.

I didn't do this for greed.  I didn't do this for power.  I didn't do it for any reason other than a friend

1  asked me to raise money.  I didn't want anything.  I

2  didn't need anything.  I didn't need to be ingratiated.  I

3  didn't need a pat on the head. A person asked me to help

4  him.  I did it in a way that was wrong.

5      I humbly ask that you look upon this life's work

6  and my conduct and find that it is worthy of a variance

7  below the guidelines.

8      Finally, I don't think I've -- not only have I

9  never been in this position, I don't think I've ever been

10 in a position where I've had to ask or beg for something

11 because the roles were always reversed.  When people ask

12 me something, I always try to say yes.  But in this case I

13 have to humbly beg you for your mercy.

14     Thank you.  And it's unusual but I think it's

15 important, and that is to answer any questions that you

16 may have of me.

17     THE COURT:  I have no questions,

18 Mr. Whittemore.  I thank you for your remarks.  I

19 appreciate everything that you've had to say.

20     Ladies and gentlemen, we've gone for two hours, and

21 I know that our court reporter and others need a break.

22 So we're going to take a break for 10 minutes.  We'll

23 resume promptly at 10 minutes to 6:00.

24     The Court will be in recess.

25

136

1          (A recess was taken from

2          5:39 p.m. until 5:52 p.m.)

3      THE COURT:  Have a seat, please.

4    Mr. Gentile?

5      MR. GENTILE:  Just one thing I want to --

6  Your Honor, when we finished and you are leaving the

7  bench, you may have heard a laugh from Mr. Whittemore.

8  I wanted to make it really clear that that was in

9  response to something that his daughter said to him and

10 it was not a carryover from his presentation.

11     THE COURT:  Well, let me tell you something.

12 When everyone gets away from the microphones, I'm hard

13 of hearing.  I don't hear a thing.

14     MR. GENTILE:  Thank you.

15     THE COURT:  But I appreciate the comment

16 nonetheless.

17     That will take us to the government's argument and

18 the government's position.

19   Counsel?  Mr. Myhre?

20     MR. MYHRE:  Thank you, Your Honor.  The hour

21 is late, and we've been at it a while, and I fully

22 recognize and fully respect and am cognitive of the fact

23 that I'm addressing a very experienced court in

24 sentencing matters and in a particular court that has

25 presided over the -- not only the trial in this matter

137

but the proceedings from the very beginning until this
point.

I don't expect my remarks to be long, Your Honor.
I don't intend to cover every aspect of the record.  I
commend that to the Court for its consideration,
obviously.

But I would like to address a few things that were
raised in argument in this case that I believe are
pertinent to sentencing and set forth succinctly the
government's position.

There's nothing that's been revealed in this record
to date, Your Honor, that would call for any variance
from, departure from, or a sentence outside of the
sentencing guideline recommendation in this case.

This is a very serious offense.  And we've heard --
we've heard sort of a -- almost a schizophrenic argument
from the defense:  On the one hand it's serious but, oh,
really not that serious; I accept responsibility but not
really.

Mr. Whittemore said that he believed his conduct
was lawful, that he was naive and perhaps arrogant to
believe that his conduct was lawful, but, oh, my goodness,
I gave myself bad advice, and I accept the fact that the
jury found me guilty and determined that I was wrong, that
I was wrong.

1    Your Honor, the verdict in this case, if it says

2  anything, it says this:  The jury convicted Mr. Whittemore

3  of knowingly and willfully violating the conduit

4  contribution prohibition, the campaign contribution

5  limitation provision, as well as knowingly and willfully

6  making false statements to the FEC.

7    They didn't find that he was mistaken.  They didn't

8  find that he made a mistake.  They didn't find that he

9  believed the law to be something other than it was.

10    The evidence in this case and the jury in this case

11  rendered a verdict from evidence beyond a reasonable doubt

12  that this defendant knew what the law was; that this

13  defendant knew what he was doing; that this defendant,

14  knowing all of that, willfully decided to go ahead and do

15  it.

16    And it -- we submit, Your Honor, it's a far cry

17  from acceptance of responsibility, a far cry from any sort

18  of expression of remorse to say I accept what the jury

19  said, but I really didn't do it.  I did something else.  I

20  thought the law was something other than it was.  I made a

21  mistake.  I'm guilty of bad judgment.

22    No, he's not.  He's guilty of knowingly and

23  willfully violating the law.  And the law he violated

24  strikes at the very heart of our election process, the

25  very cornerstone of our government.

1    Mr. Whittemore talked at length about how he's

2    earned everything he earned.  Okay.  He earned it in an

3    environment that was brought about by a democratic

4    process, by a clean election process.

5    He took advantage and took advantage of the

6    opportunities presented to him because of the security and

7    the freedoms that he enjoyed, security and freedoms that

8    these laws were designed to protect.  And he had such

9    little regard for those laws that he went ahead and just

10   ran over them.

11   As the evidence points out, Your Honor, and as

12   Mr. Whittemore says himself, he was an attorney.  He was

13   an experienced attorney.  He was a partner in one of the

14   most prestigious law firms in this state.  He was a

15   partner for many years.

16   He then became the managing partner in a very large

17   real estate holding company, held incredible amounts of

18   property valued at hundreds and hundreds of millions of

19   dollars.  We don't even know what the value was.  There

20   are various numbers kicked around during trial.  Mr. -- I

21   believe at some point during trial, Mr. Gentile

22   represented that Mr. Whittemore was worth 300 million.

23   So he was a person that got to those positions not

24   by happenstance.  He didn't become a partner by being

25   careless.  He didn't become the head of Wingfield Nevada

1    Group by making bad judgments.  He didn't get to be where

2    he is by just making mistakes.

3         There are very few attorneys that anybody knows --

4    that anybody can think of who knowingly go around

5    violating or committing felony offenses.  He did.

6         And what was the reason?  And this goes back to the

7    very argument we made during trial.  The only reason that

8    he did this, why he would risk everything and violate --

9    knowingly violate the law, knowingly commit a felony

10   offense for a friend -- that's what he says happened here,

11   for a friend.  Do friends let other friends commit

12   felonies?

13        We are all aware in our common experience of

14   friendship and what it means, and it can mean a great

15   deal.  But there -- I can't think of situations where

16   someone would knowingly violate a law, would commit a

17   felony offense for a friend, unless it somehow required --

18   they were required to do so to protect life, limb,

19   property, or health.

20        But that's not the case here.  What was this about?

21   This was about a campaign contribution.  Three years

22   before the election.  A campaign contribution pledge that

23   he made at the very time that he's sitting on 30,000 acres

24   of property in southern Nevada that will forever seal his

25   fortune, forever seal his wealth.

1         And while Mr. Gentile says, well, you know, there

2    was no evidence of quid pro quo, yes, there was no

3    evidence of quid pro quo but there was evidence of

4    currying favor and there was evidence of access.

5         And it's common sense that people who -- and it's

6    shown by this case.  We have a dinner meeting with Senator

7    Reid.  You just don't -- or, excuse me, a luncheon meeting

8    with Senator Reid.  That type of access just doesn't come

9    because you're a person of ordinary means, that you don't

10   have some sort of special ability, influence to get that

11   type of access.

12        And that pledge, that campaign pledge, he went to

13   the extent of committing a felony offense so that he could

14   maintain his status, his access, his level of influence,

15   his level of accessibility to the senator.

