E9nndoss                        Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          14 CR 34 (RMB)

5    DINESH D'SOUZA,

6                   Defendant.

7    ------------------------------x

8                                    New York, N.Y.
                                     September 23, 2014
9                                    11:00 a.m.

10

11
     Before:
12
                        HON. RICHARD M. BERMAN,
13
                                          District Judge
14

15                         APPEARANCES

16   PREET BHARARA
          United States Attorney for the
17        Southern District of New York
     CARRIE COHEN
18   Assistant United States Attorney

19   BENJAMIN BRAFMAN
     ALEX SPIRO
20   MARK BAKER
     Attorneys for Defendant

21

22

23

24

25

E9nndoss                         Sentence

1          (In open court)

2          THE COURT:  First off today we have some housekeeping

3    matters.  And they are these.  Counsel if you would just give

4    me a minute.  Thanks.

5          We have some recent additions to the docket.

6          There were three letters posted, one from a man named

7    Dan Robinson; one from a man named James Baker, and today I saw

8    a letter from Dixie D'Souza, Mr. D'Souza's ex-wife.  We posted

9    that letter as well.  I will make reference to it during the

10   course of my remarks.

11         I will also make reference to post-plea, presentence

12   interviews of Mr. D'Souza in the media.  In fact, two were

13   submitted by the government in connection with the sentencing.

14   My thought is this:  They are, to be sure, unusual in my

15   experience.  Many defendants prefer to lay low so to speak

16   before sentencing, but they have an absolute right to

17   participate in interviews as Mr. D'Souza has done as a matter

18   of free speech.

19         So how this sentencing will proceed today is as

20   follows:

21         We have a very full record in this case which I have

22   been over I think quite carefully with a fine-toothed comb, so

23   I am going to for the first part of the sentence explain what I

24   see in the record and what the implications of that are, and

25   also I will review and have reviewed before coming on the bench

what are called 18 United States Code Section 3553(a) factors,

which we as sentencing judges are directed to look at now that

and for some time the United States sentencing guidelines are

no longer mandatory.

        I didn't mean to cut you off, Mr. Brafman.

        Did you want to say something preliminarily?

        MR. BRAFMAN:  No, your Honor.

        THE COURT:  Mr. D'Souza is being sentenced today

because he pled guilty before trial to a felony pursuant to a

written plea agreement which is dated May 19, 2014, and which

is available on the public docket, the plea agreement.

        He has also in that plea agreement waived his rights

to appeal both his conviction and his sentence if he receives a

sentence that is within or less than what is called the

agreed-to sentencing range, that is to say, agreed to by the

defense and the government, and that range is 10 to 16 months

of incarceration.

        So any sentence that's within that range or lower he

has essentially waived his rights to appeal directly and

indirectly.

        Before Mr. D'Souza pled guilty on May 15, 2014, I

denied a defense motion which had been filed on April 17, 2014.

There was a reply submitted on May 2, 2014.  That was what we

call a motion to dismiss the case.

        Despite the media discussion and those presentence

E9nndoss                          Sentence

1    interviews with Mr. D'Souza regarding the topic of selective

2    prosecution, I wish to point out at the outset that defendant's

3    motion to dismiss was not in any way based upon selective

4    prosecution.  It was not based upon Mr. D'Souza's

5    often-repeated contention that he was being singled out for

6    this election law violation because of his prior critiques in

7    film, in writing, in speeches and as a TV commentator of

8    President Obama and the Obama Administration.  Rather, the

9    defense motion to dismiss raised technical constitutional

10   challenges to the two counts with which Mr. D'Souza was

11   charged.  And on May 15, 2014, the Court determined that the

12   motion to dismiss was without merit.

13          I said, among other things, at that time, "Where, as

14   in our case, the defendant is alleged to have engaged in

15   so-called conduit contributions or straw donor contributions,

16   the statute is constitutional."  The full text of my decision,

17   which is considerably longer than that, appears also on the

18   public docket.

19          In a separate motion, also filed by the defendant, the

20   defense sought to discover documents and other information from

21   the government based upon its suspicion and/or its claim that

22   D'Souza was being selectively prosecuted.  He presented no

23   evidence of selective prosecution and was asking the Court to

24   allow him to look for such evidence.  And this motion, too, was

25   denied.

1        I said at the time, among other things, "The Court

2   concludes that the defense respectfully has presented no

3   evidence that he," Mr. D'Souza, "was selectively prosecuted.

4   The burden is on Mr. D'Souza and the burden is the presentation

5   of some evidence.  There is no evidence of discriminatory

6   effect, nor of discriminatory purpose."  That is also found in

7   the transcript of proceedings.

8        So what I'm trying to say is that the claim of

9   selective prosecution, legally speaking, is all hat, no cattle.

10       Mr. D'Souza's underlying crime was that he wilfully

11  and knowingly violated the campaign finance laws by

12  contributing $20,000 more than the $10,000 legal limit which

13  Mr. D'Souza and his former wife, Dixie D'Souza, had already

14  contributed.  The $20,000 was contributed to the United States

15  Senate campaign of his friend and Dartmouth classmate, Wendy

16  Long.

17       Willfully is defined as follows:  An act is done

18  willfully is it is done with an intention to do something the

19  law forbids or with a bad purpose to disobey the law or with a

20  specific intent to fail to do something the law requires to be

21  done.  The defendant need not have known that he was breaking

22  any particular law or any particular rule.  He need only have

23  been aware of the general unlawful nature of his actions.

24       There is no doubt that Mr. D'Souza's crime was

25  willful.  This crime occurred in August 2012.  The illegal

E9nndoss                        Sentence

contributions were made through four so-called straw donors who
were personal friends of Mr. D'Souza and/or, in the case of
Tyler Vawser, a work subordinate.  Tyler Vawser worked for Mr.
D'Souza at Kings College as Mr. D'Souza's executive personal
assistant.

        The straw donors were Mr. and Mrs. Tyler Vawser, who
gave $10,000 to the Long campaign, and Denise Joseph and her
husband, Dr. Louis Joseph, who also gave $10,000 to the Long
campaign.

        The $20,000, that is to say the two $10,000 dollar
contributions, were made at Mr. D'Souza's request and on the
understanding that Mr. D'Souza would reimburse the Vawsers and
the Josephs.  And hence the contributions were really
contributions of Mr. D'Souza, and hence the term straw donors.
The reimbursements by Mr. D'Souza were made in cash very soon
after the contributions were made by the Vawsers and the
Josephs.

        Mr. D'Souza's actions in orchestrating these campaign
contributions were unquestionably willful, as reflected in his
plea in this case.  That plea transcript is also in the public
docket of this matter.

        The presentence investigation report prepared by the
probation department has this to say about what I have just
been talking about:  "Neither the Josephs nor the Vawsers would
have made the $10,000 campaign contributions to the Long

E9nndoss                         Sentence

1    campaign but for D'Souza's assurance that D'Souza would

2    reimburse them for these contributions.  D'Souza knew and

3    understood the monetary limit on an individual contribution to

4    a federal candidate.  Vawser asked D'Souza if what he was

5    asking Vawser to do was permissible, to which D'Souza responded

6    that if anyone asked Vawser about the donation, Vawser should

7    tell them that Vawser knows Wendy Long and supports her

8    candidacy."  D'Souza also had conversations with Wendy Long

9    about the contributions which I will discuss as we go forward.

10            I urge you not to believe anything to the contrary of

11   what I just said.

12            In sentencing a defendant, after the Supreme Court

13   decisions in the *Gall* case in 2007, the *Kimbrough* case in 2007,

14   in the *Booker* case in 2005, and also in Second Circuit Court of

15   Appeals decision in *Crosby* and *Regalado*, in 2005 and 2008,

16   respectively, we know that the United States Sentencing

17   Guidelines are no longer mandatory.

18            The elimination of mandatory sentencing guidelines

19   sentences is generally regarded as a positive development.

20   Guidelines sentences were, in my view, too rigid and formulaic,

21   and they undervalued the judgment of the courts in fashioning

22   reasonable sentences.  So, in sentencing these days, today, the

23   Court must, and I have at least preliminarily before coming on

24   the bench today, considered all of the factors and objectives

25   listed at 18 United States Code, Section 3553(a), which include

these:  The nature and the circumstances of the offense for the

crime, the history and characteristics of the defendant.

        We try to accomplish these objectives:  One is to

reflect the seriousness of the offense, another is to promote

respect for the law, another is to provide a just punishment

for the offense, yet another is to afford adequate deterrence

to criminal conduct.  These objectives are all quite important

in this case, as you will see going forward.

        Another is to protect the public from further crimes.

Yet another is to provide the defendant with needed educational

or vocational training or medical care or other correctional

treatment in the most effective manner.

        In doing all that, in reviewing what a fair and

reasonable sentence is, we look at the kinds of sentences

available.  We look at the kinds of sentence and the sentencing

range established in the United States Sentencing Guidelines,

even though, as I've said, they are no longer mandatory.

        We look at any policy statements issued by the United

States Sentencing Commission to the extent they are applicable.

        We seek to avoid unwarranted sentence disparities

among similarly situated defendants, and in appropriate cases

to provide for restitution.

        These factors, these 18 U.S.C. 3553(a) factors are

nearly all important in this case, with the exception of No. 7

which is restitution.  That does not appear to be an issue in

1    this case.

2            In evaluating those 18 U.S.C. 3553(a) factors, I have

3    concluded, among other things, that Mr. D'Souza's crime is

4    serious.  This campaign law offense and much of the inaccurate

5    chatter and interviews surrounding this case do not promote

6    respect for the law and need to be remedied.

7            The public certainly needs to be deterred -- this is

8    the concept of general deterrence -- from making phony

9    contributions and violating the election laws.  And in my

10   judgment, as you will see, Mr. D'Souza can benefit from certain

11   services that I think ought to be put into place.

12           So, even though the guidelines are no longer

13   mandatory, we start our sentences with a guidelines analysis as

14   a point of reference.  Here the Court has determined that the

15   applicable guideline range in this case is ten to sixteen

16   months of incarceration based on what we call an offense level

17   of 12 and a criminal history category of I.

18           In his plea agreement, Mr. D'Souza agrees with this

19   analysis, and he also acknowledges and agrees that he is being

20   given no credit for what we call acceptance of responsibility.

21   This concept of acceptance of responsibility has also been the

22   subject of some, in my opinion, misunderstanding in the media,

23   particularly as also reflected in some of the interviews.

24           Mr. D'Souza it should be noted agreed in the plea

25   agreement that he would not seek a two-level reduction in the

E9nndoss                         Sentence

1    stipulated offense level for acceptance of responsibility.

2           In considering these factors at 18 United States Code

3    Section 3553(a), I have also made these findings:

4           Mr. D'Souza pled guilty before me on or about May 20,

5    2014, to violating federal campaign finance laws, 2 United

6    States Code, Sections 441f and 437g(d)(1)(D) by contributing

7    $20,000 to the Senate campaign of Wendy Long in the name of

8    others; that is, as we've said, Mrs. Denise Odie Joseph and

9    Dr. Louis Joseph and Mr. and Mrs. Tyler Vawser.

10          This is the defendant's first offense in an otherwise

11   apparently law-abiding life, and this is an important

12   consideration.

13          Mr. D'Souza is 53 years of age.

14          He's single, having divorced.

15          He has one child who is 19 and is also a student at

16   Dartmouth college and who has written in fact a letter of

17   support on his behalf.

18          Mr. D'Souza is a naturalized U.S. citizen and a

19   permanent U.S. resident.  He was born in Mumbai and came to the

20   United States for high school.  He obtained his high school

21   diploma from Patagonia Union High School in Patagonia, Arizona,

22   and thereafter has remained in the United States.

23          Mr. D'Souza has a bachelor's degree in English from

24   Dartmouth College, class of 1983.  I am not aware that he has

25   any advanced academic degrees such as a master's or a Ph.D.,

E9nndoss                        Sentence

1     but counsel can address that if that's incorrect.

