F7DJDSOC                     Teleconference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                              14 Cr. 34 RMB

DINESH D'SOUZA,

            Defendant.

------------------------------x

                                      July 13, 2015
                                      11:10 a.m.

Before:

                  HON. RICHARD M. BERMAN,

                                   District Judge


                     APPEARANCES


PREET BHARARA,
    United States Attorney for the
    Southern District of New York
CARRIE COHEN,
PAUL KRIEGER,
    Assistant United States Attorneys

BENJAMIN BRAFMAN,
    Attorney for defendant D'Souza

Also Present:
    BRETT HALEM, USPO SDNY
    KATHY SCHWARTE, USPO SDC   (Telephonically)

1               (Teleconference in the Robing Room)
2               THE COURT:  Hi.  How you are?  It is Judge Berman
3     here.
4               MS. SCHWARTE:  Good morning.  Yes, this is Kathy
5     Schwarte.
6               THE COURT:  I don't recall if -- Mr. D'Sousa, I guess,
7     is not present.  He is here?
8               MR. BRAFMAN:  Correct.  I have him on standby, but
9     your Honor has permitted him to waive his appearance.  Unless
10    you need him on the call, he has agreed to allow me to waive
11    his presence and then inform him after-the-fact.
12              THE COURT:  That works.
13              MS. COHEN:  Your Honor, I don't have your prior order
14    in front of me, but I do believe you said he should be on the
15    telephone call for today's conference.
16              THE COURT:  I don't have it in my notes from our last
17    conference on March 2.
18              MS. COHEN:  Correct.  It would have been in your order
19    you issued after the Vanity Fair article came out.
20              THE COURT:  Do you have that?
21              MR. BRAFMAN:  I will waive his appearance, both
22    personal appearance and his telephone appearance.  If you want
23    to try to patch him in, I think I spoke to him about 40 minutes
24    ago and told him I might need to contact him.
25              THE COURT:  Let's do it because we are going to talk

1   about him and if we can get him, we'll get him.
2           MS. SCHWARTE:  He is available, your Honor.  I just
3   communicated with him and he was --
4           MR. BRAFMAN:  I can give you the number, but I can't
5   do it from my phone in terms of patching him.
6           THE COURT:  Maybe, Ms. Schwarte, you can arrange that.
7           MS. SCHWARTE:  Can I ask him to call in, your Honor?
8           MR. BRAFMAN:  I can do that.  What number should he
9   call you at?
10          THE COURT:  It is not a question of calling, but
11  whether he can get into this call that we're on as it were.
12          MR. BRAFMAN:  I can call him and put him on speaker on
13  my phone.
14          THE COURT:  Let's see what happens.
15          MR. BRAFMAN:  It will be very hard to hear.
16          MS. COHEN:  My phone is fine.
17          MR. BRAFMAN:  858-926-9298.  Let me talk to him so he
18  doesn't have a heart attack when he sees you number, okay?
19          MS. COHEN:  He should know my number.
20          (Off-the-record discussion)
21          MR. BRAFMAN:  Can you hear me?
22          THE DEFENDANT:  Yes, I can.
23          THE COURT:  All right.  So, Mr. D'Sousa, we have, as
24  you know, your counsel, government counsel, Ms. Schwarte on the
25  line, several members of the press here.  This is a status

1     report as to how things are going in the area of supervised

2     release, and why don't we start with Probation.

3              I think it is clear that Mr. D'Sousa has completed the

4     time that he was to spend at a community confinement center,

5     but why don't we hear from Probation as to specifically what is

6     going on, first from Probation in New York or do you want --

7              MR. HALEM:  I will defer to Ms. Schwarte.

8              THE COURT:  Ms. Schwarte, why don't we start with you.

9              MS. SCHWARTE:  Okay, yes, your Honor.  As you said, he

10    completed a placement on May 31st of this year.  There were no

11    incidents to report there at all.  Everything went smoothly.