16        Nothing wrong with that.  I want to be very clear.

17   The courts have said you can have access to members of

18   Congress or to politicians.  Happens all the time.  It's

19   part of the, you know, fabric, unfortunately, of many of

20   our campaigns, that money drives things.

21        But it has to be money that's raised legally.  It

22   has to be money that is raised where there's transparency

23   as to who's providing those funds.  It has to be money

24   that's raised in a way so that the playing field is level,

25   so that people of ordinary means have as much influence

1    and power and ability to aggregate campaign contributions

2    as the rich and the powerful.

3           And that was the very purpose behind these

4    violations -- excuse me, these laws that were violated

5    here, was access -- excuse me, not access, transparency

6    and level playing field.

7           Mr. Whittemore smudged that transparency.  He

8    obscured it.  And he tipped the playing field in his favor

9    for him.  And there was no other reason, except for

10   himself.  This was a crime that was committed for himself,

11   for the benefit of himself and only for himself.

12          One of the most nefarious aspects of this, Your

13   Honor, most insidious aspect, from our standpoint, is the

14   fact that he brought other innocent people into the

15   scheme: people who trusted him; as the Court has pointed

16   out, people who loved him.

17          There was no evidence that at the time he

18   approached Josh Whellams or Terry Reynolds or any of the

19   other number of people that testified during trial that

20   Mr. Whittemore said to them, hey, would you make this

21   campaign contribution to Harry Reid, and, by the way, you

22   should know that it's a felony offense for you to move my

23   money into Harry Reid's campaign, but I have a different

24   interpretation of the law, perhaps you'd like to sit down

25   and hear what it is.

1           There was no such disclosure.  These people

2    believed in him.  They believed that he knew the law

3    because he was an attorney, they believed in him because

4    he was their boss.  He took that belief, he took that

5    trust relationship and he twisted it for his own benefit.

6    He bent their will to make contributions they otherwise

7    would not have made using his money.  And he didn't tell

8    them when they were doing it they violated the law, that

9    they were committing a felony offense.

10          Where was the charity, Your Honor, in that?  Where

11   was the humility in that?  Where was the goodwill in any

12   of that?

13          Why did these people have to suffer through a

14   criminal investigation, a federal criminal investigation?

15   Why did these innocent people have to endure a grand jury

16   investigation?  Why did their families have to sit at home

17   at night and wonder why am I involved in this, how did I

18   get mixed up in this?

19          Where was the charity then?  Where was the

20   selflessness then?  Why did these people have to come into

21   court, in a very public way, testify about what happened,

22   in a negative context, where their name now is in the

23   public record?

24          It was because of him.  He abused his power.  He

25   abused his wealth.  And he abused it for his own purposes,

1  in order to break the law, to knowingly and willfully

2  commit a felony offense.

3       Your Honor, leniency in a case like this, or any

4  other case that comes before the Court, should be given

5  out when there is some demonstration of true remorse.  It

6  should be reserved for those who are truly, truly sorry,

7  not who just come in at a very convenient time, in a very

8  convenient way and say, well, yeah, I'm sorry, jury found

9  me guilty.  I'm sorry.

10       As we point out in our papers that are before the

11  Court, after the trial of this matter, after the verdict

12  was rendered, in very -- within an hour or two after the

13  verdict, Mr. Whittemore attended a press conference that

14  he apparently called.

15       Mr. Gentile was there as well.  Mr. Whittemore made

16  a statement.  Among other things he said at that statement

17  was when his appeals were exhausted -- and I'm somewhat

18  paraphrasing, but I have the direct quotations in the

19  sentencing memorandum before the Court -- says then I'll

20  be able to say who is really behind this, who is

21  responsible for this.

22       His message to the public wasn't I accept the

23  jury's verdict, his message to the public was not, you

24  know, I'm really sorry for what happened, I made a bad

25  call.  No.  His message to the public was there was some

1  other unseen forces at work here.  There was some

2  mystical, magical hand perhaps working in the background

3  that someday you'll all know about this.

4      That's hardly, Your Honor, we would submit, someone

5  who is -- those are not the remarks of someone who is

6  truly sorry, who is truly remorseful.

7      He has not -- as we've already said, he has not

8  accepted the jury's verdict.  He has not said, yes, I did

9  it.  I knowingly -- I knew the law, I knew it was wrong, I

10 went ahead and I did it anyway.  His claim is that he made

11 a mistake.

12     He has expressed sadness.  And there's no doubt

13 that he's sad.  There's no doubt that his family's sad.

14 There's no doubt that his friends are sad.

15     But so is every defendant in every case.  So is

16 anyone who stands before the Court, having been found

17 guilty of a felony offense.  They're all sad.  The fact

18 that he's sad is not relevant to what is a just and

19 appropriate sentence in this case.

20     Much has been made of his character.  You have

21 heard a great deal of evidence during the course of the

22 trial about his character from distinguished members of

23 the community.  You have many letters before you from

24 distinguished members of the community attesting to

25 Mr. Whittemore's character, attesting to Mr. Whittemore's

1    charity.

2          But, Your Honor, we submit those character

3    witnesses that testified at trial, the character witnesses

4    who have provided documents to the Court, letters in

5    support and so forth, were not here for the trial.

6          They did not hear the evidence.  They do not know

7    what all of us in these proceedings know, having heard

8    from the witnesses, having reviewed the documents.  They

9    don't know what the true nature of this crime is, that he

10   knowingly and willfully violated the law, that he violated

11   these statutes.

12         Friends will always try to help friends, and that's

13   nice, and that's great.  But that does not render them in

14   any particular special position to render judgment in this

15   case because they have not heard the evidence.

16         As I was reading through those letters, I was

17   reminded of the often quoted -- the quote that is often

18   attributed to the late, great John Wooden, the basketball

19   coach at UCLA.  And he is quoted as saying:  But the true

20   test of a man's character is what he does when no one is

21   looking.

22         And in this case, Your Honor, when no one was

23   looking, Mr. Whittemore shoveled over $130,000 of his own

24   money into the Reid campaign, brought others into it,

25   didn't tell them that they were exposing themselves to

1    severe risk of exposure to criminal violations.

2         Mr. Whittemore said, well, you know, I never

3    destroyed records and I didn't hide what I was doing.

4         The Court recalls the two lists to the FEC, the one

5    list that Roxanne Doyle testified that she said went out

6    and the second list that Jake Perry testified about that

7    the Reid campaign received.  They were different.

8         And the list that the Reid campaign received did

9    not spell out, in true and correct form, the positions of

10   each of the members of Wingfield Nevada Group.

11        As you recall that second list -- it was not

12   apparent from the way the officers and the employees were

13   listed on that list that they were associated with

14   Mr. Whittemore, that they were associated with Wingfield

15   Nevada Group.

16        That was deception.  That was deceit.  That was

17   hiding the offense.  That was concealing the offense.

18        Much has been made, Your Honor, about the amount of

19   money that Mr. Whittemore has -- or Mr. Whittemore claims

20   that he has provided to charities and different causes

21   over the course of his professional life.

22        Your Honor, Mr. Whittemore stands before the law

23   just like any other person, stands before this Court.

24   Mr. Whittemore is held accountable just as any other

25   person would be who stands before the Court, whether they

1  have $100 million or they don't have a hundred dollars to

2  their name, whether they have got a hundred friends who

3  travel in elite circles of politics, or whether they don't

4  have a soul in the world they could call their friend,

5  both stand before you, both stand equal before the law.