2              Mr. D'Souza has been very successful in a career of

3     writing commentary, filmmaking, and he reports to the probation

4     department a net worth of in excess of $5 million.  Since

5     approximately 2010, he has earned his living as a well-known

6     best-selling author and film producer and TV commentator.

7              From 2010 to 2012, he was the president of King's

8     College, a Christian college in New York City, about which the

9     presentence investigation reports states the following:

10    "D'Souza stated that he resigned from this employment due to

11    having been dating a woman while he was going through his

12    divorce, which D'Souza believed conflicted with the school's

13    values, which we are told are conservative Christian."

14             This is in the presentence report, which goes on to

15    say, Per King's College, D'Souza was president from August 2010

16    to October 2012, earning $600,000 per year and that he

17    resigned.  No further data was provided.

18             And Mr. Vawser writes in his letter to Court, While

19    the circumstances around his departure from King's College were

20    not ideal, the staff that worked closest with Dinesh still

21    respect him greatly to this day."

22             From 2008 to 2010, Mr. D'Souza derived his income

23    principally from writing and through speaking fees.  According

24    to the presentence report, he earned $200,000 per year in books

25    and another $200,000 to $250,000 per year in speaking.

E9nndoss                    Sentence

From 2001 to 2007, he was a research scholar at Hoover Institute.

From 1989 to 2001 he was a research scholar at American Enterprise Institute.

Between 1987 and 1988, during the Reagan Administration, Mr. D'Souza was a domestic policy analyst at the White House.

From 1985 to 1987 he was the managing editor of Policy Review, a Washington, D.C. publication.

From 1983 to 1995 he was employed as editor in chief at The Prospect, of Princeton, New Jersey.

I am going to talk about the submissions of the parties for a few moments. Of course, Mr. Brafman, Mr. D'Souza, and of course the government as well, will be invited to speak when I finish this background.

By submission dated September 3, 2014, the defense, as noted, agrees with the probation office calculation of Mr. D'Souza's sentencing guideline range of 10 to 16 months of incarceration, "Although for guideline purposes" -- this is the defense speaking -- "the plea agreement precludes defendant from advocating a downward adjustment based upon his acceptance of responsibility. Nevertheless, for purposes of considering a variance sentence outside the guidelines, the fact that defendant spared the government a trial by pleading guilty, even at a later time than might have otherwise been the case,

1    may well be considered by the Court."

2              That is a correct statement under 3553(a), the Court

3    may consider all of these factors.

4              The defense goes on to say that "Defendant's guilty

5    plea is buttressed by his heartfelt statement of contrition, as

6    recognized in the letters included herein by those who know him

7    best."

8              There were some 27 or so letters, excluding the three

9    that I mentioned at the beginning of this proceeding, that were

10   submitted on behalf of Mr. D'Souza.

11             "So, too" -- back to the defense submission -- even if

12   not for purposes of a downward departure, in order to initially

13   arrive at the total offense level, the Court may well

14   consider -- certainly for purposes of the Section 3553(a)

15   factors -- the reality that Dinesh D'Souza's aberrant

16   criminality in this case was so completely alien to his normal

17   character."

18             This is an issue that I will discuss a little bit

19   further below.

20             Back to the defense contention:  "Mr. D'Souza, who

21   pled guilty and accepted responsibility for his actions, is

22   sincerely remorseful for his conduct.  Throughout the case

23   neither D'Souza nor his attorneys have ever disputed D'Souza's

24   factual guilt, merely challenging the charges based on complex

25   legal principles later rejected by the Court."

E9nndoss                          Sentence

            That is a quote from the defense submission which

tracks what I said at the outset about the motions.

            "These complex legal principles did not include

selective prosecution as I said before.  To be sure, what Mr.

D'Souza did was wrong, and his conduct violated the law.  He

has acknowledged criminal conduct and has accepted full

responsibility for his crime."

            Defense counsel go on to say the following, "It is

accordingly requested that as a condition of the term of

probation, the Court direct that Dinesh D'Souza engage in a

sufficient amount of community service by which he can help

educate others, perhaps less fortunate, and thereby enable them

to benefit from those lessons learned as a result of his own

mistakes in general and this criminal prosecution in

particular."

            The defense describes the defendant as "a self-made

man who rose from humble roots to achieve a significant degree

of professional and personal accomplishment.  Along the way his

demeanor was selfless, community oriented and devoted more to

the betterment of others than for any purposes of

self-aggrandizement."

            I'm still quoting from the defense submission.

Counsel argues further that "Mr. D'Souza has had a

distinguished and heretofore unblemished career as a scholar,

and Mr. D'Souza has continually placed a priority on caring for

1    friends, family and neighbors."

2          Defense counsel also adds, and this is something I am

3    a little bit unclear of and perhaps a little bit later on,

4    Mr. Brafman, you could explain, you say in the letter that,

5    "Mr. D'Souza also potentially faces an array of parallel

6    proceedings which carry substantial financial, administrative,

7    and civil penalties," and I might just ask you later to

8    elaborate on what that means.

9          Turning to the government position, the government

10   takes a markedly different view of sentencing than the defense,

11   as is not uncommon.

12         By submission dated September 10, 2014, the government

13   states that "The defendant both instructed Vawser to lie about

14   his contribution and lied to Wendy Long about the Vawsers' and

15   the Josephs' contributions.  Specifically, when the defendant

16   asked Vawser to make the donation to the Long campaign with the

17   promise that the defendant would reimburse Vawser for the

18   donation, Vawser asked defendant if what the defendant was

19   asking Vawser to do was permissible."

20         This is the government speaking.

21         "So the defendant responded in sum and substance that

22   if anyone asked Vawser about his contribution, Vawser should

23   tell them that Vawser knows Wendy Long and supports her

24   candidacy.  When Ms. Long questioned the defendant about the

25   Josephs' contribution to her campaign as well as the Vawsers'

1    contribution, the defendant responded, in sum and substance,

2    not to worry, and that they both had sufficient funds with

3    which to make the contributions."

4              This is all from the government's letter.

5              The government seeks a sentence of incarceration

6    within the guideline range of 10 to 16 months.  The government

7    states, "A sentence within the range of 10 to 16 months'

8    imprisonment is sufficient but not greater than necessary to

9    serve the legitimate purposes of sentencing, especially in

10   light of the seriousness of the offense, the defendant's post

11   plea failure to accept responsibility for his criminal conduct,

12   the need for general deterrence, and the need to avoid

13   unwarranted sentence disparities."

14             And the government there cites a series of cases.

15             The government also states, Defendant's "educational

16   and work history actually aggravate his illegal conduct, as he

17   is a sophisticated individual who rather than follow the law

18   chose, in his words, to take a shortcut and break the law."

19             The government argues that defendant pled guilty at

20   the last possible moment before trial began not because he

21   actually accepted responsibility for his conduct, but because

22   he was in fact guilty, and he had no defense or excuse for his

23   criminal conduct.

24             The government encloses, as I think I mentioned

25   before, two videos and transcripts of defendant's post-plea

E9nndoss                    Sentence

1   appearances on TV.  They are government's Exhibits C and F, in

2   which the defendant acknowledges that he pled guilty because --

3   this is a quote from the government, "going into a trial with

4   in a sense, no defense.

5        One of these videos, the F video, I am going to play

6   part of at this point.

7        (Video played)

8        THE COURT:  I mentioned before and I will say it

9   again, Mr. D'Souza had every right to appear in that interview

10  and others.

11       Now let's talk about the letters of support submitted

12  on his behalf for just a few minutes.  Defense counsel relies

13  heavily on these letters.  I think, as I said before, there are

14  27.  They are, with the exception of the latest letter from

15  Dixie D'Souza -- that is not one of the 27, that came in this

16  morning, at least as far as I am aware.  The other letters are

17  supportive and they come from, among others, Mr. D'Souza

18  himself, his daughter, Tyler Vawser, Wendy Long, Laura

19  Ingraham, Reverend Michael Jones, and others, all of whom

20  describe Mr. D'Souza's positive qualities.  Several also

21  describe his crime as a mistake, as defense counsel has also

22  said in its submission.

23       Wendy Long, for example, says, "He has admitted his

24  mistake."

25       Danielle D'Souza says, "I understand his giving nature

E9nndoss                    Sentence

and can see how my father made the mistake of giving too much

to her campaign."

        Margaret D'Souza says, "My son has made an error and

is extremely sorry for it."

        Sandira D'Souza says, "I'm quite sure that his

intentions were never to break the law of the land that he so

very loves."

        Bruce Schooley says, "Since I know Dinesh so well, I

can tell you why he did what he did regarding this case.  His

generosity got the better of him, and he did something very

foolish.  I know for certain that he had no intention of

committing a felony.  He was merely trying to help a very good

friend, and he did it in a shortsighted and wrong way."

        These letters submitted by the defense describe Mr.

D'Souza as generous and intelligent and request leniency on his

behalf.

        Wendy Long, for example, says, "I'm certain that his

problem arose in part from his virtue of being an extremely

generous person -- in this case, to a fault -- with others."

        Jim Hanon says, "What I experienced from Dinesh was

grace, and what I saw in him was a heart without malice."

        Laura Ingraham says, "Dinesh is simply one of the

finest human beings I have ever met.  His generosity of spirit,

philanthropy, keen sense of compassion and devotion to country

are what I hope my own children exhibit when they mature into

E9nndoss                         Sentence

adults."

Reverend Jones says, "Dinesh D'Souza is one of the sharpest, smartest, and most experienced individuals in the world of politics, education, and media and should have known better."

And Gerald Molen, whose name you heard mentioned in the interview, says, "What I saw was a learned and highly intelligent individual with a passion for our country, its people, and its growth as a nation."

And Sonya Pourmand said, "I have always thought of Dinesh as an understanding, compassionate, kind, intelligent, graceful, and humble man."

Letters of support I should tell you have become an integral part of sentencing, not just this one, especially since the sentencing guidelines became no longer mandatory. Such letters are always welcome, and they are informative, even if they are almost always supportive, if not glowing, in support of the particular defendant.  The Court receives packages of letters of support not unlike those submitted in this case in virtually every criminal case, including one I received just the other day where a defendant had pled guilty to a conspiracy to commit a Hobbs act robbery of drugs involving fake police uniforms, badges, police car sirens, and the possession of two guns to be used in connection with the robbery conspiracy.  The robbery never occurred.  And someone

wrote in his behalf to me, "I have known the defendant" -- who,

by the way, had five prior convictions -- "for almost 20 years

now.  To be honest, throughout all the many years of knowing

him, he's always been a loving, kind, well-mannered, dedicated,

hard-working, respectful young man."

          So letters, including those that we have here, can be

revealing sometimes for what they don't say as much as for what

they do say.  With respect to the letters in this case, first,

they don't in my view adequately explain why Mr. D'Souza, a

successful, famous political commentator, author, lecturer and

filmmaker at the pinnacle of his success, would commit an

election law felony.  Such self-destructive behavior cannot

neatly in my view be explained either as friendship or as a

mistake or as out of character.  And we would in my view need a

thoughtful psychological intervention or analysis to have

better insight.

          Second, Ms. Long's letter never explains what she

really thought about the two straw $10,000 contributions from

Vawser or Joseph.  We understand she admires Mr. D'Souza, but

we know she had expressed concerns about the contributions.

          The presentence report says this: "On more than one

occasion, Wendy Long questioned D'Souza about the Josephs'

contribution to her campaign as well, as the Vawsers'

contribution, in part because the Vawsers and the Josephs were

not typical of other donors and were connected to D'Souza.

1    D'Souza responded not to worry, and that they both had

2    sufficient funds with which to make the donations."  This is

3    the presentence report continuing.  "Eventually, in or about

4    the first half of 2013, after Ms. Long continued to press the

5    defendant about the Josephs' and the Vawsers' campaign

6    contributions, D'Souza acknowledged to Ms. Long that he had

7    paid for their contributions, but that Ms. Long should not

8    worry because she had not known about it."

9        Third with respect to the letters, Mr. Vawser's letter

10   is silent as to any potential legal or moral culpability he

11   might have by violating the election law.  How is that

12   friendship to write a $10,000 check and implicate one's spouse

13   and one's self in a possible election crime?