12             He continues to do his eight hours of community

13    service per week at a huge church and Later Day school.  He

14    completed, my letter noted, 268 hours.  He spent 16 hours since

15    that time, so we have a total of 284.

16             He continues to see Dr. Marshall weekly.  If he misses

17    a session for any one of the scheduled conferences, he makes it

18    up with two-hour sessions.  He is on target with that.  At this

19    point Probation doesn't have any any concern.  The only

20    outstanding issue we have today is a request to travel this

21    fall to England and India, which we do not object to.  If the

22    court is in support of that, we request a minute order so the

23    U.S. Pretrial Services can release his passport.

24             THE COURT:  Okay.

25             MS. SCHWARTE:  That is all we have.  Otherwise, we

1     consider him doing well and compliant.
2            THE COURT:  So you first talk about supervision -- I
3     mean community service.  By our calculation, Mr. D'Sousa, you
4     need to have about 416 hours, I think, by September, so that is
5     eight hours a week for a year.  Mr. Brafman, I think he started
6     supervision in September, so it would be September he would
7     need to have 416 hours.
8            MR. BRAFMAN:  May I ask the court a question.  I have
9     discussed this with the government and I think we both have a
10    similar understanding.  I have the judgment here, and the
11    judgment does not specify an amount of time of supervised
12    release.
13           THE COURT:  I thought it said eight hours per week.
14           MR. BRAFMAN:  It says eight hours per week, but we
15    believe, I hope correctly, that was during the period of
16    confinement.
17           THE COURT:  Oh, no.  I thought it was for the entire
18    term of supervision post-confinement.
19           MR. BRAFMAN:  We are talking about five years.
20           THE COURT:  That is exactly what we are talking about,
21    yes, yes.
22           MR. BRAFMAN:  But, Judge, I appreciate all of the
23    courtesies the court has extended.
24           THE COURT:  Right.
25           MR. BRAFMAN:  It doesn't, it doesn't say that in the

1    judgment.

2            THE COURT:  But there is no basis for the conclusion

3    that you've drawn that the community service is limited to the

4    period of community confinement.  Community confinement is the

5    first paragraph of additional probation terms and supervised

6    release is the second paragraph, and it simply reads:

7            "Defendant shall perform one full day, eight hours per

8    week of community service.  The community service shall consist

9    of teaching non-English speaking citizens and those who have

10   applied for citizenship in the English language."

11           MR. BRAFMAN:  Both the government and counsel had the

12   understanding the court implied, the court's sentence was

13   implicitly related to community service while he was in the

14   community confinement center.  The difficulty --

15           THE COURT:  That was not my intention, and I may have

16   been unclear, but the judgment reflects my recollection.

17           MR. BRAFMAN:  The judgment doesn't, your Honor.

18           THE COURT:  We can look at the transcript.

19           MR. BRAFMAN:  I have it, Judge.  There is no amount

20   specified in the judgment or in the transcript.

21           THE COURT:  It says eight hours per week.  To me, that

22   is the amount and during the period of supervision is what that

23   amount applies to.

24           MR. BRAFMAN:  I don't look to argue with you, Judge.

25   I want the court to understand that this is a very serious

1   impediment to obtaining full-time employment because you miss

2   one day every week.  To the extent that he is able to do his

3   work around it, it is not without substantial difficulty.  For

4   the nature of the offense, what we are talking about is

5   thousands of hours of community service plus eight months of

6   confinement in a community treatment center.

7            THE COURT:  Yes.  I thought it was, think and thought

8   it was appropriate.  I thought he got a sentence you all

9   anticipated to some extent.  I think it is reflected in the

10  record he might actually have incarceration as a sentence.

11           I gave him a less severe, far less severe sentence,

12  and one aspect of that sentence is a significant amount of

13  community service.  So I am happy that you have raised the

14  issue so that there is clarity, but my intention was that the

15  community service is to occur throughout the period of his

16  supervision.