6  The law is blind when it comes to that, Your Honor.

7       And does he really believe that because he had the

8  means to give to charity, does he really believe that

9  because he was in a position and wealthy enough to spread

10  money around, that that somehow makes him less

11  accountable, that puts him in a higher stead than someone

12  else?

13       He is equally accountable, Your Honor.  The charity

14  aspect, we can't speak intelligently to that.  We go by

15  the numbers that he has provided to the Court.  But we

16  also contend, Your Honor, that it's really not relevant.

17  It's not relevant for accounting what he did back in March

18  of 2007.

19       The Court has commented and Mr. Whittemore has

20  talked about his family.  And the government is obviously

21  very respectful of his family.  And it was not easy to be

22  able to put members of his family on the stand.  We know

23  that it was not easy on them.

24       Nevertheless, Your Honor, the government's done

25  nothing to put his family in this position.

1    Mr. Whittemore has.  He placed his own family in harm's

2    way when he enlisted them to be conduit contributors.  As

3    with his employees, he exposed them to tremendous amount

4    of risk.  And we go back to the central question, why

5    would anybody do that?  We contend it's not for a friend.

6          I'd like to talk a little bit about the *Citizens*

7    *United* because much has been made of that in the context

8    of the seriousness of this -- of the offenses here that

9    somehow, well, Your Honor, it's really not as bad as all

10   that because in light of *Citizens United* there will be no

11   more conduit contribution schemes and really we don't have

12   to send a message anymore about the fact that conduit

13   contribution schemes are, you know, not approved of in the

14   law, that there's some underlying principle here that no

15   longer has to be held up.

16         But, Your Honor, as recently as September of this

17   year an indictment was returned in the Northern District

18   of Ohio, United States versus Benjamin Suarez and Michael

19   Giorgio, case 513-CR-420.  And in this case, Your Honor,

20   the defendants are charged with violations of committing

21   conduit contributions, conspiracy to commit campaign law

22   violations, conspiracy to commit campaign violation --

23   excuse me, and campaign violations involving conduit

24   contributions to a member of Congress who was running for

25   office in 2012.

1     This conduct, according to the indictment, occurred

2    in 2011, post-*Citizens United*.

3     The defendants, it is alleged in the indictment,

4    agreed to raise about $100,000 for the 2012 campaign of an

5    individual who was running for the Congress in Ohio.

6     So the notion that there will no longer be conduit

7    contribution schemes, Your Honor, Exhibit A is right

8    there.  As long as candidates need to raise money to run

9    for office, there will be people who are there to try to

10    raise that money for them, and there will be conduit

11    contribution schemes.  *Citizens United*, as this Court has

12    already ruled, really has nothing to do with this case.

13     This case involving Mr. Whittemore involves hard

14    dollars, dollars that went directly to support the Senator

15    Reid candidacy.  That meeting back in March of -- or,

16    excuse me, in February of 2007 between Senator Reid and

17    Mr. Whittemore had nothing to do about raising money for

18    PACs, had nothing to do about PACs.  It had to do about

19    raising $150,000 for the Reid campaign in hard dollar

20    contributions.

21     There were hard dollar contribution limits before

22    *Citizens United*, there were hard dollar contribution

23    limits after *Citizens United*.  It is just as wrong in 2013

24    to use conduits to shovel money into a -- directly into a

25    candidate's campaign funds, just as it was wrong in 2007.

1    It is really mixing apples and oranges.

2        I'd like to talk a little bit about the disparate

3    treatment, or the supposed disparate treatment.  At the

4    threshold, Your Honor, a guideline sentence, the very --

5    the guidelines exist to prevent disparate treatment, to

6    promote uniform treatment of defense. That's why the

7    guidelines are there.  They represent the considered

8    judgment of the sentencing commission, which is comprised

9    of many different experts from all sorts of different

10   walks of life, including federal judges.

11       So the sentencing commission has already expressed

12   the level of the seriousness and the level of punishment

13   that should be meted out here.

14       Mr. Gentile cites to a number of cases where

15   probation was the sentence.  In those cases, Your Honor,

16   the defendant pleaded guilty.  In those cases, Your Honor,

17   the defendant admitted what he did was wrong, that his

18   conduct was a violation of the law.  Nothing in the trial

19   and nothing presented to date shows that Mr. Whittemore

20   has made similar admissions.

21       But, more importantly, Your Honor, we could spend,

22   I guess, all day or all evening, and nobody wants to, to

23   talk about the differences between those cases and this

24   case, the cases where they sentenced the defendant to

25   prison and versus those where they were not sentenced to

1   prison.

2        But the fact of the matter is, Your Honor, there is

3   no need for the Court to look at those other cases.  This

4   record is very sufficient to make a judgment call on.

5   This record, Your Honor -- the Court has been through two

6   weeks of trial.  The Court has presided over all of the

7   pretrial proceedings.  This is not a case where the Court

8   is coming in cold and trying to see where this case might

9   fit into others.  It's well-versed in the facts of this

10   case.

11        This case stands on its own fours, on all fours.

12   It stands by itself.

13        Mr. Gentile made reference to the *Rhodes* case and

14   to other cases involving the Federal Election Commission.

15   The Federal Election Commission doesn't make prosecution

16   decisions.  We don't know what the prosecution decisions

17   were in those cases.  We don't know what the

18   administrative decisions were in those cases.  So it's

19   impossible to compare those to this.

20        There's nothing in this record that shows that

21   Mr. Whittemore has been treated any differently than any

22   other defendant in this district when it comes to the

23   charging decisions made in this case, when it comes to the

24   way the case was tried, nor when it comes to the sentence

25   that's being requested here.

1    Nothing. There is just simply no evidence to show

2    that this defendant has been treated any differently in

3    this district than anybody else for any other

4    inappropriate reason. Other -- the only reason he's being

5    treated the way he's being treated, the only reason that

6    the government is seeking the sentence it seeks is because

7    he committed a serious offense, and he did it knowingly

8    and willfully. And that is what is called for in the

9    guidelines.

10    Mr. Gentile said that at some point that this is

11    not a malum in se case, this is a malum prohibitum,

12    meaning that the only reason we're here is that

13    Mr. Whittemore violated some sort of regulation that's

14    not -- one wouldn't consider intuitively wrong.

15    Well, Your Honor, the conviction here was spawned

16    from deceit and deception and cheating. Those are all

17    things that we all know to be wrong. This is not just the

18    violation of some obscure regulation that only affects

19    some, you know, obscure sector of the public. This goes

20    to the very heart of our electoral process. And it

21    involved all of those malum prohibitum, if I could use his

22    term, type of characteristics.

23    Mr. Gentile also says Mr. Whittemore's medical

24    condition should deserve some consideration as well. As

25    the Court's fully aware, the prison system is more than

1    able to meet the medical conditions that Mr. Whittemore

2    has indicated in his presentence report.

3          So, lastly, Your Honor, we believe that this was an

4    offense that was conceived in greed, it was conceived in

5    self-promotion, it was conceived in arrogance.  There is

6    no other reasonable explanation.  Friends don't commit

7    felonies for friends, period.  Lawyers don't commit

8    felonies for friends.  Lawyers don't willy nilly and

9    mistakenly and unguardedly wander into committing felon

10    offenses, not lawyers of Mr. Whittemore's talent, his

11    experience, and his training.