14       And, fourth, almost every defendant expresses remorse

15   for his mistake.  They often mean it was a mistake in

16   hindsight, and they are certainly sorry that they got caught.

17   But Mr. D'Souza's crime was clearly no mistake.  A mistake here

18   might have been his writing a check for $30,000 to Ms. Long.

19   That would have been a mistake about election law contribution

20   limits.  But that's not what happened.  Instead he asked two

21   friends to write a $10,000 check from essentially you, being

22   one of the friends, and your spouse -- he said that in effect

23   to both contributors -- to Wendy Long.  In effect he said,

24   Trust me and do this.

25       He said, I'll pay you back right way so you won't

E9nndoss                          Sentence

really be out of pocket in cash, and if anyone asks you about

this, just say you know Wendy Long and support her candidacy.

That is neither friendship nor mistake.  That's taking a

staggering, enormous risk.

        The letter that came in today from Dixie D'Souza is

quite at odds with the letters submitted by the 27 individuals

in support of Mr. D'Souza.  I posted that letter, as all the

others, on the docket.

        It says, though, among other things, "I know Dinesh

better than anyone and can attest to his flawed character and

lack of truthfulness.  Please accept this letter as my effort

to correct the record Dinesh created by his false and

misleading submissions to the Court regarding me, the extent

and nature of his criminal conduct, etc."

        Dixie D'Souza also says respectfully, with respect to

defense counsel, nothing that they said on her behalf was

remotely correct.

        "Now I must take this opportunity to speak -- this is

Dixie D'Souza speaking -- "for myself and truly let the record

be complete.

        "First, Dinesh's counsel wrote in describing the

crimes to which Dinesh pled guilty that Dinesh acted bereft of

any corrupt purpose or design other than blind and misguided

loyalty.

        "That simply is not true."

E9nndoss                    Sentence

1              This is her letter.

2              "Dinesh served on the Wendy Long finance committee and

3      obviously knew the contribution guidelines and political

4      finance campaign laws."

5              She goes on to say that "Dinesh also contributed

6      $5,000 to a candidate for the United States Senate in my name,"

7      meaning in her name, without her knowledge.  She says, "without

8      my knowledge or permission and forged my signature on the

9      campaign contribution form in an effort to disguise the

10     fraudulent campaign donations."

11             Dixie D'Souza also says, "I urge the Court to act

12     accordingly to afford adequate deterrence to similarly situated

13     defendants, namely, spouses who are tempted to contribute on

14     behalf of their spouses without their knowledge or consent."

15             She also says that Mr. D'Souza's motives were

16     self-serving, "As Dinesh indicated to me," meaning to her,

17     "that his support for Ms. Long's campaign was due in part to

18     her support of his Obama 2016 movie."

19             She said, "He told me that he felt compelled to pay

20     her back because she introduced him to a big donor who helped

21     fund the Obama 2016 movie."

22             She also says something that's -- well, she says the

23     following.  She says, "Contrary to the statements made in Mr.

24     D'Souza's sentencing memorandum, it is my former husband,"

25     meaning the defendant, "who has an abusive nature.  In one

E9nndoss                         Sentence

1    instance it was my husband who physically abused me in April

2    2012 when he, using his purple belt karate skills, kicked me in

3    the head and shoulder, knocking me to the ground and creating

4    injuries that pain me to this day."

5         Well, the letter speaks for itself.  It goes on for

6    some four, five pages.  As I said before, it's on the public

7    docket and can be read.

8         I'm almost done with my presentation.

9         I just want to talk for a moment about the rule of

10   law.  So one judge said that, "If we cannot have faith and

11   confidence in our election process, then we can't exist as a

12   democracy."  That is Judge Collier, a district judge in Florida

13   in the case of *United States v. Odom*.  I totally agree with

14   that quote.  I understand that the parties in this case dispute

15   the applicability of that case to our sentencing, but it seems

16   to me the quote of the judge is unassailable.  If we cannot

17   have faith and confidence in our election process, then we

18   can't exist as a democracy.

19        So the D'Souza case here is at its core about the rule

20   of law.  The law said that Mr. D'Souza could not contribute

21   more than $10,000, Mr. and Mrs. D'Souza, to the Long campaign.

22   The defendant by virtue of his education and political

23   expertise knew that and yet knowingly made the unlawful straw

24   contributions.  No plea, including the plea in this case, is

25   accepted by the Court unless the defendant acknowledges that he

E9nndoss                        Sentence

had the requisite intent to commit the crime.  Mr. D'Souza had

the requisite intent, and he acknowledged that and said so both

in his plea agreement and at his plea allocution.

        To be sure, Mr. D'Souza never said that he didn't do

the crime.  His principal public contention was after the crime

had happened and after the plea was entered that he is a victim

and is being singled out.  But, as I said before, the claim of

selective prosecution was never a basis for the defense motion

to dismiss, and it was unsupported by any evidence.

        The defense says it has accepted the Court's rulings

in this case, yet Mr. D'Souza, having every right to be

interviewed -- I said that now three times -- continues to

deflect and minimize the significance of the crime and of his

behavior by reference to other people, other issues, and other

events, including by reference to President Obama, by reference

to Senator Harry Reid, and I believe his granddaughter's

wedding, by reference to the IRS, by reference to the Tea

Party, by reference to having no intent, by reference to having

no corrupt motivation, and by reference to misguided friendship

for Wendy Long.

        I'm not sure, Mr. D'Souza, that you get it.  And it's

still hard for me to discern any personal acceptance of

responsibility in this case.  Notwithstanding Mr. D'Souza's

contention in his post-plea TV interview that you saw, I'm

totally confident that Lady Justice is doing her job and that

E9nndoss                        Sentence

1    she's not taking off her blindfold to target Dinesh D'Souza.

2            So one last point.  I want to answer this question why

3    the rule of law is so important.  It's important for three

4    reasons, and perhaps more:

5            One, it's important because free and fair elections,

6    including only lawful campaign contributions, are at the heart

7    of our political system.

8            Two, it's important because in violating the election

9    law, Mr. D'Souza compromised anywhere from two to five of his

10   friends and associates, Mr. and Mrs. Vawser and Mrs. Joseph and

11   her husband, Wendy Long, and Dixie D'Souza, perhaps six people.

12   It doesn't matter if these people still like him and write

13   letters of support on his behalf.

14           And, third, the rule of law is important, because if

15   we don't follow the law and the court decisions, we are

16   diminished as a society, and not just the laws and decisions

17   that we like or all agree upon, but especially those laws and

18   those court decisions that we don't like and disagree over.

19           So the, Steve Malzberg I think is his name, interview

20   that I have just played respectfully misleads the listener.

21   You will recall Mr. D'Souza says in that interview that:  "The

22   case revolved really on two points.  One is the issue of

23   selective prosecution.  In other words, is it the case that I

24   was being selectively prosecuted or excessively prosecuted for

25   something that normally doesn't get this kind of treatment?"

E9nndoss                         Sentence

Incidentally, just as an aside, the defense and the government have each submitted approximately eight to ten cases, different cases about prosecutions for election law violations. They argue about which cases are applicable here, but there's 20 cases right there that belie this notion that it's only Mr. D'Souza that's being charged.

Then in that interview he says, "The second issue was my intent. Did I intend to commit a crime? Did I intend to break the law?"

He goes on to say, "What really changed in the case, is that the judge," that would be me, "ruled that the selective prosecution issue could not be, could not be introduced in court. And, second he" -- I guess meaning me -- "defined intent in quite a narrow way that made it almost impossible for me to launch a defense based on that. So those were the things that changed."

That's Mr. D'Souza in the interview. That is nonsense. Spin is what that is.

In fact, nothing changed except Mr. D'Souza pled guilty. Selective prosecution was always sheer speculation on Mr. D'Souza's part. He presented no evidence of it. And the definition of willfully and knowingly, the intent issue has been constant for me and for many of my colleagues for decades.

So I have also reviewed the presentence investigation report, approved September 16, 2014, together with a sentencing

E9nndoss                        Sentence

1   recommendation of the same date and an addendum of the same

2   date, the correspondence from the defense dated September 3 and

3   September 15 and the correspondence from the government dated

4   September 10.  Mr. Brafman I would ask you if I have missed

5   anything, or anything from the government that I missed?

6             MS. COHEN:  No, your Honor.

7             MR. BRAFMAN:  No, sir.

8             THE COURT:  So, Mr. Brafman, have you and Mr. D'Souza

9   had the opportunity to read and discuss that presentence

10   investigation report and these other pretrial submissions?

11             MR. BRAFMAN:  Yes, sir.

12             THE COURT:  Mr. D'Souza, you have been over those

13   materials with your attorney?

14             THE DEFENDANT:  Yes, I have.

15             THE COURT:  Do either of you have any remaining

16   objections to the contents of the presentence report?

17             MS. COHEN:  No, your Honor.

18             MR. BRAFMAN:  No, your Honor.

19             THE COURT:  Mr. D'Souza?

20             THE DEFENDANT:  No, your Honor.

21             THE COURT:  So I will return the report, which is our

22   practice, to the probation department.

23             At this time I am happy do to hear from defense

24   counsel, from Mr. D'Souza, and from the government, in that

25   order, if they wish to be heard.

E9nndoss                         Sentence

1                MR. BRAFMAN:  Your Honor, may I ask for just a

2     two-minute break.

3                THE COURT:  Sure.

4                MR. BRAFMAN:  Thank you.

5                THE COURT:  You bet.

6                (Recess)

7                THE COURT:  Mr. Brafman.

8                MR. BRAFMAN:  Your Honor, may I proceed?

9                THE COURT:  Yes, sir.

10               MR. BRAFMAN:  Does the Court mind if I speak from

11    here.  I think you will be able to hear me.

12               THE COURT:  Wherever you are more comfortable.

13               MR. BRAFMAN:  Thank you, Judge.

14               Judge, I want to start by saying that while I am not

15    pleased by a lot of what I heard your Honor say this morning, I

16    am grateful that you said it now so that I could have the

17    opportunity to respond.

18               I also have been doing this for a long enough time to

19    recognize that I am climbing a very steep hill, given the tenor

20    of the Court's remarks.  But I intend to climb as hard as I

21    possibly can for a number of reasons:  One, because I don't

22    believe Mr. D'Souza should go to prison for what he did; and,

23    two, because, and I say this with great respect, I think

24    although this is the first case I have had the privilege of

25    appearing before your Honor on I think you will conclude

E9nndoss                    Sentence

```
 1  hopefully from the manner in which I have conducted myself at

 2  all proceedings that I have great respect for this Court and

 3  for the integrity of this Court.  And while I can disagree with

 4  you and we can disagree, and sometimes that's my job, it

 5  doesn't mean that I have any less respect for you just because

 6  I think your Honor is wrong on some of these issues.

 7          THE COURT:  I have no doubt about that.  And I have

 8  the greatest respect for you personally and as an attorney as

 9  well.

10          MR. BRAFMAN:  Thank you, sir.

11          Thank you.  Your Honor, I spoke with Ms. Cohen

12  yesterday briefly after we both got a copy of what we will call

13  the wife letter.  And, true to form, never get sentenced if you

14  are also going through a bitter divorce, because there's always

15  a bitter, scorned spouse who may show up on the horizon.

16          Both of us agree in words or substance that we really

17  weren't going to focus on what the wife said.  But your Honor

18  did, so I need to respond very briefly.  As a practical

19  matter --

20          THE COURT:  I just want to say one thing, and I won't

21  interrupt you.  What I meant to do was to give a complete

22  description of the record that was presented before me.  That

23  was my goal.  Whether I succeeded ordinary not, I don't know.

24  But I wanted you to know the universe before you spoke actually

25  of what I knew.
```

E9nndoss                    Sentence

1          MR. BRAFMAN:  I appreciate that.  But since the Court

2     has placed some very personal and derogatory information from

3     the wife into the record, I just need to briefly respond, and

4     then I am going to move on, because I don't believe, and I hope

5     I'm right that your Honor's sentence is going to be determined

6     based on what this woman said to you in a letter which we got

7     the day before sentence and don't have a chance to even respond

8     to.