17           MR. BRAFMAN:  Okay.

18           THE COURT:  Anyway, back to where we are, where I was,

19  if he has got 284, then he's got until September to reach the

20  number of 416 hours of community service.  Just so there is no,

21  you know, lack of clarity, this is a real sentence in every

22  respect.  He pled guilty to a felony and he avoided

23  incarceration, I think properly so.

24           But there are certain implications of that violation,

25  and community service is one of them.  This may not answer your

1    question directly, but I don't think at any time that I've been
2    on the Bench ever have I imposed a period -- not that it would
3    matter to you, you perceive it the way you do -- of community
4    service that is limited to a period of community confinement.
5    I have never done that.
6              MR. BRAFMAN:  Your Honor, just so we understand, I am
7    just a little bit concerned.  I think Kathy will bear me out.
8    Sometimes the defendant is unable to perform a full eight hours
9    during a given week because the facility he teaches at either
10   closes or is on vacation and it is not through any fault of his
11   own.  The fact he may be behind by a couple of hours, it is not
12   because of willfulness by the defendant.
13             THE COURT:  I think that came up before in one of our
14   conferences.  Ms. Schwarte mentioned that, and I said okay, you
15   have to make it up.  That was months and months ago.  She said
16   they would, they did, whatever.  That is what is required.
17             The thrust of this whole sentence is some contribution
18   to the community.  The community confinement center was some
19   limitation on his freedom, which I think is appropriate.  The
20   mental health counseling is yet another requirement here.  I
21   would like to talk about that in a moment as well.
22             Yes, no, in my mind I don't think I ever said it, but
23   in my mind, it was never contemplated that the eight hours of
24   community service was related to the period of community
25   confinement only.

1          MR. BRAFMAN:  Your Honor, can we move to the mental

2     health issue?  I am accepting your Honor's ruling.

3          THE COURT:  Thanks.

4          MR. BRAFMAN:  Your Honor, he has -- I think Ms.

5     Schwarte will confirm -- he has complied with your Honor's

6     request he receive mental health counseling.  I think a lot of

7     the issues that caused I think the kind of concerns that your

8     Honor would issue this type of a directive have been dealt

9     with.  He no longer has any relationship with his ex-wife.  The

10    divorce is over.  He has moved on.  She has moved on.  They

11    have no contact with each other.

12          The health, mental health care professional who has

13    been treating him has advised Probation and counsel that she

14    sees no reason for him to continue in therapy because there is

15    nothing wrong with him.  The stress and anxiety that caused him

16    to use poor judgment is over, and he is now, there is no reason

17    for her to continue his treatment.

18          THE COURT:  So I've read all the report.

19          There are several reports in here, and they are

20    somewhat varying, you might say, so there is a study that is

21    done which, among other things, finds that the client tends to

22    deny problems and is not very introspective or insightful about

23    his own behavior.  The individual is likely to have little

24    awareness of his difficulties, is likely project an excessively

25    positive self-image and to be somewhat arrogant and intolerant

of other's feelings. That is one.

On the other hand, Dr. Gould, who I think saw Mr. D'Sousa during his period of marriage turmoil for family counseling, has a different view, and he concludes on a more -- let me get exactly what he says. He says he sees no evidence of psychopathology and certainly no need for any kind of psychotropic medication. He does not have symptoms of anxiety or depression.

It was never my intention, unless somebody thought medication was appropriate, I certainly don't proscribe medication and wouldn't pretend to do that. It is an area that I am interested in. I do have some training in this area, in the respect that I have social work training, so I am sort -- which had as its major psychology. So I am very interested in these reports.

For whatever it's worth, some of these conclusions are compatible with my own impression which I'm required to have as a judge, so to speak, not just because I have an interest in psychology. I do think that -- and that is the reason that I included in this sentence therapeutic counseling on a weekly basis. That is certainly not intended as a punishment. That is intended as something that is helpful.