12          This was not an attorney who dabbled in the --

13    practiced law and dabbled in politics on the side.  This

14    was in his wheelhouse.  This was his expertise.  He was an

15    expert in the laws governing the election process.  He was

16    the go-to person in this state for that.  So he knew the

17    law.  He didn't think he'd get caught.  He didn't think

18    that anybody would care about it if he did.  So he did it.

19    And that, Your Honor, that's the seriousness of this; that

20    he cared so little for the electoral process, that he

21    would just drag it through the mud.

22          So we ask Your Honor that the Court impose a

23    guideline sentence in this case.

24          If the Court feels that because of Mr. Whittemore's

25    family circumstances and his charitable works merit it,

1    then we would take the position that perhaps a low-end

2    sentence in the guideline range of level 22 would be

3    appropriate, taking into account his charitable works and

4    his family situation.

5          But this offense, Your Honor, is so serious that

6    the message needs to be sent, not only to Mr. Whittemore,

7    to impress upon him the seriousness of it, because he

8    still doesn't get it, but also to others -- and we've seen

9    the cases where others still continue to engage in this,

10   to others who might be contemplating crimes of this

11   nature, to others who think that the laws governing our

12   electoral process don't really matter, that we send a

13   message to everyone, to the general public, that these

14   laws do matter, that the electoral process does not just

15   belong to the rich and the influential, that the laws that

16   are there to protect against that are enforced, that those

17   laws matter, and that no one, regardless of how rich they

18   are, how well-connected they are, or what they've done

19   stand above it, that they are equally accountable to it.

20         And, therefore, Your Honor, we ask that the Court

21   impose a custodial sentence in the guideline range of

22   level 22, as well as impose a fine of $133,400 and other

23   mandatory assessments, and a period of supervised release

24   for a period of three years.

25         And if the Court has any questions; otherwise, we

1   will submit on that.

2           THE COURT:  I do not.

3       Is there any reason, legal or just, why the Court

4   should not proceed with sentencing at this time?

5           MR. MYHRE:  Not from the government, Your

6   Honor.

7           THE COURT:  Mr. Gentile, you rose.

8           MR. GENTILE:  Your Honor, I wanted to address

9   a couple of points that Mr. Myhre --

10          THE COURT:  As long as it's not a repeat of an

11  argument I've already heard.

12          MR. GENTILE:  No, it won't be.  It won't be.

13      He brought up list number two.  There was no --

14  excuse me.  We still don't know who created list number

15  two.  That was never connected to anybody.

16      Mr. Perry said that that's what he found.  And he

17  never examined list number two and the e-mail together, so

18  he couldn't say that they were, in fact, related to each

19  other.  That's what was given to him.  That's number one.

20      Number two, Mr. Whittemore stood before you and

21  said to you today, just before Mr. Myhre spoke, that he

22  was arrogant in his judgment when these events took place.

23  Arrogant.  Arrogant with respect to the way that he dealt

24  with the legal situation at the time.

25      And your instruction to the jury said you could

1  either -- you could be guilty if you deliberately disobey

2  the law or if you disregard the law.  Arrogance isn't

3  disregard of the law.  And so I don't think his argument

4  flies.

5          And while it is true that everybody that stands in

6  the courtroom is equal before the law, you are charged,

7  under 3553 and under all the supreme court authority since

8  *Booker*, to make this an individualized sentence.

9          So while we're all equally -- we're all treated

10 equally before the law, the law in this instance, because

11 it's a sentencing, requires you to individualize it.

12          And that's all I have to say.

13          THE COURT:  All right.  Thank you.

14         I'll repeat again, is there any reason, legal or

15 just, why the Court should not proceed with sentencing at

16 this time?

17          MR. MYHRE:  Not from the government, Your

18 Honor.

19          MR. GENTILE:  No, Your Honor.

20          HE COURT:  All right.  I'm not sure that at

21 the time the verdicts were returned, whether I had

22 entered findings of guilt of Mr. Whittemore on the

23 offenses upon which the jury found him guilty.

24          And I certainly do that at this time if I didn't do

25 it then, that I do find him guilty of Making Excessive

Campaign Contributions, as set forth in Count One of the
Indictment; Making Contributions in the Name of Another,
as set forth in Count Two of the Indictment; and making --
let's see, Making a False Statement to a Federal Agency
and Aiding and Abetting, as set forth in Count Three of
the Indictment.  That was relative to the statement that
was made to the Federal Election Commission, not the FBI.
Count Four, the False Statements to the FBI, the Court has
dismissed that charge without prejudice.

Where do you start on something like this?  It's
obviously a late hour, and we've covered just about every
territory that could be covered in this case.

I'm sure that there's no one in this courtroom who
doesn't recognize that one of the most difficult jobs and
responsibilities imposed upon a trial court judge is
imposing sentences in criminal cases.  I can't begin to
tell you how difficult that is.  But the issue here is not
me and my responsibility, the issue is carrying out that
responsibility.

First of all, it's troubling to the Court that it's
almost, in so many of these criminal cases, as though the
guideline calculations are just a beginning point in
negotiations concerning what the sentence should be.
Under our sentencing guidelines they aren't.

Our sentencing guidelines are established for

1    the -- in the interest of defendants who commit similar

2    conduct being treated similarly in our criminal justice

3    system throughout the United States.

4         Under our sentencing guidelines, as the Court has

5    found them in this case, the suggested term of

6    imprisonment is between 41 and 51 months.  Under our

7    sentencing guidelines, there is no probation, or probation

8    should not be considered.

9         The fact is the supreme court, for good reason, has

10   backed off of the requirement, as has Congress not changed

11   it since that was done, that the Court is bound by the

12   sentencing guidelines and bound by the prison sentence

13   that they espouse.

14        But what is recognized is that there's a series of

15   criteria that the Court must consider.  And they've been

16   alluded to throughout the arguments here.  And I'm going

17   to comment on some of those in relative strength as I view

18   them as applying in this particular case.

19        But I have to start with the offenses themselves.

20   These three offenses are all serious felony offenses for

21   which Mr. Whittemore has been convicted, making excessive

22   campaign contributions, making contributions in the name

23   of another, false statement to a federal agency, and

24   aiding and abetting.

25        What those speak to -- if we think a moment for the

1    likely defendant who's going to appear charged with these

2    felony offenses and convicted of them, either by virtue of

3    a guilty plea or by virtue of having gone to trial and

4    been found guilty by a jury of our peers of these

5    offenses, are likely going to have been committed by

6    someone who was involved in the political processes in

7    varying degrees, I'm sure.

8         But the fact is it almost always is going to be a

9    person who has absolutely no criminal history, who

10   probably is highly respected within either the lobbying

11   community or, in a state like Nevada, where respect and

12   recognition become statewide, because we're a small state,

13   and people like Mr. Whittemore is a classic example, have

14   become known north and south.  And any number of the

15   people who may be involved in this case, known well

16   throughout the State of Nevada.

17        And that person, not referring to Mr. Whittemore,

18   is likely to have no criminal history whatsoever.

19   Moreover, he's likely -- I say he, it could be a she as

20   well, obviously, the cases I've seen have all dealt with

21   men -- a person who is respected in the business

22   community, a person who has a family behind them.  Because

23   with success and with respect come all the things that

24   make for good families and good relationships.  Not

25   always, as we all know, but certainly they lend themselves

1   to that.