9          But I will say parenthetically, if she were here and

10    we placed her under oath, I could demonstrate in 20 minutes

11    that 90 percent of what she said in the letter is patently

12    false.

13         What I tried to do in the short time that I have had

14    since I got the letter, the only thing I could do is get a

15    letter from the accountants who prepared all of the returns for

16    the husband and wife for the last ten years, and he tells me in

17    the letter -- that I'm happy to submit although I am assuming

18    it doesn't matter -- that she never took any interest in any of

19    the couple's finances and that she always authorized Mr.

20    D'Souza to do everything on behalf of the couple.  I don't

21    think the government even disputes that.

22         But I also want to just read one quote from a letter

23    from the daughter of the couple concerning the issue of abuse,

24    because that is personal, and that hurts to have that in the

25    record, regardless of the sentence your Honor imposes.

1          At page 19 of our memo we cite from a letter to the

2     Court from Danielle.  Danielle is a 19-year-old honor student

3     at Dartmouth.  This is not a kid.  This is not an abused child.

4     And she writes, in pertinent part, "My parents had a broken

5     marriage for a long time, and unfortunately my father did not

6     understand my mother's abusive nature before marrying her.  For

7     this, I wept for him.  Then he told me he would marry her 20

8     times over just to have me, because I am the joy of his life."

9          That letter does not sound to me like someone who is

10    lying to a court about her relationship with either her father

11    or her mother.  So I ask your Honor when imposing sentence to

12    give the letter from Mrs. D'Souza as much credit as I think it

13    deserves, which is none.

14         So let me start and talk about the issues that I think

15    are important.  I want to start with what your Honor said

16    before concluding your remarks, because I think one of the

17    things you said resonates well with me and I think suggests why

18    a sentence of prison is not appropriate.

19         Your Honor said, and I'm paraphrasing because I

20    couldn't write as fast as I would have liked to, but your Honor

21    said something to the effect, we need to follow the law and we

22    need to follow precedent.

23         There is not a single case anywhere in the United

24    States of America that either I or the government with all of

25    their resources have found where someone like Mr. D'Souza, who

1    is a first offender, who is not an attorney, who is not a

2    campaign official, who had no corrupt relationship with the

3    candidate, who has given $20,000 through straw donors, has gone

4    to prison.

5            What we did, judge, we cite a dozen cases in our memo

6    of cases far worse than the defendant's, and all of the judges

7    in all of those cases throughout the country imposed a

8    nonprison sentence.

9            Then, when the government cited their cases in their

10   memo, in our reply memo what we did, and I did it for the

11   convenience of the Court, we made a chart.  We made a chart

12   side by side as to what the government claimed those cases were

13   about and why you should look at them as precedent, and then we

14   wrote in the chart the facts about those cases that so greatly

15   distinguish them from this case that in a million years they

16   could not be cited as precedent.

17           In many of the cases cited by the government where

18   sentences of imprisonment were imposed the defendants went to

19   trial, they were concluded to have lied on the witness stand,

20   to have engaged in obstruction of justice.

21           In the *Odom* case which your Honor cites, the defendant

22   was involved in an attempt to fix a construction project in a

23   school.  There was a corrupt intent.

24           There was a corrupt motive in the *Bigica* case, which

25   they cite.  It was a 2.5 million tax fraud that was part of the

1    case.

2              In the *Feiss* case which they cite, they attempted to

3    appoint people to a committee that selects judges.  And the

4    woman who was sentenced to several months in jail was the

5    person who was organizing all of the people in the law firm to

6    contribute money to that campaign so her boss, this corrupt

7    lawyer, could be able to pick judges.  How is that a precedent?

8    How is that a parity argument for this case.

9              In the *O'Donnell* case O'Donnell was an attorney, and

10   it was his second offense.  He got a two-month prison sentence.

11   He was an attorney, and it was his second offense.  He got a

12   two-month prison sentence.

13             In the *Tigani* case, there was a scheme involved to

14   influence matters affecting a family liquor business, and it

15   was a tax case.

16             In the *Hogan* case, the corrupt purpose was attempting

17   to influence cigarette tax legislation.  That is every one of

18   the cases cited by the government with the exception of the

19   *Whittemore* case.  The *Whittemore* case involved a level 22.  41

20   to 51 months was the sentencing guidelines.  The judge in that

21   case imposed a 24-month sentence.  Whittemore was a lobbyist

22   and an attorney.  He went to trial and testified.  The

23   government told the Court that he lied, and that he should

24   enjoy an obstruction of justice enhancement.  In that case the

25   court cut the sentence by 50 percent.

1          There isn't a single case, not a single case -- and

2     we've looked, Judge.  Trust me.  We looked.  If we could have

3     found one, the government could have found one.  Not one case.

4          You know what they do in their response to the dozen

5     cases that we cite which are on point, where people did what

6     Mr. D'Souza did and have less of an impressive background where

7     they got probation, they completely ignore them.

8          You look at the government's memorandum from page 1 to

9     the end and it doesn't touch a single case, because it can not.

10    And here's the argument, Judge.  I can say it, so if there are

11    people quoting us both, we can say I am assuming and concluding

12    for the purposes of this discussion that there was not a

13    selective prosecution.

14          Let's assume for the purposes of this discussion that,

15    as the government maintained, that this was a routine audit

16    that disclosed these contributions, because when you look at

17    the Wendy Long campaign filings, and I don't mean this in a

18    pejorative way, but Ray Charles could see these donations.

19    It's 250, 250, 60, 300, 10,000, 10,000, 10,000.

20          So I will accept for the purposes of this discussion

21    or the purposes of intellectual honesty that it came up at a

22    routine audit.  But from that moment on, when they realized who

23    they had in their sights, there is nothing about this case that

24    was handled in a normal fashion.  That is not selective

25    prosecution.

1           So I'm now arguing that the zeal with which this case

2   was brought from inception to the Southern District is

3   uncharacteristic of any case that we have found.  If you

4   recall, we didn't make a motion to dismiss for collective

5   prosecution.  Your Honor is right.  We made a motion to ask for

6   additional discovery.

7           What we did in that motion is we showed your Honor

8   that the normal pattern in cases where there's only this much

9   money and no candidate involved and no element of corruption,

10  90 percent of those cases are handled as FEC matters and there

11  is a settlement and you pay a fine.

12          What else we showed is that those cases that are

13  referred for criminal prosecution take years to get through the

14  process.  We were at the Southern District in a matter of

15  months, in a matter of months.

16          So Mr. D'Souza has a political view of the world.  I

17  don't have to agree to it to defend him.  Your Honor doesn't

18  have to agree to it to understand him.

19          I begged him, I begged him not to go on any show until

20  after the sentencing, because I understood that there's no way

21  that you could go on.  And he did listen to me about one thing.

22  He never discussed any of the facts of the case.  There's no

23  reference to Tyler Vawser or any of the facts.  He doesn't say

24  anything about the case.

25          And there is never a clip, including the one your

Honor played, where he doesn't say, I was wrong, I admitted I
was wrong, I pled guilty.  He doesn't say he was forced to
plead guilty.

          I ask the Court on the issue of acceptance of
responsibility, because here's the deal we made, and to be
honest with you, if ever I was in doubt that this case is being
treated special, it's this case, they have proven it to me, to
me not, to Mr. D'Souza.  And I am not known in this building as
a crazy person, and I didn't drink the Kool Aid, and I am not a
political individual who espouses the end of the Obama
administration.  I am just a practitioner in this building.  In
this case things happened in this prosecution that are not
ordinary.

          For example, we pleaded guilty the next court date
after your Honor decided our motions.  Now, in this case, after
the *McCutcheon* decision, to be perfectly candid it would have
been considered malpractice for a lawyer like me not to at
least challenge the standing of whether or not *McCutcheon*
applied to this case, because I believe it should and many
people agree with me.

          Maybe one day it will, and that will be the tragedy.
Two years from now it will apply, and we will have finished
these proceedings.

          So we filed these motions.  The government cavalierly
refers to them as frivolous.  When your Honor ruled, your Honor

said, I got serious briefs from both sides, who did an

excellent job at presenting me with the issues.  The Court

spent a great deal of time responding to our motions in a

cogent, well-reasoned decision, and denied them.

        That happens.  We then had in effect a preview of a

charging conference.  Because the issue of intent, for example,

in the area of structuring has been litigated for years in this

building.

        We had the same thought.  Is there an issue of the

level of willfulness, of the level of intent.  This wasn't Mr.

D'Souza who is not a lawyer.  This was us trying to be good

lawyers.

        Then, when your Honor told us what your definition was

going to be, we told Mr. D'Souza, You cannot win this case.

And Mr. D'Souza pled guilty.  Even though it was before trial,

the government insisted that he loses his acceptance of

responsibility.

        Judge, I have never had that happen any case in 37

years.  What you lose is the extra point if it applies, because

you only get the authorized point under 3E if you don't cause

the government to prepare for trial.  But I have never had a

defendant who actually pled on the eve of trial lose his two

points.

        I am sure they have examples of it.  It's never

happened to me.  In addition, Judge, we have cases in other

1    districts where a defendant after trial still gets acceptance

2    of responsibility by the Court.  So, to take it away from him

3    in this case, and that's why what we did, because I trusted in

4    your judgment, what we did was we had a carve-out.  We can't

5    contest under the plea agreement that he's entitled to the two

6    points, but at the time of sentence, we made the very, very

7    careful record of the fact that we were permitted to ask the

8    Court to give him his acceptance of responsibility in the

9    context of your Honor's mind when you were considering whether

10   or not what sentence should or should not apply.

11           If I wanted to be cute, I've never violated terms of a

12   plea agreement before, but if I wanted to be cute I could make

13   the following argument.  If you give him the acceptance of the

14   responsibility that I believe he deserves because he pled

15   guilty and has never said he's not guilty.  In your Honor's own

16   mind he is in zone B if you want him to be there.  We can't do

17   it because we can't advocate for it.  But if you are in zone B,

18   you are entitled to probation.

19           THE COURT:  In a way, that is an irony here in a

20   sense.  And, of course, you have every right to make those

21   motions and to litigate this case, and you did a good job.  The

22   irony is, and I don't know if that's the right word, but we are

23   in zone C.  If this were in the guidelines regime, he would be

24   stuck with 10 to 16 months of incarceration.

25           If he had pled early, or soon after committing the

```
 1   crime, he would be in zone B as you point out, for which

 2   probation is an alternate sentence.

 3             MR. BRAFMAN:  Yes.

 4             THE COURT:  Almost every judge in this building would

 5   give a first offender in zone B probation.

 6             MR. BRAFMAN:  Yes.

 7             The probation officer correctly points out that, even

 8   though we are in zone C, it is not 10 to 16 months as the

 9   lowest sentence; you are entitled to apply a sentence of five

10   months of incarceration, five months' home confinement.  But

11   we're asking for a variance.

12             THE COURT:  I understand.

13             MR. BRAFMAN:  Your Honor, I think your Honor obviously

14   gets this.  We are asking for a variance, and we're asking for

15   a variance for a couple of important reasons.

16             I want to make a distinction, and it is not slick

17   lawyering.  We rewrote our reply 15 times to make sure the

18   language was correct.  There is a difference between a

19   defendant saying I am guilty, I accept responsibility, and yet

20   being able to maintain that I am guilty, I did it but I am

21   being aggressively punished because of who I am.

22             In this case I think he's right.  It doesn't matter at

23   the end of the day what I think obviously what matters is what

24   you think, and what I think you think based on what the

25   defendant says is that by talking about these issues, he is
```

E9nndoss                    Sentence

1  abdicating his acceptance of responsibility.  And I don't think
2  that is a correct statement of the law.
3       If I plead guilty, and I come into court and say I am
4  guilty, and I do it under oath and then I go on a TV show and I
5  say I violated the law, what I did was wrong, however, I think
6  I'm being treated more harshly because of who I am, Judge,
7  there are millions of people who might agree with him.  And to
8  the extent that the Court --
9            THE COURT:  I suspect that's why he went on all of
10  those shows.
11            MR. BRAFMAN:  No, your Honor.  I'm getting to my next
12  point.
13            THE COURT:  OK.
14            MR. BRAFMAN:  There is another thing that I have to
15  deal with that prosecutors rarely understand unless they have
16  served in private practice.
17       I am representing an individual who is someone who
18  makes a living by being in the public venue.  To the extent
19  that you see his movie and you don't like it, it's the number
20  one documentary in the world.
21       To the extent that you read his book you don't like
22  it, it is on the bestseller list, so it's not considered trash
23  or frivolous writing by a great part of the world.  You may
24  disagree with him and I may disagree with a lot of the things
25  that Mr. D'Souza says, but as your Honor pointed out he has a

E9nndoss                        Sentence

1   right to say it, and he is right.