I do think, if you want to know my personal view, based on my training and my experience as a judge in supervision, and based on our court appearances and discussions

1   with Mr. D'Sousa, and based on the plea and all of the
2   surrounding, we discussed at the time TV appearances, et
3   cetera, I think personally Mr. D'Sousa is a very intelligent
4   person.  I think he has remarkably little insight actually into
5   some of his own motivation, and I do agree about his lack, I
6   think, of being introspective and insightful.
7          That is not a condemnation; that is just an impression
8   which leads me to believe, and which I believed at the time of
9   the sentence, that therapeutic counseling could be and would be
10  or might be, one never goes in, helpful to Mr. D'Sousa.  It is
11  only designed to be helpful.  That is not part of any kind of
12  punishment or retribution, et cetera.
13         It was based on my impression and also what I read in
14  the record.  So I would like to continue that.  Sometimes
15  counseling doesn't work because the person, for whatever
16  reason, is not amenable to be counseled.  I don't know if that
17  is applicable here, but I certainly don't want to end the
18  treatment at this time.
19         What I clearly don't want to do, which seems to be on
20  the table, implicitly or explicitly, is for anybody to think
21  that the sentence was for eight months community confinement
22  center and then it is all over because that is not the
23  intention of this sentence.
24         MR. BRAFMAN:  I understand, and your Honor has made
25  that perfectly clear this morning even if I came here with a

1  misimpression from reading the wording of the judgment.
2          THE COURT:  Fair enough.
3          MR. BRAFMAN:  With respect to the issue of mental
4  health, and again I didn't come here to fight, I would just
5  like to make one observation.  If the person who is in therapy
6  does not believe he needs further treatment, and if the
7  therapist who is treating him believes there is no need for
8  further treatment, I don't understand the purpose of directing
9  it.
10          We are not dealing with someone who ever exhibited any
11  violence, not dealing with a criminal that poses a danger to
12  the community.  He served eight months of home confinement
13  without incident.  He has been perfect in every pretrial
14  supervision order that he has been given.  I think the
15  probation officer will direct it, and I think forcing
16  essentially someone to continue in treatment with a therapist
17  who is treating you doesn't think you require treatment, to me
18  just doesn't make any sense.
19          If we get him a different doctor who will justify the
20  meetings so he or she can bill the patient, I don't think that
21  is fair.
22          THE COURT:  In the scheme of things probably 85
23  percent of all defendants think they don't need any treatment
24  or don't need any further punishment, et cetera, et cetera, or
25  services, don't need to go to drug counseling, et cetera, that,

so that has to be discounted somewhat by a person's self-interest.  It is a little bit harder if the therapist doesn't think that.

I am going to continue the requirement whether you all feel maybe a different therapist and maybe Ms. Schwarte can address that can be more helpful.  I do think bottom line there is an insight issue here.  Whether that can be -- whether that is right, first of all, it is just my opinion.  Whether I am correct about that, A; and whether anything can happen in that regard, B, is, frankly unclear to me as well.  It seems more clear to you, Mr. Brafman.

I would like to continue.  If the therapist doesn't want to be the therapist because he or she doesn't think that it is having any good, then I would fully understand that and I would want to try with somebody else.

You know, this is more art than science.  Who knows exactly what impact it is going to have.  When I talk about insight, I'm referring both to the studies that have been presented to me, but also to the original crime, the offense, the crimes that brought us here which Dr. Gould describes as an act of helpfulness or being helpful.  I think there probably is a dimension of that there, but fundamentally I think that it happened because of a colossal failure of insight and introspection.

Anybody who is as sophisticated in the political

world, as Mr. D'Sousa was and is, would know that that is criminal behavior, I think. So I think that what perhaps, what gave rise to it was a lack of insight, or somebody here, one of these reports they saw, they say, a week necessary in impulse control. I don't know if that is true or if that had something to do with it, but it certainly could explain it. Here it says, however, he reported some tenancy towards impulsiveness and anger proneness under conditions of conflict.