2        So in the background of that, you're looking at a

3   defendant -- I'm not referring specifically to

4   Mr. Whittemore, except that he falls within this

5   profile -- to be not a criminal in the ordinary sense of

6   criminality and not a threat of any kind of violence,

7   obviously, and in a case like this, of course, no further

8   threat of criminal activity.  I can't believe that after

9   what Mr. Whittemore has gone through in this case -- just

10  given the nature of it and the felony conviction, there's

11  no threat of future criminal activity.

12       So this individual, the type of individual I'm

13  talking about, under the sentencing guidelines, which are

14  designed to be imposed across the United States as a

15  starting point for sentencing, in this case call for --

16  make sure I don't make a mistake here, 41 to 51 months in

17  prison.

18       We started, when we came in here, with a very

19  thorough and well-written presentence investigation and

20  report, where the probation officer felt that there was --

21  because of the issue concerning misstatements to the FBI

22  law enforcement agencies, felt that there should be

23  enhancements that would have caused this to be a

24  51-to-63-month sentence.

25       I didn't agree.  And I'm sure the probation officer

162

understands why. And I'm sure that everyone in the courtroom understands why. I didn't feel that that should be applied because these -- the statements were inconsistent, we had credible witnesses both ways, they were made in a period of minutes without any advance notice or warning, and they covered a course of conduct that occurred some four years earlier, at a time when Mr. Whittemore was completely unsuspecting that he might be coming in that morning to be interrogated about three felony offenses.

So I didn't apply that guideline. And the guideline I applied was the one that came out of -- these calculations, I know, drive people crazy. But I can tell you that, as a sentencing judge, they serve a real value because they serve that value of attempting to achieve some uniformity and fair treatment of any defendant. And they have come out, by the Court's calculations, at 41 to 51 months.

Now, before me I have this man, Harvey Whittemore, who I personally have known over the years and known the family, or known of the family, not close personal friends, but at least to the level of being people who you say hello to when you pass in the hallway and you appreciate seeing them.

But the fact is that these laws are created for a

1    reason. I have a man here who he and his wife have -- I

2    mean, the way they've treated their family, the way

3    they've treated their friends, are reflected in the

4    letters that have been received by the Court, I think I

5    said 67 letters received by the Court, letters from the

6    family members that -- you can imagine how many letters

7    the Court sees in the course of criminal sentencings.

8    It's not just hundreds for me, I think it's probably

9    between 500 and 1,000. You can imagine how many of those

10   cases I've received letters from family and friends. And

11   I've seen some incredible ones. But none that would

12   exceed the type of letters I've received here.

13          I've received letters from people who I know in the

14   community to be the respected, respected people in the

15   community, leaders, people who you just respect, people

16   who are the worker bees that work behind organizations and

17   do great jobs and are never recognized by names. And I

18   see friends and neighbors and the family members who have

19   written to me here.

20          And I can tell you that those letters are

21   absolutely incredible. This man is a fine family man.

22   This man has done great things in this community. And

23   these are not things that are to be treated lightly.

24          And, I mean, simple examples are president of South

25   Reno Babe Ruth, University of Nevada Reno Foundation. He

164

1   was chairman.  Airport Authority of Washoe County, a board

2   member.  Athletic Association of the University of Nevada,

3   chairman.

4        If I recall Mr. Trechok's letter correctly,

5   Mr. Whittemore and his wife are identified as in the top

6   10, and I believe it was number 7, of all-time

7   contributors to the University of Nevada.

8        It goes on from there.  He's been honored by the

9   Desert Research Institute, given the award for alumnae of

10   the year of University of Nevada, Reno, in 2001, annual

11   honoree for the American Lung Association, American Heart

12   Association, Juvenile Diabetes Research Foundation, and a

13   list of charitable contributions which the math reflected

14   exceeded $12 million over the period of years that were

15   involved, to just about every charity that you could think

16   of, most of which this man never sought recognition or

17   credit for.

18        So it's in that vacuum that this Court has to

19   approach sentence.  I will say that the sentencing

20   guidelines in this case, I believe, deserve some variance

21   by virtue of the extreme accomplishments of this defendant

22   in the community, what he has given, what he represents to

23   his family, what he represents in many ways throughout the

24   state of Nevada.

25        But the backdrop of all of that is the criminal

1  offense which is committed here.  These offenses go to the

2  very heart of our electoral processes.  If we cannot have

3  faith -- and this was said by one of the other judges in

4  one of the cases that was cited, words to the effect that:

5  If we cannot have faith in our election process, then we

6  can't have faith in the strength of our democracy.

7         That's true.  That's why these offenses are viewed

8  as so serious and why even a man of no criminal

9  background, respected in the community, intelligent,

10  strong peer group, strong business support, is no less

11  responsible when he has done something that goes to the

12  very heart of our democratic process, when there's

13  criminal undermining of the electoral process.

14         As recognized by our United States Supreme Court --

15  and this is disturbing throughout this case that

16  there's -- someone suggests that because -- as a result of

17  the United States Supreme Court's decision in *Citizens*

18  *United* in 2010, there now are no limitations on super

19  PACs, anyone can contribute any amount of money to a super

20  PAC without a limitation.  The super PAC is the entity

21  that's responsible for reporting.

22         But that law hasn't replaced these laws.  These

23  laws are still in force and effect, just as they were in

24  2007.  *Citizens United* came three years later than what

25  occurred in this particular case.  And it did nothing to

1  undermine or devalue or decriminalize the criminal

2  offenses which we are dealing with in this case.

3      The supreme court has commented on these laws and

4  recognized in the *Valeo* decision, which is some years ago

5  now, that the primary purpose of these campaign laws, be

6  it conduit contributions or limitations on campaign

7  contribution, is to impose limitations upon the giving and

8  spending of money in political campaigns for federal

9  office.  A primary purpose is to limit the actuality and

10 the appearance of corruption resulting from large

11 individual financial contributions.

12     If ever we had a case where there was such clear

13 proof, clear evidence -- I reviewed the evidence carefully

14 in this case, and it was undisputed -- I mean,

15 Mr. Whittemore knows the law.  He's been recognized as one

16 of the authorities in the law, promises a United States

17 Senator that he'll raise $150,000 for him by the end of

18 March 2007.

19     On March 21st or March 22nd, he's reminded by the

20 campaign committee that he hasn't brought the money in

21 yet.  And by the end of the week, there is, roughly, a

22 total of 149,000 and something in the senator's campaign

23 fund.

24     We've talked a lot here about these particular

25 violations.  There were 29 conduit contributors; in other

words, people who were funded by Mr. Whittemore, who were
given the money for the contribution to the Reid campaign,
and who then turned it over virtually immediately. These
people were all approached one day, and the next day the
money was transferred, paid over, and then transferred by
Mr. Whittemore's office to the Reid campaign.

That was $133,400 of the money. But on top of that
was Mr. Whittemore's personal funds of $4,300 -- $4,300,
Mrs. Whittemore's personal funds of $4,300, his sister's
contribution of I believe it was $4,300. So it was there
right, roughly, at the $150,000 level.

Of course, there's nothing wrong with them
contributing in their own name and in their own right.
It's just at the same time and part of this incredibly
intentional criminal act.

And when you think about the appearance of this,
the Court is not here making findings that there was --
this money was advanced because Mr. Whittemore had a
30,000 acre pending development in southern Nevada or that
the Whittemore Peterson Institute needed X amount of money
or that Mr. Whittemore needed X amount of recognition or
prestige within the business and political community of
the state of Nevada.