2          When a person is making a film -- everything happened

3   at the same time.  That is the problem with this case.  With a

4   film, you have certain contractual obligations.  You have to

5   promote it.  You have certain contractual obligations with

6   respect to your book.  You have to promote it.

7          This is someone who can be on TV every single night if

8   he wanted to be on TV.  So, when he was invited, I said, Don't

9   to it.  Don't do it because you are bound to say something or

10  they're bound to say something that is going to be interpreted

11  or misinterpreted by someone else, and you are going to get

12  this thrown at you at the time of sentence.

13         And he said to me:  Ben, I promise you.  I won't talk

14  about the case.  I will not say that I am not guilty, but I

15  have an obligation to do some of this publicity during this

16  period of time.  I can't tell a professional author that he is

17  required to completely shut down.

18         Now, with the benefit of hindsight, maybe he will

19  regret those appearances, but at the end of the day this was

20  not him flaunting himself at you, sir.  This was not a sign of

21  disrespect to you, and it was not a sign of disrespect to this

22  process.

23         So let me talk about the issues that are not in

24  dispute.  Let me talk about why I think he shouldn't go to

25  prison.

E9nndoss                    Sentence

1          THE COURT:  You know what, I didn't take it as an

2     instance of disrespect or any of that.  I thought it was

3     thoughtless.

4          I thought it was thoughtless of what he was trying to

5     convey in this sentencing submission and what he was trying to

6     do there.  I thought it was not reflective.  I thought actually

7     if it were me or if it were most people, most defendants that

8     who had pled guilty to serious -- it is a felony after all,

9     right?  I know you wanted it to be a misdemeanor, but it was a

10    felony.  It carries a jail sentence.

11         I thought it was totally thoughtless and not

12    self-reflective and not self-aware to think that, whatever

13    anybody thinks about the TV interview -- I saw three.  One I

14    mentioned to you I inadvertently ran across, two that the

15    government submitted.  I think there were more from what I

16    understand, but I have not seen any more.  I thought that was a

17    thoughtless, not self-aware undertaking.

18         MR. BRAFMAN:  I will accept that from the Court

19    without argument, because I begged him not to do it, regardless

20    of whether it would turn out right or wrong, because I was

21    afraid.

22         But I submit, sir, with great respect, that whether

23    someone should or should not go to prison should not be based

24    on whether he did something thoughtless or careless in an

25    interview.

E9nndoss                          Sentence

1          I think what you should focus on, and I want to just

2     talk about, first of all, you are not just required to sentence

3     under the law for the offense.  I understand the offense is

4     serious.  But the courts tell us that the court must also

5     sentence the man, the person.

6          The person you have before you is a first offender.

7     There's no dispute.  He's 53 years old.  Whether you agree or

8     disagree with this politics, he's made a stunning success of

9     his life, coming to this country at 17 years old with $500,

10    getting into one of the best universities in the country,

11    ending up working in the White House, ending up lecturing

12    throughout the world, and never once violating the law, and

13    being a contributing factor to the education of a number of

14    people.

15         Something which your Honor I think should have noted I

16    hope in the Tyler Vawser letter is there is a spontaneous

17    generosity of this individual.  Because there is a story Tyler

18    will recounted of a young African-American student coming into

19    the office of Kings College when the defendant was present at

20    Kings College.

21         He broke down in tears and he said, I'm $10,000 in

22    debt.  I cannot continue my education.  And after trying to get

23    him a scholarship, which he couldn't get him, the defendant

24    wrote him a check for $10,000, paid off his debts, and the kid

25    finished college.  This happened in a minute.  This happened in

1   a spontaneous moment of generosity.

2           Wendy Long in her letter explains to you that she

3   considers Dinesh D'Souza her brother.  When her mother was

4   dying, he took care of her.  When her father was dying, he took

5   care of her.

6           Wendy Long wasn't just a politician that Dinesh

7   D'Souza wanted to befriend.  They went to college together.

8   And what's interesting in this letter is that he had no family

9   in the United States for a significant period of time.  He was

10  here alone from India at the time when we didn't have the

11  Internet and e-mail and Skype.  A call to India was like going

12  to the moon.

13          He was here alone.  The people he met at Dartmouth

14  became his family.  Several have written to the Court, and

15  Wendy Long was one of those people.

16          So here we are.  And the real chutzpah in the wife's

17  letter of suggesting there a quid pro quo and for the

18  government to argue this in their own sentencing memorandum is

19  just a mindless voyage where they are trying to grasp, to

20  suggest to you that there's something sinister about what went

21  on, when it couldn't be further from the truth.

22          Wendy Long didn't fix him up with someone.  Wendy Long

23  introduced him to a group of her friends who were successful

24  who he wanted to show the film to and discuss.  One of them

25  independently, on his own, agreed to lend Mr. D'Souza money to

make the film.  There was a loan agreement, there was interest,
the loan was repaid, the man made money on it, and it turned
into a hugely successful film.

          This was not why he contributed money to Ms. Long's
campaign.  He contributed money to Ms. Long's campaign because
he didn't have time to go to meetings.  He was technically part
of the campaign committee.  He never went to meetings.  She
wanted him to hold fundraisers.  He didn't want to.  She wanted
the him to be -- he could have created a PAC for her if he went
to a lawyer and given her a million dollars and we would not be
having this conversation.

          So, he did do something stupid which happened to
violate the law, and he knew it was wrong.  But as your Honor
would charge a jury, you don't have to know that specific thing
that you are doing is a felony which violates a specific
statute.  He knew it was wrong.  He said he knew it was wrong.
He intended to do it, and he intended to know that it was
wrong.

          In a million years, to be perfectly candid, he
testified at trial he would tell you that he didn't know
whether was a felony or a misdemeanor or something that you
could go to jail for.  You know why?  Because most of the
campaign finance cases involving no acts of corruption are not
settled with jail and felony prosecutions.  You Google this,
you read this, that is all that comes out.  That is what the

E9nndoss                              Sentence

 1  Federal Election Commission does all day.  They settle cases

 2  likes this.

 3          So, this case, there's no ask of Wendy Long.  All of

 4  the cases cited by the government, there is an ask.  I want you

 5  to do something in your official capacity.  That is a

 6  corruption case.  I want to get something from you.  I want you

 7  to do something in return for me giving you more money than

 8  he's supposed.

 9          There's no demand, and there's no offer by Wendy Long.

10  The reason he tells Wendy Long that she knows nothing about it,

11  he doesn't want to get her involved.  He's done something

12  wrong.  He doesn't want the candidate on even know.

13          A person who wants to corrupt a candidate wants them

14  to know.  What's the point of giving them a lot of money if

15  they don't know you're doing it, if you have corrupt intent, if

16  you want something in return?

17          He doesn't want her to know.  This is an act of

18  friendship by Dinesh D'Souza.  And who did he pick?  He picked

19  the two people who were closest to him at the time.  This whole

20  case was sort of like, I'll date myself, it's sort of like

21  Peyton Place.  You know Denise Joseph was living with Mr.

22  D'Souza; Denise Joseph's husband was living with someone else.

23          This woman who writes to you, who cries about her

24  husband being a philanderer, was dating a Las Vegas performer

25  two years before Mr. D'Souza had a mistress.  All of that would

E9nndoss                          Sentence

have come out at a messy trial.  And to be honest with you,

Judge, there's part of me, there's part of me that wanted to go

to trial because sometimes in a trial the information is

softened to a Court as opposed to a plain plea agreement.

So there is no impact on the election whatsoever.

Wendy Long had as much chance of unseating Kirsten Gillibrand,

and everyone knew that, as I have of playing center for the New

York Knicks.  It was just not going to happen.  She was

flailing.

The e-mails which the government gave us in droves,

send money to the campaign, raise money for the campaign, so he

did it.  So he did it and he did it, and now he's paying the

ultimate price.

You asked me about collateral penalties and what I

meant by that with respect to it.  He is a well-sought-after

speaker.  There are a number of universities who will not host

a convicted felon.  There are a number of sponsors, corporate

sponsors who will not sponsor a convicted felon.

He's already received declinations from people.  He is

going through a divorce.  His felony conviction is going to be

used by his wife.  It's already being used by his wife to try

to get every dollar that he has, even though she contributed

basically nothing to the marriage.

So, to the extent that people say, well, if you don't

go to prison, you don't get punished, that's not true.  We have

cited the United States Supreme Court, which basically says

being on probation, being under restriction, being under house

arrest, doing community service, those are punishments that a

court has available to it.

So, you know, Judge, after listening to you, sir, I

had an outline that I wanted to address, and essentially it's

gone out the window, because what I am doing now is I am trying

to address the remarks that your Honor made, which indicates to

I think a good lawyer where your Honor's head is at.

THE COURT:  It's funny, because my sense hearing you

is that you are not disagreeing with anything that I said.  I

was not in saying what I said giving you a sentence.  So

everything that you have said and everything that I have said,

including the specific letters and the specific people, maybe

not the same sentence or the same paragraphs, has totally

overlapped.

That's what I was trying to do, by the way.  I'm

hopeful that which when the government stands up they say that

I said what they say, without taking sides one way or the

other.

That's what I was trying to do.  As I say, listening

to you, I think I succeeded.  You haven't said anything that I

have said that was incorrect, illegal, or factually.  I was

giving a good-faith assessment so that it's all out there of

what the record shows.

1          The conclusion, I didn't say whether we will agree

2     about it or disagree about it.  I think that's what you are

3     leading up to, but I am hopeful that I did a fair recitation of

4     what is contained in the documents and of my interpretation of

5     them.

6          MR. BRAFMAN:  I will agree that your Honor said

7     nothing wrong, that you gave a fair recitation of what was in

8     the documents.

9          I disagree as to some of your Honor's implicit

10    interpretations because it's very important for me, if I

11    convince you of nothing else, to do the following:  One, he is

12    entitled to acceptance of responsibility, because he pled

13    guilty in this courtroom before this Court under oath.

14         THE COURT:  All I'm saying is I didn't say as a legal

15    matter, I am saying as a person -- as the judge in the case,

16    under 3553 I can pretty much impose any sentence.  I could

17    impose probation, I could impose incarceration.  I was careful

18    to say, I thought, that he signed a plea agreement in which he

19    didn't get acceptance of responsibility, as you pointed out,

20    from the government.

21         But what I was trying to convey was I thought, and I

22    still do think, that as a person there is a disconnect between

23    what I saw in the interview and a person who really accepts

24    responsibility.  Not in a legal sense, because I know what I

25    can do.  I know what my options are here.  That is all I was

E9nndoss                        Sentence

1    trying to say, and I still think that, to be perfectly honest

2    with you.

3              MR. BRAFMAN:  I agree with you, that there is a

4    disconnect.  I am not certain it is a disconnect between me and

5    you.  I think it may be a disconnect between Mr. D'Souza and

6    the rest of the people who don't think like he does.  But I

7    don't suggest that that's a basis to put him in jail.

8              THE COURT:  I get that.

9              MR. BRAFMAN:  If your Honor was inclined to put him in

10   jail.