      MR. BRAFMAN: Judge, Judge, again I am going to accept your Honor's ruling, but just because there are -- this is a very, very unfortunately public record.

      Let me just say a couple of things. We are not talking about someone who is fighting addiction, who is often unable to control their impulse. We are not talking about someone who is a recidivist or has a prior criminal record. We are talking about someone who admitted to a crime during a period when he was going through a bitter divorce and also the person whose campaign was illegally funded was one of his closest friends. Those are matters of record not in dispute.

      We are also talking about someone who, if your Honor's hypothesis is correct, then every white collar defendant who knows that what he or she is doing violates the law and then does it anyway, would necessarily, by this theory, require treatment to understand why a sophisticated person would knowingly violate the law. Sometimes people do things for the

1    wrong reason.  They pay their debt to society.  He has honored
2    the terms of his punishment.
3            To suggest that Mr. D'Sousa is unique, it is
4    unfortunate because he happens to be a public person and
5    everything he says gets taken down somewhere and we read about
6    it.  I will continue, I will advise him to continue in
7    treatment because I don't want to fight the court on this
8    because I think on balance, you treated the defendant fairly,
9    and I am not looking to go back.
10            I just don't think that it is fair to require someone
11    who doesn't need therapy to continue in treatment with a
12    therapist, any study that your Honor could quote from, I think
13    I could find 10 psychiatrists in this room and we were allowed
14    to cross-examine them, I think I would get different opinions.
15            THE COURT:  Different opinions.
16            MR. BRAFMAN:  It is an art, not a science.  It is a
17    guessing game.
18            THE COURT:  It is what it is.  First of all, I always
19    respect your opinion and what you have to say.
20            Second, don't get the impression that I am singling
21    out Mr. D'Sousa as a general proposition.  While I don't really
22    have comparative data, I tend to -- I would assume, and I think
23    it is a fair bet, that in my sentences, therapeutic counseling
24    very often comes up in white collar, drug, every kind of crime,
25    I'm always looking to be helpful especially when one can't

1  understand for obvious reasons why somebody does what they do.
2  It is not for my benefit.  It is intended to be helpful.
3          I hear what you're saying and I understand what you're
4  saying.  I would like to keep it going for a while.  This is
5  certainly an issue that can be reviewed.  I would like your
6  help, Mr. Brafman, and I know I'll get it, in talking to
7  Mr. D'Sousa and explaining from your point of view why I am
8  doing what I am doing.  I am not trying to pick on anybody, and
9  in this context, that is to say, therapeutic counseling, I am
10 thoroughly motivated by trying to be helpful to him.
11         MR. BRAFMAN:  I will repeat what your Honor has just
12 said.  Mr. D'Sousa heard it for himself, and the one thing I
13 can tell you, whether he needs therapy or not, he is a very
14 intelligent man who I think will understand exactly what you
15 said and will comply strictly with the court's order.
16         THE COURT:  That brings us to the last question, the
17 question of travel.  So here is what I would like to do.  The
18 anniversary date, our timing is good in this respect is
19 September.  Sometime if you tell me a date in September, we can
20 get back together.  I am happy to do that.  If Mr. D'Sousa is
21 in compliance with the terms and conditions of supervision,
22 including community service, including counseling, whatever it
23 is, if the recommendation from everybody else is that he be
24 permitted to travel, no problem.
25         He has got sort of the control over this situation.