The fact is, no matter how you look at this, the
appearance of impropriety, of corruption which arises from

1  such a clear violation of the law committed so quickly, so

2  clearly in knowing violation of the law where $133,400

3  in -- literally one day's paid over to the Reid campaign

4  is astounding.

5       There's some question here about the list.  But

6  when the funds are forwarded to the Reid campaign -- we

7  had Exhibit, I think it was, 6 that was the memorandum

8  prepared by Mr. Whittemore's secretary Roxanne -- I keep

9  forgetting her last name -- Doyle, I believe, and it

10 listed -- the money was forwarded, and the names of all

11 the contributors were listed.

12      And out of the 29 of them, 11 key members, who were

13 conduit contributors in this case, were identified as

14 coming from either Wingfield Nevada Group or from -- well,

15 the simple -- the simple example would be Mr. Whittemore

16 himself.  When that list was submitted, it was submitted

17 indicating that Mr. Whittemore was the chairman of

18 Wingfield Nevada Group.

19      It indicated that his partner -- or, excuse me, one

20 of his key managers in Wingfield Nevada Group, Bradley

21 Mamer, was the Chief Executive Officer of Wingfield Nevada

22 Group, that his wife was the Vice President of Human

23 Resources of Wingfield Nevada Group.  Well -- and it goes

24 on from there.  I don't need to go through it ad nauseam.

25      But the point is that someone somewhere -- the

1    inference would be it probably came from someone at -- who

2    had received this list who said, you know, it appears that

3    it's one contributor making all these contributions,

4    Wingfield Nevada Group is identified 11 times out of 29,

5    30 contributors here.

6         Well, a new list was submitted.  And, no, the

7    evidence didn't show that it came from Mr. Whittemore.

8    But the information on the new list, the changes certainly

9    suggest that Mr. Whittemore was somehow involved in

10   sending those out or approving their being sent out.

11   Because all of a sudden, instead of Mr. F. Harvey

12   Whittemore being the chairman of Wingfield Nevada Group,

13   he was now partner of Lionel Sawyer & Collins.

14        Mr. Mamer, who had been the Chief Executive Officer

15   of Wingfield Nevada Group, was now identified as Chief

16   Executive Officer Coyote Springs Investment, LLC.  His

17   wife, Christina, was identified as the Vice President of

18   Resources of Whittemore Seeno Company, not -- no longer

19   Wingfield Nevada Group.

20        It goes on from there.  But the point is, this was

21   intentional misrepresentation that if not committed by

22   Mr. Whittemore at least, by inference, was approved

23   somehow by himself.

24        It was willful concealment.  We were beyond the

25   point of just making contributions which were knowing

170

1    violations of the law.

2          This Court is in the position of saying, well, if

3    I'm not going to impose a guideline sentence, why?  I need

4    to express the reasons why.

5          Well, insofar as the offense itself is considered

6    and these felony offenses are considered, the knowing,

7    voluntary thought process that's behind 29 conduit

8    contributors in a one-day period of time, totalling

9    $133,000 would say that sentence should be right within

10   the sentencing guidelines.

11         But still I am influenced, as I've said, by

12   Mr. Whittemore personally, his individual accomplishments,

13   his family relationships, what his family means to him,

14   what they all think of him, what he thinks of them, what

15   he's accomplished in this community, and what he's done in

16   this community causes me to conclude that there needs to

17   be a downward variance.

18         But I do not view this as a probation case.  It is

19   simply too aggravated under the circumstances.  It is too

20   severe in the nature of the conduct.  It would be an

21   insult, in the Court's view, to the purpose of complete

22   and accurate disclosure of contributions to campaigns in

23   our federal elections.

24         I wanted to fall back on the primary criteria that

25   the Court is to pass on in imposing sentence in a case

1   like this.  The first one, of course, is to reflect the

2   seriousness of the crime.

3        As I've indicated, this is a serious, serious

4   felony offense, committed three ways.  One, conduit

5   contributions, clearly fraudulent.  Two, excessive

6   contributions, clearly prohibited by law.  By law

7   Mr. Whittemore could have contributed $4,600.  And under

8   the law that -- facts that were proven in this trial, he

9   contributed $133,400 on top of his $4,600 contribution.

10       When you consider that -- the Court's view, that

11  these offenses go to the very heart of our electoral

12  process and they go to the strength of our democracy and

13  they go to the prevention of the appearance of corruption

14  within our political elective process, the seriousness of

15  these crimes is of the utmost magnitude.

16       The next consideration is the promotion of respect

17  for the law.  As I said, I'm not making findings in this

18  case that there was some quid pro quo, that this was money

19  raised so that Coyote Springs would be approved in all of

20  its glory.

21       What I'm more concerned about is the appearance.

22  Here's a man with this wealth, with this kind of a

23  business operation underway, involving property that

24  involved numerous federal concerns, who's willfully

25  committing a violation of law wherein he's -- which I

172

don't need to comment further on, and it's going right to
one of the most powerful senators, certainly the most
powerful United States Senator the State of Nevada has
ever known, and I would say probably the most powerful
United States Senator in the United States.  A man who
was, by law, supposed to contribute no more than $4,600
and submitting something in the neighborhood of 138 or
$139,000 and covering it by listing other contributors.

What's that say about the respect for the law -- if
this individual was given, as the defense would argue,
probation, what's it say for the respect of the law if the
Court is to depart so seriously from the guidelines that
have been established under our law?  That doesn't make
sense.

The next consideration is to provide just
punishment.  That's a variation of a couple of the
concepts I've been talking about.  But I wanted to say,
too, there's two things that I think everyone appreciates.
It's respect -- it's from every citizen in this state,
probably in the United States, believes that there must be
just punishment for criminal conduct.

And here we have three felony offenses willfully
committed by a person who clearly knew they were
violations of law that are aggravated and they're gross.
And the appearance that arises from them is about as ugly

1   as it can get, whether or not there was anything factual

2   underneath it to support illegality.  There has to be just

3   punishment for this kind of a violation of our law.

4        The other principle and concept that we all agree

5   on is that no one is above the law.  And you take a person

6   who, with this education and training, commits this kind

7   of offense, who jeopardizes his family, who jeopardizes

8   himself, who is led to, I can only guess, sheer

9   speculation, the kind of financial loss which has fallen

10  on Mr. Whittemore as a result of what has happened here.

11       But how do you afford adequate -- provide just

12  punishment and afford adequate deterrence to criminal

13  conduct if you -- you don't follow these laws which are

14  intended to cover this very type of conduct when it's

15  committed in an aggravated fashion and where the evidence

16  was so clear concerning the manner in which it was

17  committed.

18       The other consideration, protect the public from

19  further crimes of the defendant, I think it's clear that

20  we don't need to worry about that one.  And I think it's

21  clear that any defendant comparably charged in any of

22  these other cases, you can bet they have suffered similar

23  personal crisis and humiliation, and there will never be

24  further crimes from them.

25       There's a couple of others, providing defendant

1  with needed education or training and avoiding sentencing

2  disparities.

3       I would say there's been some reference here to the

4  *Rhodes* case, which was a Nevada case involving conduit

5  contributions.  But that was never prosecuted by the

6  Department of Justice.  It was never treated as a criminal

7  offense.  It involved much lesser sums of money per -- I'm

8  not sure, as I sit here, what the details were.