11             THE COURT:  I get that.

12             MR. BRAFMAN:  He has a unique view of the world.

13   We've spent a lot of time together.  On some of the issues he

14   discussed, I disagree vehemently.  On some that he discusses, I

15   think he's right.

16             At the end of the day, that's not what this case

17   should be about.  He violated the law.  The law he violated is

18   a felony unfortunately.  He was prosecuted for a felony that

19   involved a $20,000 donation.

20             THE COURT:  I get that.

21             MR. BRAFMAN:  And he is a first offender.

22             THE COURT:  I get all that.  You probably do know I am

23   a former family court judge.  So what I am looking for there,

24   and even here just by nature is to figure out why he really did

25   what he did.  It is so -- not irresponsible.  It is such a risk

E9nndoss                    Sentence

1   that he took.  I can't help but think that it is still

2   unexplained as to why a person at the pinnacle of his career,

3   at the pinnacle of society, why a person would commit a felony.

4              MR. BRAFMAN:  Maybe I can help you.

5              THE COURT:  Honestly, I still don't get it.  It's so

6   self-destructive.  I look for the same issues in family court.

7   Why do people do that.  Why do people beat their children in

8   family court or whatever they do.  I still can't figure it out

9   here.  It is why I think I reacted to the interviews, because I

10  don't see real self-reflection or serious thought here as to

11  what motivated the behavior.  That is all.

12             MR. BRAFMAN:  Let me help you, your Honor.

13             THE COURT:  Please.

14             MR. BRAFMAN:  One of the ways that we do this at times

15  is, unless we have compelling proof to the contrary, we do it

16  through a process of elimination.

17             Was there a corrupt motive?  No.

18             Did he want a contract from her to built a bridge or

19  get an appointment?  The answer is no.

20             Was there a romantic relationship?  Did he do this out

21  of love?  No.

22             Was there anything ulterior here with respect to why

23  he did this?  No.

24             So what you have that is undisputed, because Wendy

25  Long is the candidate and she writes it, there is friendship.

E9nndoss                    Sentence

Sometimes friends do things out of friendship where they mean

well and they do something stupid and they destroy their lives

and they destroy the lives of others.

        If your Honor can't grab an alternative reason, that's

why.  It wasn't to thumb his nose at the Obama Administration,

because if he pleads guilty that's over.  He could have gone to

trial if he wanted to create a soapbox, and he could have stood

up in this court and somehow managed to convince a jury that he

was being picked on.

        He pled guilty.  Once you plead guilty, you can't

argue effectively anywhere that I was innocent because I pled

guilty.  So if you are looking for some reason, because I have

looked and what I have found and what Tyler Vawser tells you --

and Tyler Vawser is an interesting young man.  He is not

prosecuted they gave him immunity.  He is not prosecuted.  He

committed a crime.

        Now I know he did it at our request, so there is a

reason to give him immunity, and he was going to be a

government witness.

        But he writes a letter to Court, and he confirms the

Wendy Long friendship a confirms the kindness of this man.  The

interesting thing about this, Judge, this is something that

happened in 15 minutes.  This isn't a crime where he plotted,

you scheme and you plan, it happens in -- you decide to do it,

you do it.

E9nndoss                         Sentence

1          It's comparable to what happened with the young

2     student who comes into the Dinesh D'Souza -- and I'm trying to

3     imagine a president of Columbia or president of another school

4     seeing a young student with hardship and taking out his

5     personal checkbook and writing him a check for $10,000.  More

6     than any other letter in the book, that vignette tells you that

7     at heart he's basically a good person.

8          So he did that with Wendy Long.  He took out a

9     checkbook, and he did it stupidly and he's right.  He made a

10    mistake, Judge, a mistake, a criminal mistake.

11         We all do things where, boy, but for the grace of God

12    I could be in more serious trouble.  So now the question that's

13    reposed with you -- and I've never wanted to be a federal

14    judge.  Today I would like to change places for a couple of

15    minutes, and I say that respectfully.  The real question.

16         THE COURT:  I say respectfully that I would rather be

17    here than there.

18         MR. BRAFMAN:  Not particularly helpful right now to

19    tell me that.  But, Judge, the question is what do we do with

20    him.

21         THE COURT:  I get it.

22         MR. BRAFMAN:  Here's what we have proposed.  Here is

23    what we have proposed.  That something good come of this

24    adventure.  You know he's never going to commit a crime again.

25    I think you know that.

E9nndoss                    Sentence

1          He certainly is never going to give a candidate money

2     again, so you never have to worry about recidivism or violating

3     any campaign law.  From the literature we have given you and

4     the references we've given you, at the age of 53 the odds of

5     recidivism in a white-collar case are almost zero in the case

6     of a first offender.

7          There's no greed motive.  There is usually a greed

8     motive when you sentence a white-collar person.  There's no

9     greed motive.  This case cost him a lot of money, this case

10    cost him a lot of embarrassment, and this case cost him a lot.

11         And it is going to continue to cost him a lot because

12    probation is recommending a fine as part of its sentence as

13    well.

14         Here's what we have suggested.  He came to this

15    country as an immigrant.  He came to this country as an

16    immigrant, where but for his guts he would have been disposed

17    of or relegated to a menial job, as so many people 35, 40 years

18    ago who came here without the English language, without a

19    career, without any money.

20         Laura Ingraham describes how he went through Dartmouth

21    with one pair of shoes, and there were holes in the soles

22    because he worked as a waiter, and all the money he made he

23    used for his education.

24         So now he is a substantial person.  We have proposed a

25    program of community service, where he would teach English as a

second language.  They need that in this country.  He's perfect

for that role.

Something good can come out of this.  To put him in

prison for eight months or a year, God forbid, or any period of

time warehouses a very smart, productive citizen who could

contribute greatly to people in need.  That's what we are

suggesting.

So now I am going to end on this, because this is the

issue that is going to hit me between the eyes I am afraid.

What are people going to think?  Is there an issue of

deterrence that has to be reached?

I look at 3553 and none of those sections really

resonate well because, despite the fact that it is a serious

crime, most people who do what he does as a first offender are

not even prosecuted.  Those who are prosecuted absent

corruption don't go to jail.

So the only factor, is there a general deterrence?

Because he is a famous guy.  Will people take note of the fact

that when you violate the law you go to prison?

I was before Judge Glasser in the Eastern District 25

years ago and a prosecutor got up and said, you should put this

man in jail so someone else who is about to do this will know

that if you do it you go to jail.

Judge Glasser said, You want me to send someone who I

don't think belongs in prison so that someone else who has not

yet committed the crime may think of that man before he commits

the crime as a sentencing?  That is not how I sentence.

Sentence is individualized.

Do we need to protect the side from Dinesh D'Souza?

No.  No.  You know that and I know that.  No.

He's not going to harm anyone.  Could he help people

if he doesn't go to prison?  Yes.

If you send him to prison for a period of time, your

Honor, which is obviously your prerogative, I just think in

this case, in this case it is just a wrong sentence because he

doesn't deserve to go to federal prison for spending ten

minutes writing a check to his best friend as an act of

friendship.

That is really the bottom line.  If he were not Dinesh

D'Souza and if he were not well known, I think we would be

having a different conversation.  We may be not even having

this conversation.

People often ask me, because I represent high-profile

people, do high-profile people get treated better or worse by

the criminal justice system?

People think, because they have good lawyers and money

for investigators and accountants, they get a pass when others

don't.  It is not the way it is.

People who are high profile when they come into a

courthouse sometimes get punishment that they really don't

1    deserve.

2              So I am asking you I have great respect for this

3    Court, and regardless of what you do I appreciate the

4    indulgence in letting me talk.

5              The passion you hear in my voice hopefully is not just

6    because I am a good lawyer.  I have lived with this man now for

7    more than a year.  He doesn't belong in a federal prison for a

8    crime that he committed.  He can do something good, and I'm

9    asking you to give him the opportunity.

10             Thank you.

11             THE COURT:  You're welcome.

12             I didn't know if you know this or not, Mr. Brafman,

13   but Judge Glasser is one of two judges, myself and him, that

14   are former family court judges.

15             MR. BRAFMAN:  I know that.  I do know that.

16             THE COURT:  Mr. D'Souza.

17             THE DEFENDANT:  Your Honor, I would like to try to

18   answer the question that you raised as something that has been

19   disturbing and puzzling you about what's going on here, why

20   would somebody like me do a thing like this.

21             I want to begin by thanking you for -- I feel it is

22   almost surreal for me to be here, and I am embarrassed.

23             THE COURT:  Let me just say one thing.  I don't want

24   to cut you off.

25             Talk in the first person, not of someone like you.

E9nndoss                    Sentence

1          THE DEFENDANT:  Of course.

2          THE COURT:  That's frankly my problem.

3          Explain to me why you -- you -- are here and why you

4     did what you did.  Not somebody like me, some famous person,

5     blah, blah, blah.

6          THE DEFENDANT:  I will.  I actually didn't mean it

7     quite that way.

8          THE COURT:  I know.  I am just trying to help in a

9     sense by saying what seems to be missing in this picture.

10          THE DEFENDANT:  OK.  I was 17 years old, which I set

11     foot in America.  I came as an exchange student from India.  I

12     grew up in a very settled community.  Most of my relatives

13     lived within a one-mile radius of where I lived and a close

14     family.

15          I didn't realize when I came here that I was actually

16     never going home.  In other words, I came here for a one-year

17     program, after which I expected I would return home.

18          But I stayed in America.  America opened up doors of

19     opportunity for me.  I found myself a student at Dartmouth.

20     The experience of leaving one's country is a little terrifying,

21     because you leave everything that matters to you behind, your

22     family, your friends, everybody you know.

23          And you are insecure in many different ways,

24     financially insecure, emotionally insecure.  And some senses

25     you are insecure your identity.  Because you leave your old

country, in some ways you are no longer Indian, and yet you

began to wonder if you'll ever be American.  You are walking a

tightrope between two buildings, and you feel in no man's land,

somewhere caught in between.

When I was at Dartmouth I found a group of friends who

sort of welcomed me in.  I became part of that group.  In some

sense you can say they became my American surrogate family.

I say that because at that time, in four years of

college, I never went home.  I had no money.  So I basically

earned my way here in America, and these became my close-knit

friends, who literally -- one or two of them are in this room

right now -- literally took me for the first time to a store to

buy a navy blue blazer, explained to me that's part of the

etiquette being a Dartmouth student.

And so the very basic assimilation to American life

was accomplished by a group of close friends that I met

basically between the time I was 18 and 20.

Wendy Long was one member of that group of four or

five people.  So, even though over the years we have lived in

different places, different states, there is a certain kind of

amalgam of hearts that occurs because of that.  You feel very

close to that person, and you care about them in a very

fundamental way, not differently than you care about your

family.

When Wendy Long approached me about the idea of

E9nndoss                        Sentence

1   running, and she approached a number of her Dartmouth friends,

2   most of us thought it was a very long shot idea, even a little

3   ridiculous.  She had never run for public office.  She had

4   never raised money.

5           I told Wendy, Don't do it.  This is a battering

6   experience.  You have delicate wings, and they are going to be

7   clipped.  I advise you not to do it, but if you decide to do

8   it, I will try to help you.

9           Wendy decided to run.  I was president of a college.

10  I had undertaken a movie project at the time, which became

11  2016.  The movie became a runaway success at the very time when

12  Wendy was running hard for the Senate.

13          And Wendy would call me:  Dinesh, I know these five

14  Indian doctors.  Can you meet with them?  I think they'll give

15  me money.

16          I don't know these guys from Adam.  I'm reluctant to

17  meet them.  I'm traveling in Tulsa, she wants me to show up at

18  a fundraiser in Westchester.  I can't do it.

19          But I feel really bad for her.  I feel like, Here's a

20  woman I know.  I can see and feel her struggling.  I don't

21  think she's going to win.  Nobody does.

22          But I can see that personally she is humiliated.  Her

23  campaign is kind of seen as a joke.  I'm like, I want to help

24  her.  I have given her $10,000 on behalf of Dixie and me.