1     He has got to have the community service hours required by
2     September and the therapy, et cetera.
3             MR. BRAFMAN:  Your Honor, the trip that is planned is
4     not planned yet.  It is planned for December to visit his
5     daughter who will be studying in London and visit his mother in
6     India he hasn't seen for four years.  She is 80 and not well.
7     Because of his status, your Honor, it is almost like a no-fly
8     list as a practical matter.  My concern is he be able to at
9     least make the reservation --
10            THE COURT:  I have no problem with that.
11            MR. BRAFMAN:  -- without violating anybody's order so
12    he is at least on those flights.  I am happy to give the
13    itinerary to Pretrial and the Government so we are not waiting
14    until --
15            THE COURT:  Fair enough.
16            MR. BRAFMAN:  -- they consent subject to your Honor's
17    ruling?
18            THE COURT:  I understand.  Fair enough.
19            Then the actual is dependent upon his being
20    compliance.  Sure, I think that is an intelligent thing to do
21    and a practical thing, I have no problem with him making the
22    reservation.
23            MS. COHEN:  It may be premature, I discussed this with
24    defense counsel, when he does travel, the government just ask
25    that he pick up his passport 24 hours before the flight and

1  returns it 24 hours within his return to the U.S.
2              THE COURT:  That is usually the normal.
3              MR. BRAFMAN:  The passport, as I understand it, is
4  here in New York.  He is on the West Coast.  If the government
5  could then arrange for the passport to be sent to Pretrial in
6  L.A., he can easier pick it up there.
7              THE COURT:  I am sure.
8              MR. BRAFMAN:  As opposed to spending a day traveling
9  to get a passport.
10             MS. COHEN:  We will because he is not under
11 supervision now in L.A.
12             THE COURT:  I am sure that will work out.  You tell
13 me, Mr. Brafman, there is some holidays in September.  I was
14 going to say late September, but I don't know if that works for
15 you.
16             MR. BRAFMAN:  It doesn't, not only because of
17 holidays, but because of a personal reason that causes me to be
18 out of the country in late September.  Could we have October?
19 Do you want to do it mid-September?  I want to make certain he
20 has enough time to fulfill the quota.
21             THE COURT:  Yes.
22             MR. BRAFMAN:  In October, it gives him a better chance
23 to finish summer.
24             THE COURT:  I can do either.
25             MR. BRAFMAN:  If we can have October 8th, is that

1    okay?  Or the following week?
2             (Off-the-record discussion)
3             MR. BRAFMAN:  Dinesh, are you on the phone?
4             THE DEFENDANT:  I am.
5             THE COURT:  Let's say October 8th, 2015, 11:30, is
6    that all right?
7             MS. COHEN:  That is fine with the government.
8             MR. BRAFMAN:  Is the defendant's presence required or
9    is it optional again?
10            THE COURT:  Probably he should be on the phone.  That
11   seems like it is a workable solution because he is going to
12   want to know what we're saying and whether it is a yes, no, and
13   talk about supervision, et cetera.  This is useful to have him
14   plugged in by phone, I think.
15            MS. SCHWARTE:  Your Honor, can I ask a question?
16            THE COURT:  Yes, sure.
17            MS. SCHWARTE:  On the community service order, it
18   looks like he is going to have a fair amount to make up in the
19   next 10 weeks, and some of that is probably because he got a
20   little bit of a late start back almost a year ago in September,
21   early October trying to secure a location deal with his hours.
22            I am wondering if as long as he continues to do the
23   eight hours per week when he is speaking English, if he needs
24   to supplement, he can find a place to do more hours, is it okay
25   if he does additional hours at another location, a community

F7DJDSOC                    Teleconference

1    service, a park, the beach, library, something like that to
2    make sure he is able to get the remainder of his hours in
3    before next --
4             THE COURT:  If you consider it community service, I am
5    not wedded to one location, I never have been.
6             MS. SCHWARTE:  Okay.
7             THE COURT:  We discussed this in the past.  If it is
8    really in Probation's judgment a valuable community service,
9    sure.
10            MS. SCHWARTE:  Okay.  Great.  Thank you, your Honor.
11            THE COURT:  Anybody have anything else?
12            MR. BRAFMAN:  No, your Honor.
13            MS. COHEN:  No, your Honor.
14            THE COURT:  Nice to see you, all.
15            (Court adjourned)