9       But it was treated by the Federal Election

10 Commission.  It was not treated as the criminal offense

11 which was prosecuted here.

12      And I might add, on that note, certainly there's an

13 implication in some of the letters I've seen, some of the

14 comments I've heard, that the government's overreacting in

15 this case?

16      Tell me.  You take this serious of a law that goes

17 to our campaign financial disclosures and our reliability

18 and how much faith we can place in our electoral process

19 and in our democracy itself, and take examples of all of

20 these conduit contributions, in one day family, friends,

21 business associates, every one of those was a separate

22 felony offense.  Combined is what makes it as grave as it

23 is.

24      But when you take that -- and the evidence given to

25 the government, admittedly provided by a competitor --

1  competitor isn't the right word, a former business

2  associate, business entity, the evidence shows black and

3  white where the money came from, Mr. Whittemore's personal

4  account; who it went to, his employees, his relatives, and

5  their spouses, all for the purpose of them making a phony

6  contribution to Harry Reid's campaign.

7       The evidence was unassailable.  And it's handed to

8  the government.  And all of this is done in a two-day

9  period.

10      What is the government to do?  Are they to say

11  these criminal offenses that strike at the heart of our

12  electoral process and arguably affect our democracy

13  itself, that we should turn this over to the Federal

14  Election Commission and have it handled civilly?  It just

15  doesn't work that way.

16      No one is above the law.  And there simply must be

17  just punishment for criminal conduct involving intentional

18  felony offenses such as these, which many would argue that

19  the Court should not depart from the sentencing guidelines

20  that are the beginning point for the Court to consider

21  sentence in this case.

22      However, I'm doing that.  What I'm going to, to

23  finish this -- I should take a further look at my notes to

24  make sure that I haven't overlooked something I wanted to

25  say.

1    I'm going to grant a downward variance.  The

2  sentencing guidelines are at level --  offense level 22.

3  I'm going to grant a five-level -- five levels downward

4  variance.  I do so because, aside from this criminal

5  conduct, I respect this man, I respect his family, I

6  respect what he has done for this state and what he's done

7  for this community, what he's done for our university.

8    Five levels is huge.  It takes it down to a

9  24-month sentence of imprisonment.  I am of the view that

10  that's absolutely as far as the Court could or should go

11  in a case such as this, for the very reasons that I have

12  cited.  And many other reasons too.  The evidence in this

13  case will speak for itself from here on out.  And there

14  clearly will be an appeal.

15    I would mention, too, there's been reference to

16  other cases where some defendant was treated differently

17  or lighter or more severe.  I would tell you that every

18  one of those cases involved a plea agreement and a guilty

19  plea, where the defendant came in the courtroom, waived

20  all rights of appeal, took complete acceptance of

21  responsibility for what he did.

22    And in every case -- I'm not aware of any off the

23  top of my mind where the offense was as aggravated that,

24  well, they pled to or the amount was as great.  Perhaps --

25  there were *Danielczyk* and *Magliocchetti.*  Mr. Gentile

1    knows how to pronounce his name and I don't.  But even

2    those men received sentences that are greater than

3    Mr. Whittemore.  And they entered all their pleas,

4    accepted all of their responsibility on a plea agreement.

5    They didn't go to trial.

6         With regard to a fine in this case, Count Two,

7    which is the making contributions in the name of another

8    offense, the conduit contribution offense, calls for

9    triple fine of the amount contributed.  That would be a

10   maximum of -- or, excuse me, a minimum of $400,000,

11   $400,200, if I followed that law.

12        I have some discretion there, for the simple reason

13   that I'm entitled to take into consideration the

14   defendant's ability to pay.  And I -- it clearly is the

15   case that he's suffered immeasurable financial and

16   personal loss as a result of everything that's happened to

17   him, in large part due to this, but other factors as well,

18   that all bear upon his ability to pay.  But he is still a

19   wealthy man, and he is still a man who the Court views as

20   a responsible individual.

21        I'm going to impose a fine of $100,000.

22             MR. GENTILE:  Your Honor, may I address that?

23        I'm not trying to talk you out of it, but I just

24   want to clear the record up.  You only have to follow the

25   trebling if you give him probation.  It allows one, the

178

1    other, or both.

2            THE COURT:  All right.  Well, then, I stand

3    corrected on that.  And I accept that.  But I -- and I

4    appreciate your bringing that to the Court's attention

5    because I had overlooked that.

6            MR. GENTILE:  Well, to the extent that that

7    weighed in on your decision at a hundred, that's why I

8    wanted to clarify it.

9            THE COURT:  No, that's fair.

10           But I'm going to impose a fine of $100,000.  That

11   will apply as to all three of the counts, not just as to

12   the one.  That, of course, is the total amount of the fine

13   for all three offenses.

14           A special assessment of $300 is required, $100 per

15   count.  And that is imposed.

16           Supervised release is -- I'm not going to follow

17   the recommendation.  I just don't see that supervised

18   release is a big issue in this case.  I'm going to order a

19   two-year term.  And that will be concurrent on all three

20   counts of conviction.

21           With regard to the conditions applicable to

22   supervised release, this is the period of time after the

23   prison time is served.  There are obviously terms and

24   conditions which apply to it.  Under the -- the law

25   mandates that the -- four mandatory conditions.  I'm going

1    to suspend two of them because they're simply not at issue

2    here.

3        But certainly Mr. Whittemore shall not commit

4    another federal, state, or local crime during the term of

5    supervision.

6        The law requires submission of DNA collection and

7    analysis.  That's ordered in every case.  That will be

8    imposed.

9        There's two others.  One, not to possess illegal

10   controlled substances.  And to submit to drug testing.

11   That's just simply not an issue in this case.  The Court

12   will suspend both of those requirements.

13       If at any time the probation department ever felt

14   that there was some reasonable grounds upon which those

15   should be activated and the suspension should be lifted,

16   the Court would do that.

17       The special conditions which have been recommended:

18       Possession of weapons.  He's already prohibited

19   from having any firearms.  But this is a little more

20   specific.  The Court will impose it because we regularly

21   do.  Shall not possess, have under his control, or have

22   access to any firearm, explosive, device, or other

23   dangerous weapons as defined by federal, state, or local

24   law.

25       Warrantless search.  The Court doesn't see the need

180

1  to impose the warrantless search requirement in this case.

2  I'm not going to do that.

3       Mental health treatment.  Based upon all of the

4  information that's been provided concerning some of the

5  medical problems that Mr. Whittemore has been suffering

6  and is suffering and the stress obviously that's

7  associated with this case cause me to conclude that the

8  mental treatment requirement is a reasonable requirement

9  for supervised release and will be imposed as set forth

10 within the presentence report.

11      Access to financial information.  He shall

12 provide -- because of the penalty imposed here by the

13 Court, the financial penalty, he shall provide the

14 probation office with access to requested financial

15 information, including personal income tax returns,

16 authorization for release of credit information, and any

17 other business financial information in which he has a

18 control or interest.

19           MR. GENTILE:  Your Honor, will that apply

20 after the fine is paid?

21           THE COURT:  After what?

22           MR. GENTILE:  After the fine is paid?

23           THE COURT:  No.  That will be -- that's a

24 good -- I'm pleased that you raise that.  Once the fine

25 has been paid in full, that condition will be exonerated

1    and nullified.

2          He will be required to contribute -- or to report

3    to the probation office in the district to which he's

4    released within 72 hours of his discharge from custody.