25          I will make a slight detour to address the Dixie

E9nndoss                    Sentence

1    issue, just because you raised it.  I didn't realize it was

2    even coming up today, but I'll bring it up since you raised it.

3         THE COURT:  Your daughter raised Dixie in the letter

4    that she sent to the Court.  So I am not pulling these issues

5    out of the blue.  I have read everything in this file.

6         THE DEFENDANT:  Sure.  Maybe I will pass over it.

7         THE COURT:  I am not saying to or not to.  But it is

8    not like I am picking anything that isn't already before me.

9         THE DEFENDANT:  Sure.

10        In the craziness of 2012 in which Wendy was asking me

11   to do a bunch of stuff to help her, I felt really bad that I

12   couldn't do more.  I had given money.  She wanted me to do a

13   butch of things for her, like appear for this event or host

14   that event.  I allowed her to use my name on her literature.

15   That's kind of all I did.

16        So I thought, What else can I do for her?  I got the

17   stupid idea or the bad idea, because I knew there was a $10,000

18   limit.  OK, listen, I got two guys who are close to me.  What

19   did they give?  And I reimbursed them.  It was a crazy idea, it

20   was a wrong idea, it was a foolish idea.  I wish I never had

21   had it.  I can't believe I did something so bad and stupid.

22        I wish I didn't do it.  I've regretted it and regret

23   breaking the law.  I knew there was a limit.  I obviously

24   didn't know it was a felony.  I shouldn't have done it.

25        I have never wavered from that.  I never thought I

E9nndoss                    Sentence

1    would be in this situation.  Not because I would be, quote,

2    caught.  I should have started a PAC.  I should have called a

3    lawyer.  There are ten ways for me to have done this.

4           I didn't do those things.  In that sense it was

5    something that was very, it was a mistake in that sense.  There

6    is a better way to have done it.  I could have helped her.  I

7    chose to help her in the worst possible way.

8           So, I'm sorry for what I did.  I have never said

9    otherwise.  I have never even said I am being selectively

10   prosecuted.  I feared that I was being.

11          The reason I feared that I was being is that I'm one

12   of the rare people in the United States who has been attacked

13   in person and by name by the sitting President of the United

14   States.  That doesn't happen to a lot of people.

15          After I made my film 2016, there was an attack on the

16   film and on me on BarackObama.com, unsigned.  That is the

17   President's personal website in which he railed against me and

18   railed against the film.  The substance of it doesn't need --

19   but I am not being paranoid in thinking that there are very

20   powerful people in Washington how see me as an effective critic

21   of their policies, to the point where they need to attack me

22   directly.  And that goes back to the very time that we are

23   talking about.

24          The reason we are here is I recognize that what I did

25   was wrong.  I am contrite about it.  In arguing with the

E9nndoss                          Sentence

government and the policies about the IRS, these are my

political views, and I have expressed them.

I am not shy.  I have not been reluctant to express my

views in public.  And I have done that for 25 years.  It's not

like I started doing that when this case began.  I have been

doing that for my whole career.

There is no inconsistency in saying I disagree with

the Obama Administration.  I think a lot of the things that

they are doing are wrong.  There is no inconsistency with me

saying that and saying at the same time I did something wrong,

which I regret.  I wish I never did, and I will never do it

again.

So I am here before your Honor to say that, under the

circumstances, I simply ask you to give me what I think is a

fair sentence, and it is not an imprisonment.  It's some other

sentence in which reflects what I did, reflects the fact that I

had no motive other than to help Wendy, whom I care about

deeply.

I had no intention to do anything corrupt, and I

didn't have a corrupt motive in this case.  I stood to gain

nothing, and I've only suffered for what I did.

I have suffered financially, I have suffered through

public embarrassment, I've suffered in all kinds of ways due to

what I did, and I will have to endure that.  So I ask you, in

the context of who I am and what I did, to impose a sentence

1    does not have imprisonment in it.

2              Thank you, your Honor.

3              MS. COHEN:  Your Honor, let me put the context of the

4    defendant's conduct in this case, and it will shed a different

5    light than I think the defense is urging the Court to view it

6    as.  Not only is this a serious offense because it goes to the

7    heart of our electoral process, and I will talk about that in a

8    minute, but the way in which the defendant committed this

9    offense, the acts he took show that he committed this offense

10   in a particularly serious way.

11             This was not, as he said, something that he did in,

12   quote, a minute or something that took 15 minutes or was

13   spontaneous.

14             The defendant withdrew a substantial sum of cash weeks

15   before he approached his executive assistant, Tyler Vawser, and

16   the woman with whom he was living at the time, Denise Joseph,

17   to make the straw donations.  He withdrew a substantial amount

18   of cash from his bank account, $25,000, your Honor.  He then

19   approached both of them independently, had a conversation with

20   them where he asked them to make the donation, with the express

21   promise that he would pay them back in cash, not a check that

22   he wrote on the spot, in cash at a later date after they had

23   written the check, the donation check not only on behalf of

24   themselves, but on behalf of themselves and their spouse.

25             Both people did it as the defendant asked.  Tyler

E9nndoss                        Sentence

Vawser wrote a check on behalf of himself and his spouse, and

Denise Joseph had her husband write a check on behalf of

herself and on behalf of herself and Dr. Joseph.

        The defendant then went back to Tyler Vawser and

Denise Joseph, made sure the checks had been written, and gave

them both an envelope, Tyler Vawser an envelope with $10,000 of

cash, and Denise Joseph an envelope with $10,000 in cash.

        This was not a one-time check writing, spontaneous

thing.  This was a premeditated decision to break the campaign

finance laws, laws that, as your Honor said, go to the very

heart of our electoral process.  In doing so the defendant

exposed people to criminal liability.

        Tyler Vawser, as the defense said, received immunity

for his conduct from the government.  Denise Joseph and Dr.

Joseph both entered into nonprosecution agreements with the

government.

        He exposed two people who relied on him both

financially -- Tyler Vawser described the defendant as his

mentor, and Denise Joseph, who was romantically involved with

him and financially dependent on him at the time.  He exposed

both of them and their respective spouses, he gave them

criminal exposure.

        So, your Honor, this motive, this was not just a

simple, misguided act of friendship.  This was a premeditated

decision by the defendant to break the laws of the United

1    States.

2            I would also add with respect to timing, because it's

3    been brought up both by Dixie D'Souza and by the defense that

4    it was not just a misguided act of friendship.  Wendy Long, and

5    the government at trial would have introduced e-mails to this

6    effect, introduced the defendant to the man who became the

7    primary financial backer of his film.

8            The timing, your Honor, of when Ms. Long introduced

9    the defendant to that financial backer is relevant here,

10   because she introduced the defendant to that backer about a

11   month before in July of 2012, about a month before the

12   defendant asked Tyler Vawser and Denise Joseph to donate to

13   Wendy Long's campaign.  So perhaps it was not only friendship,

14   but a desire, as Dixie D'Souza said, to pay back someone who

15   had helped them secure much-needed funding for his film.

16           But, your Honor, I offer these facts that are not

17   disputed just to help your Honor understand the seriousness of

18   this offense and to rebut any claim that it was a mistake that

19   happened in the span of 15 minutes or one minute even.

20           Your Honor, also, the government in bringing the

21   defendant's post-plea statements to the Court's attention was

22   not trying to suggest the defendant should go to jail for

23   making such statements or for, as is his right, speaking to the

24   public.  Rather, the government brought those statements to the

25   attention of the Court to show the Court that the defendant's

1   claim of remorse and in his words profound contrition were

2   false.

3          Your Honor showed one of the videos.  We provided

4   transcripts of both that video and another one, and I know your

5   Honor has viewed another of the defendant's statements to the

6   media.

7          I think in those statements that the defendant made it

8   shows his true personal belief about his crime, which is not

9   that he is contrite or remorseful or that he has respect for

10  the law.

11         The government believes that those videos show that

12  the defendant's views on the law, on this court, on the

13  prosecution are quite different than the views he presents to

14  the Court in his sentencing letter and that the defense

15  presents to the Court in its submission.

16         Your Honor, just because the defense raised this, the

17  government is compelled to respond.  The idea that this

18  prosecution was treated any differently from any other

19  prosecution that is brought by the United States Attorney's

20  Office for the Southern District of New York in this courthouse

21  is, in your Honor's words, total nonsense.

22         This prosecution proceeded as every other prosecution

23  proceeds in this court.  It was brought on by an indictment

24  obtained by a grand jury, the indictment was unsealed.  The

25  defendant actually was permitted to self-surrender.

E9nndoss                        Sentence

1            The parties appeared before your Honor.  The day after

2       the indictment was unsealed, the day of the defendant's

3       surrender, the parties discussed the case, set a briefing

4       schedule and set a trial schedule.

5            There was nothing out of the ordinary.  It was not

6       fast tracked.  The deadlines were deadlines.  The deadlines for

7       motions and the trial date of May 20 was what the parties

8       agreed to before your Honor based on the parties' trial

9       schedule and your Honor's trial schedule.  There was nothing

10      out of the ordinary.  There was nothing particularly zealous

11      about this prosecution.

12           To address briefly the other cases that both the

13      government and defense have brought to your attention in

14      similar straw donor type fraud cases, as the government has

15      repeatedly stressed, every case is different, every case turns

16      on different facts, every defendant is a different individual.

17      So comparisons between defendants are always somewhat tricky.

18           Here the government presented numerous defendants who

19      have been imprisoned for similar crimes, similar amounts of

20      donations, similar amounts of straw donors.

21           Every defendant may have had a different motive.

22      Defendants may have been employed as an attorney or been

23      employed as a lobbyist.  Some have, some are different.  All

24      defendants are different, and I know your Honor will sentence

25      this defendant based on his individual characteristics.

E9nndoss                        Sentence

1          But, your Honor, what rings true through all those

2     cases and this one, your Honor, is that when our election laws

3     are violated it needs to be taken extremely seriously.  The

4     importance of a transparent and fair election system goes to

5     the heart of our democratic system, and I think the government

6     submitted several transcripts in sentencings by judges in other

7     districts, similar straw donor cases where those judges

8     emphasized the importance of our election law system and of

9     transparency and truth in our campaign donations.

10          Your Honor, the sentence recommended here by probation

11     within the guidelines range of 10 to 16 months we believe is a

12     sentence that is, in light of all the 3553(a) factors

13     sufficient but not greater than necessary.

14          To the extent the defendant argues that no good can

15     come from prison, the government argues that, based on all

16     those factors, a prison sentence is sufficient but not greater

17     than necessary.  And to the extent your Honor would like to

18     order community service, such community service can be

19     performed as part of his supervised release.  It is not a bar

20     to also a term of imprisonment.

21          Thank you, your Honor.

22          MR. BRAFMAN:  Your Honor, I want to beg the Court's

23     indigence just two more minutes, sir, please, because there are

24     a couple of things that Ms. Cohen said that just can't be left

25     as she said them.

1          The only person who has knowledge of this event who

2     has spoken to the court about whether this was premeditation or

3     not is Mr. D'Souza and Tyler Vawser, one of the people who the

4     government immunized in his letter which appears at Exhibit 21.

5          In pertinent part Mr. Vawser says the actions that led

6     up to his plea happened quickly and without premeditation.  I

7     believe that the Dinesh was caught up in the demands of running

8     a college, launching and promoting a film, and a desire to help

9     a friend in her efforts to become a senator.

10         She's just wrong.  In terms of referencing the

11    $25,000, she knows full well that if he had a sinister motive

12    involved he would have structured the removal of that cash and

13    taken it in amounts under 10,000 so that the bank would not

14    have to file a CTR.

15         They came out all on the once, and the reason for

16    taking the money out had nothing to do with what later

17    happened.  He had just moved to New York.  He no credit line

18    here.  So to the extent that he used this money, this isn't a

19    question of a premeditation that changes the landscape.

20         Your Honor, the one thing I want to just end on, I

21    have never been in a case, especially in the Southern District

22    of New York, where they can't give a Court one case, one case

23    where a defendant like this has gotten a prison sentence absent

24    evidence of corruption and scheming or special relationship or

25    special knowledge.