5          And I'm going to also impose a requirement of

6    community volunteer service of a minimum of 100 hours.

7          And I'm doing that -- Mr. Whittemore obviously has

8    a lot to give others.  And recalling that I've come down

9    from a sentencing guideline of 41 months to 24 months, it

10   doesn't take a mathematician to compute how many days that

11   is --

12          MR. GENTILE:  Community service is not a

13   punishment to him.

14          THE COURT:  -- 100 hours of community service,

15   do it with a smile on your face, Mr. Whittemore.  It's

16   probably the only positive note I've been able to give

17   you here this evening.

18          MR. GENTILE:  I have two requests of the

19   Court.

20          THE COURT:  All right.

21          MR. GENTILE:  Mr. Whittemore has an active law

22   practice.  It's going to take a little bit of time to

23   wind it down.  Can we -- obviously we're going to be

24   notified as to a place for surrender.

25          I'm going to ask that you recommend Herlong as the

1    facility because it's going to be easiest for his family

2    to get to.

3            And the second thing is that it's probably going to

4    take him 120 days to wind down that practice.  It's no

5    easy thing to do.  And we do have to deal with the bar

6    during that time.

7            So I would ask that you make the surrender about

8    first of February.

9                    THE COURT:  All right.

10                   MR. GENTILE:  That's exactly 120 days, by my

11   calculation.

12                   THE COURT:  All right.

13           Let me hear from the government.

14                   MR. MYHRE:  Well, Your Honor, traditional

15   practice is around 60 days, as I recall, 60 to 90 days.

16   So we don't see any reason why the Court should vary

17   from its usual practice for report date.  We're not

18   seeking remand.  We agree to the same terms and

19   conditions as before.

20           Mr. Whittemore's known of this sentencing date for

21   quite some time to get his affairs in order.

22                   THE COURT:  All right.  I appreciate the

23   government's position.  But he's not going to report

24   before the Christmas holidays.  And the additional month

25   that's requested beyond that, given the nature of

1  everything from his law practice to his business

2  relationships, to his family situation, cause the Court

3  to conclude that an additional 30 days is a reasonable

4  request.  So the Court will agree to a self-surrender.

5          And I assume, Mr. Myhre, you're not objecting to

6  him self-surrendering; is that correct?

7                  MR. MYHRE:  That's correct, Your Honor.

8                  THE COURT:  All right.

9                  MR. GENTILE:  We do need the recommendation,

10  if the Court's willing to do so.

11                  THE COURT:  Well, I'll certainly give the

12  recommendation to FCI Herlong.  That's the closest

13  Federal Correctional Institute to Reno, Nevada.

14          I've also personally toured it.  It's an impressive

15  facility.  But it's also not one that's typically

16  designated by white-collar defendants.  So,

17  notwithstanding that, it is closest to here.  I recognize,

18  because of family considerations, that's probably the

19  primary reason -- the reason for the request.  I think

20  it's reasonable.  I certainly will recommend that.

21          But if for some reason he doesn't qualify for

22  Herlong, I would recommend one of the light-security

23  facilities that may be available.

24                  MR. GENTILE:  Well, I believe -- but if you've

25  just recently toured it, you'd know better, that there

184

1   is a camp at Herlong.

2              THE COURT:  There is a camp.  And I'm not

3   familiar with it.

4              MR. GENTILE:  Well, that's really the

5   designation.

6              THE COURT:  All right.

7              MR. GENTILE:  Because that's a -- that fits

8   within that security level.

9              THE COURT:  The Court will make that

10  recommendation.

11       And that's not binding on the Bureau of Prisons.

12  But many times they can accommodate it.

13       There was another point -- or was that everything

14  you wanted, Mr. Gentile?

15             MR. GENTILE:  No, I wanted a designation and a

16  February 1st surrender date.

17             THE COURT:  All right.

18       Mr. Myhre, was there an issue you wanted to raise?

19             MR. MYHRE:  Yes, Your Honor.  Just for

20  clarification purposes.

21       Since Count Two does not allow discretion to go

22  below the $400,000, is the Court's ruling that the

23  $100,000 fine applies to Counts One and Three?  So that

24  this isn't an issue on appeal.

25             THE COURT:  It's -- it wasn't clear to me

1   concerning the mandatory nature of Count Two.  It was

2   clear to me that under the circumstances that are before

3   me, based on these offenses and Mr. Whittemore's

4   personal situation, and for all the reasons I've

5   commented on, that $100,000 fine should be imposed.

6   So --

7              MR. GENTILE:  Your Honor, I would agree with

8   the government that if you were to impose it on Count

9   One and Three and impose no fine on Two, that that would

10  comply.

11             THE COURT:  All right.  Well, I will impose --

12  in light of the fact that everyone's in agreement on

13  that, I will impose it that way.

14             Probation is not being granted.  It's definitely

15  being denied.  And no fine will, therefore, be imposed on

16  Count Two.

17             MR. MYHRE:  Thank you, Your Honor.

18             THE COURT:  Finally, the Court will say this,

19  that I find that this sentence imposed, considering the

20  history and characteristics of the defendant, is

21  sufficient but not greater than necessary to comply with

22  the purposes of sentencing as set forth in Title 18,

23  United States Code, Section 3553(a).  And the Court has

24  considered all of the factors identified in

25  subparagraphs (a)(1)-(7) of that section of law.  I've

1    commented on a number of them.

2         And I also -- I agree with the sentencing

3    justifications which are also set forth at paragraphs 119

4    to 124 of the presentence report.  I do adopt those as

5    additional sentencing justifications with the modification

6    that the prison sentence portion of this be 24 months.

7         Mr. Whittemore, I know you're very aware of your

8    rights of appeal in this case.  But I still have to tell

9    you, notice of appeal would have to be filed within 14

10   days or you would lose that right of appeal.

11        Do you understand that?

12             THE DEFENDANT:  Yes, I do, Your Honor.

13             THE COURT:  All right.

14        Is there anything further that either counsel would

15   like the Court to -- well, wait a minute.  My clerk

16   reminds me I didn't make the record clear.

17        With regard to the 24-month sentence, it is 24

18   months on each one of the three counts of conviction to be

19   served concurrently; as is the term of supervised release

20   of two years.  The record will so show.

21        And is there anything further?

22             THE CLERK:  The report date.

23             THE COURT:  Oh, we do need to finalize that

24   report date.  February 1st of 2014 is a Saturday.  So

25   I'm going to move it up a day to Friday, January 31st,

1    2014, before noon.

2              MR. GENTILE:  Thank you, Your Honor.

3              THE COURT:  All right.

4              MS. BECKNER:  Your Honor, may I please present

5    the defendant with the conditions in this case?

6              THE COURT:  Yes, would you do that, please.

7              MS. BECKNER:  Thank you, sir.

8              THE COURT:  That's a routine matter.  And I

9    overlooked it.  And I apologize.

10         It appears that there's nothing further.

11         Mr. Whittemore, I wish you the best.

12              THE CLERK:  Please rise.

13                   (The proceedings were concluded at

14                   7:14 p.m.)

15                        *    *    *

16

17

18

19

20

21

22

23

24

25

188

-oOo-

I certify that the foregoing is a correct

transcript from the record of proceedings

in the above-entitled matter.

_____          11/15/13
Donna Davidson, RDR, CRR, CCR #318          Date
Official Reporter