E9nndoss                          Sentence

1          Throughout this case, that's what they have done.

2     They cite these cases, they send them to your Honor, where they

3     cherrypick certain facts which suggest, Wow, this sounds like

4     it's an impressive sentence parity precedent.  And then, when

5     you read the cases, you realize how distinguishable they are.

6          In all of our cases, the ones we cited, it is exactly

7     the same.  They were election law violations.  There were

8     various district court judges involved, who all believe in the

9     integrity of the system, and in none of those cases was a

10    prison sentence imposed in the case of first offender with no

11    prior criminal record.

12         So I offer that to the Court because I think the

13    strongest argument we have, to be perfectly candid, is a

14    sentence parity argument, because that is an argument that you

15    can debate, but you have to put up a shut up.  Excuse the

16    expression.  I don't mean that to the Court.  I mean the

17    government hasn't put up on that issue, not one case.

18         Thank you.

19         THE COURT:  OK.

20         I am going to adopt the findings of fact in the

21    presentence report unless defense counsel has any further

22    objections?

23         MR. BRAFMAN:  No, none, your Honor.

24         THE COURT:  How about Mr. D'Souza?

25         THE DEFENDANT:  No, none, your Honor.

E9nndoss                    Sentence

1              THE COURT:  How about the government?

2              MS. COHEN:  None, your Honor.

3              THE COURT:  All right.

4          So, if you give me one minute, I am going to come out

5    and preview the sentence and then impose it.

6              I will say two things.

7          One, Mr. Brafman and Ms. Cohen I think actually have

8    done a good job, because I have read every inch of and I think

9    I have presaged each of your arguments.  And I read your chart

10   and even the parts that were in bold to make a specific

11   distinction between your case and this case.  I think I've

12   fairly addressed the same issues that you had addressed.  I

13   also think incidentally that throughout today's process, here's

14   what I think, and I don't mean to be insulting or critical, I

15   think I have figured out a little bit more about Mr. D'Souza.

16             This may come across as a criticism.  I don't really

17   mean it as a criticism.  He is a talker.  In fact, he's almost

18   a compulsive talker.  I don't think he's a listener.  I don't

19   think he's really hearing himself, his surroundings, his

20   advisers.

21             That's just a comment.  That's the way I understand

22   what's happened here.  But, in any event, give me one minute

23   and I will propose the sentence.

24             (Recess)

25             THE COURT:  I don't think that it's necessary for Mr.

E9nndoss                    Sentence

1    D'Souza to go to jail.  I think that a probationary sentence is

2    appropriate based on everything that I have said before, the

3    cases to be sure, what counsel have argued.

4         I do think it's important to put some teeth into the

5    probation period, it's going to be for five years -- this is

6    the preview of the sentence -- in order to achieve the

7    objectives of 18 United States Code Section 3553(a) and in

8    order for that sentence to be fair and reasonable, and also for

9    this sentence to reflect the seriousness of the crime, I've

10   discussed that before, to promote respect for the law, and to

11   provide a just punishment, and to also provide for services

12   that I think would be helpful.  I think it will be helpful.

13        It's going to include one thing which is a little bit

14   different than most probationary sentences, and that is in the

15   five-year period.  For the first eight months of that period,

16   he's going to be directed to be located at and live at what's

17   called a community confinement center.  He's also going to be

18   required to do community service, as you have suggested, at

19   every week, one eight-hour day of community service during the

20   five years, not two hours here, two hours there, but one full

21   eight-hour day devoted to community service.

22        I also like the idea of his teaching English to people

23   who can't speak English who are either citizens or would-be

24   citizens.  So that would be fine with me.

25        He's also going to be required to pay for the

community confinement center and for the supervision.  There

are fees with probation.  I'm sure you can discuss that with

Mr. D'Souza.

I am going to impose a $30,000 fine as well.  And I'm

also going to impose therapeutic counseling during the period

of probation.

The probation is also subject to what we call the

mandatory conditions, that defendant not commit another

federal, state or local crime; that he not illegally possess a

controlled substance; that he not possess a firearm, dangerous

weapon or destructive device, and that he refrain from any

unlawful use of a controlled substance.

He will be required to submit to one drug test upon

placement on probation and at least two unscheduled drug tests

thereafter as may be directed by the probation officer.

In addition, he has to comply with what are called

standard conditions 1 through 13, plus these:  That he be

supervised in his district of residence -- Mr. Brafman, I take

that to be California?

MR. BRAFMAN:  Yes.  In San Diego, your Honor.

THE COURT:  San Diego.

As I say, the first eight months of that probationary

period are to be spent as a resident of a community confinement

center, sometimes also called a residential reentry center.  He

will need to report to probation -- actually I anticipated this

E9nndoss                        Sentence

1    and arranged for that to happen today.  I think you and he

2    should go to probation and discuss this community confinement

3    center.  There is a facility in San Diego.  There is also one

4    in the Bronx, but I assume that it would be San Diego, and the

5    probation department, who are here, have been very helpful in

6    identifying that resource.  So that should happen today, so you

7    get all of this under way.

8         He will be, as I said before, required to participate

9    in weekly therapeutic counseling by a licensed therapist, and

10   in that regard may be required to contribute to the cost of

11   services rendered as by a copayment in an amount to be

12   determined by the probation officer based on such factors as

13   ability to may or availability of third-party payment.

14        As I said before, the community service is not to be

15   done piecemeal.  It's one full day per week, eight hours,

16   teaching English language to non-English-speaking residents or

17   applicants for residency to the United States.  That community

18   service is to be supervised by an agency that agrees to provide

19   written logs to probation and to the Court attesting to the

20   hours and the work performed.  Probation again will make these

21   arrangements.

22        I am going to set another conference in the

23   not-too-distant future.  I was thinking of October 8 at 10 a.m.

24   if you are all available.  I just want to make sure that all of

25   the arrangements have been made.  The $30,000 fine is to be

1    paid within 60 days of today.

2              I am not intending to impose restitution because

3    there's no victim within the meaning of 18 U.S.C. Section 3663

4    or 3663(a).

5              I do intend to impose a $100 special assessment, which

6    is mandatory under 18 United States Code Section 3013.

7              Briefly, the reasons for this sentence, the offense

8    level is 12, the criminal history category is I, the guideline

9    range is 10 to 16 months.

10             I feel though that this sentence best reflects the

11   criteria of 18 U.S.C. Section 3553(a), including the nature and

12   the circumstances of the crime, the history and characteristics

13   of Mr. D'Souza, who as Mr. Brafman and I pointed out earlier,

14   is a first offender.

15             I think this sentence reflects the seriousness of the

16   offense, promotes respect for the law, provides a just

17   punishment, affords adequate deterrence to criminal conduct,

18   both general and specific, adequately protects the public from

19   further crimes, and also offers the opportunity for appropriate

20   services in this case, therapeutic counseling in the most

21   effective manner.

22             So, Mr. Brafman, you certainly can be heard again if

23   you wish to before I impose that sentence.

24             MR. BRAFMAN:  No, I just want to say thank you.  I

25   also have to ask a logistical question.  Provided that we can

1    provide the written assurance to the Court to the satisfaction

2    of the government that everything is in place in San Diego, do

3    you want Mr. D'Souza here personally on the 8th?

4             THE COURT:  I would like everybody to be back here to

5    see me to make sure everything is in place.

6             MR. BRAFMAN:  OK.  I understand.

7             THE COURT:  Mr. D'Souza, did you want to add anything

8    before I impose the sentence?

9             THE DEFENDANT:  No.  Thank you, your Honor.

10            THE COURT:  How about the government?

11            MS. COHEN:  No, your Honor.

12            THE COURT:  I would ask Mr. D'Souza to stand, and I

13   will state the sentence.

14            The guideline range is 10 to 16 months.

15            Having considered all of the factors at 18 United

16   States Code, Section 3553(a) -- and I should mention again,

17   just as I did at the time of the motion practice, the

18   submissions of both the government and the defense were very,

19   very professional in this matter and very helpful -- it is my

20   judgment that Dinesh D'Souza be sentenced to a term of

21   probation for five years with the mandatory conditions that I

22   mentioned before and the special conditions 1 through 13, plus

23   the first eight months to be spent as a resident of a community

24   confinement center or residential reentry center.

25            He is to report today to probation to put that in the

E9nndoss                              Sentence

1    works.

2            He will be supervised in his district of residence in

3    San Diego.

4            He is to participate in weekly therapeutic counseling

5    by a licensed therapist, and may be required to contribute to

6    the cost of services rendered.

7            He will also be required to reimburse the costs at the

8    residential community confinement center and also during the

9    period of probation supervision.

10           The community service again is one full eight-hour day

11   per week teaching English language.  That would be supervised

12   by an agency which will supply written logs to probation and

13   the court attesting to the hours and work performed.

14           Conference October 8 at 10 a.m. just to make sure that

15   everything is working.

16           The fine of $30,000, payable within 45 days of today.

17           No restitution.

18           A special assessment of $100, which is due

19   immediately.

20           As for the reasons for this sentence, I believe it

21   complies with the criteria of 18 U.S.C. Section 3553(a).

22           Does either counsel know of any legal reason why the

23   sentenc should not be imposed as so stated.

24           MS. COHEN:  No, your Honor.

25           MR. BRAFMAN:  No, sir.

E9nndoss                         Sentence

1          THE COURT:  Then I hereby order the sentence to be

2     imposed as so stated.

3          Mr. D'Souza, to the extent that you have not already

4     waived your appeal rights, pursuant to the plea agreement dated

5     May 19, 2014, and here, of course, as I said before in my

6     remarks, the plea agreement does include a waiver of the right

7     to appeal.

8          It waives the right to file a direct appeal.  It also

9     waives the right to bring a collateral challenge, including but

10    not limited to an application under 28 United States Code

11    Sections 2255 or 2241, the so-called habeas proceedings.

12         It also waives the right to seek a sentence

13    modification pursuant to 18 United States Code, Section

14    35(a)(2)(C) of any sentence that is within or below the

15    stipulated guidelines range of 10 to 16 months, which of course

16    this sentence is.

17         So, because it is below that, these waivers apply.

18         Are there any open counts or aspects of the case the

19    government was seeking to resolve at this time?

20         MS. COHEN:  Yes, your Honor.  The government dismisses

21    any open counts.

22         THE COURT:  I will grant that application.

23         Starting with the government, did you wish to add

24    anything to today's proceeding?

25         MS. COHEN:  Your Honor, only if I could request that

E9nndoss                      Sentence

1    the Court, on October 8 at 10 a.m. I have another court

2    appearance.  I just checked my schedule.  If we could

3    reschedule that for either a different day or maybe later in

4    the afternoon.

5              THE COURT:  We can do it at 9:30 on that day.  How is

6    that?  Are you busy then?

7              MS. COHEN:  Your Honor, I will be preparing witnesses

8    for a hearing that begins at 11 a.m., in the morning.

9              MR. BRAFMAN:  Your Honor, I can make it on the 8th,

10   but I can't make it on the 9th or the 10th.  But I am available

11   on the 14th, 15th in the morning at any time convenient to the

12   Court.  There are a number of holidays in the intervening

13   period.

14             THE COURT:  Ms. Cohen?

15             MS. COHEN:  Your Honor, I am just scrolling down on my

16   calendar.  October 15?

17             MR. BRAFMAN:  If it is in the morning, I can do that.

18             MS. COHEN:  The morning is fine.

19             THE COURT:  10:30 on October 15.

20             MS. COHEN:  Thank you, your Honor.

21             MR. BRAFMAN:  Thank you, Judge.

22             THE COURT:  Did you want to add anything else,

23   Mr. Brafman?

24             MR. BRAFMAN:  No, I just want to thank you very much

25   for the care and thought that you have obviously put into this

E9nndoss                          Sentence

1    proceeding, and I appreciate your patience this morning.

2              THE COURT:  You bet.  Thanks very much.

3              We are adjourned.

4              MS. COHEN:  Thank you, your Honor.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25